WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
John K. Cunningham
Thomas E. MacWright
Ricardo M. Pasianotto

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (*pro hac vice* pending)
Amanda Parra Criste (*pro hac vice* pending)

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
(312) 881-5400
Jason N. Zakia (*pro hac vice* pending)

*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 24-12291 (MG) |
| InterCement Brasil S.A.,[1] | Chapter 15 |
| Debtor in a Foreign Proceeding. | |
| In re: | Case No. 24-12295 (MG) |
| InterCement Participações S.A, | Chapter 15 |
| Debtor in a Foreign Proceeding. | |

---

[1]    The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: InterCement Brasil S.A. (01-36–Brazil); InterCement Participações S.A. (01-22–Brazil); InterCement Financial Operations B.V. (3771–Netherlands); and InterCement Trading e Inversiones S.A. (7798–Spain).

|  | ) |  |
|---|---|---|
| In re: | ) |  |
|  | ) | Case No. 24-12296 (MG) |
| InterCement Financial Operations B.V., | ) |  |
|  | ) | Chapter 15 |
| Debtor in a Foreign Proceeding. | ) |  |
|  | ) |  |
| In re: | ) |  |
|  | ) | Case No. 24-12297 (MG) |
| InterCement Trading e Inversiones S.A., | ) |  |
|  | ) | Chapter 15 |
| Debtor in a Foreign Proceeding. | ) |  |
|  | ) |  |

**PETITIONER'S DECLARATION AND VERIFIED PETITION
FOR RECOGNITION OF THE BRAZILIAN PROCEEDING
AND MOTION FOR ORDER GRANTING RELATED RELIEF
PURSUANT TO 11 U.S.C. §§ 105(a), 1515, 1517, 1520, AND 1521**

2

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................2

BACKGROUND ........................................................................................................................5

    A.    General Background and History...........................................................................5

        i.    An Overview of the Company's Business ..................................................5

        ii.    Connections to the United States .................................................................8

        iii.    The Company's Financial Situation.............................................................8

    B.    Events Precipitating Commencement of the Brazilian RJ Proceeding.................10

        i.    The Cimpor Acquisition .............................................................................10

        ii.    The Macroeconomic Crisis That Affected the Cement Sector .................11

        iii.    Initial Restructuring Efforts ......................................................................12

        iv.    Events Precipitating the Filing of the RJ Proceeding ..............................16

JURISDICTION, ELIGIBILITY, AND VENUE.......................................................................20

RELIEF REQUESTED.............................................................................................................21

REQUIRED DISCLOSURES ..................................................................................................21

BASIS FOR RELIEF...............................................................................................................22

    A.    The Chapter 15 Debtors Are Eligible to Be Debtors Under Section 109(a) of
        the Bankruptcy Code, and this Court is the Proper Venue for the Cases .............22

    B.    The Requirements of Section 1517(a) of the Bankruptcy Code Are Satisfied ......24

        i.    The Brazilian RJ Proceeding is a "Foreign Proceeding" ..........................25

        ii.    The Brazilian RJ Proceeding Satisfies the Requirements for
            Recognition as a "Foreign Main Proceeding" ...........................................27

        iii.    The Petitioner is a Proper "Foreign Representative"................................50

        iv.    The Petition Was Properly Filed Under Sections 1504 and 1509 and
            Meets the Requirements of Section 1515 and Bankruptcy Rule
            1007(a)(4) ..................................................................................................51

      C.      Alternatively, the Court Should Find That the Brazilian RJ Proceeding is a
Foreign Nonmain Proceeding and Grant Discretionary Relief ..............................53

NOTICE ...................................................................................................................................62

PRIOR REQUEST .................................................................................................................62

CONCLUSION .......................................................................................................................62

## TABLE OF AUTHORITIES

Page(s)

## CASES

*In re ABC Learning Ctrs Ltd.*,
    728 F.3d 301 (3d Cir. 2013) ............................................................................... 25, 28

*In re ABC Learning Ctrs. Ltd.*,
    445 B.R. 318, 333 (Bankr. D. Del. 2010) ................................................................ 28

*Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*,
    470 B.R. 408 (Bankr. N.D. Tex. 2012) .............................................................. 51, 52

*Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*,
    701 F.3d 1031 (5th Cir. 2012) ............................................................................... 51

*In re Americanas S.A.*,
    No. 23-10092 (Bankr. S.D.N.Y. Mar. 3, 2023) .............................................. 27, 50

*In re Andrade Gutierrez Engenharia S.A.*,
    645 B.R. 175 (Bankr. S.D.N.Y. 2022) .................................................................. 50

*In re Artimm, S.r.l.*,
    335 B.R. 149, 160 (Bankr. C.D. Cal. 2005) .......................................................... 60

*In re Ashapura Minechem Ltd.*,
    480 B.R. 129 (S.D.N.Y. 2012) ............................................................................. 25

*In re Avanti Commc'ns Grp. PLC*,
    582 B.R. 603 (Bankr. S.D.N.Y. 2018) .................................................................. 21

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
    374 B.R. 122 (Bankr. S.D.N.Y. 2007) .............................................................. 52, 54

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
    389 B.R. 325 (S.D.N.Y. 2008) ............................................................................. 54

*In re Berau Capital Res. PTE Ltd.*,
    540 B.R. 80 (Bankr. S.D.N.Y. 2015) .............................................................. 21, 23

*In re Betcorp Ltd.*,
    400 B.R. 266 (Bankr. D. Nev. 2009) .................................................................... 26

iii

*In re British Am. Ins. Co.*,
    425 B.R. 884 (Bankr. S.D. Fla. 2010)...........................................................................54, 55

*In re Cell C Proprietary Ltd.*,
    571 B.R. 542 (Bankr. S.D.N.Y. 2017) ..................................................................................23

*In re Creative Financial, Ltd.*,
    543 B.R. 498 (Bankr. S.D. N.Y. 2016) ................................................................................55

*CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*,
    482 B.R. 96 (Bankr. S.D.N.Y. 2012).....................................................................................60

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
    737 F.3d 238 (2d Cir. 2013)...................................................................................20, 22, 25

*In re Fairfield Sentry, Ltd.*,
    No. 10 Civ. 7311 (GBD), 2011 U.S. Dist. LEXIS 105770 (Bankr. S.D.N.Y. Sep. 15,
    2011) ......................................................................................................................................55

*Hertz Corp. v. Friend*,
    559 U.S. 77 (2010)................................................................................................................29

*In re Inversora Eléctrica de Buenos Aires S.A.*,
    560 B.R. 650 (Bankr. S.D.N.Y. 2016) .................................................................................23

*In re Irish Bank Resolution Corp. (Special Liquidation)*,
    No. 13-12159 (CSS), 2014 Bankr. LEXIS 1990 (Bankr. D. Del. Apr. 30, 2014) ...............25

*Jaffe v. Samsung Elecs. Co.*,
    737 F.3d 14 (4th Cir. 2013) ..................................................................................................60

*Lavie v. Ran (In re Ran)*,
    607 F.3d 1017 (5th Cir. 2010) ..............................................................................................54

*In re Matter of Videology Limited*,
    [2018] EWHC 2186 (Ch) (Snowden, J.)...............................................................................55

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
    458 B.R. 63 (Bankr. S.D. N.Y. 2011)............................................................................54, 54

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
    474 B.R. 88 (S.D.N.Y. 2012)........................................................................................29, 54

*In re Mina Tucano Ltda.*,
    No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022).................................................27, 51

iv

*In re Modern Land (China) Co., Ltd.*,
    641 B.R. 768 (Bankr. S.D.N.Y. 2022) .......................................................... 30, 30, 55, 58, 58

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
    714 F.3d 127 (2d Cir. 2013)............................................................................ 28, 31

*In re Novonor S.A.*,
    No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019).................................... 27

*In re OAS S.A.,*
    No. 15-10937 (SMB) (Bankr. S.D.N.Y. Aug. 3, 2015)...................................... 27

*In re OAS S.A.*,
    533 B.R. 83 (Bankr. S.D.N.Y. 2015)............................................................*passim*

*In re Odebrecht Engenharia e Construção S.A.*,
    No. 20-12741 (Bankr. S.D.N.Y. Dec. 30, 2020)................................................ 27

*In re Oi Brasil Holdings Coöperatief U.A.*,
    578 B.R. 169 (Bankr. S.D.N.Y. 2017).........................................................*passim*

*In re Oi S.A.*,
    No. 16-11791 (SHL) (Bankr. S.D.N.Y. Jul. 22, 2016) ...................................... 27

*In re Oi S.A.*,
    No. 23-10193 (JPM) (Bankr. S.D.N.Y. Mar. 29, 2023) ..................................... 27

*In re Oversight & Control Comm'n of Avánzit, S.A.*,
    385 B.R. 525 (Bankr. S.D.N.Y. 2008)............................................................... 25

*In re PT Bakrie Telecom Tbk*,
    601 B.R. 707 (Bankr. S.D.N.Y. 2019) ............................................................... 23

*In re Rede Energia S.A.*,
    No. 14-10078 (SCC) (Bankr. S.D.N.Y. Sept. 9, 2014)...................................... 27

*Samarco Mineracao S.A. - Em Recuperação Judicial*,
    No. 21-10754 (Bankr. S.D.N.Y. May 13, 2021)................................................ 27

*In re Servicos de Petroleo Constellation S.A.*,
    600 B.R. 237 (Bankr. S.D.N.Y. 2019) .............................................. 26, 50, 54, 55

*In re Serviços de Petróleo Constellation S.A.*,
    613 B.R. 497 (Bankr. S.D.N.Y. 2019)..........................................................*passim*

v

*In re SPhinX, Ltd.*,
 351 B.R. 103 (Bankr. S.D.N.Y. 2006) .................................................. 28, 28, 55, 60

*In re Suntech Power Holdings Co*,
 520 B.R. 399 (Bankr. S.D.N.Y. 2014) .................................................. 20, 29

*In re Toft*,
 453 B.R. 186 (Bankr. S.D.N.Y. 2011) .................................................. 60

*In re U.S. Steel Can. Inc.*,
 571 B.R. 600 (Bankr. S.D.N.Y. 2017) .................................................. 23

*U.S.J. – Açúcar e Álcool S.A., et al.*,
 No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022) .................................................. 27

*In re Usina de Açúcar Santa Terezinha Ltda.*,
 No. 19-11199 (MEW) (Bankr. S.D.N.Y. May 16, 2019) .................................................. 27

## FEDERAL STATUTES

11 U.S.C. § 101 .................................................. 1, 25, 50

11 U.S.C. § 109 .................................................. 20, 22, 23

11 U.S.C. § 362 .................................................. 4, 14, 61

11 U.S.C. § 1504 .................................................. 20, 52

11 U.S.C. § 1509 .................................................. 20, 52

11 U.S.C. § 1515 .................................................. 1, 2, 21, 52, 52

11 U.S.C. § 1516 .................................................. 28

11 U.S.C. § 1517 .................................................. *passim*

11 U.S.C. § 1520 .................................................. 1, 2, 62

11 U.S.C. § 1521 .................................................. 1, 2, 53, 59

11 U.S.C. § 1522 .................................................. 60

28 U.S.C. § 1140 .................................................. 24

28 U.S.C. § 1410 .................................................. 24

28 U.S.C. § 1746.................................................................................................................... 2, 64

## FEDERAL RULES

Fed. R. Bankr. P. 1007 ..................................................................................................... 21, 51, 53

Fed. R. Bankr. P. 7007.1 ........................................................................................................... 53

Antonio Reinaldo Rabelo Filho (the "**Petitioner**" or the "**Foreign Representative**"), the duly-authorized foreign representative of InterCement Brasil S.A. ("**ICB**"), InterCement Participações S.A ("**ICP**"), InterCement Financial Operations B.V. ("**IC Financial**"), InterCement Trading e Inversiones S.A. ("**ITI**" and, together with ICB, ICP, and IC Financial, the "**Chapter 15 Debtors**") in the jointly-administered judicial reorganization (*recuperação judicial* or "**RJ**") proceeding (the "**Brazilian RJ Proceeding**") of the Chapter 15 Debtors and certain of their affiliated debtors (the "**RJ Debtors**" or the "**Company**"),[1] commenced on December 3, 2024 (the "**RJ Petition Date**"), under Federal Law No. 11.101 of February 9, 2005 (as modified, the "**Brazilian Bankruptcy Law**"), of the laws of the Federative Republic of Brazil ("**Brazil**"), pending before the 1st Bankruptcy and Restructuring Court of São Paulo (the "**Brazilian Bankruptcy Court**"),[2] through his undersigned counsel, respectfully submits this *Petitioner's Declaration and Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* (the "**Verified Petition**").  This Verified Petition is filed in furtherance of each form of voluntary petition [ECF No. 1] (collectively, the "**Voluntary Petition**" and, together with this Verified Petition, the "**Petition**") filed on December 9, 2024, by each of the Chapter 15 Debtors.  The Petitioner requests that the Court enter an order substantially in the form attached as Exhibit A (the "**Proposed Order**") under sections 105(a), 1515, 1517, 1520, and 1521 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"):[3]

---

[1]   "**RJ Debtors**" or the "**Company**" include the Chapter 15 Debtors and non-debtor affiliates InterCement Trading e Inversiones Argentina S.L. ("**ITI Argentina**"), Sucea Participações S.A. ("**Sucea**"), Sincro Participações S.A. ("**Sincro**"), and Mover Participações S.A. ("**Mover**").

[2]   The case number for the Brazilian RJ Proceeding before the Brazilian Bankruptcy Court is 1192002-34.2024.8.26.0100.

[3]   Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

(a)      granting the Petition in these chapter 15 cases (the "**Chapter 15 Cases**") and recognizing the Brazilian RJ Proceeding as the "foreign main proceeding" for each of the Chapter 15 Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, as a "foreign nonmain proceeding" and granting appropriate relief;

(b)      finding that the Petitioner is the duly appointed "foreign representative" of the Chapter 15 Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each of the Chapter 15 Debtors; and

(c)      granting such other and further relief as the Court deems just and proper (collectively, the "**Relief Requested**").

In support of this Verified Petition, the Petitioner relies upon and incorporates by reference the *Declaration of Ana Elisa Laquimia Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Declaration and Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* (the "**Brazilian Counsel Declaration**").  In further support of the relief requested herein, the Petitioner respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The commencement of the Brazilian RJ Proceeding and these Chapter 15 Cases is the latest stage of a comprehensive financial restructuring of the InterCement Group[4] that began earlier this year in Brazil.  The in-court process began on July 15, 2024 when certain members of the InterCement Group (the "**Brazilian Applicants**")[5] initiated a court-supervised mediation process in Brazil ("**Brazilian Mediation**") administered by a specialized Brazilian mediation chamber for restructuring and insolvency.  In connection with the Brazilian Mediation, the Brazilian Applicants requested and obtained a 60-day injunction from the Brazilian Bankruptcy

---

[4]      "**InterCement Group**" includes the Chapter 15 Debtors, and non-debtor affiliate: ITI Argentina.  ITI Argentina is a RJ Debtor in the Brazilian RJ Proceeding.  Importantly, all of these entities are subsidiaries of Mover.

[5]      The Brazilian Applicants are ICP, ICB, IC Financial, ITI, ITI Argentina, and Mover.

