WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
John K. Cunningham
Thomas E. MacWright
Ricardo M. Pasianotto
Ashley R. Chase

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7000
Susheel Kirpalani

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (admitted *pro hac vice*)
Amanda Parra Criste (admitted *pro hac vice*)

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
(312) 881-5400
Jason N. Zakia (admitted *pro hac vice*)

*Attorneys for Antonio Reinaldo Rabelo Filho,*
as Petitioner and Foreign Representative

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 15 |
| | ) | |
| InterCement Brasil S.A., *et al.*,[1] | ) | Case No. 24-12291 (MG) |
| | ) | (Jointly Administered) |
| Debtors in a Foreign Proceeding. | ) | |
| | ) | |

**PETITIONER'S BRIEF ON COMI**
**DETERMINATION AS OF THE DECEMBER 9, 2024 FILING**
**DATE FOR CHAPTER 15 DEBTORS IC FINANCIAL AND ITI**

---

[1]  The debtors in these chapter 15 cases, along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: InterCement Brasil S.A. (01-36–Brazil); InterCement Participações S.A. (01-22–Brazil); InterCement Financial Operations B.V. (3771–Netherlands); and InterCement Trading e Inversiones S.A. (7798–Spain).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND........................................................................................... 4

I.    Relevant Events Before Previous Chapter 15 Petition Date ............................... 4

II.   Relevant Events After Previous Chapter 15 Petition Date ................................. 5

      A.    Commencement of Foreign Proceedings ................................................... 5

      B.    Engagement with Noteholders During the Prior Brazilian Proceedings ... 7

      C.    Continued Negotiations and Challenges During the EJ Proceeding.......... 9

ARGUMENT................................................................................................................ 12

I.    Even if previously in the Netherlands and Spain, COMI has shifted to Brazil .............. 13

      A.    IC Financial.............................................................................................. 16

      B.    ITI .......................................................................................................... 21

II.   Events After the Previous Petition Date Provide Even More Evidence of IC Financial &
      ITI's Establishment in Brazil .................................................................................. 22

CONCLUSION............................................................................................................. 26

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re British Am. Ins. Co. Ltd.*,
  425 B.R. 884 (Bankr. S.D. Fla. 2010) ................................................................. 23, 25

*In re Creative Fin.*,
  543 B.R. 498 (Bankr. S.D.N.Y. 2016) ................................................................. 14, 23

*In re Fairfield Sentry Ltd.*,
  440 B.R. 60 (Bankr. S.D.N.Y.) ................................................................................. 13

*In re Fairfield Sentry, Ltd.*,
  No. 10 Civ. 7311 (GBD), 2011 U.S. Dist. LEXIS 105770 (Bankr. S.D.N.Y. Sep. 15,
  2011) ......................................................................................................................... 23

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
  474 B.R. 88 (S.D. N.Y. 2012) .................................................................................. 23

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
  458 B.R. 63 (Bankr. S.D.N.Y. 2011) ....................................................................... 23

*In re Modern Land (China) Co.*,
  641 B.R. 768 (Bankr. S.D.N.Y. 2022) ................................................ 2, 14, 15, 16, 23

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
  714 F.3d 127 (2d Cir. 2013) ................................................................................ 12, 14

*In re OAS S.A.*,
  533 B.R. 83 (Bankr. S.D.N.Y. 2015) ........................................................................ 16

*In re Ocean Rig UDW Inc.*,
  570 B.R. 687 (Bankr. S.D.N.Y. 2017) ...................................................................... 13

*In re Oi Brasil Holdings Coöperatief U.A.*,
  578 B.R. 169 (Bankr. S.D.N.Y. 2017) ............................................................ 12, 14, 15

*In re Serviços de Petróleo Constellation S.A*,
  613 B.R. 497 (Bankr. S.D.N.Y. 2020) ................................................................. 22, 24

*In re Serviços de Petróleo Constellation S.A.*,
  600 B.R. 237 (Bankr. S.D.N.Y. 2019) ................................................................. 23, 24

*In re Suntech Power Holdings Co.*,
  520 B.R. 399 (Bankr. S.D.N.Y. 2014) ................................................................ 14, 15, 16

## FEDERAL STATUTES

11 U.S.C. § 1502........................................................................................................... 22, 23

11 U.S.C. § 1515........................................................................................................... 1

11 U.S.C. § 1517........................................................................................................... 1, 23

11 U.S.C. § 1520........................................................................................................... 1

11 U.S.C. § 1521........................................................................................................... 1

28 U.S.C. § 1746........................................................................................................... 6, 21

## MISCELLANEOUS

*In re Matter of Videology Limited*,
   [2018] EWHC 2186 (Ch)........................................................................................... 24

Antonio Reinaldo Rabelo Filho ("**Petitioner**" or the "**Foreign Representative**"), the duly-authorized foreign representative in the above-captioned jointly administered chapter 15 cases (the "**Chapter 15 Cases**") of InterCement Brasil S.A. ("**ICB**"), InterCement Participações S.A. ("**ICP**"), InterCement Financial Operations B.V. ("**IC Financial**"), and InterCement Trading e Inversiones S.A. ("**ITI**" and, together with ICB, ICP and IC Financial, the "**Chapter 15 Debtors**") in the *recuperação judicial* proceeding (the "**RJ Proceeding**") commenced by the Chapter 15 Debtors and certain affiliates (the "**RJ Debtors**")[2] on December 3, 2024, before the 1st Bankruptcy and Restructuring Court of São Paulo (the "**Brazilian Bankruptcy Court**"), submits this supplemental brief (the "**Supplemental Brief**") in accordance with the Court's December 16, 2024 order [ECF No. 26] (the "**Status Conference Order**"), and in further support of the *Petitioner's Declaration and Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* [ECF No. 2] (the "**Verified Petition**").[3]

## PRELIMINARY STATEMENT

1.      As this Court correctly noted at the December 16, 2024 status conference in these Chapter 15 Cases, the Court must determine the center of main interest ("**COMI**") for each of the Chapter 15 Debtors as of December 9, 2024 (the "**New Petition Date**")—when these Chapter 15 Cases were filed—before it can grant recognition of the RJ Proceeding.  Although the COMI of the Chapter 15 Debtors as of July 15, 2024 (the "**Previous Petition Date**")—the petition date of the Previous Chapter 15 Cases (as defined below)—was the subject of extensive briefing and a two-day hearing in the Previous Chapter 15 Cases, the new developments that

---

[2]     "**RJ Debtors**" or the "**Company**" include the Chapter 15 Debtors and affiliates InterCement Trading e Inversiones Argentina S.L. ("**ITI Argentina**"), Mover Participações S.A. ("**Mover**"), Sucea Participações S.A. ("**Sucea**"), and Sincro Participações S.A. ("**Sincro**").

[3]     Capitalized terms used but not defined herein have the meanings set forth in the Verified Petition.

occurred during the nearly six months since the Previous Petition Date are now relevant for determining COMI as of the New Petition Date.