Court (the "**Mediation Period**").  Also on July 15, 2024, the Chapter 15 Debtors commenced

jointly-administered chapter 15 cases (the "**Previous Chapter 15 Cases**") in this Court and

requested a provisional stay of potential creditor actions against the Chapter 15 Debtors and their

property located in the United States.[6]  The provisional stay was granted on July 18, 2024.[7]

2.      During the Mediation Period, the Brazilian Applicants were able to reach an

agreement in principle with a majority of their largest creditor constituency—the holders of the

Brazilian law-governed debentures (the "**Debenture Holders**") regarding the terms of a

restructuring plan (the "**EJ Plan**").  Accordingly, on September 16, 2024, certain of the Brazilian

Applicants (the "**EJ Debtors**")[8] filed a petition with the Brazilian Bankruptcy Court converting

the Brazilian Mediation into a Brazilian *recuperação extrajudicial* proceeding (the "**EJ

Proceeding**").  On the same day, the Brazilian Bankruptcy Court entered an order accepting the

EJ Proceeding and provided the EJ Debtors with an additional stay of 120 days against creditor

action while they sought support for the approval of the EJ Plan.  The EJ Plan was premised on

the sale of all the EJ Debtors' business and provided the EJ Debtors with a period of 30 days to

finalize their marketing and sale process with the leading bidder, Companhia Siderúrgica Nacional

("**CSN**").  This deadline was automatically extendable for 30 days periods absent an objection

from the majority of the affected creditors.  The Chapter 15 Debtors requested and obtained a

further provisional stay in the Previous Chapter 15 Cases until a determination was made at the

foreign recognition hearing (the "**Supplemental Provisional Relief Order**").[9]

---

[6]     *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 15, 2024) [Docket No. 5].

[7]     *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18, 2024) [Docket No. 22].

[8]     The EJ Debtors are ICP, ICB, IC Financial, ITI, ITI Argentina, which correspond to all Brazilian Applicants
        except Mover.  Mover consented to the EJ Plan but was not a debtor because Mover was not an obligor with
        respect to any of the claims affected by the EJ Plan.

[9]     *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. September 20, 2024) [Docket No. 40].

3.      The EJ Debtors were able to make significant progress in the negotiations with CSN and their creditors.  But unfortunately, due to a number of circumstances, including the complexity of the negotiations and the litigation brought by the Ad Hoc Group in various jurisdictions, the EJ Debtors concluded that neither a sale agreement with CSN nor the requisite creditor support for the EJ Plan could be obtained before the deadline required under the Brazilian Bankruptcy Law. Accordingly, on December 3, 2024, the RJ Debtors commenced the Brazilian RJ Proceeding and have sought and obtained a further stay of creditor actions from the Brazilian Bankruptcy Court. Although before the same Court, the Brazilian RJ Proceeding was commenced not only by the EJ Debtors but also several other new entities, including Mover and its subsidiaries, Sucea and Sincro, which were not debtors in the EJ Proceeding.  Thus, under Brazilian law, the Brazilian RJ Proceeding is a new insolvency proceeding and not a continuation or conversion of the EJ Proceeding.[10]

4.      As such, the Petitioner filed new petitions commencing these Chapter 15 Cases and now seeks recognition of the Brazilian RJ Proceeding for each of the Chapter 15 Debtors (which are the same entities that commenced the Previous Chapter 15 Cases) while the Company's restructuring continues to progress in Brazil.  Additionally, pending the recognition of the Brazilian RJ Proceeding, the Petitioner is seeking the same provisional stay relief that was granted in the Previous Chapter 15 Cases[11] under the *Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 105(a), and 362* (the "**Provisional Relief Motion**").

5.      The Chapter 15 Debtors and the Ad Hoc Group have already engaged in a robust discovery process, in the Previous Chapter 15 Cases, regarding the Chapter 15 Debtors' center of

---

[10]   Brazilian Counsel Decl. ¶ 14.

[11]   *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. September 20, 2024) [Docket No. 40].

main interests ("**COMI**") and establishments.  These issues were fully briefed and argued before this Court on November 20 and 21, 2024.  In connection with those proceedings, the Foreign Representative filed a detailed declaration supporting the recognition of the EJ Proceeding as the foreign main proceeding for all Chapter 15 Debtors, or alternatively, as the foreign non-main proceeding for ITI and IC Financial.[12]  While the Brazilian RJ Proceeding is a new insolvency proceeding due to the inclusion of additional entities, the Chapter 15 Debtors remain the same, and the factual record in these cases substantially overlaps with the record in the Previous Chapter 15 Cases.  The Chapter 15 Debtors will continue to engage with counsel to the Ad Hoc Group and the Indenture Trustee to determine the most appropriate next steps to propose to this Court to streamline these Chapter 15 Cases and avoid unnecessary duplication of the extensive briefing and arguments already presented.[13]

6.      The Petitioner respectfully requests that the Court enter the Order granting the Petition in these Chapter 15 Cases, recognizing the Brazilian RJ Proceeding, and authorizing such other relief that the Court deems appropriate.

## BACKGROUND

A.      **General Background and History**

i.      **An Overview of the Company's Business**

7.      Mover Participações S.A. ("**Mover**," together with the InterCement Group, the "**Brazilian Debtors**")–formerly Camargo Corrêa S.A.–is the ultimate holding company for the InterCement Group and has roots dating back to 1936 when Sebastian Camargo and Sylvio Correa

---

[12]   *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. September 20, 2024) [Docket No. 78] ("**Rabelo Trial Declaration**").

[13]   This Verified Petition expressly incorporates by reference all facts and statements set forth in the Rabelo Trial Declaration.

formed a construction company in downtown São Paulo, Brazil. This small construction company grew, making significant contributions to Brazil's development, having constructed the Presidente Dutra, Fernão Dias, and Castello Branco highways, the Itaipu hydroelectric power plant, the Rio-Niteroi Bridge, and the federal capital, Brasilia.

8.      In addition to serving the Brazilian cement market, the InterCement Group also has operations in Argentina through Loma Negra Compañía Industrial Argentina S.A. ("**Loma Negra**"). Loma Negra is a publicly traded company whose stock is traded on the New York Stock Exchange and the Bolsas y Mercados Argentinos (the BYMA), the stock exchange market in Argentina. Loma Negra is not a debtor in Brazilian RJ Proceeding because its business activities are segregated, and its financial structure is independent from the Brazilian Debtors. ITI Argentina holds an approximately 51.14% interest in Loma Negra, and those Loma Negra shares are pledged as collateral for the Debentures, as discussed below.

9.      A simplified organizational chart is set forth below.

Each entity plays an indispensable role in the Company:



(a) Mover is the ultimate holding company that engages in capitalization and financing activities for the InterCement Group's operations. It is also responsible for business management, including providing InterCement Group with strategic direction on key business matters. Mover is incorporated in Brazil and has its headquarters in São Paulo.

(b) ICP is a holding company of the InterCement Group that is controlled by Mover. It is responsible for concentrating all of Mover's investments in the cement sector. ICP is incorporated in Brazil and has its registered office in São Paulo.

(c) ICB is a Brazilian operating company that engages in all stages of cement production and sales. It has its registered office in São Paulo.

(d) IC Financial is a financial special purpose vehicle that was formed by ICP to provide the InterCement Group access to the international capital markets. IC Financial is incorporated in the Netherlands and has its registered office in Amsterdam.

(e) ITI is a sub-holding company. It owns 99.46% of the shares of ICB, the main Brazilian operating company. It also owns the shares of ITI Argentina, a sub-holding company, which in turn holds 51.97% of the shares in Loma Negra, the Argentine operating company. Both ITI and ITI Argentina engage in financing efforts for the companies based in Brazil, providing guarantees for financial instruments procured in the Brazilian market, including the Debentures. ITI

7

Argentina and ITI are incorporated in Spain and have their registered offices in Bilbao.

A detailed organizational chart of the InterCement Group and other affiliated entities is attached as Exhibit C.

### ii.      Connections to the United States

10.      Although a significant portion of the Chapter 15 Debtors' assets and interests is located in Brazil, some of their assets and obligations are also located in or connected to the United States.  IC Financial, as issuer, and ICP and ICB, as guarantors, have contract rights under the Indenture (defined below) for the U.S. dollar-denominated NY Notes.  The Indenture is governed by New York law and contains a forum selection clause that provides that the parties have consented to the jurisdiction of the courts in New York and federal courts located in the Borough of Manhattan, New York, with respect to any action that may be brought in connection with the Indenture or the NY Notes.  ITI also has assets in the United States; it repurchased approximately US$200 million of NY Notes that are being held on deposit with Jefferies in New York.

11.      In addition, IC Financial, ICP, ICB, and ITI have approximately US$20,000 in total (or US$5,000 each) in cash in a trust account at CitiBank N.A. (the "**New York Escrow Account**") in Manhattan in New York of White & Case LLP.

12.      The RJ Debtors that are not Chapter 15 Debtors do not own assets in the United States, do not owe debts governed by U.S. law, or otherwise do not currently require the protection of this Court.

### iii.      The Company's Financial Situation

13.      The principal financial indebtedness of the Chapter 15 Debtors is set forth summarily below:

8

14.     ***The Debentures***.   On June 8, 2020, ICP issued a debenture in the aggregate
principal amount of approximately R$2.98 billion (or US$579.5 million) (the "**ICP June 2020
Debenture**").   ICP's obligations under the ICP June 2020 Debenture are guaranteed by ICB and
ITI and secured by ITI's shares in ITI Argentina and ITI Argentina's shares in Loma Negra. The
ICP June 2020 Debenture, including the terms of ICB's and ITI's guarantee, is governed by
Brazilian law.

15.     On June 8, 2020, ICB issued a debenture in the aggregate principal amount of
approximately R$1.7 billion (or US$331 million) (the "**ICB June 2020 Debenture**").   ICB's
obligations under the ICB June 2020 Debenture are guaranteed by ICP and ITI and secured by
ITI's shares in ITI Argentina and ITI Argentina's shares in Loma Negra.   The ICB June 2020
Debenture, including the terms of ICP's and ITI's guarantee, is governed by Brazilian law.

16.     On September 30, 2021, ICB issued a debenture in the aggregate principal amount
of approximately R$1.0 billion (or $183.8 million) (the "**ICB September 2021 Debenture**" and,
collectively with the ICB June 2020 Debenture and ICP June 2020 Debenture, the "**Debentures**").
The same day, a payment in the same amount R$1.0 billion (or $183.8 million) was made to the
ICP Debentures, reducing the remaining principal amount to approximately R$1.98 billion.  ICB's
obligations under the ICB September 2021 Debenture are guaranteed by ICP and ITI and secured
by ITI's shares in ITI Argentina and ITI Argentina's shares in Loma Negra.   The ICB September
Debenture, including ICB's and ITI's guarantee, is governed by Brazilian law.

17.     The Debentures are held by Banco do Brasil S.A. (a bank controlled by the
Brazilian government), Banco Bradesco S.A., and Itaú Unibanco S.A (collectively, "**the
Debenture Holders**"), each of which is domiciled in Brazil.

18.   ***The NY Notes.***   IC Financial issued unsecured notes in the aggregate principal amount of US$750 million (the "**NY Notes**")[14] under the terms of an indenture dated July 17, 2014 (the "**Indenture**") between ICP and ICB, as guarantors, and Deutsche Bank Trust Company, as trustee (the "**Indenture Trustee**").[15]   UMB Bank, N.A. has replaced Deutsche Bank Trust Company as Indenture Trustee.   Neither InterCement Portugal S.A. ("**IC Portugal**"), nor ITI nor any of its subsidiaries is an obligor under the Indenture.   The Indenture is governed by New York law.   The NY Notes matured on July 17, 2024.   As of the Petition Date, US$750 million remained outstanding under the NY Notes, including the almost $200 million of NY Notes repurchased and owned by ITI (which have not been cancelled) sitting in Jefferies NY.

**B.      Events Precipitating Commencement of the Brazilian RJ Proceeding**

**i.      The Cimpor Acquisition**

19.   In 2012, ICP acquired substantially all of the shares of Cimentos de Portugal, better known as "**Cimpor**," a Portuguese cement company.   At the time, Cimpor was one of the largest cement companies in the world with operations in Africa, Asia, Europe, and the Americas with shares trading on the Lisbon Stock Exchange.   In connection with the Cimpor acquisition, ICB issued debentures in the aggregate amount of R$1.5 billion, which ICP guaranteed.   Then, in 2013, ICP issued preferred shares to Banco Bradesco BBI S.A., raising approximately R$1.55 billion in funding for the InterCement Group.

20.   In addition to the investments necessary to finance the acquisition of Cimpor, the Company had to refinance the outstanding debt of Cimpor, which was denominated in U.S. Dollars

---

[14]   *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 15, 2024) [Docket No. 2], Ex. F.

[15]   *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 15, 2024) [Docket No. 2], Ex. E.

and Euros.  These refinancing efforts included the issuance of bonds, which were restructured into the NY Notes, described above.

<strong>ii.    The Macroeconomic Crisis That Affected the Cement Sector</strong>

21.    The increase in the demand for cement observed since the early 2010s changed radically with an economic crisis in Brazil in 2015.  This crisis led to a decrease in infrastructure and housing projects, which were primarily government funded, and a sharp drop in demand for InterCement Group's products.  The precipitous decline in cement consumption was reflected in the idle rates of cement plants.  Specifically, the decrease in demand led to the idleness of a significant portion of cement plants, registering, in 2018, a record level of only about 46% of the productive possibility of the cement sector being unutilized.  This decline caused a wave of restructuring activity for cement companies, including competitors Joao Santos Group and Cimento Tupi S.A.

22.    The Company was resilient during the outset of the economic decline, as it adopted a financial strategy focused on enhancing its capital structure, including repaying the R$5.7 billion in debentures issued in connection with the purchase of Cimpor through the issuance of the Debentures, discussed above.  But the new Debentures required ICP and ICB to make semi-annual interest and principal payments between June 2023 and June 2027.

23.    The macroeconomic conditions plaguing the cement industry have continued to worsen following the issuance of the Debentures.  Cement consumption fell by 2.8% and 1.7% in 2022 and 2023, respectively.  This decreased demand was coupled with a substantial increase in the InterCement Group's costs of operation, further aggravating its liquidity position.  For example, one of the main elements used in cement production is petroleum coke ("**pet coke**"), which represents approximately 1/3 (one-third) of the cement production cost.  The price of pet

11

coke soared, reaching R$1,012 per ton in March 2022.  Prices for plaster and refractory materials, which are also raw materials used in the Company's production process, increased by 96% and 40%, respectively, in 2022.  The price of diesel also increased by 19% in the corresponding period, raising transportation costs for raw materials and cement sold.  Consequently, InterCement Group experienced a 28% increase in costs in 2022 compared to 2021.

24.     There was also a significant increase in the cost of the Company's financial debt.  The value in *reais* of the U.S.-dollar denominated NY Notes sharply appreciated given the corresponding depreciation of the Brazilian *real* during this period, with the U.S. dollar reaching an exchange rate of R$5.90 during the Covid-19 pandemic.  This contributed significantly to the imbalance of the Company's debt structure.  In the domestic market, there was also a significant increase in the basic interest rate, with the Selic rate[16] reaching the level of 13.75% per annum between August 2022 and July 2023, increasing the Company's funding costs.  In mid-2023, the Company determined that a holistic financial restructuring would be in its best interest and initiated a process to renegotiate its liabilities with its creditors.