2.      The COMI for each of the Chapter 15 Debtors, including IC Financial and ITI, is in Brazil.  While the Chapter 15 Debtors submit that was true under chapter 15 of the Bankruptcy Code as of the Previous Petition Date, the facts as of the New Petition Date leave no doubt that Brazil is the COMI of IC Financial and ITI.  This Court has recognized that a debtor's pre-filing restructuring efforts in a location—such as the negotiation of a restructuring support agreement, the filing of a scheme or arrangement and creditor meetings—are relevant to the determination of its COMI in that location.[4]  Not only can such restructuring efforts inform the reasonable expectations of creditors, but in the case of companies with few operations (such as a financing vehicle), they can form the debtor's primary business activity.[5]  Here, the restructuring efforts for the InterCement Group,[6] including IC Financial and ITI, have been centralized in Brazil.  These efforts include a two-month mediation presided over by a Brazilian mediator, the proposal of a 136-page restructuring plan filed with the Brazilian Bankruptcy Court and signed by 45% of third-party creditors, the provision of confidential information from group employees in Brazil to key creditors, and, most recently, the filing of a plenary RJ proceeding by the RJ Debtors, including the Chapter 15 Debtors.  All creditor actions in Brazil, the U.S., Spain, and the Netherlands have been stayed to allow the RJ Debtors and their creditors to continue negotiating a restructuring plan centered in Brazil.

3.      Given that IC Financial is not an operating company but is a special purpose financing vehicle with no operations whose only remaining purpose is to pay back the NY Notes, its restructuring efforts were its primary business activity as of the New Petition Date.

---

[4]     *In re Modern Land (China) Co.*, 641 B.R. 768, 775-81, 787-88 (Bankr. S.D.N.Y. 2022).

[5]     *See id.* at 789-90.

[6]     "**InterCement Group**" or "**Group**" includes the Chapter 15 Debtors, and affiliates: InterCement Portugal S.A. and ITI Argentina.  ITI Argentina is a RJ Debtor in the RJ Proceeding.  Importantly, all of these entities are subsidiaries of Mover.

Likewise, given ITI is also not an operating company but is an intermediate holding company that guaranteed the debentures issued by ICP and ICB in Brazil, its restructuring activities were also its primary business activity as of the New Petition Date.  Because the vast majority of IC Financial's and ITI's restructuring activities as of the New Petition Date took place in Brazil, their respective COMIs are in Brazil.

4.      This conclusion aligns with the expectations of IC Financial's and ITI's creditors as of the New Petition Date.  The Ad Hoc Group—which holds a majority of the NY Notes— sought and obtained information from the InterCement Group in Brazil, engaged in restructuring discussions with the InterCement Group in Brazil, attended a creditors' meeting in Brazil and actively participated in the Brazilian Meditation and Brazilian EJ Proceedings.[7] The Debenture holders—ITI's largest third-party creditors—similarly participated in the Brazilian Mediation, received confidential information in Brazil, negotiated the EJ Plan, signed and agreed to support the EJ Plan, and attended the creditors' meeting in Brazil at which they were elected to sit on a sales' committee established under the EJ Plan.[8]

5.      When considering the facts previously presented, including the nerve center, creditor expectations, the economic realities of special purpose vehicles, and other relevant circumstances, along with the extensive Brazilian restructuring efforts leading up to the filing of these Chapter 15 Cases, it is clear that the COMI of IC Financial and ITI as of December 9, 2024 is in Brazil.  The Court should therefore recognize the RJ Proceeding as the foreign main proceeding for all of the Chapter 15 Debtors.

6.      Alternatively, the Court should recognize the RJ Proceeding as a foreign non-main proceeding for IC Financial and ITI.  In addition to evidence of non-transitory economic

---

[7]    It is hardly surprising that the Ad Hoc Group has looked to Brazil for its recovery as its members admitted that they expected any restructuring cases for IC Financial would be conducted in Brazil.  *See The Petitioner's and the Ad-Hoc Group's Joint Stipulation of Facts* (Bankr. S.D.N.Y. Nov. 13, 2024) (Docket No. 73) ¶ 6.

[8]    Two of the three Debenture holders signed and supported the EJ Plan, and all three Debenture holders participated in the Sales Committee.  Rabelo Declaration (defined below) ¶ 12.

activity submitted at the November hearing, the extensive restructuring efforts centered in Brazil led by the Brazilian directors of these entities as of the New Petition Date further supports a finding that both entities maintain establishments in Brazil.

## FACTUAL BACKGROUND

I.   **Relevant Events Before Previous Chapter 15 Petition Date**

7.   Starting in 2023, the InterCement Group attempted to restructure its debts through an out-of-court process, including through the sale of non-essential assets.[9]   Ultimately, the InterCement Group determined that the sale of substantially all of the InterCement Group would be the best potential solution to reduce its debt burden.   *Id.*   The InterCement Group hired a Brazilian-based financial advisor, Banco BTG Pactual SA, and, in February 2024, launched a competitive sale process in which it sought binding offers for either the sale of its assets or a strategic partnership.   *Id.*   The process resulted in Companhia Siderúrgica Nacional ("**CSN**") being the front-runner potential acquirer.   *Id.*

8.   While the sale process was ongoing, on June 28, 2024, an ad hoc group (the "**Ad Hoc Group**") of holders (the "**Noteholders**") of unsecured notes issued by IC Financial in the aggregate principal amount of US$750 million (the "**NY Notes**") filed a lawsuit against the obligors of the NY Notes in Brazil seeking discovery in anticipation of a collection action, and on July 9, 2024, one Noteholder, Redwood Master Fund, Ltd. ("**Redwood**") filed a petition in the Amsterdam Court (Private Law Department) (the "**Dutch Court**") seeking appointment of a restructuring expert under the Dutch extrajudicial restructuring scheme (WHOA).   Verified Petition ¶ 26.

9.   To defend against this litigation and other potential creditor actions, certain members of the InterCement Group and its parent entity Mover (the "**Brazilian Applicants**")[10]

---

[9]   *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. November 15, 2024) [Docket No. 78] ("**Rabelo Trial Declaration**").

[10]   The Brazilian Applicants are ICP, ICB, IC Financial, ITI, ITI Argentina, and Mover.

initiated a court-supervised mediation process in Brazil under the Brazilian Bankruptcy Law

(the "**Brazilian Mediation**") and sought injunctive relief from the Brazilian Bankruptcy Court

for a period of 60 days (the "**Mediation Period**"). Verified Petition ¶ 27. The Brazilian

Mediation began on July 15, 2024, when the Special Chamber for Dispute Resolution in

Business Restructuring accepted the Brazilian Applicants' mediation request. *Id.*

II.    **Relevant Events After Previous Chapter 15 Petition Date**

A.    ***Commencement of Foreign Proceedings***

10.    To prevent litigation and enable the Brazilian Applicants to negotiate a

comprehensive restructuring solution with their main financial creditors in Brazil, certain of

the Brazilian Applicants commenced proceedings in the U.S., Netherlands, and Spain.

11.    On July 15, 2024, the Chapter 15 Debtors each filed forms of voluntary petition

and a verified petition in this Court, initiating jointly-administered chapter 15 cases (the

"**Previous Chapter 15 Cases**"). Verified Petition ¶ 27. The Chapter 15 Debtors sought

recognition of the Brazilian Mediation and the subsequent EJ Proceeding as their main or non-

main proceedings under chapter 15 of the Bankruptcy Code. Verified Petition ¶¶ 4, 5, 27, 33.

While recognition of the Brazilian Mediation and the EJ Proceeding was pending, the Chapter

15 Debtors requested and obtained provisional relief to stay creditor actions against them and

their assets within the territorial jurisdiction of the United States.[11] Verified Petition ¶¶ 1, 2,

28, 33.