### iii.     Initial Restructuring Efforts

25.     The Company's initial out-of-court negotiations with its largest creditors were focused on (a) reducing InterCement Group's funded debt obligations through the sale of non-essential assets and (b) enhancing the terms of the Company's indebtedness.  The InterCement Group's divestment program was successful, resulting in the sale of operations in Paraguay, Egypt, South Africa, and Mozambique.  But its capital structure remained overleveraged.  To solve its debt burden, the Company determined the sale of substantially all of the InterCement Group, including operations in both Brazil and Argentina, would likely be required.  The Company hired

---

[16]     The Selic rate is the Sistema Especial de Liquidação e Custodia in the Brazilian Central Bank system.

a Brazilian-based financial advisor, Banco BTG Pactual SA, and in February 2024, the InterCement Group launched a competitive sale process pursuant to which it sought binding offers for either the sale of its assets or a strategic partnership. Eventually, the process resulted in CSN being the front-runner potential acquirer, and the InterCement Group executed an exclusivity agreement with CSN in May 2024. In parallel, the InterCement Group negotiated successive payment postponements for the Debentures and maintained discussions and engagement with certain of its international creditors.

26.     While the sale process was ongoing, on June 28, 2024, an ad hoc group (the "**Ad Hoc Group**") of holders (the "**Noteholders**") of the NY Notes filed a lawsuit against the obligors of the NY Notes in Brazil seeking discovery in anticipation of a collection action (the "**Brazilian Early Discovery Action**"), and on July 9, 2024, an individual noteholder (the "**Redwood Master Fund**") filed a petition in the Amsterdam Court (Private Law Department) (the "**Dutch Court**") seeking the appointment of a restructuring expert under the Dutch extrajudicial restructuring scheme (WHOA).

27.     It was a natural next step to initiate the Brazilian Mediation and receive protections from the Special Chamber for Dispute Resolution in Business Restructuring (the "**Brazilian Mediation Chamber**") during the Mediation Period and allow the Brazilian Applicants the ability to negotiate with their creditor constituency in hopes of coming to a consensual resolution. The Brazilian Mediation began on July 15, 2024, when the Brazilian Mediation Chamber formally accepted the mediation request, and the Brazilian Applicants filed their petition for a preliminary 60-day stay against creditor actions with the Brazilian Bankruptcy Court (the "**Mediation Petition**"). *See In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 15, 2024) [Docket No. 2], Ex. H. Key creditors that were invited to participate in the mediation

13

process include Banco Bradesco S.A., Banco do Brasil SA, Itaú Unibanco SA, and the Noteholders.  The Brazilian Bankruptcy Court entered the order granting the Mediation Petition (the "**Mediation Acceptance Order**") on that same day.  *See In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 15, 2024) [Docket No. 4], Ex. D-E.  On July 15, 2024, the Chapter 15 Debtors each filed forms of voluntary petition and a verified petition commencing the Previous Chapter 15 Cases and seeking recognition of the Brazilian Mediation, as the Chapter 15 Debtors' main or non-main proceedings under chapter 15 of the Bankruptcy Code.

28.    The purpose of the Brazilian Mediation and the Previous Chapter 15 Cases was to provide a stable environment without the threat of litigation to allow the Brazilian Applicants to negotiate a comprehensive restructuring solution with their main financial creditors.  To that end, at the initiation of the Previous Chapter 15 Cases, the Petitioner filed the *Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 105(a), 362, and 1519*.[17]  At a hearing held on July 17, 2024, the Court granted that motion and, on July 18, 2024, entered an order granting a provisional stay of all actions against the Chapter 15 Debtors or their property located in the United States through September 13, 2024, which was the date the Mediation Period expired.  *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18, 2024) [Docket No. 22] (the "**Initial Provisional Relief Order**").

29.    Shortly after the Brazilian Mediation commenced, on July 17, 2024, ITI and ITI Argentina filed a notice (the "**Spanish Notice**") communicating the opening of negotiations with its main creditors and seeking an initial pre-insolvency protection period of three months before the Commercial Court No. 2 of Bilbao, Spain (the "**Spanish Court**").  *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. August 6, 2024) [Docket No. 26] (the "**August**

---

[17]    *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 15, 2024) [Docket No. 5].

Statement") ¶ 1.  On July 24, 2024, the Spanish Court provided notice of the issuance by the Court Clerk of a decree (*Decreto*) (on July 19, 2024) accepting the Spanish Notice (the "**Spanish Order**").  *Id.*  As a result, under Spanish insolvency law, all creditor enforcement actions against ITI's rights and assets essential to its business activities were stayed for a three-month period, retroactively commencing on July 16, 2024, the date when the communication was filed with the Spanish Court.  *Id.*  On October 15, 2024, ITI filed a motion with the Spanish Court seeking to extend the stay of creditor enforcement actions against ITI and its assets for a further three-month period (the "**Extension Motion**").  *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. August 6, 2024) [Docket No. 68] (the "**November Statement**") ¶ 5.  The Spanish Court, through a judicial resolution, determined that the Extension Motion had the necessary creditor support under Spanish insolvency law and issued an order extending the stay and associated protections for an additional three months (the "**Spanish Extension Order**").  *Id.*

30.     On July 17, 2024, IC Financial responded to the WHOA petition filed by the individual holder of NY Notes objecting to the request for appointment of a restructuring expert and requested a four (4) month cooling-off period under the WHOA.  August Statement ¶ 2.  On July 31, 2024, the Dutch Court issued an order (the "**Dutch Order**") denying the request for appointment of a restructuring expert and granting IC Financial's request for a four (4) month cooling-off period expiring on December 1, 2024.  *Id.*  As a result, during this period, all third parties that had received notice of the cooling-off period were prohibited from exercising any right to recover on their claims against IC Financial, except with the express authorization of the Dutch Court.  *Id.* ¶ 3.  The Dutch Court also appointed Mr. Frederic Verhoeven as an observer (the "**Observer**") pursuant to Section 380 of the WHOA to, among other things, supervise the formation of a restructuring plan for IC Financial under the WHOA.  *Id.*

15

### iv.      Events Precipitating the Filing of the RJ Proceeding

31.      Despite the actions pursued by the Ad Hoc Group, the Company continued progressing in its restructuring negotiations with its key creditors.  Indeed, during the Mediation Period, the mediator from the Câmara Especial de Resolução de Conflitos em Reestruturação de Empresas presided over meetings between the Brazilian Applicants and each of the creditor constituencies and/or their respective advisors.  As part of those negotiations, the Brazilian Applicants set up a virtual data-room and executed non-disclosure agreements with certain of its creditors and advisors—including the advisors (the "**Ad Hoc Group Advisors**") to the Ad Hoc Group—to facilitate sharing confidential information.  After numerous mediation sessions, the Brazilian Mediation culminated in the Brazilian Applicants reaching an agreement in principle regarding the terms of an EJ Plan with a significant part of their largest creditor constituency—the Debenture Holders.  These supporting creditors held 45% of the EJ Debtors' total indebtedness that was subject to the proposed EJ Plan.

32.      On September 16, 2024, the EJ Debtors filed a motion to convert the Brazilian Mediation into an EJ proceeding by filing a petition for *recuperação extrajudicial* (the "**EJ Petition**"), together with the EJ Plan, with the Brazilian Bankruptcy Court.  The EJ Petition was filed within the same proceeding as the Brazilian Mediation before the same Brazilian Bankruptcy Court.  On the same day, the Brazilian Bankruptcy Court entered an order accepting the EJ Petition (the "**EJ Acceptance Order**") and granted a stay against all collection actions or enforcement proceedings relating to impaired claims commenced against any EJ Debtor for 120 days (the "**EJ Stay**").[18]

---

[18]      *See In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. Sept. 17, 2024) [Docket No. 30], Ex. A, B, and C.

33.     Under the EJ Plan, the EJ Debtors were given a period of 30 days to finalize their marketing and sale process, which deadline was automatically extendable for 30-day periods absent an objection from the majority of the affected creditors.  As the provisional stay in the Previous Chapter 15 Cases terminated on its own terms upon the conclusion of the Mediation Period, the Chapter 15 Debtors requested and obtained a further provisional stay with respect to the Chapter 15 Debtors and their assets in the United States until a determination was made at the recognition hearing.  *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. September 20, 2024) [Docket No. 40] (the "**Supplemental Provisional Relief Order**").  Shortly thereafter, the Chapter 15 Debtors and their creditors agreed upon an expeditious trial schedule that scheduled the recognition hearing for November 20-21, 2024.  *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. October 3, 2024) [Docket No. 40] (the "**Recognition Hearing Management and Scheduling Order**").  In conjunction with the Recognition Hearing Management and Scheduling Order, the Chapter 15 Debtors, the Ad Hoc Group, and Indenture Trustee stipulated to the terms of a protective order under which the Foreign Representative provided the Ad Hoc Group and Indenture Trustee substantial access to documents and other discovery relating to the Chapter 15 Debtors.  *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. October 11, 2024) [Docket No. 49].

34.     On September 25, 2024, certain members of the Ad Hoc Group (the "**Appealing Creditors**") claiming to represent 59% of the principal amount of the NY Notes appealed the EJ Acceptance Order.  Specifically, the Appealing Creditors requested, among other things, that the court reconsider the inclusion of IC Financial and ITI in the EJ Proceeding.  The Appealing Creditors argued that the Brazilian Bankruptcy Court did not have jurisdiction with respect to IC Financial and ITI on the basis that each of their centers of main interests are not in Brazil, but

17

rather in the Netherlands and Spain, respectively.  The Brazilian Bankruptcy Court denied the Appealing Creditors request on October 24, 2024 (the "**Appeal Order**") and confirmed its finding of jurisdiction over IC Financial and ITI on the basis that each of their principal place of business and COMI is in Brazil.[19]  On November 22, 2024, the Ad Hoc Group filed an interlocutory appeal of the Appeal Order with the São Paulo Court of Justice but did not seek expedited relief or to enjoin the Appeal Order.

35.    In parallel, in the Netherlands, following their loss in Brazil, members of the Ad Hoc Group escalated their efforts to disrupt the EJ Proceeding.  On November 1, 2024, Redwood Master Fund filed a petition to lift the cooling-off period under the WHOA, and the Ad Hoc Group filed a separate petition for IC Financial's bankruptcy declaration.  IC Financial opposed these motions, arguing that the WHOA's cooling-off period automatically suspended the bankruptcy petition, and sought an extension of the cooling-off period before its December 1, 2024 expiration. The Dutch Court held a hearing regarding the cooling-off period on November 21, 2024. Subsequently, IC Financial conditionally filed for the appointment of a plan expert to help mediate its disputes with the Noteholders.  On December 5, 2024, the Dutch Court entered an order to extend the appointment of the Observer and the WHOA cooling-off period until January 31, 2025.[20]

---

[19]   *See In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. Nov. 8, 2024) [Docket No. 68], Ex. A.

[20]   In its decision dated December 5, 2024, the Dutch Court restated its previous finding that pursuant to article 3(1) of the European Insolvency Regulations, the COMI of IC Financial is presumed to be in the Netherlands based on its registered office, and therefore the WHOA proceeding is the main proceeding with respect to IC Financial. Original and machine translated copies of the decision from the Dutch Court dated December 5, 2024 are attached hereto as Exhibits E-F.  A certified translation of the Dutch order has been procured and will be filed with this Court when finalized.

36.    The EJ Debtors were able to make significant progress in the negotiations with CSN and their creditors during the pendency of the EJ Proceeding.  Unfortunately, due to a number of circumstances, including the complexity of the negotiations and the litigation brought by the Ad Hoc Group in various jurisdictions, the EJ Debtors concluded that neither a sale agreement with CSN nor the requisite creditor support for the EJ Plan could be obtained before the deadline required under the Brazilian Bankruptcy Law.

37.    Accordingly, on December 3, 2024, the RJ Debtors filed a petition (the "**RJ Petition**") to initiate the Brazilian RJ Proceeding[21] and requested a further stay of creditor actions from the Brazilian Bankruptcy Court, which was granted on December 5, 2024 (the "**RJ Acceptance Order**").[22]  The RJ Acceptance Order reaffirmed the Brazilian Bankruptcy Court's Acceptance Order and determined that the Brazilian Bankruptcy Court had jurisdiction over IC Financial, ITI, and all other RJ Debtors, citing Brazil as the principal place of business and nerve center for each.[23]  Although filed in the same court, the Brazilian RJ Proceeding was initiated not only by the EJ Debtors but also by several new entities that were not debtors in the EJ Proceeding, including Mover, Sucea, and Sincro.  In addition, whereas the Brazilian EJ Proceeding affected only a subset of the existing indebtedness of the EJ Debtors, the Brazilian RJ Proceeding affects all claims existing against the RJ Debtors at the filing date of the RJ Petition (absent certain

---

[21]   A copy of the RJ Petition is attached to the Brazilian Counsel Declaration as Exhibits C-D.

[22]   Pursuant to the Brazilian Bankruptcy Law, the RJ proceeding, upon acceptance by the relevant Brazilian court, imposes a stay against creditor actions for a period of 180-days, which can be extended for an additional 180-days at the request of the debtor.  If, prior to the commencement of the RJ, the debtor sought and obtained a stay in support of a pre-insolvency mediation proceeding, the stay period granted prior to the commencement of the RJ proceeding is subtracted from the initial 180-days.  Here, the Brazilian Bankruptcy Court held that the RJ stay would be backdated to when the stay in support of the Brazilian Mediation was granted, July 15, 2024, notwithstanding that certain RJ Debtors were not debtors in the Brazilian Mediation proceeding.  Brazilian Counsel Decl. ¶ 14.  The RJ Debtors reserve all rights with respect to this aspect of the RJ Acceptance Order.

[23]   A copy of the RJ Acceptance Order is attached to the Brazilian Counsel Declaration as Exhibits C-D.

19

exceptions explained in detail below) as required by the Brazilian Bankruptcy Law.  On December 5, the Brazilian Bankruptcy Court entered an order dismissing the Brazilian EJ Proceeding (the "**EJ Dismissal Order**").[24]  The Brazilian RJ Proceeding is a new insolvency proceeding, rather than a continuation or conversion of the EJ Proceeding, considering the inclusion of new debtors entities and the broader scope with respect to creditors impaired by the proceeding, among other factors.

## JURISDICTION, ELIGIBILITY, AND VENUE

38.     This Court has jurisdiction to consider the Verified Petition under sections 157 and 1334 of title 28 of the United States Code as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re:  Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "**Amended Standing Order**").

39.     These Chapter 15 Cases have been properly commenced with respect to the Petitioner and the Chapter 15 Debtors in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by the filing of the Petition.  This is a core proceeding under section 157(b) and (2)(P) of title 28 of the United States Code.

40.     Venue is proper in this Court under section 1410(1) of title 28 of the United States Code, as the principal U.S. assets of the Chapter 15 Debtors are located within New York County and thus within this District.

41.     The presence of assets within the United States renders each of the Chapter 15 Debtors eligible to file these Chapter 15 Cases under section 109(a) of the Bankruptcy Code.  *See In re Suntech Power Holdings Co*, 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014); *Drawbridge Special*

---

[24]     A copy of the EJ Dismissal Order is attached to the Brazilian Counsel Declaration as Exhibits E-F.

*Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247-51 (2d Cir. 2013) (applying

section 109(a)'s local property requirement to chapter 15 cases).[25]

## **RELIEF REQUESTED**

42.     The Petitioner requests that this Court enter an order substantially in the form of

the Proposed Order attached hereto under sections 105(a), 1515, 1517, 1520, and 1521 the

Bankruptcy Code:

> (a) granting the Petition in these Chapter 15 Cases and recognizing the Brazilian
> RJ Proceeding as the "foreign main proceeding" for each of the Chapter 15
> Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative,
> recognizing the Brazilian RJ Proceeding as a "foreign nonmain proceeding" and
> granting appropriate relief;

> (b) finding that the Petitioner is the duly appointed "foreign representative" of each
> of the Chapter 15 Debtors within the meaning of section 101(24) of the
> Bankruptcy Code and is authorized to act on behalf of each Chapter 15 Debtor;
> and

> (c) granting such other and further relief as the Court deems just and proper.