12.    On July 16, 2024, ITI and ITI Argentina filed a notice (the "**Spanish Notice**")

communicating the opening of negotiations with its main creditors and seeking an initial pre-

insolvency protection period of three months before the Commercial Court No. 2 of Bilbao,

Spain (the "**Spanish Court**"). Rabelo Trial Declaration ¶ 28. On July 24, 2024, the Spanish

Court provided notice of the issuance by the Court Clerk of a decree (*Decreto*) (on July 19,

---

[11]    *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18, 2024) [Docket No. 22].

2024) accepting the Spanish Notice (the "**Spanish Order**").  Rabelo Trial Declaration ¶ 29.
Under Spanish insolvency law, this stayed all creditor enforcement actions against ITI's rights
and assets essential to its business activities for a three-month period, effective July 16, 2024,
the date when the communication was filed with the Spanish Court.  *Id.*

13.    On July 17, 2024, IC Financial responded to the involuntary WHOA petition filed
by Redwood against IC Financial in the Netherlands objecting to the request for appointment
of a restructuring expert and requested a four (4) month cooling-off period under the WHOA
from the Dutch Court.  Verified Petition ¶ 30.  On July 31, 2024, the Dutch Court issued an
order denying the appointment of a restructuring expert and granting IC Financial's request for
a four (4) month cooling-off period expiring on December 1, 2024.  *Id.*  During this period, all
third parties that had received notice of the cooling-off period were prohibited from exercising
any right to recover on their claims against IC Financial, except with the express authorization
of the Dutch Court.  *Id.*  The Dutch Court also appointed Mr. Frederic Verhoeven as an observer
(the "**Observer**") under Section 380 of the WHOA to, among other things, observe and report
in writing on the progress of the restructuring of IC Financial under the WHOA.  *Id.*  The
Observer hired Brazilian counsel, Galdino & Coelho, Pimenta, Takemi, Ayoub Advogados, at
IC Financial's expense, to attend meetings with the InterCement Group and the Ad Hoc
Group's Brazilian counsel and to appear in the Brazilian restructuring proceedings.  Rabelo
Declaration ¶5.[12]  On October 15, 2024, ITI requested a further three-month extension staying
all creditor actions against ITI and ITI Argentina and their assets.  Verified Petition ¶ 29.  The
Spanish Court, through a judicial resolution, determined that the three-month extension had
sufficient creditor support under Spanish law and issued an order extending the stay and
associated protections for an additional three months.  *Id.*  In the extension motion, ITI

---

[12]    Filed contemporaneously with the Supplemental Brief is the Declaration of Antonio Reinaldo Rabelo Filho
Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Brief on COMI Determination as of the December
9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI (the "**Rabelo Declaration**").

informed the Spanish Court that it intended to ask the Spanish Court to recognize ITI's Brazilian proceeding as its foreign main proceeding.

### B.    Engagement with Noteholders During the Prior Brazilian Proceedings

14.    As noted above, the Brazilian Mediation began on the Previous Petition Date and lasted 60 days. Verified Petition ¶ 27. The InterCement Group invited its material financial creditors to participate in the Brazilian Mediation including Banco Bradesco S.A. ("**Bradesco**"), Banco do Brasil S.A. ("**Banco do Brasil**"), Itaú Unibanco S.A. ("**Itaú**"), the Ad Hoc Group, and UMB Bank, N.A., in its capacity as trustee under the NY Notes (the "**Indenture Trustee**"). Verified Petition ¶ 27. The InterCement Group participated in approximately six mediation sessions with the AHG Advisors and four mediation sessions with the Indenture Trustee. Rabelo Trial Declaration ¶ 32. These sessions were presided over by the mediator appointed by the Brazilian Bankruptcy Court, Câmara Especial de Resolução de Conflitos em Reestruturação de Empresas (the "**Brazilian Mediator**"). *Id.*

15.    As part of the Brazilian Mediation, on August 13, 2024, ICP (on behalf of itself and its subsidiaries) entered into non-disclosure agreements (the "**Initial NDAs**") with the Ad Hoc Group's U.S. and Brazilian counsel, Cleary Gottlieb Steen & Hamilton[13] and Padis Mattar Advogados, respectively, as well as Moelis & Company ("**Moelis**"), the Ad Hoc Group's financial advisor (collectively, the "**AHG Advisors**").[14] Rabelo Trial Declaration ¶ 32. The Initial NDAs were executed by ICP on behalf of itself and its affiliates, represented by two of its directors who are also the Brazilian directors of IC Financial. Rabelo Declaration ¶8. Under the Initial NDAs, ICP provided the AHG Advisors with information responsive to their

---

[13]    Francisco L. Cestero, one of the partners working on this matter for Cleary, is based in Brazil. He attended Brazilian Mediation sessions and various diligence calls and meetings with the InterCement Group—many of which were conducted in Portuguese. Moreover, the Moelis and Houlihan Lokey teams working on this matter are similarly based in Brazil. Rabelo Declaration ¶9.

[14]    The Dutch counsel hired by the Ad Hoc Group did not execute non-disclosure agreements or participate in the Brazilian Mediation. Rabelo Declaration ¶10.

extensive diligence requests.  Rabelo Declaration ¶6.  ICP provided the AHG Advisors access to a virtual data room based out of Brazil and made information available pursuant to diligence requests from the AHG Advisors.  Rabelo Trial Declaration ¶ 32-34; JX-280.  Despite having received confidential information and actively participating in the Brazilian Mediation, the AHG Advisors unilaterally terminated the Initial NDAs on August 30, 2024.  *Id*.

16.    Notwithstanding the termination of the Initial NDAs, certain of the Brazilian Applicants (the "**EJ Debtors**")[15] were still able to reach an agreement in principle regarding the terms of a plan of reorganization (the "**EJ Plan**") with a significant part of their largest creditor constituency.  This agreement was reached with Brazilian institutions that hold the InterCement Group's Brazilian law-governed debentures (the "**Debenture Holders**").  Verified Petition ¶ 31.  The EJ Plan was supported by two of three Debenture Holders, Itaú and Bradesco, holding 70.2% of the Debentures.[16]  Rabelo Trial Declaration ¶ 22.

17.    On September 16, 2024, the EJ Debtors filed a motion to convert the Brazilian Mediation into a Brazilian *recuperação extrajudicial* proceeding (the "**EJ Proceeding**") by filing a petition for *recuperação extrajudicial* (the "**EJ Petition**"), together with the EJ Plan, with the Brazilian Bankruptcy Court.  Verified Petition ¶ 32.  The EJ Petition was part of the same proceeding as the Brazilian Mediation before the same Brazilian Bankruptcy Court.  On the same day, the Brazilian Bankruptcy Court entered an order accepting the EJ Petition.  *Id*.

18.    The EJ Plan was a detailed 132-page document, which outlined a full restructuring plan of the InterCement Group's financial claims.[17]  Presented in both Portuguese

---

[15]    The EJ Debtors are ICP, ICB, IC Financial, ITI and ITI Argentina, which correspond to all Brazilian Applicants except Mover.  Mover consented to the EJ Plan but was not a debtor because Mover was not an obligor with respect to any of the claims affected by the EJ Plan.

[16]    Banco do Brasil—an entity controlled by the Brazilian government—is the third and final Debenture Holder.  While it did not expressly sign onto the EJ Plan it engaged in negotiations and held several meetings with the InterCement Group in Brazil to discuss the EJ Plan.  Rabelo Declaration ¶12; *see also* Verified Petition ¶ 17.