## **REQUIRED DISCLOSURES**

43.     Appended to the Voluntary Petitions are the following certified disclosures by the

Foreign Representative in accordance with Rule 1007(a)(4) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"):

> (a) a Corporate Ownership Statement identifying any corporation, other than a
> governmental unit, that directly or indirectly owns 10% or more of any class of
> each of the Chapter 15 Debtors' equity interests as of the commencement of
> these Chapter 15 Cases;

> (b) a list of administrators, parties to litigation in the United States to which the
> Chapter 15 Debtors are a party, and entities against whom provisional relief is
> being sought; and

> (c) a statement pursuant to section 1515(c) of the Bankruptcy Code identifying any

---

[25]     *See also In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 611 (Bankr. S.D.N.Y. 2018) (finding that the "property
in the United States" requirement of section 109(a) is satisfied by a New York law-governed indenture); *In re
Berau Capital Res. PTE Ltd.*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) (same).

other foreign proceedings of the Chapter 15 Debtors.

**BASIS FOR RELIEF**

44.     The Court should grant the Petition and recognize the Brazilian RJ Proceeding as the foreign main proceeding for each of the Chapter 15 Debtors.  Each of the requirements in section 1517(a) of the Bankruptcy Code are satisfied.  As an initial matter, each of the Chapter 15 Debtors are eligible to be a debtor under the Bankruptcy Code, and this Court is the proper venue for them to administer their Chapter 15 Cases.  Additionally, the Petitioner is the duly appointed "foreign representative" of the Brazilian RJ Proceeding with respect to each of the Chapter 15 Debtors, and the Brazilian RJ Proceeding satisfies the standard to be considered a "foreign main proceeding" for the purposes of chapter 15 because the center of main interests for each of the Chapter 15 Debtors is in Brazil, which aligns with the expectations of the Chapter 15 Debtors' creditors.  In the alternative, if this Court declines to recognize the Brazilian RJ Proceeding as the foreign main proceeding for any of the Chapter 15 Debtors, those Chapter 15 Debtors are eligible for non-main recognition and relief to ensure a comprehensive restructuring of the InterCement Group.  Lastly, the Petition meets the requirements of section 1515.

### A.     The Chapter 15 Debtors Are Eligible to Be Debtors Under Section 109(a) of the Bankruptcy Code, and this Court is the Proper Venue for the Cases

45.     Each of the Chapter 15 Debtors has assets in the United States and is thus eligible to be a debtor under chapter 15 of the Bankruptcy Code in accordance with section 109(a) of the Bankruptcy Code.  *See Barnet*, 737 F.3d at 250-51.  Section 109(a) states that a debtor can be "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality."  11 U.S.C. § 109 (a).  Here, the Chapter 15 Debtors have property located in the United States, including cash held in certain accounts and contractual rights.

22

46.    With respect to accounts in the United States, IC Financial, ICP, ICB, and ITI hold US$20,000 in cash in the New York Escrow Account of White & Case LLP, which is their U.S. counsel for these Chapter 15 Cases.  *See In re U.S. Steel Can. Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) ("Some courts, including this one, have held that an undrawn retainer in a United States bank account qualifies as property in satisfaction of section 109(a).").

47.    With respect to contractual rights, IC Financial, as issuer, and ICP and ICB, as guarantors, each have rights under the U.S. dollar-denominated NY Notes that are governed by New York law.  ITI also repurchased a portion of the NY Notes, and those NY Notes are being held on deposit with Jefferies in New York.  The Indenture also contains a forum selection clause that provides that parties to the Indenture have consented to the jurisdiction of courts in New York and federal courts in Manhattan, New York, with respect to an action related to the NY Notes or the Indenture.  This Court previously held that a chapter 15 debtor is able to meet the debtor eligibility requirement under section 109(a) of the Bankruptcy Code if it has debt instruments that are governed by New York law and contain New York forum selection provisions.  *See Berau Cap. Res.*, 540 B.R. at 84 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement."); *In re PT Bakrie Telecom Tbk*, 601 B.R. 707, 715 (Bankr. S.D.N.Y. 2019) ("An indenture subject to New York governing law and containing New York forum selection clauses constitutes property in the United States and thereby satisfies Section 109's eligibility requirement."); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017) (holding that presence of "debt subject to New York governing law and a New York forum selection clause constitutes property in the United States," thereby satisfying the requirement under section 109(a)); *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr.

S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction."). Thus, even if the Chapter 15 Debtors did not have any cash in the United States, the NY Notes and Indenture are sufficient for each Chapter 15 Debtor to satisfy section 109(a) of the Bankruptcy Code.

48.    Moreover, "[a] case under chapter 15 of title 11 may be commenced in the district court of the United States for the district" (a) "in which the debtor has its principal place of business or principal assets in the United States," (b) "if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court," or (c) "in a case other than those specified in paragraph [(a) or (b)], in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative." 28 U.S.C. § 1140. As discussed above, the Chapter 15 Debtors have assets in New York. Additionally, venue in this Court is consistent with the interest of justice and is convenient for the parties because certain Noteholders may have corporate offices in New York. Furthermore, the Chapter 15 Debtors' undersigned counsel is in New York and close to this Court. Similarly, counsel (Cleary Gottlieb Steen & Hamilton LLP) to the Ad Hoc Group and counsel (Greenberg Traurig, LLP) to the Indenture Trustee also have offices in New York that are close to the Court. Accordingly, venue in this District is proper. *See* 28 U.S.C. § 1410 (3).

**B.    The Requirements of Section 1517(a) of the Bankruptcy Code Are Satisfied**

49.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if the following three requirements are met: (a) such foreign proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code; (b) the foreign representative

applying for recognition is a person or body; and (c) the petition meets the requirements of section 1515. *In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008). These foregoing requirements are satisfied with respect to the Brazilian RJ Proceeding, the Petitioner, and the Verified Petition. Therefore, the Brazilian RJ Proceeding should be recognized as the foreign main proceeding of the Chapter 15 Debtors.

### i.      The Brazilian RJ Proceeding is a "Foreign Proceeding"

50.     The Brazilian RJ Proceeding satisfies the general definition of "foreign proceeding" as set forth in section 101(23) of the Bankruptcy Code. Section 101(23) requires that a "foreign proceeding" be: (i) either judicial or administrative in character; (ii) collective in nature; (iii) pending in a foreign country and authorized or conducted under a law related to insolvency or the adjustment of debts; (iv) a proceeding in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (v) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23); *Barnet*, 737 F.3d at 247; *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012); *see also In re ABC Learning Ctrs Ltd.*, 728 F.3d 301, 308 (3d Cir. 2013); *In re Irish Bank Resolution Corp. (In Special Liquidation)*, No. 13-12159 (CSS), 2014 Bankr. LEXIS 1990, at *39-40 (Bankr. D. Del. Apr. 30, 2014). The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3).

51.     **First**, the Brazilian RJ Proceeding is judicial in nature, as the Chapter 15 Debtors commenced the case with the Brazilian Bankruptcy Court, which entered the RJ Acceptance Order on December 5, 2024, accepting jurisdiction over the Brazilian RJ Proceeding. Brazilian Counsel Decl. ¶ 5-7; 15-19.

52.    **Second**, the Brazilian RJ Proceeding is also "collective," in that it "considers the rights and obligations of all creditors" in a single proceeding.  *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 263 (Bankr. S.D.N.Y. 2019) ("***Constellation I***") (holding that courts in the Second Circuit have long agreed that a Brazilian RJ process satisfies the standards for a "foreign proceeding," including being a collective proceeding); *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009).  Indeed, its purpose is to create a forum for the orderly administration of the RJ Debtors' debts and assets, giving creditors the ability to file proofs of claims, participate in the plan process, and voice their positions throughout the proceedings, including by filing objections and appeals.  Brazilian Counsel Decl.¶ ¶ 5, 23-38.

53.    **Third**, the Brazilian RJ Proceeding is pending in a foreign country—Brazil—under a law relating to insolvency, the Brazilian Bankruptcy Law.  Brazilian Counsel Decl. ¶¶ 5-14.

54.    **Fourth**, throughout the Brazilian RJ Proceeding, the assets and affairs of the Chapter 15 Debtors are subject to the control and supervision of the Brazilian Bankruptcy Court.  Brazilian Counsel Decl. ¶¶ 6, 20, 29.  For instance, with the entry of the RJ Acceptance Order by the Brazilian Bankruptcy Court, the Chapter 15 Debtors are no longer allowed to dispose or encumber its fixed assets without prior authorization from the Brazilian bankruptcy court as provided in the plan of reorganization approved by creditors and the Brazilian bankruptcy court.  *Id*. ¶¶ 23, 29.  The Brazilian Bankruptcy Court's oversight of the RJ Debtors' assets and affairs will continue until such time as the RJ Debtors' reorganization is complete, or up to two (2) years from the confirmation of the applicable plan of reorganization.  *Id.* ¶¶ 44-46.

55.    **Fifth**, the Brazilian RJ Proceeding is a judicial proceeding commenced for the purpose of reorganization of the RJ Debtors, including the Chapter 15 Debtors.  *Id.* ¶¶ 5-6.  As set forth in the Brazilian Counsel Declaration, the Brazilian RJ Proceeding is intended to protect the

RJ Debtors so that they may continue to operate their business and negotiate a value-maximizing resolution for all parties. *Id.* ¶¶ 5, 29.

56.     Bankruptcy courts, including Courts in this district, have repeatedly held that restructuring proceedings under the Brazilian Bankruptcy Law are "foreign proceedings." *See, e.g.*, *In re Oi S.A.*, No. 23-10193 (JPM) (Bankr. S.D.N.Y. Mar. 29, 2023) [ECF No. 30] (recognizing as foreign main proceeding a case filed pursuant to the in-court reorganization section of the Brazilian Bankruptcy Law); *In re Americanas S.A.*, No. 23-10092 (MEW) (Bankr. S.D.N.Y. Mar. 3, 2023) [ECF No. 32] (same); *In re Mina Tucano Ltda.*, No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022) [ECF No. 32] (same); *U.S.J. – Açúcar e Álcool S.A., et al.*, No. 22-10320 (DSJ) (Bankr. S.D.N.Y. Apr. 14, 2022) [ECF No. 21] (same); *Samarco Mineracao S.A. - Em Recuperação Judicial*, No. 21-10754 (LGB) (Bankr. S.D.N.Y. May 13, 2021) [ECF No. 22] (same); *In re Odebrecht Engenharia e Construção S.A.*, No. 20-12741 (MEW) (Bankr. S.D.N.Y. Dec. 30, 2020) [ECF No. 15] (same); *In re Usina de Açúcar Santa Terezinha Ltda.*, No. 19-11199 (MEW) (Bankr. S.D.N.Y. May 16, 2019) [ECF No. 30] (same); *In re Novonor S.A.*, No. 19-12731 (SMB) (Bankr. S.D.N.Y. Sept. 18, 2019) [ECF No. 22] (same); *In re Serviços de Petróleo Constellation S.A.*, No. 18-13952 (MG) (Bankr. S.D.N.Y. May 9, 2019) [ECF No. 86] (same); *In re Oi S.A.*, No. 16-11791 (SHL) (Bankr. S.D.N.Y. Jul. 22, 2016) [ECF No. 38] (same); *In re OAS S.A.*, No. 15-10937 (SMB) (Bankr. S.D.N.Y. Aug. 3, 2015) [ECF No. 85] (same); *In re Rede Energia S.A.*, No. 14-10078 (SCC) (Bankr. S.D.N.Y. Sept. 9, 2014) [ECF No. 36] (same).

### ii.     The Brazilian RJ Proceeding Satisfies the Requirements for Recognition as a "Foreign Main Proceeding"

57.     The Brazilian RJ Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code for the Chapter 15 Debtors.  A "foreign main proceeding" is defined in the Bankruptcy Code as a "foreign proceeding pending in the country where the

debtor has the center of its main interests." 11 U.S.C. § 1502 (4). While the Bankruptcy Code does not define a debtor's center of main interests ("**COMI**"), section 1516(c) provides that, in the absence of evidence to the contrary, a debtor's registered offices or habitual residence "is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516 (c). The legislative history indicates that this rebuttable presumption was "designed to make recognition as simple and expedient as possible" in cases where the "COMI" of a debtor is not controversial. H. Rep. No. 109-31, pt. 1, at 112-13 (2005).

58.     In assessing whether the registered office statutory presumption withstands scrutiny, courts have developed a list of non-exclusive factors for determining COMI, which, while not to be applied mechanically, are helpful in assessing an entity's COMI. *See In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010) *aff'd*, 728 F.3d 301 (3d Cir. 2013) (citation omitted); *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137-38 (2d Cir. 2013) (referring to the COMI factors developed by the court in *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)). Those factors include the following: (a) the location of the debtor's headquarters; (b) the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); (c) the location of the debtor's primary assets; (d) the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and (e) the jurisdiction whose law would apply to most disputes. *In re SPhinX, Ltd.*, 351 B.R. at 117.

59.     Some courts have also employed the concept of "principal place of business" to guide their COMI analysis and, accordingly, have applied the Supreme Court's definition of that concept in the context of subject-matter jurisdiction, which looks at a corporation's "nerve center," *i.e.*, "where a corporation's officers direct, control, and coordinate the corporation's activities."

*See id.* at 138 n.10 (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 91 (2010)). Given Congress's choice

to use "COMI" instead of "principal place of business" in chapter 15, the "nerve center" concept

does not control, "[b]ut to the extent that the concepts are similar, a court may certainly consider

a debtor's 'nerve center,' including from where the debtor's activities are directed and controlled,

in determining a debtor's COMI." *Id.*

60. Indeed, the COMI of a subsidiary entity that is a holding company or a financing

vehicle often turns on the location of the group's nerve center and the entity's function within its

corporate group. *See e.g.*, *Constellation II*, 613 B.R. at 512 (holding that the nerve center of Arazi,

a SPV holding company, weighs in favor of COMI in the location of its parent that controlled it);

*OAS*, 533 B.R. at 102 (finding COMI of a foreign SPV in the jurisdiction of its corporate group

largely because its "principal purpose [was] the financing of the operations of [the parent], its

affiliates and direct and indirect subsidiaries"); *Oi Brasil*, 578 B.R. at 184-85 ("Case law including

the OAS case notes that the COMI of an SPV turns at a location of the corporate nerve center and

the expectation of creditors.").

61. Similarly, some courts also look to the expectations of creditors, which can be

"evaluated through examination of the public documents and information available to guide

creditor understanding of the nature and risks of their investments." *In re Serviços de Petróleo*

*Constellation S.A.*, 613 B.R. 497, 508 (Bankr. S.D.N.Y. 2019) ("***Constellation II***") (citing *In re*

*Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017)); *In re OAS S.A.*,

533 B.R. 83, 101-03 (Bankr. S.D.N.Y. 2015) (reviewing offering memorandum to establish

noteholder expectations as part of a COMI analysis); *In re Millennium Glob. Emerging Credit*

*Master Fund Ltd.*, 474 B.R. 88, 93-94 (S.D.N.Y. 2012) (same); *Suntech Power*, 520 B.R. at 418

(considering terms of indenture to establish creditor expectations regarding likely location of a

29

restructuring as part of a COMI analysis). In addition to this objective evidence, courts also consider the actual expectations of creditors. *In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 789 (Bankr. S.D.N.Y. 2022) ("[D]efinitive creditor expectations and overwhelming creditor support solidify a finding of COMI in the Cayman Islands.").