[17]    *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. September 17, 2024) [Docket No. 30], Ex. B.

and English, the EJ Plan was premised on the sale of the InterCement Group to CSN and the consolidation of all of the EJ Debtors (including IC Financial and ITI) under Brazilian law.[18]

### C.    Continued Negotiations and Challenges During the EJ Proceeding

19.    On September 25, 2024, members of the Ad Hoc Group (the "**Appealing Creditors**") claiming to represent 59% of the principal amount of the NY Notes appealed the order accepting the EJ Petition. Verified Petition ¶ 34. The Appealing Creditors requested, among other things, that the court reconsider the inclusion of IC Financial and ITI in the EJ Proceeding. *Id.* The Appealing Creditors argued that the Brazilian Bankruptcy Court did not have jurisdiction with respect to IC Financial and ITI on the basis that each of their centers of main interests are not in Brazil, but rather in the Netherlands and Spain, respectively. *Id.*

20.    Despite pursuing an appeal that sought to disrupt the Brazilian restructuring process, the Ad Hoc Group continued to engage in negotiations with the InterCement Group, and new non-disclosure agreements (the "**AHG Advisor NDAs**") were executed on September 30, 2024 with Cleary, Padis Mattar, and Moelis. Rabelo Trial Declaration ¶ 33. Further NDAs were also executed with the Ad Hoc Group's Brazilian tax and regulatory counsels on October 25, 2024 and October 28, 2024. *Id.* Indeed, during the EJ Proceeding, the AHG Advisors actively participated in seven calls with the InterCement Group's legal and financial advisors, attended a creditors' meeting in Brazil, and engaged in a diligence meeting with the InterCement Group in Brazil to discuss contingent liabilities.[19] *Id.* The InterCement Group also granted the AHG Advisors access to substantial additional information in a virtual data room to facilitate their extensive additional diligence requests.[20]

---

[18]    *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. September 17, 2024) [Docket No. 30], Ex. B; Verified Petition ¶ 2.

[19]    The Ad Hoc Group's Dutch counsel did not participate in these calls with the InterCement Group or attend the creditors' meeting in Brazil under the EJ Plan.

[20]    The InterCement Group populated the virtual data room pursuant to the AHG Advisors' own diligence requests. *See* Rabelo Trial Declaration ¶ 33.

21.    On October 4, 2024, the Observer appointed in the WHOA proceeding submitted a report (the "**Oct. Observer Report**")[21] to the Dutch Court acknowledging that the WHOA proceedings were part of the broader restructuring of the entire InterCement Group taking place in Brazil.[22]  The Observer emphasized that IC Financial generated no independent income and that its ability to repay its debts was entirely dependent on the restructuring efforts in Brazil.[23]

22.    On October 24, 2024, the Brazilian Bankruptcy Court denied the Appealing Creditors' request (the "**Appeal Order**").  Verified Petition ¶ 34.  In the Appeal Order, the Brazilian Bankruptcy Court found that the standard under Brazilian law to establish jurisdiction for insolvency proceedings is the location of the debtor's principal place of business ("*principal estabelecimento*"), which is different, but similar to, the concept of COMI.  Considering the facts of the case, the Brazilian Bankruptcy Court confirmed its jurisdiction over IC Financial and ITI on the basis of their principal place of business and COMI being in Brazil.[24]  On November 22, 2024, the Ad Hoc Group filed an interlocutory appeal with the São Paulo Court of Justice but did not seek expedited relief or to enjoin the Appeal Order.  Verified Petition ¶ 34.

23.    Following the denial of their appeal; in Brazil, members of the Ad Hoc Group intensified their efforts to disrupt the restructuring process by returning to the Netherlands.  Verified Petition ¶ 35.  On November 1, 2024, Redwood filed a petition to lift the cooling-off period under the WHOA, while the Ad Hoc Group filed a separate petition for IC Financial's bankruptcy declaration.  *Id*.  IC Financial opposed both motions, asserting that the WHOA's cooling-off period automatically suspended the bankruptcy petition.  *Id.*  IC Financial also

---

[21]    Observer Report is attached hereto as <u>Exhibit A</u>.  The Observer also submitted a report ("**Nov. Observer Report**") on November 19, 2024, which is attached hereto as <u>Exhibit B</u>.

[22]    Oct. Observer Report §§ 2.3., 5.; *see also* Nov. Observer Report §§ 3., 5.

[23]    Oct. Observer Report, Annex 1 §§ 1.2.3., 5.1.1.; *see also* Nov. Observer Report, Annex 1 §§ 1.2.3., 5.1.1.

[24]    *In re InterCement Brasil S.A.,* Case No. 24-11226 (MG) (Bankr. S.D.N.Y. November 15, 2024) [Docket No. 76] ("**Laquimia Trial Declaration**"), ¶13.

requested an extension of the cooling-off period that was set to expire on December 1, 2024. *Id.* At a hearing on November 21, 2024, the Dutch Court considered these matters. *Id.* Although reaffirming its decision that the COMI of IC Financial was in the Netherlands under EU Law as of the commencement of the WHOA proceedings, the Dutch Court also recognized that the substantive restructuring negotiations were centered in Brazil. Verified Petition, Ex. F, ¶¶ 7.4., 7.8. On December 5, 2024, the Dutch Court entered an order extending the Observer's appointment and the WHOA cooling-off period until January 31, 2025. Verified Petition ¶ 35. This extension was granted to allow the parties to finalize a restructuring in Brazil, which would then be reflected in a WHOA plan for IC Financial. Verified Petition, Ex. F, ¶¶ 7.4.-7.12.

24.    Despite the Ad Hoc Group's efforts to disrupt the EJ Proceeding, on November 14, 2024, Brazilian counsel for the Brazilian Debtors and Mover reached out to the Ad Hoc Group's Brazilian advisors, inviting them to review the purchase and sale agreement (the "**SPA**") with CSN, which was in Portuguese and governed by Brazilian law.[25] Rabelo Trial Declaration ¶ 34. Mover explained that, although the EJ Plan designated the Sale Committee as the exclusive body to analyze the SPA, Mover, acting in good faith and in a spirit of collaboration, was offering the SPA to the AHG Advisors to address their questions and benefit from their input. *Id.* The AHG Advisors subsequently reviewed the SPA in a confidential virtual data room.

25.    Due to a number of circumstances, including the complexity of the negotiations and the litigation brought by the Ad Hoc Group, the EJ Debtors concluded that neither a sale agreement with CSN nor the requisite creditor support for the EJ Plan could be obtained before the deadline required for approval of the EJ Plan under the Brazilian Bankruptcy Law. Verified Petition ¶ 36.

---

[25]    On this date, Mover's M&A counsel extended the same invitation to the Debenture Holders and the Observer.