62.     This Court must make an independent COMI determination and is not bound by statements and/or determinations made by courts in other jurisdictions, as the meaning of COMI and the standard for establishing its location is determined by the applicable laws of each jurisdiction, and do not correspond to the same ones used by the courts in the United States. Indeed, in *In re Oi Brasil Holdings Coöperatief U.A.*, Judge Lane found that although derived from the same origins, COMI as it is applied in the context of the Bankruptcy Code differs from the term COMI applied by European courts in the context of the European Insolvency Regulations. 578 B.R. 169, 206-07 (Bankr. S.D.N.Y. 2017).

63.     Relatedly, courts may consider whether recognizing a foreign proceeding as a foreign main proceeding would create conflicts, lead to inconsistent results, or fail to maximize the value of the debtor's assets. Chapter 15 is intended to promote cooperation between American and foreign courts, facilitate the rescue of financially troubled enterprises, and ensure the fair and efficient administration of cross-border insolvencies. *See In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 784 (Bankr. S.D.N.Y. 2022). In *Mod Land*, the court found that "[r]ecognition of the Cayman proceeding as a foreign main proceeding would comport with the goals of Chapter 15" because "Chapter 15 contemplates cooperation between American and foreign bankruptcy courts." *Id.* at 787. It found that denial of main recognition of the Cayman Scheme would likely result in the Cayman Scheme being converted to a Cayman liquidation and would not maximize the value of the debtor's assets. *Id.* "Such an outcome would clearly diverge from Chapter 15's

30

stated goal of maximizing value of the Debtor's assets, as well as facilitating the rescue of financial troubled business.  Further, recognition of the Cayman Proceeding would promote cooperation between the American and Cayman courts, by helping facilitate the Cayman Proceeding and maximizing the chances of a successful reorganization."  *Id.* at 787.

64.     Finally, courts consider the facts regarding COMI "at or around the time the chapter 15 case is filed."  *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 137 (2d Cir. 2013)*; see also In re Oi Brasil Holdings Coöperatief U.A.*, 578 at 207.   Here, although these Chapter 15 Cases were commenced on December 3, 2024, whereas the Previous Chapter 15 Cases were commenced on July 15, 2024, the facts regarding each of the Chapter 15 Debtors that are relevant for the determination of COMI are similar.  The Foreign Representative laid out the facts relevant to each of the Chapter 15 Debtors' COMI and establishments in great detail in the Rabelo Trial Declaration, which is incorporated herein and attached hereto as <u>Exhibit D</u>.  For the convenience of the Court, however, an overview of the relevant COMI factors for each of the Chapter 15 Debtors is also provided below.  Counsel to the Foreign Representative will also coordinate with counsel to the Ad Hoc Group and with the office of the United States Trustee as to whether new facts or evidence need to be introduced on the record as to the issue of COMI for each of the Chapter 15 Debtors and will endeavor to do so by joint stipulation.

a.     *The COMI for ICB is Brazil*

65.     ICB is a Brazilian operating company that engages in all stages of cement production and sales in Brazil.  ICB is incorporated in Brazil and has its registered office in São Paulo.  As Brazil's third largest cement producer in Brazil, ICB plays an important role in the Brazilian economy.  All of ICB's directors and officers are based in Brazil, and all of its 1,745 employees are based in Brazil.  ICB's board of directors holds its meetings in Brazil.  ICB benefits

from mining concessions in Brazil, operates 14 cement plants in Brazil, and is party to collective bargaining agreements in Brazil.  ICB's books and records are kept in São Paulo, Brazil.  ICB's primary creditors are comprised of the Brazilian taxing and antitrust authorities, the Debenture Holders, and the Noteholders.  No creditor in the Previous Chapter 15 Cases disputed that ICB's COMI is in Brazil.  At the hearing held by the Court on the request for recognition with respect to the Previous Chapter 15 Cases, the Court found that COMI for ICB is located in Brazil.  *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. November 21, 2024) [ECF No. 94] ("**Hearing Tr.**"), 9:13-10:17; 121:20-122:2.  Consequently, the Court announced it would enter an order granting recognition of the EJ Proceeding as a foreign main proceeding for ICB.  Hearing Tr. 9:13-10:17; 121:20-2.  As the facts related to ICB have remained substantially the same since the filing of the Previous Chapter 15 Cases, the Brazilian RJ Proceeding should also be recognized as a foreign main proceeding for ICB.

> b.      *The COMI for ICP is Brazil*

66.      ICP is the parent company of the other Chapter 15 Debtors and certain non-debtor affiliates.  ICP is incorporated in Brazil and has its registered office in São Paulo.  ICP's headquarters are located in São Paulo, Brazil.  All of ICP's directors, officers, and its 19 employees are based in Brazil.  ICP's board of directors holds its meetings in Brazil.  ICP's books and records are kept in São Paulo, Brazil.  ICP's obligations under the Debentures are governed by Brazilian law, and its obligations under the Indenture are governed by New York law.  Each of the Debenture Holders is domiciled in Brazil.  The members of the Ad Hoc Group are neither domiciled in Brazil nor domiciled in the Netherlands, and the domicile of the other Noteholders is unknown.  The common equity of ICP is owned by Mover, a Brazilian corporation headquartered in São Paulo, Brazil.  No creditor in the Previous Chapter 15 Cases disputed that ICP's COMI is in Brazil.  At

the hearing held by the Court on the request for recognition with respect to the Previous Chapter 15 Cases, the Court found that COMI for ICP is located in Brazil. *Id.* Consequently, the Court announced it would enter an order granting recognition of the EJ Proceeding as a foreign main proceeding for ICP. *Id.* As the facts related to ICP have remained substantially the same since the filing of the Previous Chapter 15 Cases, the Brazilian RJ Proceeding should also be recognized as a foreign main proceeding for ICP.

*c.*    *The COMI for IC Financial is Brazil*

**1.    <u>Location of IC Financial's Headquarters</u>**

67.    IC Financial is incorporated in the Netherlands and has its registered office in Amsterdam. IC Financial does not have a physical office of its own, but lists the office of Vistra Management Services (Netherlands) B.V ("**Vistra**") as its office address. Vistra provides a registered office in the Netherlands to IC Financial as well as corporate services to IC Financial in the Netherlands to comply with certain Dutch laws. IC Financial is not an operating company; it is a special purpose financing vehicle that was formed to fund the operations and activities of ICP and its subsidiaries through the international markets. ICP indirectly owns and controls IC Financial. ICP is headquartered in São Paulo, Brazil.

**2.    <u>Location of those who actually manage IC Financial</u>**

68.    Mover, through its own board comprised entirely of Brazilian nationals, controls ICP and ICP in turn controls each of the other members of the InterCement Group, including each of the other Chapter 15 Debtors. For instance, ICP directly or indirectly has the power to appoint or remove the directors of each of its direct and indirect subsidiaries, including the other Chapter 15 Debtors.

33

69.     In light of IC Financial's lack of operations and limited financing function within the InterCement Group, it performs two regular and essential acts, each of which are performed by its directors based in Brazil that are also ICP officers, as well as other of ICP's directors, officers, and/or other employees in Brazil.   First, these ICP personnel manage, on behalf of IC Financial, the relationships with the Noteholders.  Second, they determine whether to pay, and arrange for payment of, the NY Notes.

70.     All investor relations with respect to the NY Notes were performed by ICP's officers and employees (some of whom are also IC Financial's Brazilian directors) in Brazil.  For instance, Paulo Diniz, ICP's chief executive, and Marco Zangari, ICP's chief financial officer, and other ICP officers and employees held many individual calls with members of the Ad Hoc Group and other holders of the NY Notes.  They also held in-person meetings in Brazil with Ad Hoc Group members (specifically with representatives of Moneda U.S.A., Inc. ("**Moneda**"), Cigna Investments, Inc. ("**Cigna**"), Contrarian Capital Management, LLC ("**Contrarian**")) and other Noteholders.   These ICP officers located in Brazil also prepared (1) quarterly investor presentations that were uploaded to ICP's investor relations website (available at https://InterCement.com/en/investidores/), (2) audited quarterly financial statements (which were prepared on a consolidated basis for ICP and its subsidiaries), and (3) market announcements (which all began with "São Paulo, Brazil").  These ICP officers also hosted quarterly investor calls in which they explained the InterCement Group's quarterly results and responded to questions by the Noteholders, credit rating agencies and analysts.

71.     In addition, the decision on when and how to pay the scheduled interest payments on the NY Notes came from ICP's board of directors or officers who, as explained above, made material strategic decisions for all entities within the group from its headquarters in Brazil, which

were then approved by the boards or officers of ICP's relevant subsidiaries as required.  Because IC Financial is only a financing vehicle and has minimal cash, ICP determined whether to transfer money from other group entities to allow IC Financial to make its scheduled payments on the NY Notes.  For instance, if IC Financial's Dutch directors wanted to make a scheduled interest payment on the NY Notes, the effectuation of such interest payment would in fact be dependent on decisions made in Brazil to transfer funds to pay IC Financial.  After ICP made this decision, the transfer of the cash from other group entities to IC Financial to allow it to make scheduled interest payments was carried out by officers or employees of ICP in Brazil.  That IC Financial's payment of the NY Notes was dependent on ICP and ICB was disclosed to the prospective Noteholders in the Offering Memorandum for the NY Notes.

72.   IC Financial has no officers or employees.  Rather ICP's officers and employees provide internal legal, finance, accounting, treasury, tax, compliance, and investor relations services to IC Financial from ICP's São Paulo headquarters in Brazil.  While a service provider in the Netherlands (PwC Netherlands) prepares the first draft of IC Financial's tax returns, ICP's employees in Brazil, including Karina Skarbnik, ICP's director of tax, comment and sign off on the tax returns before they are submitted.  Similarly, while Vistra prepares the first draft of IC Financial's annual accounts, ICP's employees in Brazil comment and sign off on the annual accounts before they are submitted to the board and shareholder for approval.  IC Financial's annual reports are audited by Ernst & Young Netherlands.  As disclosed on page 6 of IC Financial's 2023 Annual Report, IC Financial "does not have its own audit committee," and "[t]he audit committee of the Group [*i.e.*, ICP's audit committee] is also the audit committee for [IC Financial]."

73.     The remainder of IC Financial's actions have typically involved the minimum corporate actions required under Dutch law.  These actions were taken by its board of managers, as well as its shareholder, IC Portugal.

74.     IC Financial's board members were appointed by IC Portugal, whose directors are all Brazilian nationals residing in Brazil and were in turn appointed by ICP.  IC Financial's board consists of three Brazilian "Directors A" and three Dutch "Directors B."   Any action of IC Financial's board requires the approval of at least one Brazilian director and at least one Dutch director.  The three Managing Directors A (Armando Sergio Antunes Da Silva, Marco Antonio Zangari and Luiz Augusto Klecz) are Brazilian Nationals residing in Brazil.  Mr. Da Silva is ICB's chief financial officer, Mr. Zangari is ICP's chief financial officer and Mr. Klecz is ICP's legal director.  The three Directors B are Dutch nationals residing in the Netherlands. The three Directors B are Matthijs Stoop and Pravienkoemar Mahabier, as well as the corporation Vistra Management Services (Netherlands) B.V.  The Dutch directors are not employees of the InterCement Group, and they rely on the Brazilian Directors A and ICP's other employees to provide them with information, guidance, and recommendations regarding the group's finances and operations, strategic initiatives and other information regarding the group's activities.

75.     IC Financial's original books and records are kept by Vistra in the Netherlands, with copies kept in Brazil.  All entries in the books and records are first approved by ICP employees in Brazil (specifically Ms. Laura Prates in ICP's legal division).

### 3.   *Location of primary assets*

76.     IC Financial's primary assets are located in Spain and Brazil.  IC Financial's primary assets are its intercompany claims against ITI and ICP, which are incorporated in Spain and Brazil, respectively.  IC Financial's only other assets consist of approximately $2 million of

cash.  IC Financial's banks accounts are located in Portugal (two accounts), The Bahamas (two accounts), the Netherlands (one account), and Brazil (two accounts).  On the Petition Date, the vast majority of IC Financial's cash was located in its accounts in The Bahamas.  IC Financial has a Brazilian tax ID number (CNPJ) issued by the República Federativa do Brasil.

### 4.  *Location of creditors*

77.     IC Financial's primary creditors are located outside of the Netherlands, and one is located in Brazil.  IC Financial's largest debt ($750 million) arises from its issuance of the NY Notes.  No known holder of the NY Notes is located in the Netherlands or Brazil.  Both UMB Bank, the indenture trustee, and Cede & Co., the registered holder of the NY Notes, are incorporated in the United States.  The investment managers for the beneficial owners of the NY Notes that comprise the Ad Hoc Group are domiciled in the United States, the Cayman Islands, the United Kingdom and Chile.  ITI is also the owner of $200 million of the NY Notes sitting in Jefferies NY.

78.     IC Financial's next largest debt (totaling EUR 121 million and BRL 1.77 billion, approximately $ 436.27 million in aggregate) is on account of intercompany loans owed to ICP incorporated in Brazil (the "**ICP Loans**").

### 5.  *Jurisdiction whose law would apply to most disputes*

79.     IC Financial's disputes are governed primarily by Brazilian law.  IC Financial's debt under the NY Notes is governed by New York law.  IC Financial's debt under the ICP Loans is governed by Brazilian law.  As an entity incorporated in the Netherlands, IC Financial is subject to certain laws of the Netherlands.  As a special purpose financing vehicle with no operations of its own, the ability of IC Financial to fulfill its remaining purpose of repaying its debt on the NY Notes is most heavily influenced by Brazilian law, including Brazilian tax, antitrust,

environmental, mining, and currency exchange laws and regulations.  The risks of these particular Brazilian laws and regulations impacting IC Financial's ability to repay the NY Notes were prominently disclosed in the offering memorandum for the NY Notes.[26]  In addition, the Offering Memorandum describes specific risks relating to hundreds of pending Brazilian antitrust, tax and labor claims, as well as risks relating to potential new tax, antitrust, mining, environmental and currency exchange regulations.  The Offering Memorandum contains at least thirteen (13) "Risk Factors" that specifically reference risks relating to laws and regulations in Brazil.

80.     In contrast, the sole risk factor in the Offering Memorandum about the Netherlands states that "Brazilian and certain European bankruptcy laws may be less favorable to you than bankruptcy and insolvency laws in other jurisdictions," including because "[a]ny insolvency proceedings with respect to the issuer in the EEA (excluding Denmark) would most likely be based on and governed by the insolvency laws of the Netherlands" and "there can be no assurance as to how the insolvency laws of the Netherlands would be applied in the event that the issuer is subject to one or more insolvency proceedings outside the Netherlands."  Offering Memorandum at 35.  Notably, that disclosure addresses only what law would govern an insolvency case commenced for IC Financial in Europe.  It does not state that an insolvency proceeding of IC Financial must (or even likely would) occur in Europe; but rather, envisions IC Financial being subject to "one or more insolvency proceedings *outside the Netherlands*."

### 6.  *Expectations of Creditors*

81.     IC Financial's creditors should have reasonably expected that IC Financial's COMI was in Brazil.  For instance, the Indenture put prospective holders of the NY Notes on notice that

---

[26]   *See* Rabelo Trial Declaration ¶55 (listing risk factors that specifically reference risks to laws and regulations in Brazil).