26.    On December 3, 2024, the RJ Debtors filed a petition with the Brazilian Bankruptcy Court to initiate the RJ Proceeding and requested a further stay of creditor actions from the Brazilian Bankruptcy Court.  Verified Petition ¶¶ 3, 37.  The Brazilian Bankruptcy Court accepted the RJ Proceeding and granted the stay on December 5, 2024 (the "**RJ Acceptance Order**").  Verified Petition ¶ 37.  The RJ Acceptance Order reaffirmed the Brazilian Bankruptcy Court's Acceptance Order and determined that the Brazilian Bankruptcy Court had jurisdiction over IC Financial, ITI, and all other RJ Debtors, referring to the same conclusions set out in the Appeal Order.  *Id.*

27.    Throughout this process, ICP publicly informed its stakeholders of each of the restructuring efforts centered in Brazil.  ICP issued press releases, each which are available on its website, and issued from São Paulo, Brazil announcing the commencement of the Brazilian Mediation, the EJ Proceeding, and the RJ Proceeding.

## ARGUMENT

28.    The Second Circuit has held that a foreign debtor's COMI is determined at or around the time the chapter 15 petition is filed.  *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) ("[A] debtor's COMI should be determined based on its activities at or around the time the Chapter 15 petition is filed."); *Modern Land,* 641 at 781-82 (same), *see also In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 207 (Bankr. S.D.N.Y. 2017) (same).  Thus, the relevant petition date for these Chapter 15 Cases is December 9, 2024.

29.    The statutory presumption is that the COMI of both ICP and ICB is in Brazil.  Verified Petition ¶¶ 65-66.  No creditor disputes this presumption, nor has any creditor presented evidence to challenge it.  *Id.*  Both entities have their registered offices in Brazil, and no facts suggest a different COMI.  *Id.*  Indeed, the Court ruled in the Previous Chapter 15

Cases—and the parties agree—that the COMI for these two entities was in Brazil, and a fresh examination as of the New Petition Date does not alter that conclusion.[26]

30.    The Chapter 15 Debtors further submit that the COMIs of IC Financial and ITI under chapter 15 of the Bankruptcy Code have also always been in Brazil.  The factors relevant to these entities' COMIs were briefed extensively as of the Previous Petition Date, and several COMI factors, such as the location of IC Financial and ITI's nerve center, management, primary assets, and creditors, have remained largely unchanged through the New Petition Date. But to the extent that the Court had been inclined to find that the COMIs for IC Financial and ITI had historically been in the Netherlands and Spain, the subsequent restructuring activities conducted by both entities since the Previous Petition Date—including the Brazilian Mediation, EJ Proceeding, and RJ Proceeding—support finding a shift in COMI to Brazil as of the New Petition Date.  Regardless of historic considerations, IC Financial's and ITI's material restructuring actions in the Brazilian Mediation, EJ Proceeding, and RJ Proceeding clearly demonstrate that their COMIs were in Brazil as of the New Petition Date.[27]

I.    **Even if previously in the Netherlands and Spain, COMI has shifted to Brazil**

31.    The Bankruptcy Code does not define COMI, and the Second Circuit has recognized that "[t]he absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts

---

[26]    *See In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. November 21, 2024) [ECF No. 94] ("**Hearing Tr.**"), 9:13-10:17; 121:20-122:2.

[27]    To the extent that a debtor's COMI has shifted prior to filing its chapter 15 petition, courts may engage in a more "holistic analysis" to ensure that the debtor has not manipulated COMI in bad faith.  *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 706-07 (Bankr. S.D.N.Y. 2017) (finding no bad faith where COMI was shifted from RMI to the Cayman Islands for the purpose of facilitating a value-maximizing restructuring of the debtor's financial debt); *see also In re Fairfield Sentry Ltd.*, 440 B.R. 60, 66 (Bankr. S.D.N.Y.) (identifying activities that may constitute an "opportunistic shift to establish COMI," including "insider exploitation, untoward manipulation, [and] overt thwarting of third party expectations.").  Here, no overt thwarting of third-party expectations, manipulation, exploitation, or other forms of bad faith can be said to have occurred where the Ad Hoc Group members have admitted they always expected the COMI of IC Financial to be in Brazil and where the majority of ITI's third-party creditors signed and supported the EJ Plan.

presented, without prescription or limitation." *Fairfield Sentry*, 714 F.3d at 138 ("there is no limited list of factors a court may consider in its COMI analysis).

32.     Pre-filing restructuring efforts can be a critical factor in determining COMI for a debtor, as they are indicative of creditor expectations as of the petition date and, in cases involving entities with limited operations, may constitute the debtor's "primary business activity." *Modern Land*, 641 B.R. 768, 789-90 (recognizing COMI in the Cayman Islands where substantial pre-filing restructuring activities of a holding company, including negotiating a restructuring support agreement, creditor meetings, and filing a scheme of arrangement, were conducted in the Cayman Islands); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416-17 (Bankr. S.D.N.Y. 2014) (finding COMI in the Cayman Islands based on pre-filing restructuring efforts, including execution of a restructuring framework agreement and filing of a winding-up petition in the Cayman Court).

33.     Activities undertaken by foreign liquidators, administrators, representatives, or debtors-in-possession, are highly relevant in determining whether a debtor's COMI has shifted. *See Fairfield Sentry*, 714 F.3d at 137 (directing examination of a debtor's COMI at the time the Chapter 15 petition is filed rather than the earlier date when the foreign insolvency proceeding was filed, and holding that "any relevant activities, including liquidation activities and administrative functions, may be considered"). Where a party administering the debtor or the debtor in possession "has engaged in significant pre-U.S. filing work to operate (or even liquidate) the foreign debtor in the jurisdiction where the foreign insolvency proceeding was commenced (even if in a letterbox jurisdiction), the COMI can be found to have shifted from the foreign debtor's original principal place of business to the new locale." *Oi Brasil Holdings*, 578 B.R. at 222 (citing *In re Creative Fin.* 543 B.R. 498, 517 (Bankr. S.D.N.Y. 2016)); *see, e.g.*, *Modern Land*, 641 B.R. at 778-81, 789-90 (recognizing COMI in the Cayman Islands where substantial pre-filing restructuring activities were conducted by the debtor, including

negotiating a restructuring support agreement and holding creditor meetings); *Suntech*, 520

B.R. at 416-17 (finding COMI in the Cayman Islands based on significant restructuring

activities conducted there by a joint provisional liquidator).

34.     In *Modern Land*, this Court granted foreign main recognition to a Cayman Islands

proceeding for a holding company conducting most of its business in China.  641 B.R. at 793.

Two critical factors underpinned that decision.  First, creditor expectations aligned with the

Cayman Islands as the debtor's COMI as evidenced by significant pre-filing restructuring

activities, including the negotiation of a restructuring support agreement, the filing of a scheme

of arrangement, and creditor meetings held in the Cayman Islands.  *Id*. at 778-79.  Second, the

court emphasized the "ongoing restructuring itself" as "[a]nother factor supporting COMI in

the Cayman Islands."  *Id*. at 789.  The court found that at "the time of the filing of the chapter

15 petition, the restructuring efforts were the Debtor's primary business activity . . . [and] the

vast majority of [such] [r]estructuring activities took place in the Caymans."  *Id*. at 790; *see

also In re Oi Brasil Holdings*, 578 B.R. at 222-23 ("In circumstances involving debtors without

significant operations in a jurisdiction, a foreign representative's work to operate or liquidate

a foreign debtor provides a basis for U.S. recognition of letterbox jurisdiction insolvency

proceedings—so long as the estate fiduciaries in those jurisdictions do enough work.").