IC Financial was managed out of Brazil.  Section 13.01 of the Indenture requires that all notices and correspondence sent to the Issuer be sent to the following address: "InterCement Participações S.A., Avenida das Nações Unidas, 12,495, 13th floor, São Paulo, São Paulo, 04578-000, Attention: Marcelo Arantes, Fax: + 55 (11) 37184240."[27]  In contrast, the Indenture did not provide contact information for the Issuer in the Netherlands.

82.  The Offering Memorandum[28] makes clear that the InterCement Group, including IC Financial, was a Brazilian-based business.[29]  Throughout the Offering Memorandum the operations and business of the individual entities comprising the InterCement Group are described as a consolidated corporate group.  Specifically, the Offering Memorandum provides that "our company," "we," "our," "ours," "us," or similar terms are references to ICP and its subsidiaries. The Offering Memorandum described the InterCement Group (including IC Financial) as a Brazilian company and stressed the degree to which it is affected by the Brazilian economy.  For instance, the Offering Memorandum provides "**[a]s a Brazilian company** with a significant portion of our operations in Brazil, we are significantly affected by economic conditions in Brazil." The Offering Memorandum further described Brazil as the InterCement Group's "**most significant market**" and made clear that the InterCement Group's operations in other countries were secondary to its operations in Brazil.  The Offering Memorandum explained that the InterCement Group had more plants and quarries in Brazil than any other market in which it operated.  Further, the Offering Memorandum explained that the adjusted EBITDA for the InterCement Group's

---

[27]  The +55 (11) fax number reflects a Brazil country code.

[28]  The sections of the Offering Memorandum relevant to IC Financial's COMI in Brazil are set forth in detail in paragraphs 40-67 of the Rabelo Trial Declaration.

[29]  The Offering Memorandum mentions "Brazil" 619 times, compared to only 52 mentions of "Netherlands."

Brazilian operations was greater than its adjusted EBITDA in all other markets combined for each of the previous three years.

83.     The Offering Memorandum also disclosed to prospective Noteholders that IC Financial had no operations, recoveries on the NY Notes were dependent on the guarantors in Brazil, and the Noteholders would only receive consolidated financials of ICP (not IC Financial).[30] The description of "Management" in the Offering Memorandum pertains only to board of directors and board of executive officers of ICP (based in Brazil) and does not describe the management of IC Financial.[31]   Notably, the Offering Memorandum explains that under the Indenture, IC Financial can be substituted as Issuer at any time without the consent of the Trustee or the Noteholders with any one of the Brazilian guarantors (ICB, ICP) taking its place as Issuer, so long as any resulting taxes or costs are accounted for.[32]   This is clear evidence that IC Financial's "place of incorporation, or for that matter its very existence, was immaterial to [creditors'] decision to purchase their notes."  *Constellation II*, 613 B.R. 497, 508.

---

[30]   *See e.g.*, Offering Memorandum at p. 75 ("Because the issuer is a finance subsidiary with no other operations, we have not included any financial statements of the issuer in this offering memorandum."), p. 33 ("Because the issuer has no operations of its own, holders of the notes must depend on the guarantors to provide it with sufficient funds to make payments on the notes when due." ), p. 33 ("The issuer's principal business activity to act as a financing vehicle for our activities and operations.  The issuer has no substantial assets (other than in connection with transactions entered into with Camargo Correa S.A. and its affiliates) and its only sources of cash flow are from its financing activities and capital contributions made by us and our other subsidiaries.  Accordingly, the ability of the issuer to pay principal, interest, and other amounts due on the notes and other indebtedness will depend upon our financial condition and results of operations.  If contributions are not made by us or our subsidiaries to the issuer, then the holder of the notes would have to rely upon claims for payment under the guarantees.").

[31]   Offering Memorandum at 125 ("We are managed by a board of directors and board of executive officers … "); Offering Memorandum at i: (explaining that references to "we," "our company," "ours", and "us" in the Offering Memorandum shall mean references to ICP and its subsidiaries, not IC Financial); Offering Memorandum at 9 ("Our principal executive offices are located at Avenida das Nacoes Unidas, 12,495, 04578-000, 13th Floor  SP, Brazil.  Our telephone number is +55 (11) 3178-4200.  Our website address is www.intercement.com.").

[32]   Offering Memorandum at 149; Indenture §4.24.

84.     ***Ad Hoc Group Members' Expectations.***   Each member of the Ad Hoc Group has stipulated in the Previous Chapter 15 Cases that they anticipated that **any main plenary proceeding** in which the NY Notes would be restructured **would be in Brazil**.  The Ad Hoc Group is IC Financial's largest creditor group.  Its members hold $371,670,000 or 67.5% of the NY Notes, excluding the approximately $200 million held by ITI.[33]  As reflected in the Ad Hoc Group's Brazilian Ealy Discovery Action complaint, many of the members of the Ad Hoc Group are specialized in investing in Latin America or Emerging Markets generally as evidenced by their fund names (e.g., Moneda Deuda Latinoamericana Fondo De Inversión; Moneda Luxembourg Sicav - LatAm Corporate Credit Fund; Moneda LatAm High Yield Fund PLC; Moneda Latin American Corporate Debt; Contrarian Emerging Markets, L.P).

85.     This understanding of the Ad Hoc Group members is also memorialized in their internal correspondence, which demonstrates their belief that the NY Notes were a Brazilian investment that, if restructured, would result in a Brazilian bankruptcy proceeding.

86.     ***Investor Relations.***   All investor relations with respect to the NY Notes was handled by ICP officers (including certain of IC Financial's Brazilian directors) and ICP employees based in Brazil.  Each of the members of the Ad Hoc Group, as well as other holders of NY Notes, investment bank analysts, and credit agencies, dealt with ICP's officers and employees located in Brazil.[34]  These individuals include Paulo Diniz, Marco Zangari, Nicholas Baines and Gabriel Motta, each of whom is based in Brazil and uses email signature blocks that

---

[33]   As members of the InterCement Group, ICP and ITI also understood IC Financial's COMI to be in Brazil.

[34]   Notably, the InterCement Group maintains an investor relations webpage that can be freely accessed at https://intercement.com/en/investidores/, which contains market announcements, investor presentations, quarterly financial reports and quarterly investor call audio recordings through which it keeps the holders of the NY Notes informed.  The internal correspondence of the members of the Ad Hoc Group reveals that they reviewed such market announcements, investor presentations and quarterly financial reports and attended the quarterly investor calls (or listened to the audio recordings).

include their Brazilian address and phone number or include disclosure language in Portuguese.
As noted above, many holders of NY Notes (including Moneda, Contrarian, and Cigna) visited
with ICP officers at ICP's headquarters in Brazil.  In contrast, each member of the Ad Hoc Group
stipulated in the Previous Chapter 15 Cases that it did not communicate with anyone acting on
behalf of IC Financial who, to their knowledge, was located or based in the Netherlands.

87.     In addition, ICP's officers and employees based in Brazil publicly engaged with
investors regularly, including by hosting quarterly investor calls.  For instance, in the first, second,
and third quarters of 2023 the InterCement Group held "fireside chat[s]" with ICP's chief
executive officer Paulo Diniz and ICP's chief financial officer (and IC Financial director) Marco
Zangari, wherein holders of the NY Notes and analysts asked questions to ICP's officers.

### 7.   *As a Financing SPV, IC Financial's COMI is in the Functional Nerve Center of Its Corporate Group*

88.     The InterCement Group is an economically and operationally integrated group,
whose main assets are located in Brazil and whose activities are managed, directed, and monitored
out of the Company's corporate headquarters in Brazil.  The nerve center for the entire InterCement
Group, including each of the Chapter 15 Debtors, is in Brazil.

89.     As an entity with no material operations of its own, that relies on the profitability
of the InterCement Group, IC Financial's COMI is in the location of the InterCement Group's
corporate nerve center in Brazil.

90.     In determining COMI of a financing SPV with little to no assets or operations of its
own, this Court (and other courts in this District) look especially to the corporate group's never
center.  *OAS*, 533 B.R. at 102 (finding COMI of a foreign SPV in the jurisdiction of its corporate
group largely because its "principal purpose [was] the financing of the operations of [the parent],
its affiliates and direct and indirect subsidiaries"); *Oi Brasil*, 578 B.R. at 184-85 ("Case law

including the OAS case notes that the COMI of an SPV turns at a location of the corporate nerve center and the expectation of creditors.").

91.     In *OAS*, Judge Bernstein found that an Austrian financing entities' limited Austrian activities, effected to maintain its corporate existence under Austrian law, did not detract from the finding of COMI in Brazil, where its nerve center and management functions were centralized. *OAS*, 533 B.R. at 102.

92.     Here, IC Financial is like the Austrian entity in that it is an entity with no material operations of its own, whose sole purpose is to function as a financing SPV.  It does not have any employees or officers and relies on the officers, directors, and employees of ICP located in Brazil to perform its core functions.  For these reasons, the Court should look to the situs of the InterCement Group's corporate nerve center (located in Brazil) just as Judge Bernstein did in determining the Austrian entities' COMI.

93.     Notably, denial of main recognition of IC Financial's Brazilian RJ Proceeding would not maximize the value of IC Financial's assets, which consist primarily of its interests in the InterCement Group's financial structure and its role as an SPV supporting the issuance of the NY Notes.  IC Financial is a shell entity with no material operations, employees, or independent functions, relying entirely on the officers, directors, and employees of ICP in Brazil to execute its core responsibilities.  The Brazilian Bankruptcy Court has exercised plenary jurisdiction over the restructuring of the InterCement Group, including IC Financial, and will continue to oversee this comprehensive process.  Granting main recognition will ensure the restructuring transaction— including any eventual sale of assets—can address the NY Notes effectively, providing certainty to potential buyers and maximizing the value of IC Financial's assets.  Moreover, denial of

43

recognition would lead to a lack of coordination among foreign courts, undermining the Brazilian Bankruptcy Court's efforts and creating inefficiencies in the restructuring process.

### d.      *The COMI for ITI is Brazil*

#### 1.      *Location of ITI's Headquarters*

94.     ITI is incorporated in Spain and has its registered office in Bilbao.  ITI's only physical office is a one room office rented in Bilbao, Spain.

#### 2.      *Location of those who actually manage ITI*

95.     ITI's dual role within the InterCement Group is to (1) hold the equity interests of ICB, the group's primary operating company located in Brazil, as well as the group's 52% interest in Argentine operating company Loma Negra and (2) provide credit support for Brazilian law Debentures issued by ICP and ICB in the Brazilian capital markets.[35]   The majority of ITI's directors reside in Brazil.  Two of ITI's three directors, Marco Antonio Zangari and Karina Zausner Skarbnik, are Brazilian nationals based in Brazil and are ICP employees.  Mr. Zangari is the CFO of ICP and Ms. Skarbnik is the Tax Director of ICP.  The third ITI director, Laureano Arostegui Lacabex, is a Spanish national based in Spain that is not involved with the InterCement Group other than in his role of director of ITI.  ITI's board members were appointed by IC Portugal, whose directors are 100% Brazilian and were appointed by ICP.  Over the three years preceding the Petition Date, a significant portion of ITI's board decisions were taken by written consents, which the two Brazilian directors executed from Brazil, and the Spanish director executed from Spain.  When the board held meetings, a majority took place in person in Spain, in compliance with Spanish law, with the remainder taking place by telephone or video conference, with the two

---

[35]   In 2012, ICP became the indirect owner of ITI as part of its acquisition of substantially all the shares of Cimentos de Portugal.  Since the acquisition, ITI has not engaged in the sale or encumbrance of Spanish securities.

Brazilian directors participating from Brazil and the Spanish director participating from Spain.  ITI has no officers.  ITI has one employee, Ms. Thaina Carlos Rocha, a Brazilian national based in Spain.  Ms. Rocha performs a limited function as an employee of ITI.  She organizes the administrative affairs for ITI in Spain, such as paying the rent and utilities associated with the one room office, preparing draft meeting minutes and preparing drafts of ITI's accounts, subject to approval by the tax and accounting teams in Brazil.  She takes direction from ICP's chief financial officer, Marco Zangari, located in Brazil.  She requires prior written approval of ICP's chief financial officer or chief legal officer before taking certain actions.

96.     Employees of ICP provide legal, finance, treasury, tax, accounting, compliance, and investor relations services to ITI out from the São Paulo headquarters in Brazil.  ITI's books and records are kept in Spain, with copies in Brazil.  All entries in the books and records are first approved by an ICP employee, Ms. Laura Prates, who is based in Brazil.  Cuatrecasas as tax advisor of ITI prepares the first draft of ITI's tax return.

### 3.  *Location of primary assets*

97.     ITI's primary asset is its equity interests in ICB.  ITI maintains the share certificates of ICB in Brazil and has registered its shares with Brazil's Central Bank.  As reflected in ITI's latest Annual Financial Report, ITI's ownership of ICB is more valuable than its indirect 52% equity interest in Loma Negra (an Argentine operating company), which ITI owns through Spanish company ITI Argentina.  The majority in amount of the intercompany claims owed to ITI are owed by Brazilian entities (ICB and ICP).  ITI has bank accounts in Spain and Brazil (as well as The Bahamas and several other jurisdictions).  Most of ITI's cash was held in its bank accounts in Spain as of the Petition Date.  While only small amounts were contained in ITI's accounts in Brazil on the Petition Date, it has previously used such accounts to transfer large amounts of money in

BRL, which has allowed ITI and other InterCement Group entities to avoid currency exchange costs.  ITI has a Brazilian tax ID number (CNPJ) issued by the República Federativa do Brasil.

### 4. *Location of creditors*

98.     The Ad Hoc Group and the other Noteholders are not creditors of ITI.  No creditor of ITI has objected to ITI's COMI being in Brazil in the Previous Chapter 15 Cases.  ITI's third-party creditors are primarily located in Brazil.  ITI, as a guarantor of the Debentures, is jointly and severally liable in the same terms as ICP and ICB, the primary obligors, for the full amounts owed to the Debenture Holders, corresponding to BRL 5.9 billion (approx. $ 1 billion) to the Debenture Holders.  The Debentures comprise ITI's largest third-party debt and are owned by three Brazilian lending institutions (Itau, Banco Bradesco S.A., and Banco do Brasil).  As provided under the indentures (*escrituras de emissão*) governing the Debentures, several meetings were held since the Debentures were issued for the Debenture Holders to deliberate with respect to certain matters concerning the Debentures, including the postponement of payment dates, the waiver of financial covenants, the extension of the deadline for ICB to refinance the NY Notes, among others (such meetings, the "**Debenture Holder Meetings**").  The Debenture Holder Meetings took place either electronically or in-person in ICP's headquarters in Brazil.  ITI, in its capacity as guarantor of the Debentures, attended Debenture Holder Meetings and was represented by its Brazilian director Mr. Marco Zangari, who attended from Brazil.

99.     ITI also owes intercompany debts to IC Financial ($ 743 million, EUR 35 million and BRL 1.9 billion) and ICB (BRL 140 million).

100.    ITI has not guaranteed, and is not an obligor with respect to, the NY Notes.

### 5. *Jurisdiction whose law would apply to most disputes*

46

101.    ITI's disputes are primarily governed by Brazilian law.  ITI's guarantee of the Debentures is governed by Brazilian law with exclusive jurisdiction with courts of São Paulo. ITI's intercompany loans owed to IC Financial are governed by Dutch law.  ITI's intercompany loans owed to ICP and ICB are governed by Spanish and Brazilian law.

102.    As a company incorporated in Spain, ITI is subject to certain laws of Spain.  As a holding company, ITI is heavily impacted by the laws governing its operating subsidiaries—Brazil and Argentina.  Because it derives most of its value from its ownership of ICB, it is most impacted by the laws of Brazil.  As noted, its equity value in ICB is subject to and at risk by large pending antitrust, tax, and labor claims pending against ICB in Brazil and is impacted by mining, environmental, currency exchange, tax, antitrust, and other Brazilian laws and regulations.