35.     Similarly, in *Suntech*, the debtor's presumptive COMI was the Cayman Islands,

where it was incorporated, but its actual COMI at the start of the scheme of arrangement was

in China, where the debtor's management and principal executive offices were located.  520

B.R. at 415-416.  The court found that the debtor's COMI had shifted to the Cayman Islands

by the time of the chapter 15 filing, due to restructuring activities conducted since the filing of

the scheme.  *Id.* at 416-19.  Key to this finding was the appointment of provisional liquidators

by the Cayman court, who exercised substantial control over the debtor's affairs, including

managing assets, meeting with employees and creditors, opening Cayman bank accounts, and

filing claims.  *Id.*  This active involvement established COMI in the Cayman Islands at the chapter 15 filing date, and the court found no evidence of bad-faith COMI manipulation.  *Id.* at 418-19.  While the presence of provisional liquidators provided a clear basis for COMI finding in *Suntech*, the absence of court-appointed fiduciaries[28] does not preclude a finding of COMI in a jurisdiction where restructuring activities by a debtor in possession are respected as they would in the U.S.  *See Modern Land*, 641 B.R. at 783.

36.    In the roughly six months since the Previous Petition Date, additional developments have occurred that support a finding that Brazil is the COMI for IC Financial and ITI as of the New Petition Date, and there is no evidence of COMI manipulation.

### A.    IC Financial

37.    Like in *Modern Land*, IC Financial's primary business activity as of the New Petition Date was its restructuring efforts.  As a special purpose financing vehicle with no operations, its sole remaining activity was to repay the NY Notes—a process it has been actively pursuing through the three Brazilian restructuring proceedings.  *Modern Land*, 641 B.R. at 789-90; *In re OAS S.A.*, 533 B.R. 83, 101 (Bankr. S.D.N.Y. 2015) (finding COMI in Brazil for an Austrian special purpose financing vehicle debtor that had issued NY notes based on the economic realities of that debtor and observing that it "had no other business except to pay [the notes] off.  This was the very business it and the other Brazilian Debtors were engaged in through the Brazilian Bankruptcy Proceedings.").

38.    IC Financials' restructuring activities as of the New Petition Date were primarily in Brazil.  As a debtor in the Brazilian Mediation, IC Financial actively engaged with its financial creditors, participating in approximately six mediation sessions with the AHG

---

[28]    While the Dutch Court appointed the Observer to, among other things, supervise the formation of a restructuring plan for IC Financial and provide written progress reports to the Dutch Court, the Observer was not granted any control over IC Financial or its activities.  *See In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. November 15, 2024) [Docket No. 80], ¶ 7.

Advisors and four sessions with the Indenture Trustee, all under the direction of the Brazilian Mediator based in Brazil.  Rabelo Trial Declaration ¶ 32.  In furtherance of the Brazilian Mediation process, IC Financial sought and obtained protective relief from the Brazilian Bankruptcy Court.[29]

39.   After the Brazilian Mediation expired, IC Financial commenced the EJ Proceeding and signed the EJ Plan.  The EJ Plan was a comprehensive 136-page restructuring plan (presented in both Portuguese and English) that would have restructured the NY Notes and IC Financial's intercompany claims owed to ICP.  The EJ Plan was filed with the Brazilian Bankruptcy Court and made available to its creditors.  IC Financial and the Ad Hoc Group filed various pleadings with the Brazilian Bankruptcy Court regarding the EJ Plan.  For example, the parties litigated whether substantive consolidation of IC Financial and the other EJ Debtors was permissible, which the Brazilian Bankruptcy Court ruled it was.  Laquimia Trial Declaration ¶¶ 9, 12, 13.  Similarly, the Ad Hoc Group challenged the Brazilian Bankruptcy Court's jurisdiction to preside over the EJ Proceeding with respect to IC Financial and ITI, but again that challenge was unsuccessful.  Laquimia Trial Declaration ¶¶ 12-13.

40.   Throughout the Brazilian Mediation and the EJ Proceeding, ICP, acting on behalf of IC Financial and the InterCement Group, executed NDAs and provided confidential information to multiple parties: (i) three Brazilian law firms retained by the Ad Hoc Group, (ii) the Moelis team based in Brazil, and (iii) Cleary, with attorneys in New York and Brazil.  Rabelo Trial Declaration ¶¶ 32-34.  ICP's CFO, Marco Zangari, and legal director, Luiz Klecz, both Brazilian directors of IC Financial, signed the NDAs.  Rabelo Declaration ¶ 8.  The Ad Hoc Group submitted extensive diligence requests to the InterCement Group's advisors in Brazil, and ICP employees in Brazil located and uploaded documents to a dataroom, including information about contingent tax and antitrust claims, projections, bids, the draft purchase and

---

[29]   Laquimia Trial Declaration, ¶¶ 7-8.

sale agreement with CSN, and anticipated recoveries under the proposed transaction.  Rabelo

Trial Declaration ¶¶ 32-34; JX-280.  IC Financial's Brazilian advisors and Brazilian directors

(Marco Zangari and Luis Klecz) also met with the Ad Hoc Group's Brazilian counsel to discuss

the InterCement Group's views on various Brazilian contingent claims that could dilute

recoveries on the NY Notes.  Rabelo Trial Declaration ¶¶ 32-34; Rabelo Declaration ¶11.

41.    By comparison, virtually no restructuring activities involving IC Financial have

occurred in the Netherlands.  The Ad Hoc Group's Dutch counsel has refused to sign an NDA[30]

and, as a result, has not received access to any of the confidential information of IC Financial

or the rest of the InterCement Group that was shared with the AHG Advisors under such NDAs,

and has not participated in any of the calls or meetings between IC Financial and the Ad Hoc

Group's Brazilian and U.S. advisors where such information was discussed.  In their arguments

to the Dutch Court, the Ad Hoc Group's Dutch counsel has consistently represented IC

Financial has not entered into discussions with its creditors under the Dutch WHOA proceeding

and that the meetings held between the InterCement Group's advisors and the non-Dutch

advisors to the Ad Hoc Group are "*irrelevant*".[31]  Both the Dutch Court and the Dutch Observer

also have recognized on multiple occasions that the substantive discussions with the Ad Hoc

Group Advisors over a comprehensive restructuring plan for IC Financial have taken place in

Brazil.  Verified Petition, Ex. F, § 7.4.; Oct. Observer Report §§ 3., 5.; Nov. Observer Report

§ 3., 5.

42.    IC Financial's restructuring activities aligned with its creditors' expectations.

The Ad Hoc Group—whose members admitted that they always expected IC Financial's main

---

[30]    IC Financial and the InterCement Group has offered for the Ad Hoc Group's Dutch counsel to execute the
same advisor NDA executed by their Brazilian and U.S. counsel on multiple occasions.