### 6.  *Expectations of Creditors*

103.    For ITI's primary third-party creditors, the Debenture Holders, the information available to them would have indicated that ITI's COMI to be in Brazil.  The notice provision of the Debentures requires notices to be sent to ITI at an address in São Paulo, Brazil (not Spain).  ITI's letter to the Debenture Holders offering them security to secure ITI's obligations was also addressed from "São Paulo, Brazil."  The Debentures were registered as securities with the Brazilian securities commission and reporting for the Debentures was provided in Portuguese.  The minutes of the Debenture Holder Meetings, including those regarding modifications and restructuring of the Debentures, reflect that these meetings occurred either in-person in or electronically out of ICP's headquarters in Brazil.  No meetings with the Debenture Holders took place in Spain.  The agents or officers who represented each of the Debenture Holders in the Debenture Holder Meetings signed the minutes of those meetings digitally, and the minutes reflect that those agents or officers are all located in Brazil.

104.    Two of three Debenture Holders, holding 70.2% of the Debentures, supported ITI's EJ Proceeding as ITI's main proceeding.  Such Debenture Holders signed the EJ Plan that would have restructured ITI's debts on the Debentures.  Such Debenture Holders also consented to the extension of the preliminary stay in the Spain pre-insolvency proceeding, in which ITI explained it would be seeking recognition of the EJ Proceeding in Spain as ITI's foreign main proceeding.

105.    ITI's other remaining debts are mainly with ICP and its indirect subsidiaries, and which were managed by ICP and therefore would have expected ITI's COMI to be in Brazil.

### 7.   *As a Financing SPV and Holding Company, ITI's COMI is in the Functional Nerve Center of Its Corporate Group*

106.    The InterCement Group is an economically and operationally integrated group, whose activities are managed, directed, and monitored out of the Company's corporate headquarters in Brazil.  The nerve center for the entire InterCement Group, including each of the Chapter 15 Debtors, is in Brazil.

107.    In determining COMI of an SPV or holding company with little to no assets or operations of its own, this Court (and other courts in this District) look especially to the corporate group's never center. *Constellation II*, 613 B.R. at 512 (finding COMI in the jurisdiction of the parent company where the SPV had no employees or independent operations, and all management and decision-making occurred at the parent level); *OAS*, 533 B.R. at 102 (finding COMI of a foreign SPV in the jurisdiction of its corporate group largely because its "principal purpose [was] the financing of the operations of [the parent], its affiliates and direct and indirect subsidiaries"); *Oi Brasil*, 578 B.R. at 184-85 ("Case law including the OAS case notes that the COMI of an SPV turns at a location of the corporate nerve center and the expectation of creditors.").

108.    In *Constellation II*, this Court found that Arazi, an SPV holding company that owned shares in Brazilian units but had no employees or independent operations, had its COMI in

48

Luxembourg because that is where its parent was located and where management and decision-making for the group were conducted.  *Constellation II*, 613 B.R. at 512.  In *OAS*, Judge Bernstein found that an Austrian financing entities' limited Austrian activities, effected to maintain its corporate existence under Austrian law, did not detract from the finding of COMI in Brazil, where its nerve center and management functions were centralized.  *OAS*, 533 B.R. at 102.

109.    Here, ITI is like Arazi in that it is an entity with no material operations of its own, whose sole purpose is to function as a holding company and financial party to the Debentures.  It has a single employee that performs a very limited function and relies on the officers, directors, and employees of ICP located in Brazil to perform its core functions.  For these reasons, the Court should look to the situs of the InterCement Group's corporate nerve center just as it did in determining Arazi's COMI.  That nerve center is in Brazil.

110.    Notably, denial of main recognition of ITI's Brazilian RJ Proceeding would not maximize the value of ITI's assets, which primarily consist of its equity interests in ICB and indirect equity interest in Loma Negra, as well as intercompany claims owed by Brazilian entities like ICB and ICP.  ITI is a holding company with no material operations of its own and relies on the Brazilian headquarters of the InterCement Group for its core functions.  The Brazilian Bankruptcy Court has exercised plenary jurisdiction over the restructuring of ITI as part of its oversight of the broader InterCement Group, including its critical role as a financial party to the Debentures.  Recognition as a foreign main proceeding will allow the Brazilian Bankruptcy Court to facilitate an efficient and coordinated restructuring that preserves value and ensures certainty for creditors.  Moreover, granting main recognition will maximize the value of ITI's assets by enabling the restructuring process to proceed smoothly, allowing potential buyers of ITI's assets to transact with confidence in the effectiveness of the restructuring under Brazilian jurisdiction.

Denying recognition would fragment the restructuring process, create inefficiencies, and undermine creditor expectations.

### iii.     The Petitioner is a Proper "Foreign Representative"

111.    The Petitioner is the proper "foreign representative" of the Brazilian RJ Proceeding, thereby satisfying sections 101(24) and 1517(a)(2) of the Bankruptcy Code.  Section 101(24) of the Bankruptcy Code provides that "the term 'foreign representative' means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."  11 U.S.C. § 101(24).  The Bankruptcy Code does not require that the foreign representative be appointed by the foreign court.  Instead, a debtor may appoint a foreign representative pursuant to corporate authorizations passed in accordance with local law.  *See, e.g.*, *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 183 (Bankr. S.D.N.Y. 2022) (holding that the foreign representative duly authorized by the chapter 15 debtors' board was a foreign representative within 11 U.S.C. §101(24) and citing Collier on Bankruptcy ¶ 13.04 (16th ed. 2022.) "[w]here the debtor remains in charge of its own affairs, the debtor itself might be able to appoint its own representative for this purpose, without express court sanction"); *Constellation I*, 600 B.R. at 270 (recognizing as proper a foreign representative authorized under resolutions to commence a chapter 15 case on behalf of each of the debtors); *Oi Brasil*, 578 B.R. at 183  (recognizing appointment of foreign representative "pursuant to resolutions and powers of attorney signed by authorized representatives of" the foreign debtors); *OAS*, 533 B.R. at 95 (holding that the "Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative"); *In re Americanas S.A.*, No. 23-10092 (MEW) (Bankr. S.D.N.Y. Mar.

50

3, 2023) (appointing a foreign representative that the chapter 15 debtors' governing body authorized).

112.     Here, the Petitioner is an individual who has been duly appointed by the Chapter 15 Debtors to act as the representative of the Brazilian RJ Proceeding in these Chapter 15 Cases in accordance with section 101(24) of the Bankruptcy Code and has been granted authority to commence these Chapter 15 Cases by appropriate corporate approvals under applicable law.  *See* Resolutions attached to the Voluntary Petitions.   As explained in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law authorizes the Chapter 15 Debtors' management to continue to administer the reorganization of their assets and affairs throughout the Brazilian RJ Proceeding.  Brazilian Counsel Decl. ¶ 29.  This Court has recognized that the appointment of foreign representatives in similar manners is acceptable for purposes of commencing chapter 15 cases.  *See, e.g.*, *In re Mina Tucano Ltda.*, No. 22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022) [ECF No. 26] (approving the verified petition where the foreign representative was authorized by chapter 15 debtors' corporate resolution); *Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.)*, 470 B.R. 408 (Bankr. N.D. Tex. 2012)), *aff'd*, 701 F.3d 1031 (5th Cir. 2012)) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican *concurso* proceeding, which contemplates "self-management" during the proceeding similar to that of a debtor in possession, fit within the scope of the definition of "foreign representative," and recognizing the individual as the foreign representative).

> ### iv.     The Petition Was Properly Filed Under Sections 1504 and 1509 and Meets the Requirements of Section 1515 and Bankruptcy Rule 1007(a)(4)

113.     The final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meet the procedural requirements of

section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517 (a)(3). Here, all of section 1515's procedural requirements are satisfied.

114.    First, the Petitioner duly and properly commenced these Chapter 15 Cases in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by filing the Petition with all the documents and information required by sections 1515(b) and 1515(c). *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code.") ("***Bear Stearns I***").

115.    Second, in accordance with sections 1515(b)(1)-(3) of the Bankruptcy Code, evidence of the existence of the Brazilian RJ Proceeding and the appointment of the foreign representative is attached to the Brazilian Counsel Declaration. *See* <u>Exhibits A-D</u> attached to the Brazilian Counsel Declaration (containing original and certified translated copies, respectively, of the RJ Petition and the RJ Acceptance Order); *see also* the Voluntary Petitions (containing copies of the corporate resolutions authorizing the Petitioner to file this Verified Petition and to act on behalf of each of the Chapter 15 Debtors in these Chapter 15 Cases as their foreign representative). *See, e.g.*, *Vitro*, 470 B.R. 408; *see also OAS*, 553 B.R. at 93 (*citing Vitro*, 701 F.3d at 1046).

116.    Third, in accordance with section 1515(c) of the Bankruptcy Code, the Petitioner filed together with the Petition a statement identifying all the foreign proceedings with respect to the Chapter 15 Debtors. As set forth in such statement, the Brazilian RJ Proceeding is currently pending with respect to the Chapter 15 Debtors. In addition, a WHOA insolvency and Spanish pre-insolvency are pending against IC Financial and ITI, respectively. *See* <u>Exhibit A</u> attached to

the Voluntary Petitions.  ITI also intends to commence a recognition proceeding to recognize the

Brazilian RJ Proceeding as ITI's foreign main proceeding shortly.

117.    Fourth, the Foreign Representative has also satisfied the additional requirements

set forth in Rule 1007(a)(4) of the Bankruptcy Rules by including the following in the Petition: (a)

a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1,

with respect to each of the Chapter 15 Debtors; and (b) a list containing the names and addresses

of all person or bodies authorized to administer the foreign proceedings of the Chapter 15 Debtors

and all parties to litigation pending in the U.S. in which the Chapter 15 Debtors are a party at the

time of the filing of the Petition.  *See supra* ¶ 43.

### C.    Alternatively, the Court Should Find That the Brazilian RJ Proceeding is a Foreign Nonmain Proceeding and Grant Discretionary Relief

118.    As demonstrated above, the Brazilian RJ Proceeding should be recognized as the

"foreign main proceeding" for each of the Chapter 15 Debtors.  Should this Court conclude,

however, that the Brazilian RJ Proceeding is not qualified as the foreign main proceeding of IC

Financial or ITI, the Foreign Representative submits that, in the alternative, the Brazilian RJ

Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section

1502(5) for any such Chapter 15 Debtor pursuant to section 1517(b)(2) of the Bankruptcy Code,

and that discretionary relief, namely, the application of a protective stay to the full extent set forth

in section 362, should be granted with respect to such debtors and their U.S.-located property.  11

U.S.C. §§ 1517 (b)(2), 1521 (a).

119.    Courts will recognize a foreign proceeding as a "foreign nonmain proceeding" if

"the debtor has an establishment within the meaning of section 1502 in the foreign country where

the proceeding is pending."  11 U.S.C. § 1517(b)(2).  Unlike COMI, chapter 15 provides no

evidentiary presumption as to whether a debtor has an establishment in a particular jurisdiction.

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 338 (S.D.N.Y. 2008) ("***Bear Sterns II***").  Thus, whether an establishment exists in a particular location is "essentially a factual question," *id.* at 338, and the petitioner bears the burden of proof.  *In re British Am. Ins. Co.*, 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010).  Importantly, section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502 (2).

120.    The Bankruptcy Code does not define "nontransitory economic activity," and, as Judge Gropper has noted, "[t]here is relatively little U.S. authority construing the term 'establishment' as it is used in chapter 15."  *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 84 (Bankr. S.D. N.Y. 2011), *aff'd* 474 B.R. 88 (S.D. N.Y. 2012).  Indeed, "[n]either [c]hapter 15 nor its legislative history explain what it means for a debtor to have 'any place of operations' or to have 'been carrying on a nontransitory economic activity' in a location."  *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1027 (5th Cir. 2010) (citing H. Rep. No. 109-31, Pt. 1, at 107).

121.    Notably, the Bankruptcy Code did not adopt the more restrictive definition of establishment found in the Model Law, which provides that "establishment means any place of operations where the debtor carries out a non-transitory economic activity with human needs and goods and services."  *Constellation I*, 600 B.R. at 271  n.27.

122.    Some U.S. courts have nonetheless interpreted the meaning of "establishment" in the context of the purpose of chapter 15 and the Model Law and by looking to the meaning ascribed to such term by foreign courts.  *See, e.g.*, *Millennium Glob.*, 458 B.R. at 84 n.49; *Bear Stearns I*, 374 B.R. at 131 n.12.  The limited number of U.S. courts to consider the question have determined a debtor has an "establishment" in a place where it has operations, conducts business, or otherwise

54

carries out a nontransitory economic activity in that jurisdiction. *See, e.g.*, *In re Fairfield Sentry*, *Ltd.*, No. 10 Civ.7311 (GBD), 2011 U.S. Dist. LEXIS 105770 at *29-30 n.8 (Bankr. S.D.N.Y. Sep. 15, 2011) (describing an establishment as "a local place of business"); *Bear Stearns I*, 374 B.R. at 131; *In re Creative Financial, Ltd.*, 543 B.R. 498, 520 (Bankr. S.D. N.Y. 2016); *British Am.*, 425 B.R. at 916.  Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *Millennium Glob.*, 458 B.R. at 85; *see In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 784 (Bankr. S.D.N.Y. 2022).  A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," *Creative Fin.*, 543 B.R. at 520; *British Am.*, 425 B.R. at 915 (same), evidenced by, among other things, "engagement of local counsel and commitment of capital to local banks."  *Millennium Glob.*, 458 B.R. at 85.[36]  Indeed, having direct or indirect subsidiaries in a jurisdiction is sufficient. *Constellation II*, 613 B.R. 497, 512-13 (granting nonmain recognition of Brazilian proceeding for holding company based on its ownership of units located and managed by related entities in Brazil).

123.    In fact, this Court has taken guidance from the UK decision, *In re Matter of Videology Limited*, [2018] EWHC 2186 (Ch). *See Constellation*, 600 B.R. 237, 276, (finding

---

[36]    While IC Financial and ITI both have directors located in Brazil that conducted economic activities on behalf of these entities from ICP's headquarters in Brazil, a debtor need not have a physical office or employees located in the jurisdiction where the proposed nonmain foreign proceeding is pending. *See Constellation II*, 613 B.R. 497, 512-13 (finding Arazi has sufficient ties to Brazil based on its ownership of units located and managed by related entities in Brazil, despite having no physical office or employees there, and its corporate parent being based in Luxembourg); *In re SPhinX*, 351 B.R. 103, 107 (granting foreign nonmain recognition of Cayman Island proceeding for Cayman entities despite finding that they "had no employees and no physical offices in the Cayman Islands" ); *In re Matter of Videology Limited*, [2018] EWHC 2186 (Ch) (Snowden, J.) (UK subsidiary of US company found to have establishment in the U.S. (under UK's adaptation of Model Law) though there was no evidence that the UK subsidiary had its own office or employees in the U.S.); *In re Millenium Global Emerging Credit Master Fund Ltd*, 458 B.R. 63, 83-85 (Bankr. S.D.N.Y. 2011). (Chapter 15 debtors, two entities incorporated in Bermuda with no employees or physical offices in Bermuda, qualified for foreign nonmain recognition of their Bermuda liquidation proceedings.).