[31]    *In re InterCement Brasil S.A.*, Case No. 24-12291 (MG) (Bankr. S.D.N.Y. Dec. 9 , 2024) [Docket No. 2], Ex.
F, § 2.2.

restructuring proceeding to occur in Brazil[32]—participated in the Brazilian Mediation and EJ Proceeding. The Ad Hoc Group availed itself of the Brazilian courts, including by appearing through its Brazilian counsel, seeking reconsideration of judicial decisions and appealing the Brazilian Bankruptcy Court order accepting the EJ Proceeding. Rabelo Trial Declaration ¶ 23; Verified Petition ¶ 34. In addition, the Ad Hoc Group, through its Brazilian counsel, also attended an in-person creditors' meeting held in Brazil and made statements on the record of the meeting. Rabelo Trial Declaration ¶ 33. And the Ad Hoc Advisors received extensive information regarding IC Financial from the InterCement Group in Brazil, including through diligence calls and meetings. Notably, prior to the commencement of the Brazilian Mediation, the Ad Hoc Group filed a lawsuit against the obligors of the NY Notes in Brazil, seeking discovery in anticipation of a collection action. Verified Petition ¶ 26. While participating in the Brazilian Mediation and EJ Proceeding, the Ad Hoc Group continued to prosecute the discovery action, which the court ultimately dismissed. Rabelo Declaration ¶3. The Ad Hoc Group's actions demonstrate they are looking to Brazil for their recovery. See *Oi Brasil Holdings*, 578 at 228. ("[a] review of that evidence confirms that a reasonable creditor would have looked to Brazil for their recovery at the time of the Prior Recognition Hearing and would still do so now."

43.    The expectations of IC Financial's creditors were further informed by public releases regarding its restructuring in Brazil. Between July 15, 2024 and December 9, 2024, ICP issued four press releases on its website to notify stakeholders that IC Financial had filed the Brazilian Mediation, EJ Proceeding, and RJ Proceeding.[33] These press releases, issued

---

[32]    *The Petitioner's and the Ad-Hoc Group's Joint Stipulation of Facts*, Case No. 24-11226 (MG), Docket No. 72 ¶ 6 (Bankr. S.D.N.Y. Nov. 13, 2024).

[33]    Attached hereto as Exhibit C is the July 15, 2024, press release regarding the Brazilian Mediation; Exhibit D contains the September 16, 2024, press release regarding the EJ Proceeding; Exhibit E contains the December 3, 2024, press release regarding the RJ Proceeding; and Exhibit F contains the December 5, 2024, press release regarding the RJ Acceptance Order.

from São Paulo on behalf of the InterCement Group, underscore the centralization of restructuring activities in Brazil and that IC Financial's creditors were duly informed.

44.    The Dutch Court also recognized that restructuring actions for IC Financial have primarily occurred in Brazil.  The Dutch Court's decision extending the stay in the WHOA proceeding  recognized that IC Financial had at that point filed the EJ Plan, that any WHOA plan submitted by IC Financial would mirror the scope of the EJ Plan once finalized, that the Ad Hoc Group (through its advisors) were involved in the EJ Plan in Brazil or at least had access to certain information in that context and that the extension of the cooling off period would allow parties to continue negotiations with respect to the InterCement Group's restructuring in Brazil.[34]  The Observer appointed by the Dutch Court is performing a role that is limited to supervising the formulation of a plan and observing discussions with creditors.  To perform this role, the Observer appropriately hired Brazilian counsel (because that was the center of activity), at IC Financial's cost, who attended meetings and calls in Brazil and appeared in the Brazilian Mediation and Brazilian EJ Proceeding.[35]  The Observer received weekly updates from IC Financial that included updates from its Brazilian counsel regarding the EJ Proceeding, discussions and diligence in Brazil.  Thus, the majority of IC Financial's restructuring efforts have occurred in Brazil, leaving no doubt that its COMI is in Brazil.

45.    Finally, COMI under U.S. and EU law are different concepts that may lead to different results.[36]  Not only are the standards different, the relevant dates for determination for this Court and the Dutch Court are also different.  As explained above, this Court has already

---

[34]    Verified Petition, Ex. F, § 7.4.  ("In the court's view, it has become sufficiently plausible that significant progress has been made in reaching an agreement. It is true that, strictly speaking, no WHOA agreement has been offered, but InterCement Netherlands, as a (co-) EJ applicant in Brazil, has presented a (draft) EJ Plan. It is the intention of İnterCement Nederland that the WHOA agreement will be a mirror agreement of the EJ Plan.")

[35]    Rabelo Declaration ¶5.

[36]    *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. Nov. 13, 2024) [Docket No. 75], ¶¶ 9-14.

stated that it will make its determination of COMI in these Chapter 15 Cases as of the New Petition Date (December 9, 2024) consistent with Second Circuit precedent. Whereas, as a matter of EU law, the only relevant date for the determination of COMI (as defined by EU law) of a particular entity in connection with a WHOA proceeding is the date when such proceeding was commenced. Haentjens Declaration ¶¶ 7-8.[37] As recognized by the Ad Hoc Group's expert witness, under EU law a COMI determination to establish jurisdiction under the EIR remains in effect for the duration of the entire proceeding, and therefore any subsequent shift in COMI would not modify the court's prior ruling. Haentjens Declaration ¶ 6.[38]

### B.      ITI

46.      Like IC Financial, ITI's primary business activity as of the New Petition Date was its restructuring activities. ITI is an intermediate holding company whose primary asset is its equity interests in ICB in Brazil. ICB guaranteed the Debentures issued by ICB and ICP, and its business activities as of the New Petition Date were primarily to restructure such obligations, as well as its substantial intercompany indebtedness.

47.      ITI's restructuring activities as of the New Petition Date primarily occurred in Brazil. Like IC Financial, ITI participated as a debtor in the Brazilian Mediation, the EJ Proceeding and RJ Proceeding. The restructuring of ITI's debts in Brazil was also consistent with the expectations of ITI's creditors. All of the Debenture Holders (who are Brazilian financial institutions) participated in the Brazilian Mediation, the EJ Proceeding, and the RJ Proceeding. Verified Petition ¶ 31. These Debenture Holders actively participated in the Brazilian Mediation and attended sessions presided over by the Brazilian Mediator. Verified

---

[37] Filed with the Supplemental Brief is the Declaration of Professor Dr. Matthias Haentjens Pursuant to 28 U.S.C. § 1746 in Support of the Petitioner's Brief on COMI Determination as of the December 9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI (the "**Haentjens Declaration**").

[38] Although not relevant to the determination of the Dutch Court's jurisdiction, in keeping with a procedural requirement, IC Financial informed the Dutch Court that its COMI—as applicable under Dutch law—had not changed in the three months prior to November 18, 2024. Haentjens Declaration ¶ 10.

Petition ¶¶ 27, 31. Two of the three Debenture Holders signed onto the EJ Plan, while the third Debenture Holder—an entity controlled by the Brazilian government—engaged in negotiations and held several meetings with the InterCement Group in Brazil to discuss the EJ Plan. Rabelo Trial Declaration ¶¶ 13, 22; Verified Petition ¶ 27. All of ITI's meetings with the Debenture holders or their advisors regarding the restructuring took place in Brazil. Verified Petition ¶ 103. During a creditors' meeting in Brazil, all three Debenture Holders appeared and were appointed to a committee established under the EJ Plan to oversee the sales process and monitor negotiations with CSN. Rabelo Declaration ¶12. All creditors of ITI were notified of the Brazilian Mediation, EJ Proceeding, and the RJ Proceeding through press releases issued by ICP from São Paulo on behalf of the InterCement Group.[39] Finally, two of the three Debenture Holders consented to an extension of the stay in Spain, and ITI explained that it intended to file a motion to recognize its Brazilian restructuring in Spain as ITI's foreign main proceeding.