*Videology* is "instructive" and a "helpful example of a company that falls into the middle category of recognition as a nonmain proceeding"). The *Videology* court applied the UK's adaptation of the Model Law to find that the debtor, a UK-domiciled subsidiary of a U.S. corporate group, had an establishment in the U.S. sufficient for nonmain recognition. [2018] EWHC 2186 (Ch), at ¶ 80. The UK court found the fact that the U.S. parent was managing business relations with the creditors of the UK debtor from the U.S. headquarters to be sufficient economic activity in the U.S.:

> In my judgment, applying these principles, the Company has an "establishment" in the US. The evidence to which I have referred … above shows that the Company has regularly managed its business relations ***with a number of its publishing creditors from the Group's headquarters in Baltimore.*** Those activities are ***clearly economic in nature***, they have been carried out through the human agency of the Company's director and with the ***services of the senior management of [its parent] who are largely based at the Group's headquarters***. They involve the Company's business dealing with third parties who perceive the Company as being associated with the Group's headquarters.

[2018] EWHC 2186 (Ch), at ¶ 80 (emphasis added).

124.     Just like the company in *Videology*, IC Financial and ITI regularly managed their respective business relationships with creditors from the InterCement Group's headquarters in Brazil. These activities included in-person meetings with Noteholders and Debenture Holders conducted by IC Financial's and ITI's directors, respectively. Members of the Ad Hoc Group— such as Cigna, Moneda, and Contrarian—attended meetings with IC Financial's Brazilian directors at the InterCement Group's headquarters, reinforcing the perception that IC Financial is closely associated with the Group's headquarters. Similarly, ITI's Brazilian directors held meetings with the Debenture Holders at ICP's headquarters in Brazil, further establishing the perception that ITI is also closely associated with the Group's headquarters. Under the reasoning of the *Videology* court, both IC Financial and ITI therefore have establishment in Brazil.

125.    In this case, even if the Court were to find that Brazil is not the COMI for IC
Financial or ITI, the Court should still find that they each have an establishment in Brazil for
purposes of chapter 15 recognition.  The Petitioner submits that the foregoing evidence in support
of finding that the COMI of each of the Chapter 15 Debtors is in Brazil also provides sufficient
evidence that each of IC Financial and ITI have a local presence and an impact on the Brazilian
marketplace and therefore maintains an establishment in that jurisdiction.  *See supra* ¶¶ 67-110.

126.    These entities play a critical role in financing Brazilian operations, including
guaranteeing financial arrangements procured in Brazil.  ICP's executives, including board
members of both ITI and IC Financial, make strategic decisions regarding these entities from
Brazil, where key corporate actions for ITI and IC Financial, including all investor relations and
negotiations with creditors.  ITI, for instance, has no officers and only one employee who reports
to ICP officers, with critical support functions for ITI provided by ICP's staff in Brazil.  ITI also
guarantees credit facilities for three Brazilian banks, including Banco do Brasil, which is controlled
by the Brazilian government, further tying it to Brazil's economic framework.

127.    ITI held its meetings with Debenture Holders in Brazil, where it was represented
by its Brazilian Director, Marco Zangari, and maintains Brazilian bank accounts and a taxpayer
identification number to facilitate its operations and minimize currency exchange costs.  Its
primary asset, shares in ICB—the third-largest cement producer in Brazil—are held and registered
in Brazil, further underscoring its presence in the jurisdiction.  ITI has also retained Brazilian legal
advisors.

128.    Similarly, IC Financial, a financing vehicle for the group, operates in close
connection with Brazil.  Half of its board members are ICP and ICB officers based in Brazil, and
Brazilian directors have attended virtually all IC Financial board meetings while located in Brazil.

IC Financial lacks officers or employees of its own; instead, ICP officers and employees based in Brazil provide crucial support in legal, tax, compliance, finance, treasury, and accounting matters. All of IC Financial's investor relations were performed in Brazil.  IC Financial's Noteholders even traveled to Brazil to meet with certain of IC Financial's Brazilian directors and other ICP officers regarding the NY Notes.

129.    Like ITI, IC Financial also maintains Brazilian bank accounts, a Brazilian taxpayer identification number, and retains Brazilian legal advisors.  These connections, along with its role in providing financial support for ICP and its subsidiaries, firmly establish IC Financial's presence in Brazil.

130.    Importantly, recognition of the Brazilian RJ Proceeding as the foreign nonmain proceeding for both IC Financial and ITI serves the purpose of the Model Law.  *In re Mod. Land*, 641 B.R. at 784.  In *Mod. Land*, this Court granted main recognition of a Cayman Scheme that restructured New York law governed debt for a Cayman domiciled debtor.  *Id.* at 786-87.  The court denied nonmain recognition of the Cayman Scheme but granted main recognition.  *Id.* at 785-86.  The Court applied the same standards previously applied in *Constellation I* and *II* and set forth above, but unlike ITI and IC Financial, the Cayman debtor there did not have significant management or activities in Cayman—it only conducted the minimum recording keeping and corporate registration filings there.  *Id.* at 786.

131.    One of the Court's leading reasons for denying nonmain recognition of the Cayman Scheme was that it would be inconsistent with the goals of the Model Law.  *Id.* 785-86. The Court noted that the Guide to Enactment and Interpretation of the Model Law explains that "'the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding'" and clearly supports "the administration of a

restructuring proceeding by a single foreign court." *Id.* (quoting United Nations UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation, 12 (2014)). In that case, the Cayman Scheme sought to restructure the New York governed notes which were not assets located in Cayman and therefore nonmain recognition would not serve the purpose of the Model Law. *Id.*

132.    Here, to the extent the Brazilian RJ Proceeding is not granted main recognition, nonmain recognition of such proceeding for IC Financial and ITI serves the goals of the Model Law. First, the Brazilian Bankruptcy Court has exercised jurisdiction over IC Financial and ITI on a plenary basis. Second, the Brazilian RJ Proceeding will seek to restructure both Brazilian-law governed debt and the NY Notes. The assets that will be used to restructure this indebtedness are largely located in Brazil. IC Financial has intercompany receivables owed by ICP, a Brazilian entity, and ITI's primary asset is its stock in a Brazilian operating company that has a significant impact on the Brazilian economy. Therefore, the Brazilian Bankruptcy Court will oversee and administer a comprehensive restructuring of all of the Chapter 15 Debtors, including IC Financial and ITI. Granting nonmain recognition would support this plenary restructuring.

133.    Regardless of whether the Court finds that the Brazilian RJ Proceeding is a main proceeding or nonmain proceeding with respect to IC Financial and/or ITI, the Petitioner requests that the Court grant discretionary relief with respect to each Chapter 15 Debtor and their U.S.-located property pursuant to section 1521 of the Bankruptcy Code. Specifically, the Petitioner requests that any protective relief that is the subject of the Provisional Relief Motion be extended pursuant to section 1521(a)(6) of the Bankruptcy Code,[37] including the continued application of

---

[37]    Section 1521(a) provides that, upon recognition of a foreign main proceeding or nonmain proceeding and at the request of the foreign representative, a court may grant (with exceptions not here relevant) "any appropriate relief"

the section 362 stay with respect to any such Chapter 15 Debtor and its property within the territorial jurisdiction of the United States.[38]  *See* 11 U.S.C. §§ 1521 (a)(6)-(a)(7); Provisional Relief Mot. ¶ 29.  The Petitioner submits that the foregoing evidence concerning IC Financial or ITI and their integral role within the InterCement Group justifies such discretionary relief, which is critical for the maintenance of the status quo and the preservation of the Chapter 15 Debtors' going-concern value.  *See supra* ¶¶ 67-110.

134.    To exercise its discretionary powers under section 1521, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522 (a) (adopting Article 22 of the Model Law).  Relief under section 1521 will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  H. Rep. No. 109-31, Pt. 1, at 116.  A determination of sufficient protection requires a balancing of the respective parties' interests.  *CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *see In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").[39]

---

necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors, including "extending relief granted under section 1519(a)."  11 U.S.C. § 1521 (a)(6).  Even if this Court does recognize the Brazilian RJ Proceeding as a foreign nonmain proceeding with respect to any of the Chapter 15 Debtors, section 1521 relief is available where "the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding."  11 U.S.C. § 1521 (c).

[38]   Notably, the Petitioner is entitled to the continued application of the protective stay even if the Court were to recognize the Brazilian RJ Proceeding as a foreign nonmain proceeding with respect to any of the Chapter 15 Debtors because "chapter [15] gives the bankruptcy court the ability grant substantially the same types of relief in assistance of foreign nonmain proceedings as main proceedings."  *SPhinX*, 351 B.R. at 116.

[39]   The analysis of whether the relief sought provides sufficient protection requires a balancing of the interests of the debtor and other affected parties to ensure that the relief does not "impinge excessively on any one entity's interests" and that "each entity must receive at least some protection."  *See Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14, 27-28 (4th Cir. 2013) ("The analysis required by § 1522(a) is . . . best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test").  Importantly, courts recognize that interests of the various parties are often

135.     Here, the balance of interests weighs in favor of granting the relief requested.  First,

recognition and the application of the stay will allow for the efficient and orderly administration

of the Chapter 15 Debtors' assets and affairs in a centralized, organized mediation, and potential

restructuring process (*i.e.*, the Brazilian RJ Proceeding), thus protecting the interests of all creditors

and maximizing the value of assets by preventing certain opportunistic creditors from

circumventing the Brazilian RJ Proceeding and commencing actions in the United States at the

expense of the broader process.

136.     Furthermore, interested parties will have the ability to participate in the Brazilian

RJ Proceeding and assert their claims therein along with all similarly situated creditors.  As set

forth in the Brazilian Counsel Declaration, the Brazilian RJ Proceeding provides creditors and

stakeholders with many of the same procedural safeguards present in chapter 11 of the Bankruptcy

Code thereby ensuring a fair and equitable process.  *See* Brazilian Counsel Decl. ¶¶ 38-43, 49-55.

The stay will not bar or otherwise disenfranchise parties from participating in the Brazilian RJ

Proceeding, where each creditor's right to be heard will remain unaffected.  Nor will the requested

stay preclude a creditor that feels unduly burdened by the Court's grant of the requested relief to

seek to lift the stay for "cause."  *See, generally*, 11 U.S.C. § 362 (d).  Instead, the Petitioner merely

seeks to prevent creditors from attempting to end-run the Brazilian RJ Proceeding.  Accordingly,

any prejudice to creditors caused by the discretionary relief requested is extremely limited.

137.     In contrast, failure to grant the discretionary relief requested will cause tremendous

harm to the Chapter 15 Debtors and their stakeholders.  As detailed more fully in the Petitioner's

---

at odds with one another and "protection of one side might well come at some expense to the other."  *Id.* at 27.
A balancing test requires the court to consider "the just treatment of all holders of claims against the bankruptcy
estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the
[foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the
order prescribed by U.S. law."  *In re Artimm, S.r.l.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005).

Provisional Relief Motion, absent relief, the Chapter 15 Debtors are at risk of adverse creditor action that could threaten their ability to continue as a going concern. Provisional Relief Mot. ¶¶ 20-23, 41-45. Accordingly, the balance between the minimal harm to those seeking to bring adverse actions against the Chapter 15 Debtors, and the significant harm to the Chapter 15 Debtors and the orderly administration of the Chapter 15 Debtors' assets that would be caused by such actions, tips in favor of granting the discretionary relief requested.

*       *       *

138.    For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and that the Chapter 15 Debtors are entitled to the relief provided by section 1520 of the Bankruptcy Code. Thus, the Court should enter the Proposed Order attached hereto as <u>Exhibit A</u> recognizing the Brazilian RJ Proceeding as the foreign main proceeding.

## NOTICE

139.    Notice of the Verified Petition has been provided to the parties (the "**Notice Parties**") set forth in <u>Exhibit B</u> attached hereto (the "**Notice List**"). The Petitioner respectfully submits that no other or further notice is required.

## PRIOR REQUEST

140.    The Chapter 15 Debtors have requested this relief in the Previous Chapter 15 Cases.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that the Court (1) grant the Verified Petition and enter the Proposed Order annexed hereto as <u>Exhibit A</u> recognizing the Brazilian RJ Proceeding as the foreign main proceeding for the Chapter 15 Debtors and granting the related relief in connection therewith and (2) grant such other and further relief

as the Court deems just and proper.

Dated: December 9, 2024

New York, New York

Respectfully submitted,

WHITE & CASE LLP

By: */s/ John K. Cunningham*
    John K. Cunningham

**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
John K. Cunningham
Thomas E. MacWright
Ricardo M. Pasianotto
jcunningham@whitecase.com
tmacwright@whitecase.com
ricardo.pasianotto@whitecase.com

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (*pro hac vice* pending)
Amanda Parra Criste (*pro hac vice* pending)
rkebrdle@whitecase.com
aparracriste@whitecase.com

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
(312) 881-5400
Jason N. Zakia (*pro hac vice* pending)
jzakia@whitecase.com

*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

Pursuant to 28 U.S.C. § 1746, I, Antonio Reinaldo Rabelo Filho, declare under penalty of perjury under the laws of the United States of America as follows:

I am the authorized foreign representative of the Chapter 15 Debtors with respect to the Brazilian RJ Proceeding for purposes of the Chapter 15 Cases.  I declare under penalty of perjury that the factual contents of the foregoing Verified Petition as well as the factual contents of each of the attachments and appendices thereto are true and accurate to the best of my knowledge, information, and belief, and I respectfully represent as follows:

I reside at Rua Barão da Torre, 550, Apt. 201, Ipanema, Brazil.  I hold a law degree from the Federal University of Bahia, a post-graduate degree in business law from IBMEC/RJ, and a Master's degree in tax law from Pontifical Catholic University of São Paulo.  I began my career at PWC Brasil, from where I left to work for the Oi Group ("**Oi**") in 2000.  In Oi, I held positions in the financial and legal departments and served on the tax legal board from 2007 to 2017.  Since 2017, I started my own law firm practice.  Additionally, I participated in the Board of Directors of the Main Technical Associations of the Telecommunications Sector.  I am also a member of the National and State Commissions of Tax Law and Judicial Reorganization and Bankruptcy of the Brazilian Bar Association.

In particular, I served as the foreign representative of Oi's chapter 15 proceeding in front of this Court and the judicial reorganization proceeding in front of the United Kingdom court, where I negotiated with various creditors and implemented Oi's restructuring plan internationally in Brazil, USA, Netherlands, and Portugal.  I also acted as the foreign representative of the chapter 15 cases for Americanas S.A. and its affiliates before this court and for Light S.A. before the Bankruptcy Court for the Southern District of Texas.

On December 3, 2024, the Chapter 15 Debtors appointed me as its foreign representative and the foreign representative of the Brazilian RJ Proceeding and authorized me to file the Verified Petition and to act on its behalf in the Chapter 15 Cases. Accordingly, I am fully authorized and take related action as the Foreign Representative.

Unless otherwise indicated, all facts set forth in this Verified Petition are based upon the following: (a) my review of relevant information, data, and documents (including oral information furnished to me by the Chapter 15 Debtors and its legal advisors; (b) information supplied to me by the Chapter 15 Debtors; officers, directors, employees, and professionals; or (c) my analyses of the information I have received on the Chapter 15 Debtors' operations and financial condition. I have also been kept abreast of major discussions with stakeholders, including the Chapter 15 Debtors' primary financial creditors. I am an individual over the age of 18. If I am called to testify, I will do so competently and based on the facts set forth herein.

*[Remainder of Page Left Intentionally Blank]*

Dated: December 9, 2024

Respectfully submitted,

/s/

**Antonio Reinaldo Rabelo Filho**
*as Foreign Representative of the Chapter 15*
*Debtors*