## II.    Events After the Previous Petition Date Provide Even More Evidence of IC Financial & ITI's Establishment in Brazil

48.    Should this Court conclude that the RJ Proceeding is not the foreign main proceeding of IC Financial or ITI, the RJ Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) of the Bankruptcy Code. Upon recognition of the RJ Proceeding as a foreign non-main proceeding, the Court has the discretion (which it should exercise here) to grant the same relief as is available upon a foreign main recognition determination. *See In re Serviços de Petróleo Constellation S.A*, 613 B.R. 497, 513 (Bankr. S.D.N.Y. 2020) ("**Constellation II**") (holding that the relief "is not limited by the fact that [the Brazilian RJ Proceeding] is recognized as a foreign nonmain proceeding.").

49.    Courts recognize a proceeding as a "foreign nonmain proceeding" if "the debtor has an establishment within the meaning of section 1502 in the foreign country where the

---

[39]    *See* Exhibits C-D attached hereto.

proceeding is pending." 11 U.S.C. § 1517(b)(2). Section 1502(2) of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). The Bankruptcy Code does not define "nontransitory economic activity," and "[t]here is relatively little U.S. authority construing the term 'establishment' as it is used in chapter 15." *In re Millennium Glob. Emerging Credit Master Fund Ltd.,* 458 B.R. 63, 84 (Bankr. S.D.N.Y. 2011), *aff'd* 474 B.R. 88 (S.D. N.Y. 2012). The Bankruptcy Code did not adopt the Model Law's more restrictive definition, which provides that "establishment means any place of operations where the debtor carries out a non-transitory economic activity with human needs and goods and services." *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 271 n.27 (Bankr. S.D.N.Y. 2019) ("**Constellation I**").

50.    The limited number of U.S. courts to consider the question have determined a debtor has an "establishment" in a place where it has operations, conducts business, or otherwise carries out a nontransitory economic activity in that jurisdiction. *See, e.g., In re Fairfield Sentry, Ltd.*, No. 10 Civ.7311 (GBD), 2011 U.S. Dist. LEXIS 105770 at *29-30 n.8 (Bankr. S.D.N.Y. Sep. 15, 2011) (describing an establishment as "a local place of business"); *Creative Fin.*, 543 B.R. at 520; *In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 916 (Bankr. S.D. Fla. 2010). Several factors "contribute to identifying an establishment: the economic impact of the debtor's operations on the market, the maintenance of a 'minimum level of organization' for a period of time, and the objective appearance to creditors whether the debtor has a local presence." *Millennium Glob.*, 458 B.R. at 85; *see Modern Land*, 641 B.R. at 784. A showing of economic impact of the debtor's activities on the local market involves a "showing of a local effect on the marketplace," *Creative Fin.*, 543 B.R. at 520; *British Am.*, 425 B.R. at 915 (same), evidenced by, among other things, "engagement of local counsel and commitment of capital to local banks." *Millennium Glob.*, 458 B.R. at 85. Having subsidiaries in a jurisdiction may be

sufficient. *Constellation II*, 613 B.R. at 512-13 (granting nonmain recognition of Brazilian proceeding for holding company based on its ownership of units located and managed by related entities in Brazil).

51.     This Court has also taken guidance from the UK decision, *In re Matter of Videology Limited*, [2018] EWHC 2186 (Ch).  *See Constellation I*, 600 B.R. at 276.  The *Videology* court applied the UK's adaptation of the Model Law to find that the debtor, a UK-domiciled subsidiary of a U.S. corporate group, had an establishment in the U.S. sufficient for nonmain recognition.  [2018] EWHC 2186 (Ch), at ¶ 80.  The UK court found the fact that the U.S. parent was managing business relations with the creditors of the UK debtor from the U.S. headquarters to be sufficient economic activity in the U.S.  *Id.*

52.     The Verified Petition and the Rabelo Trial Declaration from the Previous Chapter 15 Cases already set out facts to support a finding that each of IC Financial and ITI have establishments in Brazil, including the fact that their respective business relations with their creditors were managed out of ICP's headquarters in Brazil.

53.     The management of IC Financial's and ITI's business relationships with creditors from Brazil is further supported by their efforts to restructure their debts in Brazil since the Previous Petition Date.  For instance, directors of IC Financial (Marco Zangari and Luiz Klecz) and employees of ICP responded to diligence request from the Ad Hoc Group's advisors, populated and maintained a confidential dataroom from Brazil, and attended a diligence meeting in Brazil with the Ad Hoc Group's Brazilian advisors.  IC Financial's detailed responses to the Ad Hoc Group's diligence requests and its engagement with the Ad Hoc Group advisors were also supported by its Brazilian-based financial and legal advisors, Houlihan Lokey and E Munhoz.  Two of IC Financial's Brazilian directors (Mr. Zangari and Mr. Klecz) and two of ITI's Brazilian directors (Mr. Zangari and Ms. Karina Skarbnik) also attended mediation sessions from Brazil with the Ad Hoc Group and the Indenture Trustee before the

Brazilian mediator.  Ms. Karina Skarbnik, Brazilian director of ITI, and Mr. Klecz, Brazilian

director of IC Financial, both attended the creditors' meeting.  *British Am.*, 425 B.R. at 916

(finding creditor interactions and their local impact on the market significant when determining

an establishment).  These actions of IC Financial's Brazilian directors (as well as Brazilian-

based ICP employees and advisors) provided an objective appearance to IC Financial's

creditors that IC Financial had a local presence in Brazil.

54.    Likewise, Brazilian directors of ITI (Marco Zangari and Karina Skarbnik)

managed ITI's relations from Brazil between the Previous Petition Date and the New Petition

Date.  These actions were taken from Brazil, including attending meetings in Brazil with the

Debenture holders regarding the restructuring, attending mediation sessions with the Debenture

holders and negotiating, structuring and documenting the EJ Plan (and underlying SPA) that

was consensually agreed with two of the three Debenture holders—all in Brazil.

55.    Each of IC Financial and ITI have shown nontransitory economic activity with

significant impacts in Brazil, further emphasized by their actions in Brazil to manage their

relationships with their creditors that occurred after the filing of the Previous Chapter 15 Cases.

Therefore, the Court should find that IC Financial and ITI have establishments in Brazil and

recognize the RJ Proceeding as a foreign nonmain proceeding for each in the alternative, even

if the Court finds that their COMIs are elsewhere.

## <u>CONCLUSION</u>

Petitioner respectfully requests that this Court grant the Verified Petition and recognize

the Brazilian Proceeding as the foreign main proceeding for IC Financial and ITI.


Dated: January 15, 2025
New York, New York


By:  */s/ John K. Cunningham*
       John K. Cunningham


**WHITE & CASE LLP**                                    **QUINN EMANUEL URQUHART**
1221 Avenue of the Americas                      **& SULLIVAN, LLP**
New York, New York 10020-1095              295 Fifth Avenue
(212) 819-8200                                              New York, New York 10016
John K. Cunningham                                  (212) 849-7000
Thomas E. MacWright                              Susheel Kirpalani
Ricardo M. Pasianotto                              susheelkirpalani@quinnemanuel.com
Ashley R. Chase
jcunningham@whitecase.com
tmacwright@whitecase.com
ricardo.pasianotto@whitecase.com
ashley.chase@whitecase.com

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (admitted *pro hac vice*)
Amanda Parra Criste (admitted *pro hac vice*)
rkebrdle@whitecase.com
aparracriste@whitecase.com

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
(312) 881-5400
Jason N. Zakia (admitted *pro hac vice*)
jzakia@whitecase.com

*Attorneys for Antonio Reinaldo Rabelo Filho,*
as Petitioner and Foreign Representative