Richard J. Cooper
David H. Botter
Luke A. Barefoot
Thomas S. Kessler
David Z. Schwartz
Thomas Q. Lynch
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>InterCement Brasil S.A, *et al.*,[1]<br><br>     Debtors in a Foreign Proceeding. | Case No.:  24-12291 (MG)<br><br>Chapter 15<br><br>Jointly Administered |

### NOTICE OF DEVELOPMENTS IN FOREIGN PROCEEDINGS

**PLEASE TAKE NOTICE** that, on December 9, 2024, Antonio Reinaldo Rabelo Filho (the "Petitioner" or "Foreign Representative"), in his capacity as the foreign representative (as such term is defined in section 101(24) of title 1 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code")) of the above-captioned debtors (the "Chapter 15 Debtors"), commenced the above-captioned cases under chapter 15 of title 11 of the United States Code in United States Bankruptcy Court for the Southern District of New York (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Section 1518 of the Bankruptcy Code, the Foreign Representative has a clear statutory obligation to promptly provide the Court with updates on developments in any foreign proceedings regarding the Chapter 15 Debtors (a "Section 1518 Statement").  *See* 11 U.S.C. § 1518.

**PLEASE TAKE FURTHER NOTICE** that the Foreign Representative has not provided the Court with a Section 1518 Statement since January 27, 2025.  *See Statement Notifying the*

---

[1]     The debtors in these chapter 15 cases (collectively, the "Debtors"), along with the last four digits of each debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: InterCement Brasil S.A. (01-36 – Brazil); InterCement Participações S.A. (01-22 – Brazil); InterCement Financial Operations B.V. (3771 – Netherlands); and InterCement Trading e Inversiones S.A. (7798 – Spain).

*Court of Developments in the Foreign Proceedings in Brazil Pursuant to 11 U.S.C. § 1518 and 28
U.S.C. § 1746* (ECF No. 34, the "Chapter 15 Debtors' 1518 Statement").[2]

**PLEASE TAKE FURTHER NOTICE** that, since the filing of the Chapter 15 Debtors'
Section 1518 Statement, there have been a number of developments in the foreign proceedings
involving the Chapter 15 Debtors in Spain, the Netherlands and Brazil for which the Foreign
Representative has filed no Section 1518 Statement.[3]

**PLEASE TAKE FURTHER NOTICE** that, on February 24, 2025, the Ad Hoc Group
submitted its appeal of the order of the Bilbao Commercial Court No. 1 issued on January 17, 2025
that purports to recognize *recuperação judicial* proceedings (the "Brazilian RJ Proceedings")
before the 1st Bankruptcy and Restructuring Court of São Paulo (the "Brazilian Court") as the
foreign main proceeding for InterCement Trading e Inversiones S.A. ("ITI") (the "Spanish
Appeal").[4] *See* Chapter 15 Debtors' 1518 Statement § 3. The Spanish Appeal is attached hereto
in the original Spanish and with a certified English translation as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that, on March 6, 2025, the observer appointed in
InterCement Financial Operation B.V.'s ("ICBV's") public WHOA proceedings (the "Dutch
WHOA Proceedings") submitted a letter to the Amsterdam District Court, Private Law Department
(the "Dutch Court") concluding that "ICBV will not succeed in bringing about a WHOA
agreement" in the Netherlands (the "March 6, 2025 Observer Letter"). While the Ad Hoc Group
consented to a prior extension of the stay in the Dutch WHOA Proceedings that was premised on
the Chapter 15 Debtors' representations of intentions to conduct meaningful negotiations with the
Ad Hoc Group (which never materialized), the March 6, 2025 Observer Letter also noted that the
"cooling off" period in the Netherlands ultimately expired on March 1, 2025. *See* March 6, 2025
Observer Letter ¶ 3.7. The Observer also concluded that the Ad Hoc Group has permanently lost
confidence in ICBV as a debtor. *Id.* at ¶ 4.8. A machine English translation of the March 6, 2025
Observer Letter is attached hereto as **Exhibit B**.[5] The Dutch Court has set a hearing with respect
to the Dutch WHOA Proceedings for March 14, 2025.

**PLEASE TAKE FURTHER NOTICE** that, following expiration of the "cooling off"
period in the Dutch WHOA Proceedings, the Dutch Court set a hearing for April 1, 2025 (the
"April 1, 2025 Dutch Hearing Notice") on the Ad Hoc Group's November 1, 2024 bankruptcy

---

[2]    Indeed, the Chapter 15 Debtors' 1518 Statement expressly indicates that the Chapter 15 Debtors will "keep
the court apprised of any developments." Chapter 15 Debtors' 1518 Statement § 4.

[3]    The Ad Hoc Group has contacted the Foreign Representative's counsel to raise the need for an additional
Section 1518 Statement reflecting additional developments in foreign proceedings, but as of the date of this filing has
received no substantive response.

[4]    The Chapter 15 Debtors' 1518 Statement failed to note that the Spanish court which issued the order on
January 17, 2025, Bilbao Commercial Court No. 1, is a different Spanish court from the one which presided over ITI's
pre-insolvency proceedings, Bilbao Commercial Court No. 2.

[5]    The Ad Hoc Group will provide a certified English translation of Exhibit B on the docket in a supplemental
filing.

request for ICBV, seeking the appointment of a Dutch bankruptcy trustee for ICBV, attached hereto in the original Dutch and with a machine English translation as **Exhibit C**.[6]

      **PLEASE TAKE FURTHER NOTICE** that, on March 11, 2025, the debtors in the Brazilian RJ Proceedings filed a motion before the Brazilian Court seeking to enjoin the Ad Hoc Group and UMB Bank, N.A., as trustee pursuant to the indenture dated July 17, 2014 (the "Indenture Trustee"), from prosecuting the Ad Hoc Group's pending bankruptcy request against ICBV in the Netherlands, among other provisional remedies, subject to the imposition of a daily pecuniary penalty (the "Brazilian Injunction Motion"). The Brazilian Injunction Motion is attached hereto in the original Portuguese and with a machine English translation as **Exhibit D**.[7] The Brazilian Court has directed that the Ad Hoc Group and the Indenture Trustee shall have five days to submit a response to the Brazilian Injunction Motion, after which the court-appointed judicial administrator and public prosecutor will also have the opportunity to submit their positions on the Brazilian Injunction Motion.

Dated: March 12, 2025
     New York, New York

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ *Luke A. Barefoot*
Richard J. Cooper
David H. Botter
Luke A. Barefoot
Thomas S. Kessler
David Z. Schwartz
Thomas Q. Lynch
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Ad Hoc Group*

---

[6]    The Ad Hoc Group will provide a certified English translation of Exhibit C on the docket in a supplemental filing.

[7]    The Ad Hoc Group will provide a certified English translation of Exhibit D on the docket in a supplemental filing.

## Exhibit A

**Spanish Appeal**



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the following documents are, to the best of my knowledge and belief, a true and accurate translation from Spanish to English.

2024.02.24 IC. Proof of filing - Apelación frente a exequatur

_____
Jacqueline Yorke

Sworn to before me this
February 28, 2025

_____
Signature, Notary Public

```
WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27
```

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

# Secure Electronic Communication

**The document has been successfully submitted.**
User: EDUARDO JOSE MANZANOS LLORENTE (05282247K)
Receipt Number: 250224004713833
Date of Submission: 02/24/2025 02:54:56 p.m.
Recipient: Office of Registration and Representation, Civil Appeals Court - Bizkaia
Registration Type: 210101 Judicial Assistance Requests. Commercial Matters
Procedure Number:
Document Type: Initial Filing
Main Document: APPEAL
Attached Digital Documentation: Index of attached documents, Document 01 Powers of Attorney
Physical Documentation: No physical documentation
Copies Sent: No copies sent

# Comunicación Electrónica Segura

El escrito se ha enviado correctamente.
Usuario: EDUARDO JOSE MANZANOS LLORENTE (05282247K)
Número de recibo: 250224004713833
Fecha envío: 24/02/2025 14:54:56
Destinatario: Of. Reg-Rep AP Civil - Bizkaia
Clase de registro: 210101 Peticiones de auxilio judicial. Asuntos Mercantiles
Número de procedimiento:
Tipo de escrito: Escrito de inicio
Documento principal: RECURSO APELACION
Documentación anexa digital: Índice de documentos anexos, Documento 01 Poderes
Documentación física: Sin documentación física
Traslado de copias: Sin traslado de copias



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the following documents are, to the best of my knowledge and belief, a true and accurate translation from Spanish to English.

2025.02.21 IC. Apelacion frente a exequatur_executed

Jacqueline Yorke

Sworn to before me this
February 28, 2025

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 2 7

Stamp, Notary Public

*Appeal*

***Originating Proceeding: Exequatur 8/2025
(Commercial Court No. 1 of Bilbao)***

## TO THE HONORABLE PROVINCIAL COURT OF BILBAO (CIVIL CHAMBER)

**Mr. EDUARDO JOSÉ MANZANOS LLORENTE,** Court Attorney, acting on behalf of (i) **MONEDA LUXEMBOURG SICAV - LATAM CORPORATE CREDIT FUND;** (ii) **MONEDA LATAM HIGH YIELD FUND PLC;** (iii) **MONEDA LATIN AMERICAN CORPORATE DEBT;** (iv) **MONEDA USA COLLECTIVE INVESTMENT TRUST - MONEDA LATAM CREDIT CIT;** (v) **CIGNA HEALTH & LIFE INSURANCE COMPANY;** (vi) **CONTRARIAN EMERGING MARKETS, L.P.;** (vii) **REDWOOD MASTER FUND, LTD;** and (viii) **REDWOOD DRAWDOWN MASTER FUND III, LP** (hereinafter, the "Ad Hoc Bondholder Group"), representation duly accredited by means of powers of attorney for litigation with special insolvency faculties, which are attached hereto as **Document No. 1**, under the legal representation of Mr. José Carles Delgado and Mr. Carlos Cuesta Martín, members of the Madrid Bar Association, registered under numbers 83,585 and 82,929, respectively, hereby **appears** before the Honorable Provincial Court of Bilbao, Civil Chamber, and as best befits in Law,

## STATES

**I.**    I. That on January 17, 2025, Commercial Court No. 1 of Bilbao, at the request of the corporations INTERCEMENT TRADING E INVERSIONES, S.A. and INTERCEMENT TRADING E INVERSIONES ARGENTINA, S.L. (hereinafter, "ITI" and "ITI ARG," respectively), issued an Exequatur Order in proceeding No. 8/2025, declaring the recognition of the opening order dated December 6, 2024 [noting that the order records the date as December 5], issued by the 1st Court of Bankruptcy and Judicial Recoveries of the Central Court of the São Paulo District, Brazil, in judicial recovery proceeding No. 1192002-34.2024.8.26.0100.

**II.**    That my clients became aware of said Order on January 24, 2025, following its respective publication on that date in the Public Bankruptcy Register.

**III.**    That, considering the aforementioned Order to be unlawful and detrimental to the interests of my clients, with all due respect and in strict terms of legal defense, and within the legal timeframe, I hereby **FILE AN APPEAL** against said decision before the **HONORABLE PROVINCIAL COURT OF BILBAO,** pursuant to the provisions of Articles 455, 458, and 459 of Law 1/2000, of January 7, on Civil Procedure (hereinafter, "LEC"), in

compliance with the following

## **PROCEDURAL REQUIREMENTS**

**I.**    This appeal is filed before the Honorable Provincial Court of Bilbao, which is the competent court to hear the appeal, pursuant to Articles 455.2.2 and 458.1 LEC.

**II.**    The appeal is filed within the twenty-day period counted from the day following its notification via publication in the Public Bankruptcy Register, pursuant to Articles 458.1 and 448.2 LEC.

**III.**    In accordance with Article 448.1 LEC, this party is duly entitled to appeal as the Order in question adversely affects its interests, as evidenced hereunder.

**IV.**    The formal representation requirements for filing this appeal are duly met, as this party is represented by a Court Attorney and assisted by practicing Attorneys, both registered and authorized to appear before the Court, in accordance with Articles 23.1 and 31.1 LEC.

All of the above is based on the following

## **GROUNDS FOR APPEAL**

**Preliminary.- On the main proceeding already initiated in Spain at the request of InterCement Trading e Inversiones, S.A. and InterCement Trading e Inversiones Argentina, S.L., with recognition of the location of their center of main interests in Bilbao.**

***Preliminary. 1. On the existence of a main proceeding for the opening of negotiations in Spain due to the location of their "center of main interests" in Spain.***

1.    On July 16, 2024, the Spanish companies INTERCEMENT TRADING E INVERSIONES, S.A. and INTERCEMENT TRADING E INVERSIONES ARGENTINA, S.L. (hereinafter, "ITI" and "ITI ARG," respectively) filed a notification under Article 585 of the Consolidated Text of the Insolvency Law before the Courts of Bilbao. This notification is attached as **Document No. 2**.

2.     In that filing, the insolvent Spanish companies themselves, under the *"Jurisdiction"* section of the Legal Grounds of their notification, stated that, *"In accordance with the provisions of Article 86 of the Organic Law of the Judiciary and Articles 44,* <u>*45*</u> [noting that this article solely refers to the center of main interests] *and 585 of the TRLC, as required by Article 586.1.2, jurisdiction over this notification corresponds to the Commercial Court of Bilbao."*

3.     On July 19, 2024, Commercial Court No. 2 of Bilbao issued a Decree which, among other matters, (i) acknowledged the filing of the communication regarding the commencement of negotiations, (ii) confirmed the declaration regarding the presence of the center of main interests in Bilbao, and (iii) declared itself territorially competent due to the location of the center of main interests in Bilbao. Said Decree, issued within the framework of the *Communication proceeding under Article 5.3 of the Insolvency Law / Art. Komunikazioa Konkurtso Legearen 5.3 211/2024, is attached hereto* as **Document No. 3**.

4.     In other words, Commercial Court No. 2 of Bilbao ruled, based on ITI's own assertions regarding the presence of its center of main interests in Bilbao, that the center of main interests was indeed located in Bilbao.

    Consequently, **Commercial Court No. 2 of Bilbao opened an insolvency proceeding in Spain for both companies, which must be considered a "main proceeding" outside Spain (including Brazil), as it is being conducted in Spain, the place where the debtors have their center of main interests, which has not been challenged by ITI, ITI ARG, or any other interested party or third party with a legitimate interest.**

5.     In this regard, Spanish law (Article 608 of Royal Legislative Decree 1/2020, of May 5, approving the consolidated text of the Insolvency Law; hereinafter, "TRLC") provides for the possibility of extending the proceeding for an additional three (3) months before the "insolvency judge." ITI and ITI ARG availed themselves of this option, extending the proceeding until January 16, 2025. The Order granting the extension is attached as **Document No. 4**. It should be noted that <u>since jurisdiction and competence are reviewed by the Spanish court at the time of filing the request for the opening of negotiations (and not at the time of the extension), the Order granting the extension contains no reference to jurisdiction, rendering ITI and ITI ARG's attempts to argue the indefensible futile</u>: that the proceeding was not initiated in Spain due to the location of their center of main interests. It is astonishing that ITI and ITI ARG would shamelessly argue that their mere statements in an extension request could unilaterally modify Spanish jurisdiction, in clear contradiction of the Spanish legal system and in defiance of a final ruling (after the

deadline for challenging international jurisdiction had passed without any objections), which is therefore binding.

6.    To reiterate, the court had already made its jurisdiction crystal clear based on the center of main interests in its Decree of July 19, 2024, and since jurisdiction is not subject to review at the time of granting an extension, mere unilateral statements by ITI and ITI ARG (statements that run counter to the law) obviously do not alter what is provided in the TRLC.

7.    Indeed, Spanish law (Article 611 of the TRLC) provides that if no solution is reached within the extension period, a debtor that has not secured a restructuring plan (in this case, ITI and ITI ARG) *"must file for insolvency within the following month, unless they are not in a state of actual insolvency."*

8.    In other words, ITI and ITI ARG were legally obligated in Spain, having failed to secure a restructuring plan in their main Spanish proceeding, to file for insolvency in Spain before February 16, 2025.

9.    However, in this case, ITI and ITI ARG failed to comply with this "duty" under Spanish law, as they have not filed for insolvency despite the expiration of the deadline.

10.    It is therefore evident that ITI and ITI ARG, as well as their respective management bodies, have breached their obligation to initiate an insolvency proceeding in Spain, resulting in the **improper circumvention of the proceeding in the very jurisdiction where ITI and ITI ARG themselves had previously acknowledged (before the court and by expressly citing Article 45 of the TRLC as the basis for the international jurisdiction of the courts of Bilbao) that their center of main interests was located**.

*Preliminary. 2. On the exequatur in Spain of a Brazilian ruling opening a foreign insolvency proceeding in contravention of Article 611 of the TRLC.*

11.    At the request of the following companies: (i) InterCement Brasil, S.A.; (ii) InterCement Participaciones, S.A.; (iii) InterCement Financial Operations B.V.; (iv) Mover Participaciones, S.A.; (v) Sucea Participaciones, S.A.; (vi) Sincro Participaciones, S.A.; **(vii) ITI; and (viii) ITI ARG**, an application was filed for the initiation of a Brazilian *"Recuperação Judicial"* proceeding. The application, along with its Spanish translation, is attached as **Documents Nos. 5 and 6**, respectively.

12.     It is particularly striking that ITI and ITI ARG, despite already having an ongoing negotiation proceeding in Spain aimed at reaching a restructuring plan, opened based on their own statements regarding the location of their center of main interests in Bilbao (a main proceeding before Commercial Court No. 2 of Bilbao), would attempt to initiate another main proceeding in a different jurisdiction at the same time.

13.     We reiterate, **it is not legally possible to have two main proceedings: one in Spain and one in Brazil. The main Spanish proceeding had already been opened by Decree dated July 16, 2024, and remained in force due to the extension request,** obligating the Spanish companies, should a restructuring agreement not be reached to resolve their state of insolvency, to file for voluntary insolvency proceedings in Bilbao pursuant to Article 611 of the TRLC (an obligation that remains in force even after the extension period has ended).

14.     **The 1st Court of Bankruptcy and Judicial Recoveries of the Central Court of the São Paulo District (Brazil) disregarded the existence of the main proceeding in Spain (despite Commercial Court No. 2 of Bilbao having already declared that the center of main interests (COMI) was in Spain) when it issued the order opening insolvency proceedings** for all the entities listed in paragraph 11 above, including ITI and ITI ARG, on December 5, 2024. The order opening the Brazilian *"Recuperação Judicial"* proceeding, along with its Spanish translation, is attached as **Documents Nos. 7 and 8**.

15.     On January 6, 2025, ITI and ITI ARG, in clear violation of Article 611 of the TRLC, filed a request for *exequatur* of the opening order concerning certain affiliated companies instead of submitting a voluntary insolvency petition. This request is attached as **Document No. 9**.

16.     Without notifying any other parties —therefore, depriving my clients of any opportunity to present arguments despite the fact that they had already appealed the decision subject to exequatur in Brazil— the Public Prosecutor's Office issued a report on January 17, 2025, with no opposition to the requested exequatur.

17.  On January 17, 2025, Commercial Court No. 1 of Bilbao issued an Order declaring *"the recognition of the opening order dated December 6* [noting that the actual text of the order states December 5]*, 2024, issued by the São Paulo State Court – Brazil, in judicial recovery proceeding No. 1192002.3.2024.8.26.0100."* Said Order, attached as **Document No. 10**, is the subject of this appeal.

18.  On January 24, 2025, the exequatur Order of January 17 was published in the Public Bankruptcy Register, as recorded in the corresponding "Bankruptcy Notice" (relating to the *"JUDICIAL RECOGNITION ORDER OF A FOREIGN RULING"*), as evidenced by the publication receipts attached as **Documents Nos. 11 and 12**. Furthermore, on February 13, 2025, the referenced Order was published under "Registry Publicity" (concerning the *"OPENING OF INSOLVENCY PROCEEDINGS PURSUANT TO ARTICLE 743.3 TRLC"*), as evidenced by the publication receipts attached as **Documents Nos. 13 and 14**.

**ONE.- NON-COMPLIANCE WITH THE REQUIREMENT SET FORTH IN ARTICLE 742.1.3 OF THE TRLC. LOCATION OF THE CENTER OF MAIN INTERESTS ("COMI") IN SPAIN AND EXISTENCE OF A MAIN INSOLVENCY PROCEEDING IN SPAIN.**

***1.1.   The requirement that the center of main interests (COMI) be located in the originating State of the ruling subject to exequatur.***

19.  Article 742 of the TRLC, regarding *"Recognition of the opening order,"* establishes in its first paragraph that foreign rulings declaring the opening of an insolvency proceeding shall be recognized in Spain through exequatur provided that a series of requirements are met. Among them, the condition set forth in subsection 3: *"That the jurisdiction of the court or authority that has opened the insolvency proceeding is based on one of the criteria set forth in this law or on a reasonably equivalent connection."*

20.  In turn, section 2 of the same article states: *"The foreign insolvency proceeding shall be recognized: 1. As a foreign main proceeding, if it is being conducted in the State where the debtor has its center of main interests."*

***1.2.   The manifest error in the appealed Order. The impossibility of the center of main interests (COMI) being in two places at the same time.***

21.   Regarding the above, the appealed Order states: *"The jurisdiction of the São Paulo State Court, which issued the ruling, has been examined by the Court itself, as stated in the decision, and is based on the same jurisdictional criteria established in our national and EU legal framework: COMI or center of main interests (Art. 45 TRLC; Art. 3 of the 2015 European Insolvency Regulation; CJEU ruling in the Eurofood case). (...) Likewise, the fact* that, prior to this recognition and based on their registered office, the subsidiaries domiciled in Spain sought the protection offered by our national legal system to negotiate a restructuring plan does not prevent recognizing the possibility that their center of main interests is in Brazil, as is the case with their main creditors."

22.   The error in the appealed Order is, with due respect and in strict terms of legal defense, manifest. Why? Because **it disregards the fact that, in Spain, as of December 5, 2024** (the date of the Brazilian ruling by which the 1st Court of Bankruptcy and Judicial Recoveries of the Central Court of the São Paulo District (Brazil) opened a proceeding concerning, among others, the Spanish companies ITI and ITI ARG), **there was already a main proceeding opened by Commercial Court No. 2 of Bilbao, based on the location of these companies' center of main interests in Spain, and at the request of ITI and ITI ARG themselves** *(Communication proceedings under Article 5.3 of the Insolvency Law / Art. Komunikazioa Konkurtso Legearen 5.3 211/2024).*

23.   Indeed, if Spain had already issued a ruling confirming that the COMI was in Spain (Decree of July 19, 2024, based on Article 45 of the TRLC), how is it possible for Spain to recognize another proceeding as main on the basis that the COMI is in Brazil, relying on the same Article 45 of the TRLC? This is completely illogical.

24.   Therefore, the existence of a prior ruling confirming the location of the COMI in Spain is, in itself, sufficient grounds to deny the exequatur of a foreign ruling opening a proceeding based on the premise that the COMI is in that country (in this case, Brazil), without any further considerations. Nonetheless, we will proceed with a detailed analysis to assist the Honorable Provincial Court in its deliberation.

*1.3.   ITI and ITI ARG's acknowledgment in their negotiation opening requests regarding the location of their center of main interests in Bilbao.*

25.     Article 586 of the TRLC requires that a debtor's request to open negotiations must include,
as part of its mandatory content: *"2. The grounds for the court's jurisdiction to hear the
communication."*

26.     In compliance with this legal requirement, ITI and ITI ARG expressly acknowledged in
their joint request to open negotiations in Spain, as their sole reference to jurisdiction and
competence, that: *"In accordance with the provisions of Article 86 of the Organic Law of
the Judiciary and Articles 44, __45__, and 585 of the Consolidated Insolvency Law, as required
by Article 586.1.2, it is stated that jurisdiction to hear this communication corresponds to
the Commercial Court of Bilbao that is assigned by rotation, as the Companies have their
registered office in Bilbao."*

27.     In other words, ITI and ITI ARG based their jurisdictional claim on the following provisions
of the TRLC:

- Article 44 of the TRLC, concerning *"Objective Jurisdiction,"* states that: *"Commercial
judges are competent to declare and handle insolvency proceedings."*

- __Article 45 of the TRLC__, concerning *"Territorial Jurisdiction,"* __refers exclusively to
jurisdiction based on the location of the debtor's center of main interests__.
Specifically, this article provides that: *"1. <u>Jurisdiction to declare and handle insolvency
proceedings corresponds to the judge in whose territory the debtor has its center of
main interests.</u> The center of main interests shall be understood as the place <u>where the
debtor habitually exercises, in a manner recognizable by third parties, the
administration of such interests (...)."*</u>

   In this regard, <u>note that the request only referenced Article 45 of the TRLC and made
no mention of other concepts or provisions</u> (such as the existence of an establishment in
Spain —despite later attempts to alter the narrative concerning the COMI to which ITI
and ITI ARG are already bound by virtue of the Decree of July 19, 2024— which is
regulated under a completely different provision, Article 49 of the TRLC, which, we
reiterate, was never cited at any point).

- Article 585 of the TRLC, concerning *"Communication of the opening of negotiations,"*
states: *"1. In the event of a likelihood of insolvency or imminent insolvency* [imminent
insolvency being the scenario asserted by the debtors in their joint request]*, the debtor,
whether a natural or legal person, __may notify the competent court for the declaration
of insolvency of the existence of negotiations with creditors,__ or the intention to initiate*

- 8 -

*them immediately, in order to reach a restructuring plan that allows them to overcome their financial situation."* This aligns perfectly with **Article 611 of the TRLC, which establishes that, if negotiations fail, the debtor *"must file for insolvency within the following month, unless they are not in a state of actual insolvency."***

In this case, by citing the provision applicable to the center of main interests (Article 45 TRLC) in their request, ITI and ITI ARG implicitly acknowledged that the courts competent to declare insolvency (again, based on Article 45 of the TRLC), to which they communicated the existence of negotiations and to which they now have the duty to submit an insolvency petition, are the Commercial Courts of Bilbao, Spain.

28.    In addition to the above, the communication itself (see Document No. 2) confirms that the center of main interests is in Spain, as evidenced by the following:

- Both companies are Spanish entities (page 3 for ITI, page 4 for ITI ARG).

- Both companies are registered in Spain with the Commercial Registry of Vizcaya (page 3 for ITI, page 4 for ITI ARG) and file their annual accounts in Spain.

- Both companies have their registered offices in Spain. More specifically, in the city of Bilbao (page 3 for ITI, page 4 for ITI ARG).

- Both companies employ their entire workforce (even if it consists of only one employee) in Spain (page 4 for ITI, page 5 for ITI ARG). Consequently, both companies contribute to the Spanish Social Security Treasury, which, in fact, ITI and ITI ARG themselves recognize as a creditor.

- Note that ITI's outstanding debt with the Vizcaya Tax Authority exceeds one and a half million euros, specifically amounting to €1,620,342.13 (page 8).

- The contracts that the companies identified as essential for their continued operations pertain to services rendered in Spain by Spanish counterparties (page 12 for both companies).

- Business decisions are made in Spain, as evidenced by the corresponding minutes of the decisions regarding the submission of the communication, dated June 21, 2024, which were attached to the communication filed by ITI and ITI ARG, and which are submitted as **Documents 15 and 16** for ITI and ITI ARG, respectively. These documents demonstrate that, with respect to ITI, the Board of Directors met in Bilbao, with all members attending in person and physically present. Similarly, with respect to ITI ARG, it is documented that the Board of Directors also met in Bilbao, with all members attending in person and physically present.

- The powers of attorney for submitting the joint communication were granted in Spain, before a Spanish Notary, with certification signed in Bilbao, referencing another Board meeting on June 21, 2024 (signed by all attendees). These powers of attorney are submitted as **Documents 17 and 18**.

- The same applies to the sworn declarations accompanying the extension request, dated October 15, 2024, which are submitted as **Documents 19 and 20**: they were executed in Bilbao, not in Brazil.

- Therefore, in terms of *"recognition by third parties"* of the actual center of management and control of the companies —as indicated in the Eurofood case referenced by Commercial Court No. 1 of Bilbao in its Order, Article 3.1, and Recital (30) of Regulation (EU) 2015/848 of the European Parliament and the Council of May 20, 2015, on insolvency proceedings (recast) (hereinafter, the "European Insolvency Regulation")— a simple review of the information and documents submitted with the request for the opening of negotiations makes it undeniably clear: it is in Bilbao, Spain. Not in Brazil.

- This recognition came from the insolvent companies themselves. ITI and ITI ARG expressly stated that international jurisdiction belonged to Spain because their center of main interests was in Spain, as follows: *"**In accordance with the provisions of Article 86** of the Organic Law of the Judiciary and Articles 44, **45** [notably, an article referring exclusively to the center of main interests], and 585 of the TRLC, as required by Article 586.1.2, it is stated that **the jurisdiction to hear this communication corresponds to the Commercial Court of Bilbao.**"*

29. This statement is crucial: **ITI and ITI ARG explicitly acknowledged that their center of main interests (as defined in Article 45 of the TRLC) is in Bilbao, Spain.** Not in Brazil.

30. This admission is not trivial. By making this statement (as required by Article 585 of the TRLC, which they also cited), ITI and ITI ARG were also acknowledging that the court with jurisdiction to declare their insolvency, based on the location of their center of main interests, was the Commercial Court of Bilbao. Again, not the courts of Brazil.

31.   In any case, once Commercial Court No. 2 of Bilbao, based on these very statements made
by the debtors, ruled on its jurisdiction and territorial competence over their COMI in its
**Decree of July 19, 2024 (opening negotiations), and that ruling became final, the**
**existence of a main proceeding in Spain became res judicata. Consequently, ITI and**
**ITI ARG are bound by this ruling, including the obligation to file for insolvency in**
**Spain, as will be further discussed below.**

*1.4.   The existence of a prior judicial decision in Spain regarding the location of ITI and ITI*
*ARG's COMI in Spain. Decree issued by Commercial Court No. 2 of Bilbao on July 16, 2024,*
*confirming that the center of main interests is in Spain.*

32.   Article 4 of the European Insolvency Regulation establishes, under *"Examination of*
*jurisdiction,"* that: *"1. The court seized of a request to open insolvency proceedings shall*
*examine of its own motion whether it has jurisdiction in accordance with Article 3. The*
*decision opening insolvency proceedings shall specify the grounds on which jurisdiction is*
*based and, in particular, whether it is based on Article 3(1) or Article 3(2)."*

33.   In accordance with this European Insolvency Regulation, opening orders throughout the
European Union (except Denmark) must specify whether the court's jurisdiction is based on
the concept of the *"center of main interests"* (Article 3(1)) or an *"establishment"* (Article
3(2)).

34.   In line with this provision, and given that the negotiation opening communication is one of
the proceedings listed in Annex A of said Regulation[1], Article 590 of the TRLC, concerning
*"Content of the order,"* establishes that the order must include, among other things, *"the*
*grounds on which the court's international and territorial jurisdiction is based, and, in*
*particular, whether it is based on the location of the debtor's center of main interests or an*
*establishment."*

---

[1]   Given the drafting date of the European Insolvency Regulation, negotiation opening proceedings are
listed in Annex A as *"Public negotiation procedure for reaching collective refinancing agreements,*
*court-approved refinancing agreements, and early proposals for composition agreements."*

35.     For this reason, Article 586 of the TRLC requires that the communication include, as previously mentioned, *"2. The grounds for the court's jurisdiction to hear the communication."* This means it must reference either the "center of main interests" (Article 45 of the TRLC) or an "establishment" (Article 49 of the TRLC). As we have seen, ITI and ITI ARG explicitly acknowledged that jurisdiction was based on the "center of main interests" by citing Article 45 of the TRLC.

36.     In the proceedings regarding the negotiation opening communication submitted by ITI and ITI ARG[2], and based on all the information they provided, Commercial Court No. 2 of Bilbao made the following statements in its Decree of July 19, 2024, opening the procedure for ITI and ITI ARG:

- Statement of Facts, ONE, page 1: "***The request states that INTERCEMENT TRADING E INVERSIONES S.A. has its center of main interests in Bilbao***." Although this refers to only one company, both made the same declaration, and the request was filed jointly, so the meaning of the ruling is clear with respect to both ITI and ITI ARG.

- Since it was a joint communication, Legal Grounds, ONE, page 2: "*It also has territorial **jurisdiction as the company with the largest liabilities has its center of main interests within its territorial jurisdiction (Article 587.3 of the Consolidated Insolvency Law** –TRLC–, approved by Royal Legislative Decree 1/2020).*"

37.     This means that, as can be seen, all references in the Decree confirm the location of the center of main interests in Bilbao, Spain. Once again, not in Brazil.

38.     The Decree opening negotiations for ITI and ITI ARG was published in the Public Bankruptcy Register on July 23, 2024. To this end, proof of the publication date of the Decree in said register is submitted as **Document No. 21**. This document is accessible to creditors, individuals with a legitimate interest, and any third party, making its **entire content, including references to the location of the center of main interests and the clear decision-making process of ITI and ITI ARG in Bilbao, "recognizable by third parties."** Therefore, regardless of what the exequatur applicants may claim to the contrary, the documentary evidence is unequivocal.

---

[2]    Given its significance, it is formally designated for evidentiary purposes as appropriate.

***I.5.   The "prior control" of the Decree carried out by the Court Clerk of Commercial Court No. 2 of Bilbao, without any doubts regarding the international jurisdiction of the Spanish courts.***

39.   Article 589 of the TRLC addresses the control exercised by Spanish courts over international and territorial jurisdiction in cases of communication regarding the commencement of negotiations with creditors, as follows: *"When the Court Clerk considers that, in accordance with the rules on international or territorial jurisdiction, the court is not competent to hear the communication, they shall immediately inform the judge, who will grant the applicant and the Public Prosecutor's Office a common period of five days to present arguments and will issue a decision by order on the following day. An appeal may be filed against an order declaring a lack of international or territorial jurisdiction."*

40.   This control takes place before the Decree opening negotiations is issued. Regarding the proceeding for the communication of the opening of negotiations by ITI and ITI ARG:

- There is no record that ITI, ITI ARG, or the Public Prosecutor's Office were given a five-day common period.

- There is also no record of any order from Commercial Court No. 2 of Bilbao ruling on a potential lack of international or territorial jurisdiction.

41.   Although this Spanish control is well known to this Honorable Provincial Court, it is worth emphasizing it because, in foreign proceedings, the Spanish attorneys of ITI and ITI ARG have attempted to downplay the importance of the jurisdictional control conducted during the negotiation opening stage, as well as its binding nature and res judicata effect after becoming final (which, as we will see, occurred solely because no party challenged the international jurisdiction of the Spanish courts, meaning that ITI, ITI ARG, all creditors, and all parties with a legitimate interest accepted it by the Decree of July 19, 2024). To illustrate this, we cite the following example:

- In **Brazil**, ITI and ITI ARG submitted a legal opinion from Spanish attorney Mr. Guillermo Ruiz Medrano, which is provided as **Document No. 22** (original in English) and **Document No. 23** (Spanish translation), which included the following:

  o   Page 4: The opinion correctly explains that Spanish jurisdiction applies to negotiation opening communications when the COMI is located in Spain (Article 45 of the TRLC) or when an establishment is located there (Article 49 of the TRLC). Up to that point, everything is correct.

o   However, the conclusion (page 11, section 1.4.40), stating that *"ITI ESP and ITI ARG did not affirm or suggest that their center of main interests was located in Spain,"* is entirely incorrect (and forms the basis of the Brazilian courts' error), as has been demonstrated in the previous sections, both through all the statements made by ITI and ITI ARG in their negotiation opening request and by the fact that they invoked only Article 45 of the TRLC (COMI) as the basis for international jurisdiction in their Legal Grounds, and not Article 49 of the TRLC. These arguments are incomprehensible.

o   Page 7, paragraph 1.2.23: "*Specifically, the Decree was issued by a Court Clerk, not by a Judge. It was an acknowledgment that the pre-insolvency protection request had been submitted. In these cases, if the relevant communication meets all formal requirements and the Court Clerk determines that the competent court has jurisdiction (based on the center of main interests or an establishment), the submission is acknowledged without any contradiction or subsequent substantive review. In fact, the Decree is not binding for future assessments by the Spanish judiciary on the matter.*" It is unclear whether the legal representatives of ITI and ITI ARG are attempting to strip the Court Clerk of the authority granted to them under Spanish law, but whether they like it or not, the Spanish judicial authority responsible for opening negotiations is the Court Clerk, as established in Article 588 of the TRLC. Likewise, we do not understand the references to the lack of binding effect on the Spanish judiciary, given the provisions of Article 611 of the TRLC on *"Enforceability of the legal duty to file for insolvency,"* which, of course, ITI and ITI ARG fail to mention before foreign jurisdictions in their (so far successful) attempt to mislead them.

•   Page 7, paragraph 1.2.24: "*The reality is that the Decree had no formal defects. Therefore, there was nothing for the companies to challenge. The Court Clerk did consider that Commercial Court No. 2 was competent to issue the Decree, but did not conduct a review of the center of main interests (COMI). The Court Clerk could have deemed the Court competent based on the existence of a non-transitory business activity or on the fact that the companies' center of main interests was in Spain.*" It appears that, according to the literal wording of ITI and ITI ARG's legal counsel, the Court Clerk would have blatantly ignored the mandatory prior control set forth in Article 589 of the TRLC, which is precisely what we are analyzing in this section. These claims are utterly absurd and were clearly made to

- 14 -

mislead courts unfamiliar with Spanish law.

- In the **United States**, ITI and ITI ARG submitted a similar legal opinion from Spanish attorney Mr. Guillermo Ruiz Medrano, which is provided as **Document No. 24** (original in English) and **Document No. 25** (Spanish translation), in which a similar argument was made:

   o Page 6, paragraph 1: "*The Court Clerk's act was neither reviewed nor approved by a judge, was not based on any judicial review of ITI's center of main interests, and is not binding on the Spanish Court. The Court Clerk's statement regarding the center of main interests in the Pre-Insolvency Recognition cannot be attributed to ITI, which had no duty to challenge it, as the ruling included in the Pre-Insolvency Communication caused no harm and had no res judicata effect on the criterion for determining the jurisdiction of the Spanish court.*" Once again, we encounter the same argument as in Brazil: ITI and ITI ARG's legal counsel appears to criticize the legal attribution of jurisdiction to the Court Clerk under Article 588 of the TRLC. Similarly, before the U.S. courts, they omit any mention of the obligation to file for insolvency once the Decree became final (a finality that, as we have repeatedly emphasized, only occurred because no jurisdictional challenge was filed for lack of international jurisdiction, as provided in Article 592 of the TRLC).

   o Regarding this opinion, ITI and ITI ARG's attorney had to confirm his statements before the U.S. court during the (*Chapter 15*) recognition proceedings in which his opinion was submitted. The transcribed statement of ITI and ITI ARG's attorney, Mr. Guillermo Ruiz Medrano (who signed both the negotiation opening communication and the exequatur request for ITI and ITI ARG, although in the *Chapter 15* proceedings he acted as an "independent" expert) is submitted as **Document No. 26** (English version), with its Spanish translation as **Document No. 27**.

   Interestingly, ITI and ITI ARG's attorney argued that the entire issue was due to an "error" by the Court Clerk of Commercial Court No. 2 of Bilbao. He again attempted to downplay the role of the Court Clerk, despite the fact that, under Spanish law (Article 588 of the TRLC), the Court Clerk is expressly designated to issue negotiation opening decrees and conduct the prior jurisdictional review required under Article 589 of the TRLC. Once again, he seems to deny the effect of Article 611 of the TRLC, which <u>is</u> legally binding even if he attempts to argue otherwise; as will be seen later, this article binds Spanish courts, EU courts, and

any other courts in countries that recognize the existence of main foreign proceedings). Indeed, the literal wording of Mr. Guillermo Ruiz Medrano's responses included the following statement:

−  Page 90 of the transcript: *"Response (by Guillermo Ruiz Medrano).* ***I would not say it is binding on the debtor.*** *It has the legal effect of granting the three months… the main effect is granting the three months…"*

−  Page 91 of the transcript: "*Question: And you agree that <u>recognitions are based on the information provided by an applicant to the court</u>, correct?*

   *MS. CHASE: Objection as to form.*

   *Response (by Guillermo Ruiz Medrano). I would say they should be, but **<u>in this case, the Court Clerk made a mistake in referring to… the companies having stated that their center of main interests was in… in Spain.</u>**"*

−  Page 93 of the transcript: *Question. "Is it your position that the Court Clerk made a mistake in finding that the COMI was in Spain?*

   *Response (by Guillermo Ruiz Medrano). The decree does not say that the center of main interests is in Spain. The decree says that the company stated that the center of main interests was in Spain, but then, when it was not, **<u>it was a mistake by the Court Clerk to say that the company's center of main interests was in Spain when there was no such reference.</u>***

   ***<u>And I must say that the court's recognition by the Court Clerk does not make a conclusion on COMI, and it is not a judicial document issued by a judge</u>**, unlike the order on the extension request, which was issued by the judge and accepted the position of an extension where the companies made explicit references to having establishments in Spain and not COMI."*

42.   This Honorable Provincial Court will surely take note that the statement in question either ignores or omits the following: (i) the mechanisms for controlling international and territorial jurisdiction set forth in Articles 589 and 592 of the TRLC; (ii) the legal instruments provided under Article 214 of the LEC, the procedural law applicable to insolvency proceedings under Article 521 of the TRLC, for clarifying and correcting errors; (iii) the legal significance of the Decree opening the negotiation period with creditors (which became final due to the lack of any challenge to Spanish jurisdiction based on COMI at the proper procedural stage), in which once the negotiation period expired, or its extension ended without securing a restructuring plan with creditors, ITI and ITI ARG were legally obligated to file for insolvency, as required under Article 611 of the TRLC. ITI and ITI ARG have attempted to mislead foreign courts (both in the United States and Brazil) into believing that the Spanish insolvency process is lax or lacks rigor, when in reality, the opposite is true.

*__I.6.   The failure to request rectification or clarification of the Decree issued by Commercial Court No. 2 of Bilbao on July 16, 2024, and, consequently, the acceptance of its content by ITI and ITI ARG.__*

43.   As is well known, if a party considers that any aspect of a ruling requires rectification or clarification, and since rulings are immutable (Article 214.1 of the LEC), they may request clarification (Article 214.2 of the LEC) or rectification (Article 214.3 of the LEC).

44.   Neither ITI nor ITI ARG requested rectification or clarification. This is logical, moreover, because the Court Clerk ruled in their Decree in the exact terms requested by ITI and ITI ARG (the center of main interests, pursuant to the provisions of Article 45).

45.   Therefore, there was no error. If neither ITI nor ITI ARG requested rectification, it was simply because no error existed, but rather because this was a matter that they subsequently attempted to modify by all possible means to avoid the application of Article 611 of the TRLC and its corresponding protection of creditors' interests and other persons with a legitimate interest, as established by our Spanish legal system.

*__I.7.   The failure to challenge Spanish jurisdiction within the proceeding for the notification of the commencement of negotiations before Commercial Court No. 2 of Bilbao and, consequently, the creditors' acceptance that the center of main interests of ITI and ITI ARG is located in Bilbao. The resulting finality of the Decree.__*

46. In the proceeding for the notification of the commencement of negotiations, since part of the mandatory content of the ruling concerns *"the grounds on which the international and territorial jurisdiction of the court to which the notification has been addressed is based, and in particular, whether it is based on the location of the debtor's center of main interests or an establishment,"* Article 592 of the TRLC provides, in addition to the "prior control" of the Decree referred to in Article 589 of the TRLC, which we have already mentioned, the possibility of filing a plea of lack of jurisdiction after the Decree has been issued.

47. The article literally provides that: "1. ***Any creditor may file a plea of lack of international or territorial jurisdiction within ten days from the publication of the ruling in the Public Insolvency Register acknowledging receipt of the notification***, *or, in the event that it was confidential, from the moment they became aware of such notification."*

48. In the case of the joint commencement of negotiations for ITI and ITI ARG, the publication in the Public Insolvency Register, as previously mentioned (see Document No. 21), took place on July 23, 2024.

49. However, after the 10-day period from the publication in the Public Insolvency Register had elapsed, no creditor of ITI or ITI ARG filed a plea of lack of jurisdiction.

50. Consequently, each and every creditor of ITI and ITI ARG has accepted the content of the Decree of July 19, 2024, given that they did not challenge the jurisdiction of the courts of Bilbao on the basis of the location of the center of main interests (COMI) in Bilbao.

51. In short, both the creditors of ITI and those of ITI ARG accepted, just as Commercial Court No. 2 of Bilbao did, that the center of main interests of ITI and ITI ARG is in Bilbao, Spain. Not in Brazil.

52. It must be concluded that, since none of the mechanisms for reviewing international and territorial jurisdiction were triggered by any of the parties, pursuant to Articles 589 (prior review by the Court Clerk and, in case of doubt, by the Judge) and 592 of the TRLC (jurisdictional challenge), nor was clarification requested in the event that an alleged error had been identified in the Decree of July 19, 2024, the Decree became final.

And whether ITI and ITI ARG like it or not, and regardless of the statements they make abroad regarding the alleged errors of our Court Clerks (which, however, they failed to raise in Spain through the appropriate procedural channels, allowing the Decree to become final), in Spain, judicial rulings are binding. **Just as one's own actions are binding. Allowing a court decision to initiate a main insolvency proceeding in Spain based on the location of the COMI in Spain is an action that, together with their prior statements before the court's decision, binds ITI and ITI ARG.**

### *I.8.   The necessary denial of exequatur for the Brazilian opening order, given that the center of main interests (COMI), as decreed by a Spanish court, is located in Spain.*

53.   We conclude that there is no doubt that the center of main interests (COMI) is in Bilbao, Spain, and that this matter constitutes "res judicata," given that:

- From the content itself, the multiple statements already recounted, and the express acknowledgment in ITI and ITI ARG's notification of the commencement of negotiations that Article 45 of the TRLC regarding COMI applies, it follows that the center of main interests of ITI and ITI ARG is located in Spain.

- When conducting its "prior review," the Court Clerk had no doubts regarding the international jurisdiction of the Commercial Courts of Bilbao to hear the pre-insolvency proceedings in Spain, given the clarity of the statements and express acknowledgment by ITI and ITI ARG.

- The Decree opening negotiations dated July 19, 2024, also establishes that the center of main interests of ITI and ITI ARG is located in Spain.

- This Decree was published in the Public Insolvency Register, making it fully recognizable by third parties (in addition to ITI and ITI ARG's own statements) that the center of main interests is in Bilbao, Spain.

- Neither ITI, ITI ARG, nor their creditors requested clarification and/or rectification, thereby accepting the content of the Decree opening negotiations for ITI and ITI ARG.

- No creditor filed a plea of lack of international jurisdiction within the 10 days following the publication of the Decree opening negotiations for ITI and ITI ARG, thereby accepting its content. And within its content, the international jurisdiction of the Commercial Courts of Bilbao.

54.    Therefore, given that the center of main interests is located in Spain, it cannot be understood that the Brazilian court issued the opening order concerning ITI and ITI ARG on the basis that the center of main interests is located in Brazil. The error in the challenged order is more than evident.

55.    In short, **the requirement set forth in Article 742.1.3 of the TRLC is not met (as the center of main interests is in Spain and not in Brazil), and it is clear that the requested exequatur must be denied**.

56.    The same error led to the recognition of the foreign proceeding as a "main" proceeding. However, since the State in which the center of main interests is located is Spain (and not Brazil), the requirement set forth in Article 742.2.1 of the TRLC for the Brazilian proceeding to be considered a main proceeding is not met. In any case, since recognition must be denied in any event, this distinction becomes irrelevant.

57.    Let us recall, pursuant to Article 611 of the TRLC, that since **there has been a main Spanish "preconcurso" (pre-insolvency) proceeding, what must necessarily follow after six months of unsuccessful negotiations is the mandatory filing of a voluntary insolvency petition.**

*I.9.    The significance of the final Decree opening negotiations and the reference to the COMI by Commercial Court No. 2 of Bilbao not only in Spain but throughout the European Union and, generally, worldwide (including Brazil), as it establishes that the Spanish proceedings under Article 5.3 of the Insolvency Law / Art. Komunikazioa Konkurtso Legearen 5.3 211/2024 must be recognized as a "main proceeding" abroad.*

58.    As stated, the Spanish pre-insolvency proceeding initiated by ITI and ITI ARG is one of the Spanish national proceedings included in Annex A of the European Insolvency Regulation.

59.    *Recital* (9) of the European Insolvency Regulation provides that: *"With regard to the national proceedings listed in Annex A, this Regulation should apply without any further examination by the courts of another Member State as to whether the conditions set out in*

*this Regulation are met. National insolvency proceedings not listed in Annex A should be excluded from this Regulation."*

60. The significance of this is enormous. It means, for example, that if a Spanish commercial court has ruled that the center of main interests of ITI and ITI ARG is in Spain, the Decree is binding not only on Spanish courts but on all courts in the European Union (except Denmark).

61. In fact, all courts in the European Union (except Denmark) are obligated to automatically recognize the Spanish court's proceeding as a main proceeding (Article 3.1 of the European Insolvency Regulation) and *"without any further examination."*

62. In this regard, the Specialist Judge of the CGPJ in Commercial Matters, Cervera Martínez, M., in "Commentary on the Articles of the Consolidated Text of the Insolvency Law" (Dirs. Peinado, J.I. and Sanjuán y Muñoz, E.), Volume IV, SEPIN, pages 74-75, 2020, clearly states: ***"At the international level, it must be taken into account that the communications under Article 5 bis (now Article 583 TRLCon) are included in the annex*** [note: referring to "Annex A"] ***of Insolvency Regulation 2015/848, so their submission will have effects at the European level in the case of cross-border insolvencies.***

   *The submission of a communication initiating negotiations under Article 583 TRLCon **will determine the competent judge if a voluntary, necessary, or consecutive insolvency proceeding is subsequently filed** (...). This provision is a novelty in the Consolidated Text, as the allocation rules of the commercial courts did not previously establish any antecedent rule, meaning that communications to the court under the repealed Article 5 bis LCon did not predetermine jurisdiction for the subsequent insolvency proceeding."* However, now, **the opening of negotiations in Spain based on the COMI, as established in the Decree of July 19 (which, we emphasize, is final), does predetermine the jurisdiction for the subsequent insolvency proceeding; hence, the obligation set forth in Article 611 TRLC before the Commercial Courts of Bilbao**. Once jurisdiction and competence have been predetermined in favor of the Spanish courts upon the request of ITI and ITI ARG themselves, the Spanish courts must ensure that ITI and ITI ARG comply with this obligation — an obligation that, logically, protects creditors and companies with a legitimate interest in Spain.

63. It would be, to say the least, peculiar if in the Netherlands (where the center of main interests of Intercement Financial Operations B.V. is also located and where a main proceeding has also been open since July 17, 2024), they are required to automatically recognize the Spanish proceeding for the opening of negotiations before Commercial Court

No. 2 of Bilbao as a "main proceeding," while, at the same time, we fail to recognize our own proceeding in our own country.

64.    Furthermore, it should be noted that the proceeding for the notification of the commencement of negotiations was opened in Spain on July 16, 2024, and remained in effect (following the corresponding extension) when the Brazilian proceeding was opened on December 6, 2024. Therefore, the recognition that has been granted cannot be understood, as it is clearly an error.

65.    The fact that the maximum 6-month period for negotiations has elapsed does not grant ITI and ITI ARG carte blanche to seek recognition of any foreign ruling. Instead, since it has been established that the center of main interests is located in Spain, ITI and ITI ARG must comply with their obligation under Article 611 of the TRLC.

66.    Beyond the European Union (with the exception of Denmark), the Decree opening negotiations for ITI and ITI ARG, with jurisdiction based on the center of main interests (COMI), binds other foreign courts (provided that the requirements of those jurisdictions are met, for example, that the COMI is located in Spain, as is the case here).

67.    In particular, Brazil is a country that has adopted the UNCITRAL Model Law on Cross-Border Insolvency (1997). As such, it must recognize, in a manner similar to the European Insolvency Regulation or Article 742.2.1 of the TRLC, as main insolvency proceedings those that have been opened in a foreign jurisdiction based on the COMI.

68.    For this reason, certain statements in the judicial recovery petition filed in Brazil are surprising, in which ITI and ITI ARG assert that: *"Even in the context of the attacks and destabilization attempts adopted by the Ad Hoc Group worldwide, the Plaintiffs, <u>including IC Financial, ITI, and ITI ARG, will seek recognition of this judicial recovery as a foreign main proceeding in other jurisdictions</u>. <u>This initiative is precisely due to the fact that the centers of main interests of these companies are in Brazil</u>"* (see Document No. 6, paragraph 100, page 24); or that: ***"The fact that three of the Plaintiffs*** *—IC Financial,* ***ITI, and ITI ARG—*** *were incorporated in other jurisdictions solely for the purpose of facilitating the financing and administration of the Cement System* ***<u>does not preclude the processing of this judicial reorganization request</u>***" (see Document No. 6, paragraph 96, page 23).

69.     On this basis, the error of the Brazilian court of origin can be understood, as ITI and ITI ARG, through these statements, must have misled it into believing that there was no main insolvency proceeding based on the COMI of these companies in Spain, when in fact there was. It is true that the mere fact that companies are incorporated in other jurisdictions (ITI and ITI ARG in Spain) does not preclude the processing of a judicial recovery proceeding in Brazil, as long as these foreign companies have branches or establishments in Brazil (if they do not, they cannot file for judicial recovery in Brazil). Furthermore, **an even more evident impediment to such processing is the existence of the already-opened main proceeding concerning ITI and ITI ARG in Spain, based on the "Spanish COMI."**

70.     All of the above was duly presented in the appeal filed by my clients against the Brazilian opening order, in which, logically, a consistent argument is made (unlike ITI and ITI ARG, who have claimed to have their COMI in two different jurisdictions, which is impossible). To substantiate this point, the appeal is submitted in its original Portuguese version and its Spanish translation as **Documents No. 28 and 29**. In any case, regardless of the decision made in Brazil on the appeal, it is clear that **Spain cannot allow the opening of a main proceeding in Brazil (or anywhere else in the world) when a main insolvency proceeding has already been opened in Spain**.

**TWO.- <u>NON-COMPLIANCE WITH THE REQUIREMENT SET FORTH IN ARTICLE 46.1 (D) OF THE LAW ON INTERNATIONAL LEGAL COOPERATION IN CIVIL MATTERS, WHICH NECESSITATES THE DENIAL OF RECOGNITION.</u>**

71.     Article 46.1 of Law 29/2015, of July 30, on International Legal Cooperation in Civil Matters (hereinafter, "LCJI") states that recognition must be denied, among other cases, under subsection (d), *"When the decision is irreconcilable with a decision issued in Spain."*

72.     In line with everything set forth in Ground ONE, the appeal filed by my clients against the Brazilian opening order (see Documents No. 26 and 27) provides a detailed analysis of the reasons why the Brazilian courts lack jurisdiction to open a judicial recovery proceeding in Brazil, as ITI and ITI ARG have neither branches nor establishments in Brazil. These reasons included that (i) the center of main interests is in Spain, not in Brazil, and (ii) **a Spanish ruling had already been issued, opening the main Spanish proceeding based on the COMI in Spain (the Decree of July 19, 2024)**.

73.     Logically, it is irreconcilable for the COMI to be in two different places. And it is irreconcilable for there to be two main proceedings in two different locations.

74.     For this reason, **the decision issued by the Brazilian judge on December 5, 2024, opening a judicial recovery proceeding as a main proceeding in Brazil**, whose recognition has been sought in Spain, **is entirely irreconcilable with the prior final Decree of July 19, 2024, issued by Commercial Court No. 2 of Bilbao, which recognized the commencement of an insolvency proceeding in Spain for these same companies as a main proceeding, given that their COMI is located in Spanish territory**. Therefore, under Article 46.1 (d) of Law 29/2015, of July 30, on International Legal Cooperation in Civil Matters (hereinafter, "LCJI"), recognition should have been denied.

**THREE.- NON-COMPLIANCE WITH THE REQUIREMENT SET FORTH IN ARTICLE 742.1.3 OF THE TRLC REGARDING THE BRAZILIAN COURT'S JURISDICTION BEING BASED ON COMI, AN ESTABLISHMENT, OR A REASONABLE CONNECTION OF AN EQUIVALENT NATURE, WHICH PRECLUDES RECOGNITION AS A MAIN PROCEEDING IN SPAIN.**

75.     As a reminder, Article 742.1 of the TRLC, in subsection 3, establishes as a requirement for granting exequatur to a foreign insolvency ruling: *"That the jurisdiction of the court or authority that has opened the insolvency proceeding is based on one of the criteria set forth in this law or on a reasonably equivalent connection."*

76.     Logically, after concluding that the Decree opening negotiations in Spain binds ITI and ITI ARG, requiring them to file for voluntary insolvency in Spain due to their COMI being located in Spain, it is clear that their COMI cannot be located anywhere else. This was already decreed in Spain on July 19, 2025.

77.     In any case, beyond the evident lack of jurisdiction of Brazil over Spanish companies, an issue that has already been resolved in Spain, it is also becoming apparent in Brazil, as **the Brazilian Public Prosecutor's Office itself has questioned the opening of the Brazilian proceeding concerning the foreign entities included in the petition, among which are ITI, ITI ARG** and Intercement Financial Operations B.V., that is, the three European companies.

78.     Indeed, in the context of the Brazilian *"Recuperação Judicial"* proceeding recognized by the appealed exequatur decision, the Public Prosecutor's Office reported on February 13, 2025, that: *"However, the authorizations for the respective legal representatives to operate*

*in the country have not been located, and there is no further information on whether they have branches in Brazil,"* requesting ITI and ITI ARG to provide information, among other things, *"(...) in order to verify the legitimacy and the procedures to be adopted concerning the foreign companies,"* regarding whether foreign proceedings exist in relation to these companies. This report is submitted in its original Portuguese version as **Document No. 30** and its Spanish translation as **Document No. 31**.

79.   That is, the Public Prosecutor's Office in the Brazilian proceeding has expressed serious doubts regarding the jurisdictional basis of the Brazilian opening order concerning ITI and ITI ARG (as well as the Dutch company) and has demonstrated that:

- The Brazilian proceeding, as it pertains to ITI, ITI ARG, and the Dutch company, is not based on the location of the center of main interests in Brazil if main proceedings exist outside Brazil (such as those in Spain).

- The Brazilian proceeding can only be opened concerning foreign companies based on a "branch" concept that has nothing to do with COMI and that, in any case, would not allow for the recognition of ITI and ITI ARG's judicial recovery in Spain as a main proceeding.

- According to the Brazilian Public Prosecutor's Office, there are even serious doubts as to whether ITI, ITI ARG, and the Dutch company have a "branch" in Brazil at all, which means there is no jurisdictional basis in Brazil to justify recognition in Spain, even as a foreign territorial proceeding based on a *"reasonable connection or an equivalent nature."*

80.   Consequently, another essential requirement for exequatur is not met (specifically, that set forth in Article 742.1.3 of the TRLC), as Brazil lacks jurisdiction, both under the *"reasonable connection or equivalent nature"* criteria, making it impossible to recognize, even as a foreign territorial proceeding, any insolvency proceeding in Spain concerning ITI and ITI ARG.

**FOUR.-    NON-COMPLIANCE WITH THE REQUIREMENT SET FORTH IN ARTICLE 742.1.5 OF THE TRLC. CONTRAVENTION OF SPANISH PUBLIC POLICY.**

81.   A ruling may be contrary to Spanish public policy based on two possible aspects: (i) contravention of procedural public policy or (ii) contravention of substantive public policy.

82.   First, with respect to **procedural public policy**, the case law of the Constitutional Court —
      including Judgment No. 17/2021, of February 15 (ECLI:ES:TC:2021:17)— establishes that:
      *"From a procedural standpoint, public policy is defined as the set of formalities and
      principles necessary in our procedural legal system (…) fundamental rights and freedoms
      guaranteed by the Constitution, as well as other essential principles that cannot be altered
      by the legislator due to constitutional requirements or the application of internationally
      accepted principles."*

83.   Likewise, Heredia Cervantes, I., and Thery Martí, A., in "Commentary on the Articles of the
      Consolidated Text of the Insolvency Law" (Coords. Peinado Gracia, J.I., and Sanjuán y
      Muñoz, E.), Volume IV, Ed. Sepin, 2020, in their commentary on Article 742 (page 1,003),
      state:  *"As for procedural public policy, it consists of the fundamental rights that shape due
      process (the right to be heard, adversarial proceedings, effective legal protection, the right
      to propose and present evidence, etc.)."* They further explain:  *"It should be recalled that a
      part of procedural public policy, specifically the right to a defense, is set forth in Article
      742.1.4."*

84.   In the present case, the procedural violation is evident because there is (i) a Spanish judicial
      decision that establishes the center of main interests of ITI and ITI ARG in Spain,
      conferring international jurisdiction to Spain and requiring ITI and ITI ARG to file for
      insolvency in Spain, and, on the other hand, (ii) a (subsequent) ruling that establishes the
      center of main interests of ITI and ITI ARG in Brazil, removing jurisdiction from Spain and
      depriving creditors and persons with a legitimate interest of the protection provided under
      Article 611 of the TRLC and, more generally, of the safeguards of the Spanish proceedings.
      This constitutes a **clear violation of procedural public policy** (as referenced in Article 46.1
      (a) of the LCJI), as the Brazilian ruling subject to *exequatur* nullifies the protection granted
      in Spain by a prior final Spanish ruling and flagrantly **undermines effective judicial
      protection and legal certainty to an extreme degree**.

85.   Regarding **substantive public policy**, Thery Martí, A., and Heredia Cervantes, I., in their
      commentary on Article 742 of the previously cited work (p. 1,003), state that: *"As for its
      substantive dimension, the public policy clause is primarily defined by two elements: **the
      principle of non-discrimination** based on nationality and **respect for property rights**. An
      example of the former would be a ruling that imposes a greater economic burden on certain
      creditors simply because of their nationality. As for an infringement of property rights, the
      clearest examples could be an insolvency declaration that effectively amounts to covert
      confiscation or the **imposition of an arbitrary or manifestly disproportionate burden on**

*certain creditors."*

86.   In this regard, **the consequences of the proposals in the Brazilian proceeding for Spanish creditors are entirely confiscatory and even violate the European Convention on Human Rights** (specifically, Article 1 on the *"Protection of Property"* of Protocol No. 1 to the Convention for the Protection of Human Rights and Fundamental Freedoms, Paris, March 20, 1952).

87.   This has been expressly pointed out by my clients in the demand letter sent to ITI and ITI ARG, as well as to their board members individually, by my clients, the Ad Hoc Bondholder Group (submitted as **Documents No. 32 and 33** in English and Spanish, respectively), in the following terms: *"Spanish law contains several (internationally accepted) safeguards for creditors, such as: (i) the absolute priority rule (APR), (ii) the best interest of creditors test, and (iii) an entity-by-entity approach, meaning that **substantive consolidation of group companies is generally not accepted (collectively, the Spanish safeguards). The adherence of ITI ESP and ITI ARG to the Brazilian insolvency proceeding is clearly an attempt to circumvent the Spanish safeguards. ITI ESP and its board of directors have failed to protect the interests of ITI ESP's direct creditors and other parties with a legitimate interest** by opting to restructure outside of Spain in a manner that does not properly take into account the Spanish safeguards and, therefore, disregards important internationally accepted safeguards that creditors would enjoy in a Spanish insolvency proceeding. This constitutes a breach of their fiduciary duties toward these stakeholders."*

88.   This is precisely the rationale behind the frequently cited Article 611 of the TRLC: companies such as ITI and ITI ARG, whose center of main interests is in Spain (a matter that has already been decided and is final in Spain), are obligated to file for voluntary insolvency proceedings in Spain. **It should be noted that Spain does not allow for the consolidation of insolvency estates (or substantive consolidation), meaning that the assets and liabilities of each company must be individualized in each insolvency proceeding**, thus protecting the creditors of each individual company separately. In this regard, Article 42 of the TRLC provides that: *"Insolvency proceedings that are declared jointly and accumulated shall be processed in a coordinated manner, without consolidation of the insolvency estates."*

89. **However, Brazil does allow for such consolidation of insolvency estates[3], which in this case results in European creditors being treated worse (i.e., discriminated against) compared to Brazilian creditors, causing them to lose their guarantees.** Why? Because ITI holds shares in several companies, including ITI ARG and another company included in the Brazilian proceeding: InterCement Brasil S.A. (referred to as "ICB" in Document No. 6).



90. It is clear that the shares of **ITI ARG and ICB must be liquidated in a Spanish proceeding**, under the supervision of a Spanish insolvency administrator, with the possibility of improved bids to maximize creditor recoveries, creditor and employee objections, judicial authorization, etc. Not in Brazil.

91. Finally, **the repayment obtained from the sale of ITI's assets must be used to repay ITI's creditors (whether Spanish or not, as Spain does not discriminate), and not to repay creditors of third-party companies (or even the ultimate beneficial owners, who would retain value in Brazil at the expense of the loss of guarantees for the creditors of the Spanish companies)**, as ITI and ITI ARG intend in clear detriment to their body of creditors and in an attempt to bypass the legally established order of priority, which would apply with full safeguards in the mandatory insolvency proceeding in Spain (pursuant to Article 611 of the TRLC).

92. Spain seeks to prevent abuses or confiscations such as those attempted by ITI and ITI ARG, which, however, are permitted under the Brazilian system through substantive consolidation, thereby confirming their contravention of Spanish substantive public policy.

---

[3]    See, in this regard, the reports from the Dutch observer, which reference the intended consolidation in Brazil.

**FIVE.-  ACTIVE LEGAL STANDING AND *AD CAUSAM* STANDING OF THE AD HOC BONDHOLDER GROUP.**

**_5.1.  Identity of my clients, their position concerning ITI and ITI ARG, and their interest in ensuring that ITI and ITI ARG comply with their legal duty to file for insolvency in the jurisdiction corresponding to their center of main interests (Spain)._**

93.  My clients, the Ad Hoc Bondholder Group, collectively hold more than 65% of one of the most significant debt instruments of IC Financial Operations B.V. (a company also referenced in the ruling subject to exequatur). Specifically, the 5.750% Senior Notes due 2024 ("the Bonds") issued by InterCement Financial Operations B.V. and unconditionally guaranteed by InterCement Participações S.A. (ICP) and InterCement Brasil S.A. (ICB).

94.  There are several references to my clients in the judicial recovery petition in Brazil (see Document No. 6) concerning these debts. For example, on page 2, point 3, it states: "*The Mediation was productive in protecting the Plaintiffs from the hostile behavior of certain creditors—particularly a certain group of foreign bondholder creditors ("Ad Hoc Group") that had already initiated insolvency proceedings against some of the Plaintiffs abroad— and allowed for a constructive channel for negotiations.*"

95.  In this case, as ITI and ITI ARG themselves acknowledge in their exequatur petition, InterCement Financial Operations B.V. is the primary creditor of ITI. For example, see the following references in the exequatur petition:

- Page 4, paragraph 5 of the petition;

- Page 8, section (d) of the petition;

- Page 23, paragraph 63, referring to Document 3 attached to the exequatur petition;

- Page 17, concerning the notification of the opening of negotiations with creditors.

96.  Regarding IC Financial Operations B.V., as ITI and ITI ARG acknowledge in the exequatur petition (see Document No. 9), an observer has been appointed under the *Wet homologatie onderhands akkoord* (or "WHOA," a well-known preventive restructuring mechanism under Dutch law) in the Netherlands to oversee the process (without any intervention or decision-making powers). This Dutch proceeding is one of the cases referred to in ITI and ITI ARG's statement in Brazil concerning the *"group of foreign bondholder creditors ("Ad Hoc Group") that had already initiated insolvency proceedings against some of the Plaintiffs abroad"* (see Document No. 6).

- 29 -

97.    The initial submissions of the Dutch proceeding are provided as **Document No. 34**, with their Spanish translation as **Document No. 35**. These submissions explicitly confirm that the COMI of IC Financial Operations B.V. is in the Netherlands, despite the fact that this company is also referenced in the Brazilian Order subject to exequatur. This suggests a systematic pattern by ITI, ITI ARG, and IC Financial Operations B.V. of claiming their COMI in multiple jurisdictions simultaneously. Notably, since the Dutch proceeding is also included in Annex A of the European Insolvency Regulation (referred to as "*de openbare akkoordprocedure buiten faillissement*"), and since it was opened in the Netherlands based on COMI, it must be automatically recognized in Spain as a main proceeding; unlike the Brazilian proceeding. The COMI of the European companies is in Spain (for ITI and ITI ARG) and in the Netherlands (for InterCement Financial Operations B.V.) because these companies expressly declared so in these jurisdictions, leading to the opening of main proceedings in Spain (for ITI and ITI ARG) and in the Netherlands (for InterCement Financial Operations B.V.). It is not in Brazil simply because, at a certain stage of the process, ITI and ITI ARG found it convenient to claim otherwise to evade the protections of European insolvency laws.

98.    Additionally, the certified translation of the observer's appointment is provided as **Document No. 36**, with its Spanish translation as **Document No. 37**. Part of the observer's role in the Netherlands is to keep the court informed about the progress of the Dutch proceeding through reports. In this regard, we present:

- The first report, dated October 4, 2024, in which the observer confirms (on page 4) the existence of an intercompany loan between IC Financial Operations B.V. and ITI. The Dutch-English version of this report is submitted as **Document No. 38**, and the Spanish translation as **Document No. 39**. This report also includes explicit references to Redwood Master Fund, Ltd., one of the members of the Ad Hoc Bondholder Group, which was the entity that initiated legal action against IC Financial Operations B.V. in the Netherlands.

   Specifically, the observer (page 4) states that **IC Financial Operations B.V. has two intercompany receivables, including a credit of <u>approximately 1.22 billion U.S. dollars from ITI</u>**. The report also states (page 13): "*The EJ Applicants have the support of 1/3 of their creditors for the EJ Plan, as required by Brazilian law for admission to the EJ Proceeding. <u>The Observer understands that the EJ Plan does not have the support of ICBV's creditors. According to ICBV, this is not an issue, as EJ</u>*

*takes a consolidated approach, and therefore, the required support for all EJ Applicants must be considered collectively. The Ad Hoc Group* [i.e., my clients] *opposed the consolidated approach in Brazil and argued, among other things, that ICBV does not meet the requirements for consolidation in the EJ Proceeding, including the fact that ICBV does not have the support of at least 1/3 of its creditors."*

- The subsequent report dated November 19, 2024, submitted as **Document No. 40** in its Dutch-English version, and as **Document No. 41** in its Spanish translation. In this report (page 9), the observer notes that the company's apparent intention through its Brazilian restructuring attempts is to entirely **eliminate the intercompany credit between the Spanish company and IC Financial Operations B.V., which would logically cause significant harm to all creditors of IC Financial Operations B.V.** As previously stated, this would be unthinkable in a Spanish proceeding, where the proceeds from the sale of assets in Spain would be used to repay creditors, including, and of course subject to the legal priority of claims, IC Financial Operations B.V.

  We reiterate that, in a Spanish proceeding, the elimination of IC Financial Operations B.V.'s credit against ITI for the amount of 1.22 billion U.S. dollars, as ITI and ITI ARG seek to do in the Brazilian proceeding, would not be possible[4], which, as stated in the section on public policy, constitutes a confiscatory attempt and a fundamental violation of my clients' property rights.

99. The credit against ITI resulting from an intercompany loan underscores the significant relationship between IC Financial Operations B.V. and ITI. In fact, the Senior Notes represent the only material external debt of IC Financial Operations B.V., and as such, the Ad Hoc Bondholder Group represents the majority of creditors with a vested interest in how the intercompany loan from IC Financial Operations B.V. to ITI is handled.

---

[4]  Note that, although the Dutch observer was commenting on the Brazilian proceeding prior to the judicial recovery, ITI and ITI ARG continue to seek the elimination of intra-group credits within the judicial recovery proceeding subject to exequatur.

100. Consequently, the Ad Hoc Bondholder Group's legitimate interest in the management of ITI's insolvency proceeding is undeniable.

101. In fact, **my clients were the ones who filed the aforementioned appeal against the opening order in Brazil concerning ITI, ITI ARG, and IC Financial Operations B.V.** (see Documents No. 28 and 29, which clearly show in their headers that the appellants are my clients), which is now subject to exequatur in Spain concerning ITI and ITI ARG.

102. Additionally, my clients have filed a claim against ITI for damages arising from the fraud committed by initiating proceedings in Brazil despite a main proceeding already being open in Spain, demanding that ITI and ITI ARG comply with Article 611 of the TRLC. As a result, beyond the matters already mentioned, my clients will hold a direct claim against ITI for the damages caused (see Documents 32 and 33). To avoid repetition, we refer to the previously stated violations of all the safeguards of Spanish law that ITI and ITI ARG seek to circumvent, as discussed in the section on public policy: violation of the absolute priority rule, violation of the best-interest-of-creditors rule, violation of the prohibition of substantive consolidation (despite the possibility of coordination), confiscatory effects preserving value for the ultimate beneficial owner to the detriment of creditors, deprivation of the legitimate recovery rights of Spanish creditors (for example, regarding the sale of the businesses in Argentina and Brazil, which, in turn, should have been carried out under the protection of the unit sale framework provided by Spanish law).

103. In fact, part of the Ad Hoc Bondholder Group's interest in the success of the appeal is, logically, to ensure that ITI and ITI ARG are compelled to comply with their legal duty under Article 611 of the TRLC (filing for insolvency in the jurisdiction where the main proceeding for the opening of negotiations was conducted). In this way, once insolvency is declared in Spain (the proper jurisdiction, not Brazil), the safeguards of the Spanish proceeding will be activated. Among these, my clients will be able to participate in the Spanish insolvency proceeding and in the corresponding liability phase, where an insolvency administrator will assess the liability of ITI and ITI ARG's management bodies. Furthermore, it is clear that there will be no consolidation of insolvency estates in the Spanish proceedings of ITI and ITI ARG, as expressly established by Spanish law.

104.  Finally, ITI is the shareholder of the material businesses of its subsidiaries in Brazil and
Argentina, has received proceeds from the sale of certain subsidiaries that operated in
Africa, and, therefore, controls all materially relevant assets for both its direct and indirect
creditors, among whom the Ad Hoc Bondholder Group is a significant stakeholder.

105.  For these reasons, it is evident that the Ad Hoc Bondholder Group is one of the parties with
a vested interest in ensuring the enforcement of the judicial exequatur ruling against ITI and
ITI ARG.

### 5.2. *On the standing of my clients.*

106.  Within each proceeding, and in accordance with their participation, each legal system
considers certain individuals who have a specific relationship with the subject matter of the
litigation to be authorized to act as a party in such proceedings. This connection with the
subject matter of the litigation establishes procedural standing and enables the effective
exercise of a legal act, including both the enjoyment and defense of a right. Generally, this
relationship is determined by active or passive ownership of the legal matter in question.

107.  That being said, numerous legal systems, including the Spanish legal system, recognize not
only the direct standing of the holder of the disputed legal relationship but also provide for
instances of indirect or extraordinary standing. In such cases, the legislature allows a person
to act as a party in a specific proceeding even if they are not the actual holder of the legal
relationship. The most common instances involve an indirectly legitimized party acting on
behalf of the true right holder due to the latter's inaction or negligence, thereby safeguarding
both the interests of the substituted party and their own.

108.  Regarding the exequatur procedure, Article 54.1 of the LCJI refers to parties who
demonstrate a *"legitimate interest"* in the petition submitted. The challenged Order itself,
on page 2, section 2, paragraph 3, also refers to the requirement to establish such an interest.

109.  Additionally, Article 54.3 of the LCJI states that passive standing would apply to *"the party
or parties against whom the foreign judicial decision is to be enforced."*

110. As stated in the challenged order, *"since this is an insolvency proceeding, there are multiple interested parties, and in many cases, they may even be unknown."* As we have seen, **my clients are the appellants challenging the Order of commencement issued on December 5, 2024, in Brazil, which is the subject of the exequatur; thus, their active standing to bring the present appeal is more than evident (in this case, they are a known interested party, not an unknown one)**.

111. Furthermore, their interest is clear given the content of the plan that is being proposed for approval in Brazil. This was expressly set forth in the letter sent by my clients to ITI and its Board of Directors (see Documents 32 and 33), detailing how (i) the plan proposals submitted in Brazil violate Spanish law and fail to meet international standards and (ii) they infringe both the absolute priority rule and the best interest of creditors rule, which are applicable in Spain, the Netherlands, the United States, and most developed jurisdictions.

112. To this end, a document submitted in Brazil by ITI, ITI ARG, and others is provided, in which they express their intention to process said consolidated plan (despite its contravention of Spanish law). This document, dated February 10, 2024, is submitted as **Document No. 41** in its original Portuguese version and as **Document No. 42** in its Spanish translation. The document states (page 2, footnote) that *"if the consolidation of estates is admitted, the debtors will submit a unified plan (…)."*

113. Therefore, the legitimate interest held by the Ad Hoc Bondholders Group as a creditor of IC Financial Operations B.V. (which, in turn, is a creditor of ITI) grants standing to my clients, who are already appellants of the very Brazilian order of commencement subject to exequatur, to file the present appeal.

114. Finally, ITI is acting, as noted, in clear conflict of interest, prioritizing the interests of its recent shareholders over those of its passive creditors. Therefore, <u>additionally, the standing to act of the Ad Hoc Bondholders Group is also an extraordinary standing that arises from the omission of actions by the management body of IC Financial Operations B.V. in this exequatur procedure, which is acting fraudulently and in collusion with ITI to prevent the recognition of the main insolvency procedure already acknowledged as such in Spain, seeking the forgiveness of an intragroup debt in Brazil of 1.22 billion US dollars through estate consolidation</u> (which would never occur in Spain, given the separation of active and passive estates for each company as part of the safeguards of our system), with the resulting confiscatory effects on my clients' assets and the corresponding harm to the recovery of their credit.

**SIX.- ON THE PROCEDURAL INFRACTION CONSISTING OF THE FAILURE TO NOTIFY THE EXEQUATUR PETITION TO THE DEFENDANT PARTIES, UNDER ARTICLE 54.5 OF THE LAW ON INTERNATIONAL JURISDICTION.**

115.    Although the exequatur procedure should not have been admitted for processing for the reasons outlined in the preceding paragraphs, once initiated, this party wishes to further emphasize that the Court of First Instance disregarded the most essential rules of procedure, specifically Article 54.5 of the LCJI, a matter which is raised for the purposes set forth in Article 459 of the LEC.

116.    Under Article 54.5 of the LCJI, the Court Clerk must serve the defendant party with the petition and documents so that they can object, if applicable, within 30 days.

117.    In the exequatur proceedings that give rise to the present appeal, the notification of the petition to the parties against whom the foreign judicial decision is to be enforced was omitted, with the argument that: *"This is a request for <u>recognition as a principal</u> (and not incidental, in an already existing judicial procedure), <u>so there are no "defendant parties" to whom the petition should be served in order to allow for opposition to the recognition. And, since this is an insolvency procedure, the interested parties are numerous</u> and, in many cases, **may even be unknown,** so judicial practice leans toward serving the petition only to the Public Prosecutor's Office** (Article 54.8 of the LCJI). This was done in this case, and similarly in the **cases resolved by Commercial Court No. 11 of Barcelona (order of January 9, 2019) and Commercial Court No. 1 of Girona (order of November 18, 2021, which cites the Supreme Court's doctrine on this matter regarding the notification of the recognition request)"** (emphasis added by this party).

118.    However, neither of the two rulings that form the basis for the Court of First Instance's decision to omit the notification of the petition to the defendant parties is substantiated. In any case, it appears that we are not dealing with even comparable cases, since the present exequatur procedure is governed by the LCJI and not by the LEC, as resolved in the Order issued by Commercial Court No. 11 of Barcelona on January 9, 2019. Furthermore, it is also not comparable to the factual situation in the order of November 18, 2021, issued by Commercial Court No. 1 of Girona, because, as stated in its first legal ground, the foreign decision was issued as a result of the exercise of a personal action, a dissolution of marriage or divorce initiated by one spouse with the consent of the other. The cited rulings are

attached as **<u>Document No. 44</u>**.

119. That being said, prior to the enactment of the LCJI, the Supreme Court, when interpreting Article 956 of the LEC of 1881, considered that in proceedings processed by mutual agreement, the hearing of the non-appearing party could be waived, with the prior service to the Public Prosecutor's Office being sufficient to issue the corresponding ruling, which was the case for divorce or separation proceedings by mutual agreement. No violation of due process occurred to the ex-spouse defendant in the exequatur, nor was their right to defense compromised, even though the petition for exequatur was not served on them, as it was presumed that they were aware of the foreign decision to which they had fully agreed.

120. This interpretation, prior to the enactment of the LCJI, we emphasize, applied exclusively to cases of divorce or separation by mutual agreement. However, even if it is considered that this criterion has persisted over time and is applied to the new regulations, Article 54 of the LCJI, it could only be applied to proceedings arising from decisions related to separations or divorces by mutual agreement.

121. Based on the foregoing, we conclude that the hearing of the defendant parties (creditors of ITI and ITI ARG) in the exequatur procedure subject to appeal could not be bypassed, as the foreign decision whose recognition is sought does not stem from a procedure processed by mutual agreement among all parties affected by the decision.

122. The Court of First Instance further argues that the reason for omitting the hearing procedure for the affected parties is that this is a foreign principal insolvency proceeding, in which there are no defendant parties. In order to avoid repetition, **we refer to what has already been stated regarding the error made by the Court of First Instance in recognizing the Brazilian order of commencement of insolvency proceedings as a principal procedure**. On the other hand, the identity of the defendants cannot be disregarded, as they are identified in the exequatur petition (see page 21 of the petition, paragraph 61, and Documents 3 and 9 submitted with the petition), as they were opposing the recognition of the Brazilian proceeding regarding ITI and ITI ARG in other jurisdictions (such as the United States) and even appealed the order of commencement in Brazil. Therefore, logically, they should have been heard beforehand. The requests by ITI and ITI ARG for the exequatur to be granted without hearing my clients or any other creditor result in a reduction of the exequatur procedure, which is limited, for my clients and the creditors, to a single instance (which, however, is already a second instance).

123. The right to defense, contradiction, and a fair process does not allow for the omission of the legally required notification to the defendant parties in the exequatur procedure (with the exception of mutual divorce proceedings, as cited by the Court of First Instance, which are not relevant to our case). This is especially true in the present factual situation, which involves the recognition for the creditors of ITI and ITI ARG of the commencement of Brazilian judicial recovery proceedings as the principal procedure, when a main insolvency procedure had already been opened in Spain.

124. This is not merely a procedural irregularity that does not cause harm to the parties; on the contrary, the harm it causes is material and effective, as it prevents highlighting the absence of the requirements that should have been met, under Article 742 of the TRLC, in the decision whose recognition is being sought.

125. Article 238.3 of the Organic Law of the Judiciary, applicable in all jurisdictional areas, states that procedural acts are null and void *"when essential rules of procedure are disregarded, provided that this may have caused harm to the parties,"* a provision that must be connected with paragraph 1 of Article 240 of the same law, which stipulates that *"the nullity of an act, in all cases, and the defects in the form of procedural acts that involve the absence of indispensable requirements to achieve their purpose or that result in actual harm, must be invoked through the legal appeals established against the relevant decision or by other means established by procedural laws,"* which is what we are asserting through the present appeal.

**SEVEN.- ON THE IMPOSITION OF COSTS.**

The acceptance of the appeal should result in the express condemnation of costs to the appellees, in accordance with the provisions of Article 398.1 of the Civil Procedure Law.

In light of the foregoing,

**I REQUEST THAT THE HONORABLE COURT OF THE PROVINCIAL COURT OF BILBAO** accept this petition, along with its attached documentation, and kindly: admit it, recognize that the appeal against Exequatur Order No. 6/2025 has been duly filed in a timely manner, and resolve as follows:

1. Reverse the first-instance decision and issue a Judgment **DENYING THE RECOGNITION OF THE EXEQUATUR, with express condemnation of costs** to those opposing this request.

2. Alternatively, order the annulment of proceedings and the retroaction of the proceedings to the moment when the petition was duly served on the defendant parties, so that the parties with a legitimate interest may make the appropriate allegations before Commercial Court No. 1 of Bilbao.

This is the justice I request and expect in Bilbao, on February 21, 2025.


**FIRST FURTHER STATEMENT:** This party hereby announces from this moment the means of evidence it intends to rely upon, and as this is an eminently legal matter (the impossibility of opening a principal procedure in Spain when there is already a Spanish decision opening a principal procedure regarding the same companies, ITI and ITI ARG), these are:

- Documentary evidence (Documents Nos. 1 to 44) attached to the appeal.

- Due to its relevance, the orders for *Communication under Article 5.3 of the Insolvency Law / Article Komunikazioa Konkurtso Legearen 5.3 211/2024* followed before Commercial Court No. 2 of Bilbao.

**I REQUEST THAT THE COURT** consider the evidence proposal and request its admission and practice.

**SECOND FURTHER STATEMENT:** This party believes to have complied with all legal requirements in the formulation of this document for the interposition of the appeal; however, should any formal defect be observed, it expresses its willingness to remedy the same.

**ONCE AGAIN, I REQUEST THAT THE COURT** consider the previous statement for the purposes of Article 231 of Law 1/2000, of January 7, Civil Procedure Law, applicable by reference to Article 521 of the TRLC.

This is justice I reiterate, on the date and at the place mentioned above.

[e-signature]
JOSE CARLES
DELGADO
Signed digitally by JOSE
CARLES DELGADO
Date: 02.24.2025
01:51:02 p.m. +01'00'

[e-signature]
JOSE CARLOS CUESTA
MARTIN
Signed digitally by
JOSE CARLOS
CUESTA MARTIN
Date: 02.24.2025
01:51:49 p.m.
+01'00'

Ldo. Mr. José Carles Delgado
Col. ICAM (Bar Association)
No. 83.585

Ltdo. Mr. Carlos Cuesta
Martín
Col. ICAM (Bar Association)
No. 82.929

Mr. Eduardo José Manzanos Llorente
Court Attorney

- 39 -

*Recurso de apelación*

*Procedimiento de origen: Exequatur 8/2025*
*(Juzgado Mercantil núm. 1 de Bilbao)*

## A LA ILMA. AUDIENCIA PROVINCIAL DE BILBAO (SALA DE LO CIVIL)

**D. EDUARDO JOSÉ MANZANOS LLORENTE**, Procurador de los Tribunales y de (i) **MONEDA LUXEMBOURG SICAV - LATAM CORPORATE CREDIT FUND**; (ii) **MONEDA LATAM HIGH YIELD FUND PLC;** (iii) **MONEDA LATIN AMERICAN CORPORATE DEBT;** (iv) **MONEDA USA COLLECTIVE INVESTMENT TRUST - MONEDA LATAM CREDIT CIT;** (v) **CIGNA HEALTH & LIFE INSURANCE COMPANY;** (vi) **CONTRARIAN EMERGING MARKETS, L.P;** (vii) **REDWOOD MASTER FUND, LTD;** y (viii) **REDWOOD DRAWDOWN MASTER FUND III, LP** (en lo sucesivo, Grupo de Bonistas Ad Hoc), representación que acredito oportunamente mediante poderes para pleitos con facultades especiales concursales que se adjuntan como **Documento núm. 1**, bajo la dirección letrada de D. José Carles Delgado y D. Carlos Cuesta Martín, miembros del Ilustre Colegio de Abogados de Madrid con números de colegiados 83.585 y 82.929 respectivamente, ante la Ilma. Audiencia Provincial de Bilbao, Sala de lo Civil, **comparezco** y, como mejor proceda en Derecho

### DIGO

I.    Que el 17 de enero de 2025, el Juzgado de lo Mercantil núm. 1 de Bilbao, a petición de las mercantiles INTERCEMENT TRADING E INVERSIONES, S.A. e INTERCEMENT TRADING E INVERSIONES ARGENTINA, S.L. (en adelante, "ITI" e "ITI ARG", respectivamente), dictó Auto de exequátur en el procedimiento de exequátur 8/2025, por el que se declara el reconocimiento de la resolución de apertura de fecha 6 de diciembre de 2024 [nótese que en la resolución consta como fecha el 5 de diciembre], dictada por el 1º Juzgado de Falencias y Recuperaciones Judiciales del Corte Central del Distrito de Sao Paulo-Brasil, en el procedimiento de recuperación judicial con nº de expediente electrónico 1192002-34.2024.8.26.0100.

II.   Que de dicho Auto tuvieron constancia mis representados en fecha 24 de enero de 2025, tras las respectivas publicaciones en dichas fechas en el Registro Público Concursal.

III.  Que considerando el referido Auto no ajustado a derecho y lesivo para los intereses de mis mandantes, dicho sea con todo respeto y en términos de estricta defensa, dentro del plazo legal, vengo a **INTERPONER RECURSO DE APELACIÓN** contra dicha resolución ante la **ILMA. AUDIENCIA PROVINCIAL DE BILBAO,** al amparo de lo

dispuesto en los artículos 455, 458 y 459 de la Ley 1/2000, de 7 de enero, de Enjuiciamiento Civil (LEC, en lo sucesivo), cumpliendo con los siguientes

## REQUISITOS PROCESALES

I.   Se presenta este escrito de interposición ante la Ilma. Audiencia Provincial de Bilbao que es el Tribunal competente para conocer del recurso de apelación, *ex* artículos 455.2.2º y 458.1 LEC.

II.  La interposición del recurso se lleva a cabo dentro del plazo de veinte días contados desde el día siguiente a su conocimiento a través de la publicación en el Registro Público Concursal, *ex* artículos 458.1 y 448.2 LEC.

III. Conforme preceptúa el artículo 448.1 LEC, esta parte se halla legitimada por afectarle desfavorablemente el Auto que se recurre, que se acompaña más adelante.

IV.  Las exigencias de postulación se cumplen para este escrito de interposición, ya que esta parte comparece representada mediante Procurador de los tribunales y asistida de Abogados en ejercicio, ambos colegiados y habilitados para ejercer ante el Juzgado, artículos 23.1 y 31.1 LEC.

Y todo ello sobre la base de los siguientes

## MOTIVOS DE APELACIÓN

**PREVIO.-** **DEL PROCEDIMIENTO PRINCIPAL YA INICIADO EN ESPAÑA A INSTANCIAS DE INTERCEMENT TRADING E INVERSIONES, S.A. E INTERCEMENT TRADING E INVERSIONES ARGENTINA, S.L. CON RECONOCIMIENTO DE LA LOCALIZACIÓN DE SU CENTRO DE INTERESES PRINCIPALES EN BILBAO.**

**Previo.1. De la existencia de un procedimiento principal de apertura de negociaciones en España por radicar su *"centro de intereses"* en España.**

1.   Con fecha 16 de julio de 2024, las sociedades españolas INTERCEMENT TRADING E INVERSIONES, S.A. e INTERCEMENT TRADING E INVERSIONES ARGENTINA, S.L. (en adelante, "ITI" e "ITI ARG", respectivamente) presentaron ante los Juzgados de Bilbao una comunicación del artículo 585 del Texto Refundido de la Ley Concursal. Se acompaña dicha comunicación como **Documento núm. 2**.

2.    En dicho escrito, las propias empresas españolas insolventes, en el apartado "*Competencia*"
de los Fundamentos de Derecho de su comunicación, aseveraron que "*De conformidad con
lo dispuesto en el artículo 86.ter de la Ley Orgánica del Poder Judicial y los artículos 44,
45 [nótese, artículo que solo se refiere al centro de intereses principales] y 585 del TRLC,
tal y como se exige en el artículo 586.1.2°, se expresa que corresponde la competencia
para conocer de la presente comunicación al Juzgado de lo Mercantil de Bilbao*".

3.    Con fecha 19 de julio de 2024, el Juzgado de lo Mercantil núm. 2 de Bilbao, dictó Decreto
por el que, entre otros extremos, (i) tenía por presentada la comunicación de inicio de
negociaciones, (ii) tenía por realizada la manifestación relativa a la presencia del centro de
intereses principales en Bilbao y (iii) se declaraba territorialmente competente por radicar
el centro de intereses principales en Bilbao. Se acompaña dicho Decreto dictado en el seno
del procedimiento *de Comunicación art. 5.3 de la Ley Concursal / Art. Komunikazioa
Konkurtso Legearen 5.3 211/2024* como **Documento núm. 3**.

4.    Es decir, el Juzgado de lo Mercantil núm. 2 de Bilbao decretó, con base en las propias
alegaciones de ITI sobre presencia de centro de intereses principales en Bilbao, que el
centro de intereses principales se encontraba en Bilbao.

      Consecuentemente, **el Juzgado de lo Mercantil núm. 2 de Bilbao abrió un
procedimiento de insolvencia en España para ambas mercantiles que ha de tener la
consideración como "procedimiento principal" fuera de España (incluido Brasil) por
estarse tramitando en España, lugar donde las deudoras tienen su centro de intereses
principales y por no haberse impugnado ni por ITI, ni por ITI ARG, ni por ningún
otro interesado o tercero con interés legítimo.**

5.    Al respecto, la legislación española (artículo 608 del Real Decreto Legislativo 1/2020, de
5 de mayo, por el que se aprueba el texto refundido de la Ley Concursal; en adelante,
"TRLC") prevé la posibilidad de una posibilidad de ulterior prórroga del procedimiento
tres (3) meses ante el "juez del concurso". Posibilidad a la que se acogieron ITI e ITI ARG,
prorrogando el procedimiento hasta el 16 de enero de 2025. Se aporta el Auto por el que se
concedía la prórroga como **Documento núm. 4**. Nótese que, **en tanto la jurisdicción y
competencia se revisan por el Juzgado español en el momento de la presentación de
la solicitud de apertura de negociaciones (y no en el momento de la prórroga), dicho
Auto que concede la prórroga no contiene ninguna referencia a su jurisdicción,
resultando inútiles los intentos de ITI e ITI ARG de defender lo indefendible**: que la
apertura del procedimiento en España no tuvo lugar por radicar en España el centro de
intereses principales. Parece increíble que ITI e ITI ARG defiendan sin pudor que sus meras

alegaciones en un escrito de prórroga podrían llegar a modificar, a su antojo, la jurisdicción española en contra de lo previsto en el ordenamiento legal español en una resolución firme (tras haber pasado el plazo para impugnar la competencia internacional sin que nadie lo hiciera) y, por tanto, vinculante.

6.   Insistimos, el Juzgado ya se refirió de forma meridianamente clara a la jurisdicción sobre la base del centro de intereses principales en su Decreto de 19 de julio de 2024 y en el momento de acordar la prórroga la jurisdicción no se revisa, por lo que unas meras manifestaciones unilaterales de ITI e ITI ARG (y *contra lege*), lógicamente no modifican lo previsto en el TRLC.

7.   En efecto, la legislación española prevé (artículo 611 del TRLC) que, de no alcanzarse una solución en dicho plazo de prórroga, el deudor que no haya alcanzado un plan de reestructuración (en este caso, las sociedades ITI e ITI ARG) "*deberá solicitar la declaración de concurso dentro del mes siguiente, salvo que no se encontrara en estado de insolvencia actual*".

8.   Es decir, ITI e ITI ARG tenían obligación legal en España, tras no alcanzar el plan de reestructuración en su procedimiento principal español, de solicitar la declaración de concurso de acreedores en España antes del 16 de febrero de 2025.

9.   Sin embargo, en el presente supuesto las deudoras ITI e ITI ARG no cumplieron con dicho "deber" dispuesto en la legislación española en tanto no han solicitado el concurso de acreedores pese a que dicho plazo ha expirado.

10.   Es claro, por tanto, el incumplimiento de ITI e ITI ARG y de sus respectivos órganos de administración de sus respectivas obligaciones de solicitar la apertura de un procedimiento concursal en España, con la **correspondiente privación del procedimiento correspondiente al lugar donde, según reconocieron las propias ITI e ITI ARG ante el Juzgado (señalando de forma expresa el artículo 45 del TRLC como base de la jurisdicción internacional de los juzgados de Bilbao), radicaba su centro de intereses principales**.

***Previo.2. Del exequatur en España de una resolución brasileña de apertura de un procedimiento de insolvencia extranjero en contravención de lo previsto en el artículo 611 del TRLC.***

11.   A instancia de las mercantiles: (i) Intercement Brasil, S.A. (ii) Intercement Participaciones, S.A., (iii) Intercement Financial Operations B.V. (iv) Mover Participaciones, S.A. (v)

Sucea Participaciones, S.A (vi) Sincro Participaciones, S.A., **(vii) ITI y (viii) ITI ARG**, se procedió a la solicitud de apertura de procedimiento brasileño de "*Recuperação Judicial*". Se aporta dicha solicitud, junto con su traducción al castellano, como **Documentos núms. 5 y 6**, respectivamente.

12. Llama poderosamente la atención que ITI e ITI ARG, con un procedimiento de negociaciones para alcanzar un plan de reestructuración ya abierto en España sobre la base de sus propias manifestaciones sobre la localización de su centro de intereses principales en Bilbao (procedimiento principal seguido ante el Juzgado de lo Mercantil núm. 2 de Bilbao), pretendiese que se abriese, a la vez, otro procedimiento principal en otra jurisdicción.

13. Insistimos, **no es factible que haya dos procedimientos principales; uno en España y uno en Brasil. Y el procedimiento principal español ya se había abierto mediante Decreto de fecha 16 de julio de 2024 y seguía en vigor al haberse solicitado la prórroga, obligando a las sociedades españolas, de no llegarse a un acuerdo de reestructuración que solventase el estado de insolvencia, a presentar sus solicitudes de concurso voluntario en Bilbao *ex* artículo 611 del TRLC (obligación que sigue vigente tras la finalización de la prórroga).**

14. **El 1º Juzgado de Falencias y Recuperaciones Judiciales del Corte Central del Distrito de Sao Paulo (Brasil), obvió la existencia del procedimiento principal en España (al haber ya declarado el Juzgado de lo Mercantil núm. 2 de Bilbao que el COMI estaba en España) cuando dictó la resolución de apertura** de todas las sociedades descritas en el párrafo 11 anterior, incluidas ITI e ITI ARG con fecha 5 de diciembre de 2024. Se aporta resolución de apertura del procedimiento brasileño de "*Recuperação Judicial*", junto con su traducción al castellano, como **Documentos núms. 7 y 8**.

15. Con fecha 6 de enero de 2025, ITI e ITI ARG, en clara contravención de lo previsto en el artículo 611 del TRLC presentaron, en lugar de una solicitud de concurso voluntario, una solicitud de *exequatur* de la resolución de apertura determinadas sociedades afiliadas. Se acompaña dicha solicitud como **Documento núm. 9**.

16. Sin traslado a nadie más —por ende, sin posibilidad alguna de alegaciones por mis mandantes pese a constar que habían apelado la decisión objeto de exequatur en Brasil—, con fecha de 17 de enero de 2025, el Ministerio Fiscal emitió informe sin oposición al exequatur solicitado.

17. Con fecha 17 de enero de 2025, el Juzgado de lo Mercantil núm.1 de Bilbao dictó Auto por el que declaraba "*el reconocimiento de la resolución de apertura de fecha 6 de diciembre* [nótese, 5 de diciembre según la literalidad de la resolución] *de 2024 dictada por el Tribunal de Justicia del Estado de Sao Paulo – Brasil, en el procedimiento de recuperación judicial con nº de expediente electrónico 1192002.3.2024.8.26.0100*". Dicho Auto, que se acompaña como **Documento núm. 10**, es objeto del presente recurso de apelación.

18. Con fecha 24 de enero de 2025 se publicó en el Registro Público Concursal el Auto de exequatur de 17 de enero según consta en el correspondiente "Edicto Concursal" (relativo a "*AUTO DE RECONOCIMIENTO JUDICIAL DE RESOLUCION EXTRANJERA*"), según se acredita mediante resguardos de publicación aportados como **Documentos núms. 11 y 12**. A su vez, con fecha 13 de febrero de 2025 se publicó el Auto referido en "Publicidad Registral" (en cuanto a "*APERTURA DE PROCEDIMIENTO DE INSOLVENCIA CONFORME AL ARTICULO 743.3 TRLC*"), según se acredita mediante resguardos de publicación aportados como **Documentos núms. 13 y 14**.

**PRIMERO.- DEL INCUMPLIMIENTO DEL REQUISITO PREVISTO EN EL ARTÍCULO 742.1.3º DEL TRLC. LOCALIZACIÓN DEL CENTRO DE INTERESES PRINCIPALES ("COMI") EN ESPAÑA Y EXISTENCIA DE UN PROCEDIMIENTO DE INSOLVENCIA PRINCIPAL EN ESPAÑA.**

***1.1. De la necesidad de que el centro de intereses principales o COMI se encuentre en el Estado de origen de la resolución objeto de exequátur.***

19. El artículo 742 del TRLC, relativo a "*Reconocimiento de la resolución de apertura*", en su apartado 1., señala que las resoluciones extranjeras que declaren la apertura de un procedimiento de insolvencia se reconocerán en España mediante el reconocimiento de exequatur si se cumplen una serie de requisitos. Entre ellos, el establecido en su apartado 3º: "*Que la competencia del tribunal o de la autoridad que haya abierto el procedimiento de insolvencia esté basada en alguno de los criterios contenidos en esta ley o en una conexión razonable de naturaleza equivalente.*"

20. Por su parte, el apartado 2 del mismo artículo señala que: "*El procedimiento de insolvencia extranjero se reconocerá: 1.º Como procedimiento extranjero principal, si se está tramitando en el Estado donde el deudor tenga el centro de sus intereses principales.*"

***1.2. Del error manifiesto del Auto recurrido. Imposibilidad de que el centro de intereses principales o COMI se encuentre en dos sitios a la vez.***

21.    Sobre lo anterior, considera el Auto recurrido que: "*La competencia del Tribunal de Justicia del Estado de Sao Paulo que ha dictado la resolución ha sido examinada por el propio Tribunal, como consta en la resolución, y está basada en los mismos criterios de atribución de competencia que recoge nuestro ordenamiento interno nacional y comunitario; COMI o centro principal de intereses (art. 45 TRLC; 3 del Reglamento Europeo de Insolvencia 2015; STJUE As. Eurofood). (…) Tampoco el que, con anterioridad a este reconocimiento y con fundamento en su domicilio social, las filiales domiciliadas en España hayan pedido ante esta jurisdicción nacional española la protección que le otorga nuestrfo ordenamiento para negociar un plan de reestructuración, no impide reconocer la posibilidad de que su centro de intereses principal esté en Brasil, como el de sus principales acreedores*."

22.    El error del Auto recurrido es, con el debido respeto y en términos de estricta defensa, manifiesto. ¿Por qué? Porque **obvia que, en España, a 5 de diciembre de 2024** (fecha de la resolución brasileña por la que el 1º Juzgado de Falencias y Recuperaciones Judiciales del Corte Central del Distrito de Sao Paulo (Brasil) abrió un procedimiento con respecto, entre otras, a las sociedades españolas ITI e ITI ARG) **existía ya un procedimiento principal abierto por el Juzgado de lo Mercantil núm. 2 de Bilbao sobre la base de la localización del centro de intereses principales de estas sociedades en España y a solicitud de las propias ITI e ITI ARG** (autos de *Comunicación art. 5.3 de la Ley Concursal / Art. Komunikazioa Konkurtso Legearen 5.3 211/2024*).

23.    En efecto, si en España había ya un pronunciamiento sobre la localización del COMI o centro de intereses principales en España (Decreto de 19 de julio de 2024, con base en el artículo 45 del TRLC), ¿cómo puede ser que España reconozca un procedimiento como principal sobre la base de que el COMI o centro de intereses principales (también artículo 45 del TRLC) se encuentra en Brasil? No tiene el mínimo sentido.

24.    Por tanto, la existencia de un pronunciamiento previo sobre localización del COMI en España es suficiente *per se* para la denegación del exequátur de una resolución de apertura de otro país sobre la supuesta base de que el COMI está en dicho país (en este caso, Brasil) sin mayores consideraciones. En todo caso, procedemos a analizar los pormenores para facilitar la labor de esa Ilma. Audiencia Provincial.

*__1.3. Del reconocimiento de ITI e ITI ARG en sus solicitudes de apertura de negociaciones sobre la localización de su centro de intereses principales en Bilbao.__*

25.    El artículo 586 del TRLC exige que la solicitud de apertura de negociaciones presentada por el deudor exprese, dentro del contenido obligatorio: "*2.º El fundamento de la competencia del juzgado para conocer de la comunicación*".

26.    En cumplimiento de lo requerido en dicho precepto, ITI e ITI ARG reconocieron en su solicitud conjunta de apertura de negociaciones en España, como únicos apuntes a la jurisdicción y competencia, que "*De conformidad con lo dispuesto en el artículo 86.ter de la Ley Orgánica del Poder Judicial y en los artículos 44, <u>45</u> y 585 del Texto Refundido de la Ley Concursal, según exige el artículo 586.1.2º, se hace constar que la competencia para conocer de la presente comunicación corresponde al Juzgado de lo Mercantil de Bilbao que por turno corresponda, al tener las Sociedades su domicilio social en Bilbao.*"

27.    Es decir, ITI e ITI ARG citaban como base de la jurisdicción y competencia de su comunicación los siguientes preceptos del TRLC:

- El artículo 44 del TRLC, relativo a "*Competencia objetiva*", refiere que "*Son competentes para declarar y tramitar el concurso de acreedores los jueces de lo mercantil.*"

- **El artículo 45 del TRLC**, relativo a "*Competencia territorial*", **<u>se refiere únicamente a la competencia sobre la base de la localización del centro de intereses principales del deudor</u>**. Concretamente, dicho artículo dispone que: "*1. <u>La competencia para declarar y tramitar el concurso corresponde al juez en cuyo territorio tenga el deudor el centro de sus intereses principales</u>. Por centro de los intereses principales se entenderá el lugar <u>donde el deudor ejerce de modo habitual y reconocible por terceros la administración de tales intereses (…).</u>*"

    Al respecto, <u>nótese que la solicitud sólo hizo referencia al artículo 45 TRLC y no hizo referencia alguna a otros conceptos ni preceptos</u> (como la localización de un establecimiento en España —por mucho que haya intentado modificar el relato del COMI al que ya están vinculadas ITI e ITI ARG en virtud del Decreto de 19 de julio de 2024—, lo que se encuentra regulado en un precepto totalmente distinto: el artículo 49 TRLC que, insistimos, no se encuentra citado en ningún momento).

- El artículo 585 del TRLC, relativo a "*Comunicación de la apertura de negociaciones*", dispone que "*1. En caso de probabilidad de insolvencia o de insolvencia inminente* [siendo la insolvencia inminente el supuesto esgrimido por las deudoras en su solicitud conjunta]*, el deudor, sea persona natural o jurídica, <u>podrá comunicar al juzgado competente para la declaración del concurso la existencia de negociaciones con sus</u>*

*acreedores, o la intención de iniciarlas de inmediato, para alcanzar un plan de reestructuración que permita superar la situación en que se encuentra."* Lo que tiene toda la lógica, en tanto **el artículo 611 del TRLC prevé que, de no tener éxito las negociaciones, el deudor "*deberá solicitar la declaración de concurso dentro del mes siguiente, salvo que no se encontrara en estado de insolvencia actual*"**.

En este caso, ITI e ITI ARG, al haber referido el precepto de aplicación al centro de intereses principales (art. 45 TRLC) en su solicitud, estaban reconociendo también que los juzgados competentes para la declaración del concurso (insistimos, con base en el art. 45 del TRLC), al que comunicaron la existencia de negociaciones y al que ahora tienen el deber de solicitar la declaración de concurso, eran los Juzgados de lo Mercantil de Bilbao, España.

28.   Además de lo anterior, de la propia comunicación (*vid.* Documento núm. 2) se derivaba que el centro de intereses principales está en España en tanto:

- Ambas sociedades son de nacionalidad española (pág. 3 en relación con ITI, pág. 4 en relación con ITI ARG).

- Ambas sociedades están registradas en España ante el Registro Mercantil de Vizcaya (pág. 3 en relación con ITI, pág. 4 en relación con ITI ARG) y presentan sus cuentas anuales en España.

- Ambas sociedades tienen su domicilio social en España. Más concretamente, en la ciudad de Bilbao (pág. 3 en relación con ITI, pág. 4 en relación con ITI ARG).

- Ambas sociedades tienen a la totalidad de su plantilla (aunque se trate de un único trabajador) en España (pág. 4 en relación con ITI, pág. 5 en relación con ITI ARG). Por tanto, ambas sociedades contribuyen a la Tesorería General de la Seguridad Social española que, de hecho, aparece reconocida como acreedora por parte de las propias ITI e ITI ARG

- Nótese que la deuda de ITI con la Hacienda Foral de Vizcaya asciende a más de un millón y medio de euros. Concretamente, a 1.620.342,13 Euros (pág. 8).

- Los contratos que las sociedades señalaron como necesarios para la continuidad de su actividad se refieren a servicios prestados en España por contrapartes españolas (pág. 12 en relación con ambas compañías).

- Las decisiones empresariales se toman en España, como demuestran las correspondientes actas de decisiones sobre la propia presentación de la comunicación de fecha 21 de junio de 2024 adjuntas a la comunicación de ITI e ITI ARG y que se

acompañan, respectivamente para ITI e ITI ARG, como **Documentos 15 y 16**. De dichos documentos se deriva que, con respecto a ITI, el Consejo de Administración se reunía en Bilbao con la totalidad de sus miembros asistiendo de forma personal y físicamente. Y con respecto a ITI ARG, se deja constancia de que el Consejo de Administración se reunía en Bilbao con la totalidad de sus miembros asistiendo de forma personal y físicamente.

- Los poderes para presentar la comunicación conjunta fueron otorgados en España, ante Notario español, con una certificación firmada en Bilbao y referida a otra reunión de Consejo de 21 de junio de 2024 (con firma de todos los asistentes). A tal efecto, se aportan los poderes como **Documentos 17 y 18**.

- Lo mismo ocurrió con las declaraciones responsables acompañadas a la solicitud de prórroga de fecha 15 de octubre de 2024, que se acompañan como **Documentos 19 y 20**: se otorgaron en Bilbao. No Brasil.

- Por ende, en términos de "*reconocimiento por terceros*" del centro efectivo de dirección y control de las sociedades —como indica el caso de *Eurofood* mencionado por el Juzgado de lo Mercantil núm. 1 de Bilbao en su Auto o artículo 3.1. o el Considerando (30) del Reglamento (UE) 2015/848 del Parlamento Europeo y del Consejo, de 20 de mayo de 2015, sobre procedimientos de insolvencia (versión refundida) (en adelante, "Reglamento Europeo de Insolvencia")—, de un mero vistazo de la información y documentos acompañados a la solicitud de apertura de negociaciones está claro: es Bilbao, España. No Brasil.

- Así fue reconocido por las propias sociedades insolventes. En efecto, ITI e ITI ARG aseveraron que la jurisdicción internacional correspondía a España por situarse en España su centro de intereses principales en los siguientes términos: "***De conformidad con lo dispuesto en el artículo*** 86.ter de la Ley Orgánica del Poder Judicial y los artículos 44, *45* **[nótese, artículo que solo se refiere al centro de intereses principales]** *y 585 del TRLC, tal y como se exige en el artículo 586.1.2º, se expresa que corresponde **la competencia para conocer de la presente comunicación al Juzgado de lo Mercantil de Bilbao***".

29. Esta comunicación es esencial: **las propias ITI e ITI ARG reconocieron que su centro de intereses principales (concepto al que se refiere el artículo 45 del TRLC) se encuentra en Bilbao, España**. No en Brasil.

30. Dicha manifestación no es baladí: ITI e ITI ARG también estaban manifestando (como refiere el artículo 585 del TRLC que también citaron) y, por tanto, reconociendo, que el

Juzgado que sería competente para la declaración del concurso en virtud de la localización del centro de intereses principales era el Juzgado Mercantil de Bilbao. De nuevo, no los juzgados de Brasil.

31. En todo caso, desde el momento en que el Juzgado Mercantil núm. 2 de Bilbao, sobre la base de estas alegaciones de las demandadas, se pronunció sobre su jurisdicción y competencia territorial sobre la base del COMI en su **Decreto de 19 de julio de apertura de negociaciones y que el mismo devino firme, la existencia de un procedimiento principal en España deviene cosa juzgada y vincula a ITI y a ITI ARG, entre otras cuestiones, a un posterior concurso en España, como veremos a continuación**.

*__1.4. De la existencia de una decisión judicial previa en España sobre la localización del COMI de ITI e ITI ARG en España. Decreto dictado por el Juzgado de lo Mercantil núm. 2 de Bilbao de 16 de julio de 2024, por encontrarse el centro de intereses principales en España.__*

32. El artículo 4 del Reglamento Europeo de Insolvencia establece sobre "*Comprobación de la competencia judicial*" que: "*1. El órgano jurisdiccional que reciba una solicitud de apertura de un procedimiento de insolvencia examinará de oficio si es competente de conformidad con el artículo 3. La resolución de apertura del procedimiento de insolvencia especificará los motivos en los que se basa la competencia del órgano jurisdiccional y, en particular, si se basa en el apartado 1 o en el apartado 2 del artículo 3.*"

33. En virtud de dicho Reglamento Europeo de Insolvencia, las resoluciones de apertura, en toda la Unión Europea (a excepción de Dinamarca), han de especificar si basa la competencia del órgano jurisdiccional en el concepto de "*centro de intereses principales*" (apartado 1 del artículo 3) o "*establecimiento*" (apartado 2 del artículo 3).

34. En línea con dicha disposición, siendo la comunicación de apertura de negociaciones uno de los procedimientos incluidos en el *Anexo A* a dicho Reglamento[1], el artículo 590 del TRLC relativo a "*Contenido de la resolución*" incluye, entre otros, "*los motivos en los que se funde la competencia internacional y territorial del juzgado al que se ha dirigido la comunicación y, en particular, si se basa en la localización del centro de los intereses principales o de un establecimiento del deudor*".

---

[1]    Dada la fecha de redacción del Reglamento Europeo de Insolvencia, los procedimientos de apertura de negociaciones aparecen en el Anexo A como "*Procedimiento de negociación pública para la consecución de acuerdos de refinanciación colectivos, acuerdos de refinanciación homologados y propuestas anticipadas de convenio*".

35.    Por ello, el artículo 586 del TRLC exige que la comunicación incluya, como acabamos de referir, "*2.º El fundamento de la competencia del juzgado para conocer de la comunicación*". Esto es, referencia al "centro de intereses principales" (artículo 45 del TRLC) o "establecimiento" (artículo 49 del TRLC). ITI e ITI ARG, como hemos visto, reconocieron que la competencia estaba basada en el "centro de intereses principales" citando el artículo 45 del TRLC.

36.    En los autos de la comunicación de apertura de negociaciones de ITI e ITI ARG[2], con toda la información aportada por ITI e ITI ARG en la comunicación que hemos referido, el Juzgado de lo Mercantil núm. 2 de Bilbao hizo las siguientes referencias en su Decreto de 19 de julio de 2024 en el que abre el procedimiento de ITI e ITI ARG a:

- Antecedentes de hecho PRIMERO, página 1: "***Afirma en la solicitud que INTERCEMENT TRADING E INVERSIONES S.A. tiene el centro de sus intereses principales en Bilbao***". Aunque se refiere a una sola compañía, ambas hicieron la misma manifestación y la solicitud era conjunta, por lo que el sentido de la resolución es claro en cuanto a ITI e ITI ARG.

- Al ser una comunicación conjunta, el Fundamento de Derecho PRIMERO, página 2: "*Es también territorialmente **competente al tener en su demarcación territorial el centro de intereses principales la sociedad con mayor pasivo (artículo 587.3 del texto refundido de la Ley Concursal** –TRLC-, aprobado por Real Decreto Legislativo 1/2020)*".

37.    Esto es, como puede verse, todas las menciones incluidas en el Decreto se refieren a la localización del centro de intereses principales en Bilbao, España. De nuevo, no en Brasil.

38.    El Decreto de apertura de negociaciones para ITI e ITI ARG fue publicado en el Registro Público Concursal con fecha 23 de julio de 2024. Se aporta, a tales efectos, resguardo de la fecha de publicación del Decreto en dicho registro como **Documento núm. 21**. Dicho documento es accesible por acreedores, personas con interés legítimo y cualquier tercero, convirtiendo **todo su contenido, incluidas las menciones a la localización del centro de intereses principales y a la clara toma de decisiones de ITI e ITI ARG en Bilbao, en "reconocible por terceros"**. Por tanto, por mucho que los solicitantes de exequatur digan lo contrario, la documental es clara.

---

[2]    Dada su relevancia, se dejan designados a los efectos probatorios oportunos.

***1.5. Del "control previo" al Decreto realizado por el Letrado de la Administración de Justicia del Juzgado de lo Mercantil núm. 2 de Bilbao sin que hubiera dudas relativas a la competencia internacional de los Juzgados españoles.***

39.   El artículo 589 del TRLC se refiere al control de los Tribunales españoles sobre la competencia internacional y territorial en materia de comunicación del inicio de negociaciones con los acreedores, en los siguientes términos: *"Cuando el letrado de la Administración de Justicia estime que, con arreglo a las normas sobre competencia internacional o territorial, el juzgado no es competente para conocer de la comunicación, dará cuenta de inmediato al juez, quien oirá al solicitante y al Ministerio Fiscal por el plazo común de cinco días, resolviendo al siguiente mediante auto. Contra el auto que declare la falta de competencia internacional o territorial se podrá interponer recurso de apelación."*

40.   Este control es, por tanto, anterior al Decreto de apertura de negociaciones. Al respecto, en el procedimiento de comunicación de apertura de negociaciones de ITI e ITI ARG:

- No consta que se diera audiencia ni a ITI, ni a ITI ARG, ni al Ministerio Fiscal, por el plazo común de cinco días.

- Tampoco consta auto alguno del Juzgado de lo Mercantil núm. 2 de Bilbao resolviendo sobre una eventual falta de competencia internacional o territorial.

41.   Aunque dicho control español es de sobra conocido por esa Ilma. Audiencia, se incide porque en procedimientos extranjeros los letrados españoles de ITI e ITI ARG han intentado restar relevancia al control de la jurisdicción en sede de comunicación de apertura de negociaciones y su carácter vinculante y de cosa juzgada tras devenir firme (que, como veremos, sólo ocurrió porque nadie impugnó la jurisdicción internacional de los Juzgados españoles, aceptándola por tanto ITI, ITI ARG y todos los acreedores y partes con interés legítimo) el Decreto de 19 de julio de 2024. A tal efecto se citan, por ejemplo:

- En **Brasil**, ITI e ITI ARG presentaron informe del abogado español D. Guillermo Ruiz Medrano que se aporta como **Documentó núm. 22** (versión original en inglés) y **Documento núm. 23** (traducción al castellano) en el que se señalaba que:

  o   Página 4: el informe explica que la jurisdicción española conocerá de las comunicaciones de apertura de negociaciones cuando en España radique el COMI (artículo 45 del TRLC) o un establecimiento (artículo 49 del TRLC). Hasta ahí todo correcto.

o   Sin embargo, la conclusión (página 11, conclusión 1.4.40.) relativa a "*ITI ESP e
    ITI ARG no afirmaron ni sugirieron que su centro de los principales intereses
    estuviera situado en España*" es completamente incorrecta (y base del error de los
    Juzgados brasileños), como se ha puesto de manifiesto en las páginas anteriores
    (tanto por todas las manifestaciones realizadas por ITI e ITI ARG en su solicitud
    de apertura de negociaciones como por haber invocado únicamente como base de
    la jurisdicción internacional en sede de Fundamentos de Derecho el artículo 45
    del TRLC (COMI) <u>y no el artículo 49 del TRLC</u>. No se entienden las alegaciones

o   Página 7, párrafo 1.2.23: "*En concreto, el Decreto fue emitido por un Secretario
    Judicial, no por un Juez. Se trataba de un reconocimiento de que se había
    presentado la solicitud de protección preconcursal. En estos casos, si la
    comunicación pertinente cumple todos los requisitos formales y el secretario
    judicial determina que el tribunal pertinente es competente (basándose en el
    centro de los principales intereses o en un establecimiento), se reconoce la
    presentación sin ninguna contradicción o revisión posterior sobre el fondo. De
    hecho, el Decreto no es vinculante para futuros análisis de la judicatura española
    en la materia*.". No entendemos muy bien si la dirección letrada de ITI e ITI ARG
    pretende despojar al letrado de la administración de justicia de las facultades que
    le otorga la Ley española, pero, le guste o no, la autoridad judicial española
    responsable para la apertura de las negociaciones es el Letrado de la
    Administración de Justicia *ex* artículo 588 del TRLC. Del mismo modo, no
    entendemos las menciones a la falta de vinculación de la judicatura española por
    lo dispuesto en el artículo 611 del TRLC sobre "*Exigibilidad del deber legal de
    solicitar el concurso*" que, por supuesto, ITI e ITI ARG ni mentan ante las
    jurisdicciones extranjeras en ese intento (por ahora exitoso) de inducir a
    confusión.

•   Página 7, párrafo 1.2.24: "*La realidad es que el Decreto no tenía defectos
    formales. Por lo tanto, no había nada que impugnar desde la perspectiva de las
    empresas. El Secretario Judicial sí consideró que el Juzgado de lo Mercantil nº
    2 de era competente para dictar el Decreto, pero no llevó a cabo un análisis de
    revisión del centro de intereses principales (COMI). El Secretario judicial
    podría haber considerado que el Juzgado era competente basándose en la
    existencia de una actividad empresarial no transitoria o en el hecho de que el
    centro de los principales intereses de las empresas se encontrara en España*." Al
    parecer, el Letrado de la Administración de Justicia, según la literalidad de las

palabras de la dirección letrada de ITI e ITI ARG, se habrían saltado a la torera el control previo obligatorio previsto en el artículo 589 del TRLC que estamos analizando en este apartado. Dichas afirmaciones son un auténtico disparate, claramente vertidas para generar confusión ante Juzgados que desconocen la legislación española.

- En **Estados Unidos**, ITI e ITI ARG presentaron informe similar del abogado español D. Guillermo Ruiz Medrano que se aporta como **Documentó núm. 24** (versión original en inglés) y **Documento núm. 25** (traducción al castellano) en el que se señalaba de forma similar que:

  o Página 6, párrafo 1: "*El acto del secretario judicial no fue revisado ni aprobado por un juez, no se basó en ninguna revisión judicial del centro de los principales intereses del ITI y no es vinculante para el Tribunal español. La declaración del secretario judicial relativa al centro de los principales intereses en el Reconocimiento Preconcursal no puede atribuirse al ITI, que no tenía el deber de impugnarla, ya que la resolución incluida en la Comunicación Preconcursal no causó ningún perjuicio ni tuvo efectos de cosa juzgada sobre el criterio para establecer la competencia del tribunal español.*" Volvemos al mismo punto que en Brasil: las anteriores manifestaciones realizadas por el letrado de ITI e ITI ARG parecen criticar la atribución legal de competencias al Letrado de la Administración de Justicia *ex* artículo 588 del TRLC. Y, del mismo modo, se omite ante la jurisdicción americana la obligación, tras la firmeza del Decreto (firmeza que, insistimos, sólo ocurre ante la ausencia de declinatoria por falta de competencia internacional según prevé el artículo 592 del TRLC).

  o Sobre dicho informe, el abogado de ITI e ITI ARG tuvo que ratificarse ante el tribunal americano en el seno del procedimiento de reconocimiento americano (*Chapter 15*) en el que se presentó su informe. La declaración transcrita del abogado de ITI e ITI ARG., D. Guillermo Ruiz Medrano (firmante de la comunicación de apertura y de la solicitud de exequátur de ITI e ITI ARG, aunque en dicho procedimiento de *Chapter 15* actuaba como experto "independiente"), se acompaña como **Documento núm. 26** (versión inglesa), con su traducción al castellano como **Documento núm. 27**.

  El letrado de ITI e ITI ARG, curiosamente, vino a defender que todo era "culpa" de un error del Letrado de la Administración de Justicia del Juzgado de lo Mercantil núm. 2 de Bilbao. Intentó, de nuevo, restar relevancia a la figura Letrado

- 15 -

de la Administración de Justicia, pese a que, en Derecho español, por atribución directa del artículo 588 del TRLC, es quien ha de dictar los decretos de apertura de negociaciones y realizar el control previo previsto en el artículo 589 del TRLC. Y, de nuevo, parece que niega el contenido del artículo 611 del TRLC (que <u>sí</u> vincula aunque pretenda defender que no; como se ve más adelante, vincula a tribunales españoles, de la Unión Europea y a cualquiera otros de países que reconozcan la existencia de procedimientos principales extranjeros). En efecto, la literalidad de las respuestas de D. Guillermo Ruiz Medrano hacían referencia a:

–   Página 90 de la transcripción: "*Respuesta (de Guillermo Ruiz Medrano).* ___Yo no diría que es vinculante para el deudor___. *Tiene el efecto legal de proporcionar los tres meses... el efecto principal de proporcionar los tres meses...".*

–   Página 91 de la transcripción: "*Pregunta: Y está de acuerdo en que* <u>*los reconocimientos se basan en la información proporcionada por un solicitante al Juzgado*</u>*, ¿verdad?*

    *MS. CHASE: Objeción de forma.*

    *Respuesta (de Guillermo Ruiz Medrano). Yo diría que deberían estarlo, pero* ___en este caso el secretario judicial cometió un error al hacer referencia a que... las empresas habían declarado que el centro de los principales intereses estaba en... en España.*___"

–   Página 93 de la transcripción: *Pregunta. "¿Es su posición que el secretario judicial cometió un error en la medida en que el decreto encuentra los COMI en España?*

    *Respuesta (de Guillermo Ruiz Medrano). El decreto no dice que el centro de los principales intereses esté en España. El decreto dice que la empresa dijo que el centro de los principales intereses estaba en España, pero luego, cuando no era,* ___fue un error del secretario judicial decir que el centro de los principales intereses de la empresa estaba en España cuando no había tal referencia.___

    ___Y debo decir que el reconocimiento de la corte por el secretario judicial no hace una conclusión sobre COMI, y no es un documento judicial emitido por un juez___*, a diferencia de la orden sobre la petición de prórroga que fue emitida por el - por el juez y aceptar la posición de prórroga en la que las*

- 16 -

*empresas hicieron referencias expresas a tener establecimientos en España*
*y no COMI."*

42.   A esa Ilma. Audiencia le llamará la atención que dicha declaración obvia u omite: (i) los mecanismos de control de la competencia internacional y territorial recogidos en los artículos 589 y 592 del TRLC; (ii) los instrumentos que arbitra el artículo 214 LEC, ley rituaria de aplicación, *ex* artículo 521 TRLC al procedimiento concursal, para la aclaración y corrección de errores; (iii) la transcendencia del Decreto de apertura de un periodo de negociación con los acreedores (firme tras no haber habido impugnación alguna de la jurisdicción española con base en el COMI en su momento procesal oportuno), en el que agotado su plazo o finalizada su prórroga, sin obtención de un plan de reestructuración con sus acreedores, exigirá de ITI e ITI ARG el cumplimiento de la obligación de solicitar la declaración de concurso, *ex* artículo 611 TRLC. ITI e ITI ARG han intentado hacer creer a los Juzgados extranjeros (tanto en Estados Unidos como en Brasil) que el procedimiento español de la insolvencia es un procedimiento poco riguroso o laxo, cuando es todo lo contrario.

### *1.6. De la no solicitud de rectificación ni aclaración del Decreto dictado por el Juzgado de lo Mercantil núm. 2 de Bilbao, de 16 de julio de 2024 y, por ende, de la aceptación de su contenido por parte de ITI e ITI ARG.*

43.   Como es bien sabido, si una parte considera que alguno de los puntos de una resolución necesita de rectificación o aclaración, y en tanto las resoluciones son invariables (artículo 214.1 de la LEC), puede solicitar aclaración (artículo 214.2 de la LEC) o rectificación (artículo 214.3 de la LEC).

44.   Ni ITI ni ITI ARG solicitaron rectificación ni aclaración. Lógico, de otro lado, porque el Letrado de la Administración de Justicia se pronunció en su Decreto en los términos exactamente solicitados por ITI e ITI ARG (el centro de intereses principales, en virtud de lo establecido en el artículo 45).

45.   Por tanto, no hubo error alguno. Si ni ITI ni ITI ARG solicitaron rectificación fue simplemente porque no se trataba de ningún error, sino de una cuestión que, con posterioridad, han intentado modificar por todos los medios para evitar la aplicación del 611 del TRLC y su correspondiente protección de los intereses de acreedores y otras personas con interés legítimo con hace nuestro ordenamiento español.

### *1.7. De la no impugnación de la jurisdicción española dentro del expediente de comunicación de inicio de negociaciones ante el Juzgado de lo Mercantil núm. 2 de Bilbao y, por ende, de la*

*aceptación por parte de los acreedores de que el centro de intereses principales de ITI e ITI*
*ARG se encuentra en Bilbao. De la consiguiente firmeza del Decreto.*

46.   En el procedimiento de comunicación de apertura de negociaciones, en tanto parte del
      contenido obligatorio de la resolución es relativo a "*los motivos en los que se funde la*
      *competencia internacional y territorial del juzgado al que se ha dirigido la comunicación*
      *y, en particular, si se basa en la localización del centro de los intereses principales o de*
      *un establecimiento del deudor*", el artículo 592 del TRLC prevé, además del "control
      previo" al decreto referido en el artículo 589 del TRLC al que ya hemos hecho referencia,
      la posibilidad de formular declinatoria por falta de competencia internacional una vez
      dictado el Decreto.

47.   En términos literales prevé dicho artículo, que: "1. ***Cualquier acreedor podrá formular***
      ***declinatoria por falta de competencia internacional o territorial en el plazo de diez días***
      ***a contar desde la publicación en el Registro público concursal de la resolución teniendo***
      ***por formulada la comunicación*** o, en el caso de que tuviera carácter reservado, desde el
      momento en que hubiere tenido conocimiento de esa comunicación."

48.   En el supuesto de los autos de apertura conjunta de negociaciones para ITI e ITI ARG, la
      publicación en el Registro Público Concursal, como se ha referido (*vid.* Documento núm.
      21), tuvo lugar el 23 de julio de 2024.

49.   Sin embargo, pasado el plazo de 10 días desde la publicación en el Registro público
      concursal, ningún acreedor ni de ITI ni de ITI ARG formuló declinatoria.

50.   Consecuentemente, todos y cada uno de los acreedores de ITI e ITI ARG han aceptado el
      contenido del Decreto de 19 de julio de 2024, dado que no impugnaron la competencia de
      los Juzgados de Bilbao sobre el la base de la localización del centro de intereses principales
      o COMI en Bilbao.

51.   En definitiva, tanto los acreedores de ITI como los de ITI ARG aceptaron, al igual que el
      Juzgado de lo Mercantil núm. 2 de Bilbao, que el centro de los principales intereses de ITI
      e ITI ARG se encuentra en Bilbao, España. No en Brasil.

52.   Se ha de concluir que, no habiéndose activado ninguno de los mecanismos de control de la
      competencia internacional y territorial por ninguna de las partes, *ex* artículos 589 (control
      previo por el Letrado de la Administración de Justicia y, en caso de duda, del Juez) y 592
      del TRLC (impugnación de la jurisdicción), ni habiéndose solicitado aclaración de haberse
      advertido un supuesto error en el Decreto de 19 de julio de 2024, el Decreto devino firme.

Y le guste a ITI e ITI ARG o no, y hagan las manifestaciones que hagan en el extranjero sobre los supuestos errores de nuestros Letrados de la Administración de Justicia (que, sin embargo, no pusieron de relieve en España mediante los cauces procesales al efecto, dejando que el Decreto haya devenido firme), en España las resoluciones vinculan. **Igual que vinculan los actos propios. Y dejar que una decisión judicial que abre un procedimiento principal de insolvencia en España sobre la base de la localización del COMI en España es un acto propio que, junto con sus manifestaciones previas a la decisión judicial, vinculan a ITI y a ITI ARG**.

### *1.8. De la necesaria denegación del exequatur de la resolución de apertura brasileña en tanto el centro de intereses principales o COMI, según ha decretado un Juzgado español, está localizado en España.*

53.    Concluimos que no hay lugar a dudas de que el centro de intereses o COMI está en Bilbao, España, y que dicha cuestión es "cosa juzgada" en tanto:

- Del propio contenido, manifestaciones múltiples ya relatadas y reconocimiento expreso en la comunicación de apertura de negociaciones de las propias ITI e ITI ARG de que aplica el artículo 45 del TRLC relativo al COMI, se deriva que el centro de intereses principales de ITI e ITI ARG está localizado en España.

- Al realizar su "control previo", el Letrado de la Administración de Justicia no tuvo ninguna duda en cuanto a la competencia internacional de los Juzgados de lo Mercantil de Bilbao para conocer del preconcurso en España, dada la claridad de las manifestaciones y reconocimiento expreso de ITI e ITI ARG.

- Del propio Decreto de apertura de negociaciones de 19 de julio de 2024 también se deriva que el centro de intereses principales de ITI e ITI ARG está localizado en España.

- Dicho Decreto fue objeto de publicación en el Registro Público Concursal, siendo perfectamente reconocible por terceras partes (además de por las propias manifestaciones de ITI e ITI ARG) que el centro de intereses principales está en Bilbao, España.

- Ni ITI ni ITI ARG ni los acreedores solicitaron aclaración y/o rectificación, aceptando el contenido del Decreto de apertura de negociaciones de ITI e ITI ARG.

- Ningún acreedor formuló declinatoria por falta de competencia internacional en los 10 días posteriores a la publicación del Decreto de apertura de negociaciones de ITI e ITI ARG, por lo que los acreedores aceptaron su contenido. Y, dentro de su contenido, la jurisdicción internacional de los Juzgados de lo Mercantil de Bilbao.

54. Por tanto, encontrándose el centro de intereses principales en España, no se puede entender que el Juzgado brasileño haya dictado la resolución de apertura, en cuanto a ITI e ITI ARG, sobre la base de que el centro de intereses principales está localizado en Brasil. El error en que incurre el Auto recurrido es más que evidente.

55. En definitiva, **no se da el requisito previsto en el artículo 742.1.3º del TRLC (al estar el centro de intereses principales en España y no en Brasil) y es patente que procede denegar el exequátur solicitado**.

56. El mismo error conlleva a que se haya reconocido el procedimiento extranjero como "principal". No obstante, el Estado en el que se encuentra el centro de intereses principales es España (y no Brasil), no se da el requisito previsto en el artículo 742.2.1º del TRLC para que el procedimiento brasileño sea principal. En todo caso, al haberse de denegar el reconocimiento en todo caso, este matiz se torna irrelevante.

57. Recordemos, *ex* artículo 611 del TRLC, en tanto **ha habido un procedimiento principal español de "preconcurso", lo que procede tras 6 meses de negociaciones infructuosas, es, obligatoriamente, presentar la solicitud de concurso voluntario de acreedores**.

***1.9. De la relevancia del Decreto firme de apertura de negociaciones y la referencia al COMI del Juzgado de lo Mercantil núm. 2 de Bilbao no sólo en España, sino en toda la Unión Europea y, en general, en todo el mundo (incluido Brasil), en tanto determina que los autos españoles de Comunicación art. 5.3 de la Ley Concursal / Art. Komunikazioa Konkurtso Legearen 5.3 211/2024 han de ser un "procedimiento principal" en el extranjero.***

58. Como se ha indicado, el procedimiento preconcursal español iniciado por ITI e ITI ARG es uno de los procedimientos nacionales españoles incluidos en el Anexo A del Reglamento Europeo de Insolvencia.

59. El *Considerando* (9) del Reglamento Europeo de Insolvencia, establece que: "*Respecto a los procedimientos nacionales recogidos en el anexo A, el presente Reglamento debe aplicarse sin necesidad de examen ulterior alguno por los órganos jurisdiccionales de otro Estado miembro acerca del cumplimiento de las condiciones establecidas en el presente*

*Reglamento. Los procedimientos nacionales de insolvencia que no estén enumerados en el anexo A deben quedar excluidos del presente Reglamento*."

60.   La relevancia es enorme. Significa, por ejemplo, que, si un juzgado de lo mercantil español ha dictaminado que el centro de los principales intereses de ITI e ITI ARG se encuentra en España, el Decreto es vinculante no sólo para los tribunales españoles, sino para todos los países de la Unión Europea (excepto Dinamarca).

61.   De hecho, todos los tribunales de la Unión Europea (excepto Dinamarca) están obligados a reconocer automáticamente el procedimiento del Tribunal español como procedimiento principal (artículo 3.1 del Reglamento europeo de insolvencia) y "*sin necesidad de examen ulterior alguno*".

62.   Al respecto, la magistrada Especialista del CGPJ en asuntos de lo Mercantil, Cervera Martínez, M., en "Comentarios al articulado del Texto Refundido de la Ley Concursal" (Dirs. Peinado, J.I. y Sanjuán y Muñoz, E.), Volumen IV, SEPIN, páginas 74-75, 2020, señala claramente que: "***A nivel internacional debemos tener en cuenta que las comunicaciones del 5 bis (ahora del 583 TRLCon) están incluidas en el anexo)*** [nota, se refiere al "Anexo A"] ***del Reglamento de Insolvencia 2015/848, por lo que su presentación producirá efectos a nivel europeo en el caso de concursos transfronterizos***.

      *La presentación de una comunicación de inicio de negociaciones del 583 TRLCon **determinará el juez competente si después se presenta el concurso voluntario, necesario** o el consecutivo (...). Esta disposición supone una novedad en el Texto Refundido, ya que en las normas de reparto de los juzgados mercantiles no se establecía regla alguna de antecedente, por lo que las comunicaciones al juzgado al amparo del derogado art. 5 bis LCon no predeterminaban la competencia del ulterior concurso*". Pero ahora, **la apertura de negociaciones en España sobre la base del COMI, según señala el Decreto de 19 de julio (insistimos, firme), sí predetermina la competencia del ulterior concurso, y de ahí el deber recogido en el artículo 611 TRLC ante los Juzgados de lo Mercantil de Bilbao.** Y una vez predeterminada la jurisdicción y competencia de los Juzgados españoles ante la solicitud de las propias ITI e ITI ARG, los Juzgados españoles han de velar por que ITI e ITI ARG cumplan con dicha obligación —que, lógicamente, protege a los acreedores y empresas con interés legítimo en España—.

63.   Sería, cuanto menos, curioso, que en Países Bajos (donde también radica el centro de intereses principales de Intercement Financial Operations B.V., donde también hay abierto un procedimiento principal desde el día 17 de julio de 2024, tengan que reconocer automáticamente el procedimiento de apertura de negociaciones español seguido ante el

Juzgado de lo Mercantil núm. 2 de Bilbao como "procedimiento principal" y que, sin embargo, no reconozcamos nuestro propio procedimiento en nuestro propio país.

64. Téngase en cuenta, para más inri, que el procedimiento de comunicación de apertura de negociaciones se abrió en España con fecha 16 de julio de 2024 y que seguía vigente (tras la correspondiente prórroga) a la fecha de abrirse el procedimiento brasileño el pasado 6 de diciembre de 2024. Por ende, no puede entenderse el reconocimiento otorgado que, claramente, se trata de un error.

65. El hecho de que hayan pasado los 6 meses máximos de duración del período de negociaciones no supone una carta blanca para que ITI e ITI ARG soliciten reconocimiento de ninguna resolución extranjera si no que, probado que el centro de intereses principales radica en España, ITI e ITI ARG han de cumplir con su deber dispuesto en el art. 611 del TRLC.

66. Más allá de la Unión Europea (con excepción de Dinamarca), el Decreto de apertura de negociaciones de ITI e ITI ARD, con jurisdicción sobre la base del centro de intereses principales o COMI, vincula a los demás tribunales extranjeros (siempre que se cumplan los requisitos que requieran las jurisdicciones como, por ejemplo, que el COMI se sitúe en España, como es el caso).

67. En particular, Brasil es un país que ha adoptado la Ley Modelo UNCITRAL / CNUDMI sobre insolvencia transfronteriza (1997). Como tal, ha de reconocer (de forma similar a cómo hace el Reglamento Europeo de Insolvencia o a cómo hace nuestro artículo 742.2.1º del TRLC), como procedimientos principales de insolvencia aquellos que se han abierto en una jurisdicción extranjera con base en el COMI.

68. Por ello, sorprenden ciertas alegaciones de la solicitud de recuperación judicial presentada en Brasil en las que ITI e ITI ARG hacen referencia a que "*Incluso en el contexto de los ataques e intentos de desestabilización que han sido adoptados por el Grupo Ad Hoc a nivel mundial, las Demandantes, <u>incluyendo IC Financial, ITI e ITI ARG, buscarán el reconocimiento de esta recuperación judicial como procedimiento extranjero principal en otras jurisdicciones</u>. Esta iniciativa <u>se debe precisamente al hecho de los centros de los principales intereses de estas empresas se encuentran en Brasil</u>*" (*vid.* Documento núm. 6, párrafo 100, pág. 24) o a que "<u>**El hecho de que tres de las Demandantes** - IC Financial, **ITI e ITI ARG** - **hayan sido constituidas en otras jurisdicciones**</u>, con el único propósito facilitar la financiación y administración del Sistema Cemento, <u>**no es un impedimento para la tramitación de la presente solicitud de reorganización judicial**</u>" (*vid.* Documento núm. 6, párrafo 96, pág. 23).

- 22 -

69. Sobre esa base, puede entenderse el error del Juzgado de origen brasileño en tanto, con esas manifestaciones, ITI e ITI ARG debieron inducirle al error de pensar que no había ningún procedimiento principal de insolvencia con base en el COMI de dichas sociedades en España, cuando sí lo hay. Es cierto que el mero hecho de que las sociedades estén constituidas en otras jurisdicciones (ITI e ITI ARG, en España) no es impedimento para que se tramite un procedimiento de recuperación judicial en Brasil, mientras que estas empresas extranjeras tengan sucursales o establecimientos en Brasil (si no las tienen, no pueden presentar una recuperación judicial en Brasil). Además, un **impedimento aún más evidente a dicha tramitación es la existencia del procedimiento principal ya abierto con respecto a ITI e ITI ARG en España con base en "COMI español"**.

70. Todo lo anterior fue debidamente puesto de manifiesto en el recurso de apelación presentado por mis mandantes ante la resolución de apertura brasileña en el que, lógicamente, se refiere de forma coherente (a diferencia de lo que ha hecho ITI e ITI ARG afirmando que tiene su COMI en dos jurisdicciones diferentes, lo que es imposible). En acreditación de dicho extremo se aporta dicho recurso, en versiones original portuguesa y traducción al castellano, como **Documentos núms. 28 y 29**. En todo caso, se decida lo que se decida en Brasil en el recurso de apelación, es claro que **España no puede permitir la apertura de un procedimiento principal en Brasil (ni en ningún otro lugar del mundo) cuando en España ya se ha abierto un procedimiento principal de insolvencia**.

**SEGUNDO.- DEL INCUMPLIMIENTO DEL REQUISITO PREVISTO EN EL ARTÍCULO 46.1 D) DE LA LEY DE COOPERACIÓN JURÍDICA INTERNACIONAL EN MATERIA CIVIL QUE IMPLICA QUE HA DE DENEGARSE EL RECONOCIMIENTO.**

71. El artículo 46.1 de la Ley 29/2015, de 30 de julio, de Cooperación Jurídica Internacional en materia Civil (en adelante, "LCJI") señala que ha de denegarse el reconocimiento, entre otros supuestos, en su apartado d), "*Cuando la resolución fuera inconciliable con una resolución dictada en España*".

72. En línea con todo lo desarrollado en el Motivo PRIMERO, el recurso de apelación presentado por mis mandantes ante la resolución de apertura brasileña (*vid.* Documentos núms. 26 y 27) hace un análisis pormenorizado de las razones por las que los tribunales brasileños no son competentes para la apertura de un procedimiento de recuperación judicial en Brasil , ya que ITI e ITI ARG no tienen sucursales ni establecimientos en Brasil. Dichas razones incluían que (i) el centro de intereses principales se halla en España y no en Brasil y que (ii) **ya hay una resolución española donde se abrió el procedimiento principal español con base en el COMI en España (el Decreto de 19 de julio de 2024)**.

- 23 -

73. Lógicamente, es inconciliable que el COMI esté en dos sitios distintos. Y es inconciliable que haya dos procedimientos principales en dos sitios distintos.

74. Por ello, **la resolución dictada por el Juez brasileño de apertura de procedimiento de recuperación judicial con carácter de principal en Brasil con fecha 5 de diciembre de 2024**, cuyo reconocimiento se ha pretendido en España, **es absolutamente inconciliable con el Decreto firme previo de 19 de julio de 2024 del Juzgado de lo Mercantil núm. 2 de Bilbao que reconocía el inicio de un procedimiento de insolvencia en España para estas mismas mercantiles con carácter de principal, por radicar su COMI en territorio español**, por lo que *ex* artículo 46.1.d) de la Ley 29/2015, de 30 de julio, de Cooperación Jurídica Internacional en materia Civil (en adelante, "LCJI"), se debió denegar el reconocimiento.

**TERCERO.- DEL INCUMPLIMIENTO DEL REQUISITO PREVISTO EN EL ARTÍCULO 742.1.3º DEL TRLC RELATIVO A QUE LA COMPETENCIA DEL JUZGADO BRASILEÑO ESTÉ BASADA EN COMI, ESTABLECIMIENTO O EN UNA CONEXIÓN RAZONABLE DE NATURALEZA EQUIVALENTE, LO QUE IMPIDE UN RECONOCIMIENTO COMO PROCEDIMIENTO PRINCIPAL EN ESPAÑA.**

75. Recordemos, el artículo 742.1 del TRLC, en su apartado 3º, introduce como requisito para otorgar el exequátur de una resolución extranjera de insolvencia: "*Que la competencia del tribunal o de la autoridad que haya abierto el procedimiento de insolvencia esté basada en alguno de los criterios contenidos en esta ley o en una conexión razonable de naturaleza equivalente.*"

76. Lógicamente, tras haber concluido que el Decreto de apertura de negociaciones en España vincula a ITI e ITI ARG, por radicar su COMI en España, a solicitar su concurso voluntario en España, es claro que su COMI no puede estar en ningún otro lugar. Así se ha decretado ya en España con fecha 19 de julio de 2025.

77. En todo caso, la falta de jurisdicción de Brasil sobre las empresas españolas, más allá de ser evidente y cuestión ya resuelta en España, comienza a ser patente también en Brasil en tanto **el propio Ministerio Fiscal brasileño ha cuestionado la apertura del procedimiento brasileño en relación con las entidades extranjeras incluidas en la solicitud, entre las que se encuentran ITI, ITI ARG** e Intercement Financial Operations B.V. Es decir, las tres sociedades europeas.

78. En efecto, en el seno del procedimiento brasileño de "*Recuperação Judicial*" reconocido mediante la resolución de exequátur apelada, el Ministerio Fiscal informó con fecha 13 de

febrero de 2025 de que "*Sin embargo, no se han localizado las autorizaciones para operar en el país de los respectivos representantes legales y no hay más información sobre si tienen sucursales en Brasil*" requiriendo a ITI e ITI ARG de que informen, entre otras cosas, y"*(...) con el fin de verificar la legitimidad y los procedimientos que se adoptarán con respecto a las empresas extranjeras*", sobre si existen procedimientos extranjeros con respecto a dichas empresas. Se aporta dicho informe en su versión original portuguesa como **Documento núm. 30** y su traducción al castellano como **Documento núm. 31**.

79. Esto es, el propio Ministerio Fiscal del procedimiento brasileño ha manifestado serias dudas en relación con la base de la jurisdicción de la resolución de apertura brasileña en cuanto a ITI e ITI ARG (además de en cuanto a la sociedad holandesa) y ha evidenciado que:

- El procedimiento brasileño, en cuanto a ITI, ITI ARG y la sociedad holandesa, no se abren con base en la localización en Brasil del "centro de intereses principales" si hay procedimientos principales fuera de Brasil (como los españoles).

- El procedimiento brasileño sólo puede abrirse en relación a sociedades extranjeras sobre la base de un concepto "sucursal" que nada tiene que ver con COMI y que no permitiría, en ningún caso, que o reconocimiento de la recuperación judicial de ITI y ITI ARG en España a título de procedimiento principal.

- Según ha manifestado el Ministerio Fiscal en Brasil, hay serias dudas incluso de que ITI, ITI ARG y la sociedad holandesa tengan incluso "sucursal" en Brasil, lo que implica que no hay base de jurisdicción alguna en Brasil para reconocer en España, si quiera, un procedimiento extranjero territorial por "*conexión razonable o de naturaleza equivalente*".

80. Por ende, se incumple otro de los requisitos necesarios para el exequátur (el recogido en el artículo 742.1.3º TRLC), no teniendo Brasil jurisdicción ni vía "*conexión razonable o de naturaleza equivalente*" y no siendo posible, si quiera, el reconocimiento en España de un procedimiento extranjero territorial en relación con ITI e ITI ARG.

**CUARTO.- INCUMPLIMIENTO DEL REQUISITO PREVISTO EN EL ARTÍCULO 742.1.5º DEL TRLC. CONTRARIEDAD AL ORDEN PÚBLICO ESPAÑOL.**

81. Una resolución podría ser contraria al orden público español en función de dos posibles aristas: (i) ser contraria al orden público procesal o (ii) ser contraria al orden público material.

82.   En primer lugar, con respecto al **orden público procesal**, la jurisprudencia del Tribunal Constitucional —entre otras la Sentencia del Tribunal Constitucional núm. 17/2021, de 15 de febrero (ECLI:ES:TC:2021:17) —, desarrolla que *"desde el punto de vista procesal, el orden público se configura como el conjunto de formalidades y principios necesarios en nuestro ordenamiento jurídico procesal (...) los derechos fundamentales y las libertades garantizados por la Constitución, así como otros principios esenciales indisponibles para el legislador por exigencia constitucional o de la aplicación de principios admitidos internacionalmente."*

83.   De nuevo, Heredia Cervantes, I. y Thery Martí, A. en *"Comentarios al articulado del Texto Refundido de la Ley Concursal"* (Coords. Peinado Gracia, J.I. y Sanjuán y Muñoz, E.), Tomo IV, Ed. Sepin, 2020, en su comentario al artículo 742 (página 1.003): *"Por lo que se refiere al orden público procesal, está integrado por los derechos fundamentales que configuran el proceso debido (principio de audiencia, contradicción, efectividad de la tutela, proposición y práctica de la prueba, etc.)"*. Y prosigue más adelante: *"Recuérdese que una parte del orden público procesal, en concreto el derecho de defensa, se recoge en el art. 742.1.4º."*

84.   En el presente supuesto es clara la infracción procesal porque hay (i) una decisión judicial española que hace referencia al centro de intereses principales de ITI e ITI ARG en España, atribuyendo jurisdicción internacional a España y obligando a ITI e ITI ARG a solicitar el concurso en España y, de otro lado, hay (ii) una resolución (posterior) que hace referencia al centro de intereses principales de ITI e ITI ARG en Brasil, sustrayendo la jurisdicción de España y despojando a los acreedores y personas con interés legítimo de la protección del artículo 611 del TRLC y, en general, de las salvaguardas del procedimiento español. Lo anterior supone una **clara vulneración del orden público procesal** (referido en el artículo 46.1.a LCJI), porque la resolución brasileña objeto de *exequátur* destruye la protección en España de una resolución española previa firme y atenta de forma flagrante **contra la tutela judicial efectiva y seguridad jurídica de manera hiperlativa**.

85.   En cuanto al **orden público material**, Thery Martí, A. y Heredia Cervantes, I. en su comentario al artículo 742 de la obra ya citada (pág.1.003), disponen que: *"En cuanto a su dimensión material, la cláusula de orden público se concreta, fundamentalmente, en dos elementos: **el principio de no discriminación** por razón de la nacionalidad y el **respeto al derecho de propiedad**. Un ejemplo de lo primero podría ser una resolución que impusiera un sacrificio económico mayor a algunos acreedores simplemente por razón de su nacionalidad. En cuanto al atentado contra el derecho de propiedad, los ejemplos más claros podrían ser el de una declaración de insolvencia que en realidad supusiera una*

*confiscación encubierta o la **imposición de un sacrificio arbitrario o manifiestamente
desproporcionado a alguno de los acreedores**.*"

86.    Al respecto, **las consecuencias de las propuestas del procedimiento brasileño para los
acreedores españoles son totalmente confiscatorias y vulneran, incluso el Convenio
Europeo de Derechos Humanos** (en particular, el artículo 1 relativo a la "*Protección de
la propiedad*" del Protocolo adicional 1º al Convenio para la Protección de los Derechos
Humanos y de las Libertades Fundamentales, Paris, 20 de marzo de 1952).

87.    Así lo han puesto de manifiesto mis mandantes en el requerimiento remitido a ITI e ITI
ARG así como a sus consejeros individualmente por mis mandantes, el Grupo de Bonistas
Ad Hoc (aportadas como **Documentos núms. 32 y 33 en inglés y castellano**,
respectivamente), en los siguientes términos: "*La legislación española contiene varias
salvaguardias (internacionalmente aceptadas) para los acreedores, tales como: (i) la regla
de prioridad absoluta (APR), (ii) el test del mejor interés de los acreedores, y (ii) un
enfoque entidad por entidad, lo que significa que **la consolidación sustantiva de las
empresas del grupo no es generalmente aceptada (en conjunto, las salvaguardias
españolas). La adhesión de ITI ESP e ITI ARG al procedimiento de insolvencia
brasileño es claramente un intento de eludir las salvaguardias españolas. ITI ESP y su
consejo de administración no han protegido los intereses de los acreedores directos de
ITI ESP, y de otras partes con un interés legítimo**, al optar por reestructurar fuera de
España de una manera que no tiene debidamente en cuenta las salvaguardias españolas y,
por tanto, importantes salvaguardias internacionalmente aceptadas de las que disfrutarían
los acreedores en un procedimiento de insolvencia español. Esto supone un
incumplimiento de sus deberes fiduciarios para con estas partes interesadas*."

88.    Tal es el racional tras el tan citado artículo 611 del TRLC: las empresas que, como ITI e
ITI ARG tienen su centro de intereses principales en España (insistimos, cuestión ya
decidida y firme en España), tienen la obligación de instar su declaración de concurso
voluntario en nuestro país. Y, **recordemos, en España <u>no</u> hay consolidación de masas (o
consolidación sustantiva), lo que conlleva que haya que individualizar masas activa y
pasiva en cada concurso de cada sociedad de forma separada**, protegiendo a los
acreedores de cada una de las sociedades individuales de forma separada. Al respecto, el
artículo 42 del TRLC prevé que: "*Los concursos declarados conjuntamente y acumulados
se tramitarán de forma coordinada, sin consolidación de las masas*."

89.  **Sin embargo, <u>Brasil sí permite dicha consolidación de masas[3], que en el presente
supuesto implica que los acreedores de las empresas europeas van a verse peor
tratados (esto es, discriminados) frente a los acreedores de las empresas brasileñas,
perdiendo sus garantías</u>**. ¿Por qué? Porque ITI es titular de las participaciones de varias
sociedades (ITI ARG y otra sociedad incluida en el procedimiento brasileño: InterCement
Brasil S.A. (denominada "ICB" en el Documento núm. 6):



90.  Y está claro que las participaciones de **ITI ARG y de ICB habrán de liquidarse en un
procedimiento español**, con la garantía de un administrador concursal español, posibilidad
de mejoras de ofertas para maximizar el valor de recuperación para acreedores, alegaciones
de acreedores y trabajadores, autorización judicial, etc. No en Brasil.

91.  Y, por último, **el repago obtenido con la venta de dichos activos titularidad de ITI
habrán de servir para repagar a los acreedores de ITI (españoles o no, porque España
no discrimina), y no a otros acreedores de terceras sociedades (o incluso los titulares
reales, que preservarían valor en Brasil a costa de la pérdida de las garantías de los
acreedores de las sociedades españolas)** como pretenden ITI e ITI ARG en claro perjuicio
de su masa pasiva de acreedores y en un intento de saltarse a la torera el orden de prelación
que operaría, con todas las garantías, en ese obligado concurso (*ex* artículo 611 del TRLC)
en España.

92.  España vela por evitar abusos o confiscaciones como la que pretenden ITI e ITI ARG que,
sin embargo, sí permite el régimen brasileño a través de la consolidación sustantiva,
afirmando la contrariedad al orden público material español.

---

[3]  Véanse al respecto los informes del observador holandés con referencias a dicha consolidación
pretendida en Brasil.

QUINTO.-  DE LA LEGITIMACIÓN ACTIVA Y LEGITIMACIÓN ACTIVA *AD CAUSAM* DEL GRUPO
DE BONISTAS AD HOC.

*5.1. De la identidad de mis mandantes, de su posición frente a ITI e ITI ARG y de su interés
en que ITI e ITI ARG cumplan con su deber legal de solicitar el concurso de acreedores en la
jurisdicción que corresponde a su centro de intereses principales (España).*

93.    Mis mandantes, el Grupo de Bonistas Ad Hoc, son titulares conjuntamente de más del
65% de uno de los instrumentos de deuda más relevantes de IC Financial Operations B.V.
(sociedad también referida en la resolución objeto de exequátur). A saber, los Bonos
Senior al 5,750% con vencimiento en 2024 ("los Bonos") emitidos por InterCement
Financial Operations B.V. y garantizados incondicionalmente por InterCement
Participações S.A. (ICP) e InterCement Brasil S.A. (ICB).

94.    Hay varias referencias a mis mandantes en la solicitud de apertura de recuperación judicial
en Brasil (*vid.* Documento núm. 6) derivadas de dichas deudas como, por ejemplo, en la
página 2, punto 3: "*La Mediación fue productiva al proteger a las Demandantes del
comportamiento hostil de ciertos acreedores - especialmente cierto grupo de acreedores
extranjeros tenedores de Bonos ("Grupo Ad Hoc") que ya había iniciado procedimientos
concursales contra parte de las Demandantes en el extranjero - y permitió un cauce
constructivo para las negociaciones.*"

95.    En el presente caso, y tal como reconocen ITI e ITI ARG en su demanda de exequátur,
Intercement Financial Operations B.V. es el acreedor principal de ITI. Por ejemplo,
véanse todas estas referencias en la demanda de exequátur

   •   página 4, párrafo 5 de la demanda;

   •   pág. 8, apartado d) de la demanda;

   •   página 23, párrafo 63, que remite al Documento 3 adjunto a la solicitud de exequátur;

   •   pág. 17, relativo a comunicación de la apertura de negociaciones con los acreedores.

96.    Respecto de IC Financial Operations B.V., tal como reconocen ITI e ITI ARG en la
demanda de exequátur (*vid.* Documento núm. 9), consta bajo el *Wet homologatie
onderhands akkoord* (o "WHOA", conocida institución de reestructuración preventiva
bajo la ley neerlandesa) en Países Bajos el nombramiento de un observador que se encarga
de supervisar (sin ningún poder de intervención de facultades) el proceso. Dicho
procedimiento holandés es uno de los procedimientos a los que se refiere la afirmación de

ITI e ITI ARG en Brasil al referirse al "*grupo de acreedores extranjeros tenedores de Bonos ("Grupo Ad Hoc") que ya había iniciado procedimientos concursales contra parte de las Demandantes en el extranjero* (*vid.* Documento núm. 6).

97.    Se aportan las alegaciones de comienzo de dicho procedimiento en Países Bajos como **Documento núm. 34** y su traducción al castellano como **Documento núm. 35**. En dichas alegaciones consta también expresamente que el COMI de IC Financial Operations B.V. está en Países Bajos pese a que dicha sociedad también se encuentra relacionada en el Auto brasileño objeto de exequátur. Parece, por tanto, una práctica patológica de ITI, ITI ARG e IC Financial Operations B.V el decir en varias jurisdicciones que su COMI está en todas ellas. Al respecto, nótese que, en tanto el procedimiento holandés está también incluido en el Anexo A del Reglamento Europeo de Insolvencia (citado como "*de openbare akkoordprocedure buiten faillissement*") y el mismo se abrió en Países Bajos sobre la base de COMI, dicho procedimiento habrá de ser obligatoriamente reconocido en España como principal; y no el procedimiento brasileño. El COMI de las sociedades europeas está en España (para ITI e ITI ARG) y en Países Bajos (para Intercement Financial Operations B.V.) porque así lo manifestaron dichas sociedades en dichas jurisdicciones, dando lugar a la apertura de procedimientos principales en España para ITI e ITI ARG) y en Países Bajos (para Intercement Financial Operations B.V.). No está en Brasil porque, a ciertas alturas del procedimiento, le haya interesado a ITI e ITI ARG para evitar la aplicación de las garantías de las legislaciones europeas.

98.    Se aporta, asimismo, la traducción certificada del nombramiento del observador como **Documento núm. 36** y su traducción al castellano como **Documento núm. 37**. Parte de la labor del observador en Países Bajos es ir informando al Juzgado de la evolución del procedimiento holandés a través de informes. Sobre ello, presentamos:

- Su primer informe de 4 de octubre de 2024 en el que confirma (página 4) la existencia de un crédito *intercompany* entre IC Financial Operations B.V. e ITI. Se aportan, como **Documento núm. 38**, la versión holandés-inglés de dicho informe y, como **Documento núm. 39**, la versión traducida al castellano. En dicho informe aparecen, además, menciones expresas a Redwood Master Fund, Ltd., uno de los miembros del Grupo de Bonistas Ad Hoc que fue quien, efectivamente, inició las acciones legales frente a IC Financial Operations B.V. en Países Bajos.

    En particular, el observador (página 4) refiere que **IC Financial Operations B.V. tiene dos derechos de cobro por créditos *intercompany*, incluyendo un crédito de**

**aproximadamente 1.220 millones de dólares americanos de ITI**. Y refiere también (página 13) que "*Los Solicitantes de*

*l EJ cuentan con el apoyo de 1/3 de sus acreedores para el Plan EJ, tal y como exige la legislación brasileña para ser admitido en el Procedimiento EJ. **El Observador entiende que el Plan EJ no cuenta con el apoyo de de los acreedores de ICBV. Según el ICBV, esto no es un problema, ya que EJ asume un enfoque consolidado y, por lo tanto, el apoyo requerido para todos los Solicitantes EJ debe ser considerado colectivamente. El Grupo Ad Hoc** [léase, mis mandantes] **defendió contra el enfoque consolidado en Brasil** y argumentó, entre otras cosas, que el ICBV no cumple los requisitos para la consolidación en el Procedimiento EJ, entre otras cosas porque el ICBV no el apoyo de al menos 1/3 de sus acreedores*."

- Su informe posterior a fecha 19 de noviembre de 2024, del que se aporta, como **Documento núm. 40**, la versión holandés-inglés y, como **Documento núm. 41**, la versión traducida al castellano. En dicho informe (página 9) el observador refiere que parece que la intención de la compañía bajo sus intentos de reestructuración brasileña es **eliminar completamente el crédito *intercompany* entre la sociedad española y la sociedad, con el lógico daño que conllevaría a todos los acreedores de IC Financial Operations B.V.** Como se ha señalado, esto sería impensable en un procedimiento español, en el que los importes que resultaren de la venta de los activos en España servirían para pagar a sus acreedores, incluido, y por supuesto sometido a la prelación de créditos, a IC Financial Operations B.V.

Insistimos, en un procedimiento español no se procedería a la eliminación de un crédito de IC Financial Operations B.V. frente a ITI por importe de 1.220 millones de dólares americanos de ITI como pretenden ITI e ITI ARG en el procedimiento brasileño[4], lo que supone, como se ha señalado en el apartado relativo al orden público, un intento confiscatorio y contra las mínimas bases del derecho de propiedad de mis mandantes.

99. El crédito contra ITI resultante de un préstamo *intercompany* pone de manifiesto que la relación entre IC Financial Operations B.V. e ITI es de gran relevancia. En efecto, los Bonos Senior se refieren a la única deuda externa material de IC Financial Operations B.V. y, como tal, el Grupo de Bonistas Ad Hoc representa a la mayoría de los acreedores

---

[4]   Nótese que aunque el observador holandés se pronunciaba sobre el procedimiento brasileño previo a la recuperación judicial, ITI e ITI ARG siguen pretendiendo dicha eliminación de créditos intragrupo en el seno del procedimiento de recuperación judicial objeto de exequátur.

que tienen interés en el tratamiento del préstamo *intercompany* de IC Financial Operations
B.V. a ITI.

100. Por consiguiente, es evidente el interés legítimo del Grupo de Bonistas en la forma en que
se gestiona el procedimiento concursal de ITI.

101. De hecho, **mis mandantes fueron quienes presentaron el ya referido recurso de
apelación frente a la resolución de apertura en Brasil con respecto a ITI, ITI ARG e
IC Financial Operations B.V.** (*vid.* Documentos núms. 28 y 29 aportado, puede verse
en su encabezamiento que coinciden con mis mandantes) que ahora es objeto de exequátur
en España con respecto a ITI e ITI ARG.

102. Además, mis mandantes han reclamado a ITI responsabilidad por daños por el fraude
generado tras haber presentado un procedimiento en Brasil existiendo ya un
procedimiento principal abierto en España, exigiendo que ITI e ITI ARG cumplan con lo
previsto en el artículo 611 del TRLC. Lo anterior derivaría en que, más allá de lo anterior,
tendrá el crédito que se corresponda, directamente, contra ITI, por la responsabilidad por
los daños causados (*vid.* Documentos 32 y 33). Por no ser reiterativos, nos referimos a lo
referido en cuanto a la vulneración de todas las salvaguardas de la legislación española
que ITI e ITI ARG pretenden evitar que hemos referido en el apartado relativo al orden
público: vulneración de la regla de la prioridad absoluta, vulneración de la regla del mejor
interés de los acreedores, vulneración de la no consolidación de masas (pese a la
posibilidad de coordinación), efectos confiscatorios preservando valor para el titular real
último en contra de los acreedores, privación del retorno legítimo a los acreedores
españoles (por ejemplo, de las ventas de los negocios de Argentina y de Brasil que, a su
vez, deberían hacerse bajo la protección de las ventas de unidad productiva que confiere
el ordenamiento español.

103. De hecho, parte del interés en el éxito del recurso del Grupo de Bonistas Ad Hoc es,
lógicamente, que ITI e ITI ARG se vean abocados a cumplir con su deber legal referido
en el artículo 611 del TRLC (solicitud de concurso en el lugar en que se siguió el
procedimiento principal de apertura de negociaciones). De este modo, declarado el
concurso en España (jurisdicción que corresponde, no Brasil) se activarán las
salvaguardas del procedimiento español. Entre ellas, mis mandantes podrán personarse en
el procedimiento concursal español y en la correspondiente pieza de calificación para que
se analice, por un administrador concursal, la responsabilidad del órgano de
administración de ITI y de ITI ARG. Y, claramente, en los procedimientos españoles de

ITI e ITI ARG no habrá consolidación de masas como también dispone la legislación española.

104. Por último, ITI es la accionista de los negocios materiales de sus filiales en Brasil y Argentina, recibió los ingresos derivados de la venta de determinadas filiales que operaban en África y, por lo tanto, controla todos los activos materiales relevantes para los acreedores directos e indirectos de ITI, de los que el Grupo Ad Hoc es un componente material.

105. Por lo expuesto, es evidente que el Grupo de Bonistas Ad Hoc es una de las partes a las que ITI e ITI ARG les interesa hacer valer la resolución judicial de exequátur.

### *5.2. De la legitimación activa de mis mandantes.*

106. Dentro de cada proceso y en orden a su participación, cada ordenamiento jurídico considera a ciertas personas que se hallan en una determinada relación con el objeto del litigio, habilitadas para operar como parte en dicho proceso. Esta conexión con el objeto del litigio establece la legitimación procesal y permite llevar a cabo de manera efectiva un acto jurídico, incluyendo tanto el uso y disfrute del derecho, como su defensa. Generalmente, esta relación se determina por la titularidad activa o pasiva en el asunto legal en cuestión.

107. Dicho lo anterior, no son pocos los ordenamientos jurídicos, entre los que se incluye el español, en los que además de reconocer la legitimación directa del titular de la relación jurídica controvertida, prevé otros supuestos de legitimación indirecta o extraordinaria, esto es, el legislador admite que una persona pueda actuar como parte en un proceso concreto, aunque no sea sujeto titular de aquellas relaciones. Los casos más comunes son aquellos en los que el legitimado indirecto actúa en nombre del verdadero sujeto por la inacción o negligencia de éste, protegiendo, al mismo tiempo los intereses del sustituido y de los suyos propios.

108. En cuanto al procedimiento de exequátur, el artículo 54.1 de la LCJI internacional se refiere a las partes que acrediten "*un interés legítimo*" en la petición formulada. El propio Auto recurrido, en su página 2, apartado 2, párrafo 3, refiere también a la acreditación de dicho interés.

109. Por su parte, el artículo 54.3 de la LCJI hace referencia a que tendrían legitimación pasiva "*aquella parte o partes frente a las que se quiera hacer valer la resolución judicial extranjera*".

110. Como señala el Auto recurrido, "*siendo un procedimiento de insolvencia, los interesados son múltiples y en muchos casos pueden resultar incluso desconocidos*". Como hemos visto, **mis mandantes son los recurrentes en apelación del Auto de apertura de 5 de diciembre de 2024 de Brasil objeto de exequátur con lo que la legitimación activa para el presente recurso de apelación es más que evidente (en este caso, se trataría de un interesado conocido, no uno desconocido)**.

111. El interés es claro, además, dado el contenido del plan que se pretende aprobar en Brasil. Así se manifestó en la carta remitida a ITI y su Consejo de Administración por mis mandantes (*vid.* Documentos 32 y 33) en la que se detalla cómo (i) las propuestas de plan presentadas en Brasil violan la legislación española y no están a la altura de las normas internacionales y (ii) violan tanto la regla de la prioridad absoluta como la del mejor interés de los acreedores, aplicable en España, Países Bajos, Estados Unidos y la mayoría de las jurisdicciones desarrolladas.

112. A tales efectos, se aporta escrito de ITI, ITI ARG y otros presentado en Brasil por el que ponen de manifiesto que pretenden tramitar tal plan consolidado (pese a ser contrario a la legislación española). Se aporta dicho escrito de 10 de febrero de 2024 como **Documento núm. 41** en su versión original portuguesa y como **Documento núm. 42** en su versión traducida al castellano. Dicho escrito señala (página 2, pie de página) que "*admitida la consolidación de masas, los deudores presentarán un plan unitario (...)*."

113. Por tanto, el interés legítimo que ostenta el Grupo de Bonistas Ad Hoc como acreedor de IC Financial Operations B.V. (a su vez, acreedor de ITI) legitima a mis mandantes, ya apelantes de la propia resolución de apertura brasileña objeto de exequátur, a la formulación del presente recurso de apelación.

114. Por último, ITI está actuando, como se ha señalado, en claro conflicto de interés, velando más por los intereses de sus últimos accionistas que por los de su masa pasiva de acreedores. Por tanto, **a mayores, la legitimación para accionar del Grupo de Bonistas Ad Hoc es, también, una legitimación extraordinaria que nace de la omisión de acciones por parte del órgano de administración de IC Financial Operations B.V. en el presente procedimiento de exequátur, quien actúa dolosamente y en connivencia con ITI para evitar el reconocimiento como principal de un procedimiento de insolvencia ya reconocido como tal en España, persiguiendo una condonación de un crédito intragrupo en Brasil de 1.220 millones de dólares americanos a través de la consolidación de masas** (que jamás ocurriría en España, dada la separación de masas activas y pasivas de cada empresa como parte de las garantías de nuestro sistema) con los

consiguientes efectos confiscatorios sobre el patrimonio de mis mandantes y el correspondiente perjuicio en la recuperación de su crédito.

**SEXTO.- DE LA INFRACCIÓN PROCESAL CONSISTENTE EN EL DEBER DE NOTIFICACIÓN DE LA DEMANDA DE EXEQUÁTUR A LAS PARTES DEMANDADAS, *EX* ARTÍCULO 54.5 DE LA LEY DE COMPETENCIA JURÍDICA INTERNACIONAL.**

115.  A pesar de que el procedimiento de exequatur no debió ni admitirse a trámite por los motivos expuestos en los ordinales que preceden, iniciado el mismo, esta parte quiere poner de manifiesto, a mayor abundamiento, que el Tribunal de Instancia prescindió de las normas más esenciales del procedimiento, en concreto, del artículo 54.5 LCJI, cuestión esta que se pone de manifiesto a los efectos de lo previsto en el artículo 459 LEC.

116.  *Ex* artículo 54.5 de la LCJI, el Letrado de la Administración de Justicia habrá de dar traslado a la parte demandada de la demanda y documentos para que se oponga, en su caso, en el plazo de los 30 días.

117.  En los autos de exequátur que dan origen al presente recurso, se ha omitido la notificación de la demanda a las partes frente a las que se quiere hacer valer la resolución judicial extranjera, argumentando al efecto que: *"Se trata en este caso de una petición de reconocimiento a título principal (y no incidental, en un procedimiento judicial que ya estuviese entablado) por lo que no hay partes "demandadas" a las que deba darse traslado para poder oponerse al reconocimiento. Y, siendo un procedimiento de insolvencia, los interesados son múltiples y en muchos casos pueden resultar incluso desconocidos, por lo que la práctica judicial se inclina trasladar la petición únicamente al Ministerio Fiscal (art. 54.8 de la LCI). Así se ha hecho en este caso, y así se hizo en los asuntos resueltos por el Juzgado de lo Mercantil 11 de Barcelona (auto de 9 de enero de 2019) y del Juzgado de lo Mercantil 1 de Girona (auto de 18 de noviembre de 2021, que cita la doctrina del Tribunal Supremo sobre esta cuestión de la notificación de la solicitud de reconocimiento)"* (énfasis añadido por esta parte)

118.  Sin embargo, ninguna de las dos resoluciones que fundamentan la decisión del Tribunal de Instancia de omitir la notificación de la demanda a las partes demandadas, aparecen fundamentadas. En todo caso, parece que no estamos ante casos ni siquiera asimilables, en tanto que el presente procedimiento de exequátur se regula por la LCJI y no por la LEC

como resuelve el Auto dictado por el Juzgado de lo Mercantil núm. 11 de Barcelona en fecha de 9 de enero de 2019. Asimismo, tampoco, se asimila al supuesto de hecho, previsto en el Auto de 18 de noviembre de 2021, dictado por el Juzgado de lo Mercantil núm. 1 de Girona, pues tal como se indica en su fundamento de derecho primero, la resolución extranjera se ha dictado como consecuencia del ejercicio de una acción personal, de una disolución del matrimonio o divorcio, instada por uno de los cónyuges con el consentimiento del otro. Se acompañan como **Documento núm. 44** las resoluciones citadas.

119.    Dicho lo anterior, previo a la entrada en vigor de LCJI, el Tribunal Supremo al interpretar el artículo 956 de la LEC de 1881, venía considerando que, en los procedimientos tramitados de mutuo acuerdo, se podía prescindir del trámite de audiencia a la parte no personada, bastando en tales supuestos con el previo traslado al Ministerio Fiscal para poder dictar la resolución correspondiente, cuestión ésta que aplicaba para los supuestos de divorcio o separaciones de mutuo acuerdo. Ninguna indefensión se producía al ex cónyuge demandado del exequátur, ni se mermaba su derecho de defensa, aunque no se le diera traslado de la demanda ejecutoria, pues se presumía que era conocedor de la resolución extranjera dictada a la que prestó su plena conformidad.

120.    Esta interpretación, anterior a la entrada en vigor de la LCJI, insistimos, se aplicaba exclusivamente a supuestos de divorcios o separaciones de mutuo acuerdo. No osbtante lo anterior y aún en el supuesto, de estimarse que dicho criterio se ha mantenido en el tiempo, aplicándose a la nueva normativa, artículo 54 de la LCJI, sólo podría aplicarse a los procedimientos que traen causa de resoluciones de separaciones o divorcios de mutuo acuerdo.

121.    Por lo expuesto, concluimos no podría obviarse el trámite de audiencia a las partes demandadas (acreedores de ITI e ITI ARG) en el procedimiento de exequátur objeto de apelación, por no traer causa la resolución extranjera cuyo reconocimiento se interesa de un procedimiento tramitado de mutuo acuerdo por todas las partes afectadas por la resolución.

122.    Aduce el Tribunal de instancia, a mayor abundamiento, que la razón de omitir el trámite de audiencia a las partes afectadas es que se trata de un supuesto procedimiento de insolvencia extranjero principal, en el que no hay partes demandadas. A fin de no ser reiterativos, **nos remitimos a lo ya expuesto, sobre el error cometido por el Tribunal de instancia de reconocer la resolución brasileña de apertura de procedimiento de insolvencia en Brasil, como procedimiento principal**. De otra parte, no puede

desconocerse la identidad de los demandados porque se identifican en la demanda de solicitud de exequátur (*vid.* página 21 de la demanda, párrafo 61 y los documentos 3 y 9 presentados con la demanda), porque se estaban oponiendo al reconocimiento del procedimiento brasileño en cuanto a ITI e ITI ARG en otras jurisdicciones (como Estados Unidos) e incluso apelaron la resolución de apertura en Brasil por lo que, lógicamente, se les hubo de dar audiencia con carácter previo. Los requerimientos de ITI e ITI ARG de que se declarase el exequátur sin audiencia de mis mandantes y de ningún otro acreedor supone una merma del procedimiento de exequátur, que queda reducido, para mis mandantes y los acreedores, a una única instancia (que, sin embargo, es ya una segunda instancia).

123.   La defensa, contradicción y derecho a un proceso justo, no permite omitir la notificación prevista legalmente a las partes demandadas en el procedimiento de exequátur (con la excepcionalidad del supuesto de procedimientos de disolución matrimonial de mutuo acuerdo como son los casos citados por el Juzgado *a quo*, supuestos que nada tienen que ver con el nuestro). Máxime en el supuesto de hecho que nos ocupa, que supone el reconocimiento para los acreedores de ITI e ITI ARG, de la apertura de un procedimiento de recuperación judicial brasileño, como procedimiento principal, cuando ya constaba en España un procedimiento de insolvencia abierto con el carácter de principal.

124.   No se trata de una mera irregularidad procesal que no causa indefensión a las partes, sino todo lo contrario, la indefensión que le produce es material y efectiva, por cuanto no permite evidenciar la falta de los requisitos que debieron concurrir, *ex* artículo 742 del TRLC, en la resolución cuyo reconocimiento se impetra.

125.   Dispone el artículo 238.3º de la Ley Orgánica del Poder Judicial, de aplicación en todos los órdenes jurisdiccionales, que los actos procesales son nulos de pleno derecho "*cuando se prescinda de normas esenciales del procedimiento, siempre que por esa causa haya podido producir indefensión*", precepto que es menester conectar con el apartado 1 del artículo 240 de la misma ley, a cuyo tenor "*la nulidad de pleno derecho, en todo caso, y a los defectos de forma en los actos procesales que impliquen ausencia de los requisitos indispensables para alcanzar su fin o determinen efectiva indefensión, se hará valer por medio de los recursos legalmente establecidos contra la resolución de que se trate o por los demás medios que establezcan las leyes procesales*", que es lo que venimos a hacer valer mediante el presente recurso.

SÉPTIMO.- DE LA IMPOSICIÓN DE COSTAS.

La estimación del recurso de apelación debe conllevar la expresa condena de las costas a las apeladas, de conformidad con lo establecido en el artículo 398.1 de la Ley de Enjuiciamiento Civil.

Por lo expuesto,

**SUPLICO A LA ILMA. SALA DE LA AUDIENCIA PROVINCIAL DE BILBAO** que tenga por presentado este escrito, con su documentación adjunta, se sirva: admitirlo, tenga por interpuesto en tiempo y forma recurso de apelación contra el Auto de Exequátur Nº 6/2025 y resuelva:

1. Revocar la sentencia de instancia y dictar Sentencia en la que acuerde **DENEGAR EL RECONOCIMIENTO DE EXEQUÁTUR, con expresa condena en costas** a quien se oponga al presente pedimento.

2. Subsidiariamente, ordenar la nulidad de actuaciones y la retroacción de las actuaciones al momento del debido traslado de la demanda a las partes demandadas de modo que las partes con interés legítimo puedan realizar las alegaciones oportunas ante el Juzgado de lo Mercantil núm. 1 de Bilbao.

Es Justicia que pido y espero en Bilbao, a 21 de febrero de 2025.

**PRIMER OTROSÍ DIGO** que esta parte anuncia desde este mismo momento los medios de prueba de que intenta valerse, y en tanto se trata de una cuestión eminentemente jurídica (imposibilidad de abrir un procedimiento principal en España cuando ya hay una decisión española que abril un procedimiento principal sobre las mismas empresas, ITI e ITI ARG) son:

- Documental (Documentos núms. 1 a 44) unida al recurso de apelación.

- Por su relevancia, se dejan designados los autos de *Comunicación art. 5.3 de la Ley Concursal / Art. Komunikazioa Konkurtso Legearen 5.3 211/2024* seguidos ante el Juzgado de lo Mercantil núm. 2 de Bilbao.

**SUPLICO A LA SALA** que tenga por realizada propuesta de prueba, interesando su admisión y práctica.

- 38 -

**SEGUNDO OTROSÍ DIGO**, que esta parte cree haber cumplido con todos los requisitos legales en la formulación del presente escrito interposición de recurso de apelación, no obstante lo anterior, para el caso de que se observara cualesquier defecto formal, muestra su voluntad de subsanar los mismos.

**NUEVAMENTE SUPLICO A LA SALA**, que tenga por realizada la anterior manifestación a los efectos de lo dispuesto en el artículo 231 de la Ley 1/2000, de 7 de enero, de Enjuiciamiento Civil de aplicación por remisión del artículo 521 del TRLC.

Es de justicia que se reitera en fecha y lugar *ut supra*.


_____
Ldo. D. José Carles Delgado
Col. ICAM. núm. 83.585

_____
Ltdo. D. Carlos Cuesta Martín
Col. ICAM. núm. 82.929



_____
D. Eduardo José Manzanos Llorente
Procurador de los Tribunales

**Exhibit B**

**March 6, 2025 Observer Letter**

**HOUTHOFF**

**COURT AMSTERDAM,**
**PRIVATE LAW DEPARTMENT, INSOLVENCY TEAM C/13/754123 /**

**FT RK 24.725**

**6 MARCH 2025**

**NOTIFICATION, ALSO OPINION, WITHIN THE MEANING OF SECTION 380(2) FW**

From:

Mr F. Verhoeven, observer in the public WHOA proceedings of
**INTERCEMENT FINANCIAL OPERATIONS B.V.**
having its registered office in Amsterdam

**HOUTHOFF**

1.      **Introduction**

1.1.      The <sup>Observer1</sup> informs your court with this notice, also opinion, within  theof section 380(2) Fw, that, in the of the Observer, at the present state of affairs, is not going to succeed in bringing about a WHOA agreement (the "ICBV **Notice**").

1.2.      This Notification is structured :as follows

(i)      background (Chapter 2);

(ii)      main developments since his letter to your court dated 9 January 2025 (the "**Observer Letter**", <u>Annex 1</u>) (Chapter 3);

(iii)      considerations under section 380(2) Fw (chapter 4); and

(iv)      concluding findings (chapter 5).

2.      **Background**

2.1.      On 9 January 2025, the Observer informed your court with the Observer Letter of the developments from the November Viewpoint. By petition dated 24 January 2025, ICBV requested your court to the cooling-off period extend for a  periodof two months. In consultation with the Ad Hoc Group and subject to certain conditions, ICBV finally made the application for a one-month extension. The Observer informed your court on 4 February 2025 that ICBV and the Ad Hoc Group had confirmed to him that the conditions for this extension had been met. On 13 February 2025, your court extended the cooling-off period until 1 March 2025 (the "**Second Extension Order**").

2.2.      In the Second Extension Order, your court considered that, even in the absence of a further application to extend the cooling-off period, an ex officio decision will have to be made on the appointment of the Observer, for which it will order an oral hearing.[2]

2.3.      The Observer, inter alia in view of the aforementioned consideration by the court, sent a letter on 21 February 2025 to (the lawyers of) ICBV, the Ad Hoc Group and the Trustee requesting their views on (i) the draft RJ Plan (as offered by the Group in the RJ Proceedings on 10 February 2025, see para. 3.1), and by extension, the

---

[1]      The Observer uses in this Notice (unless otherwise indicated) the same definitions as  inthe Observer's view of 19 November 2024 in respect of the winding-up and/or first renewal request (the "**November View**"). New or different definitions are in this Notice.

[2]      Second Extension Decision, para 5.7.

20541800003/37388907.1



feasibility of a WHOA agreement, and (ii) the continuation of the WHOA proceedings (Annex 2). The Observer  the views of ICBV, the Ad Hoc Group receivedand the Trustee by letter on 28 February 2025 (Annexes 3 to 5).

2.4.   For the sake of completeness, the Observer is pleased to first inform your court of the main developments since the Observer letter, before briefly considering the views of ICBV, the Ad Hoc Group and the Trustee as they follow from the aforementioned letters. Finally, the Observer shares its findings 2) Fw.under section 380(

**3.   Key developments since the Observer letter**

3.1.   In Brazil, the Group on 10 February 2025 offered a draft RJ Plan to its creditors (the "in the RJ Proceedings **RJ Plan**"). ICB, ICP, ITI ESP, ITI ARG and ICBV (the "**RJ Debtors**")  a (consolidated) RJ Plan to the São Paulo Court. Mover, as a shareholder of the Group, has offered its own RJ Plan (the "**Mover Plan**"). The Mover Plan is closely related to the RJ Plan.

3.2.   As part of the RJ Procedure, Galdino, the Brazilian lawyer retained by the Observator,  two meetings in Brazil, where, among , other thingsthe competition law and tax contingent claims against the Group (*contingent liabilities)* and next steps in the RJ Procedure were discussed. In this context, a was also by ICBV and Group advisers "next steps plan" shared with the respective Ad Hoc Group and Observer advisers.[3] In addition to the non-disclosure agreement entered into between the Group's US advisers and the Ad Hoc Group, a non-disclosure agreement was also entered into between the Group's principals  in early February 2025and the Ad Hoc . The RJ Plan was discussed by principals of ICBV and the Ad Hoc Group on 7 February 2025 - i.e. prior to the offer of the RJ Plan on 10 February 2025.[4] Following the offer of the RJ Plan

---

[3]   Next steps plan dated 9 January 2025 (production 23 Second Extension Request).

[4]   The Observer refers in  thiscontext to the digital discussion of 7 February 2025 between ICBV and the Group and the Ad Hoc Group, at which also the Observer was present.

205418000337388907.1

**HOUTHOFF**

Ad Hoc Group's financial adviser requested information additional from the 's lawyers and financial adviser.

3.3.   For now, the RJ Procedure has a cooling-off period until 4 April 2025, which can be extended once by 180 days. The Ad Hoc Group on 27 January 2025filed an appeal against the opening decision of the RJ Procedure .[5]

3.4.   In the United States, RJ Debtors and the Ad Hoc Group are litigating in the Chapter   15onthe recognition of the RJ Procedure as a *foreign main proceeding*. The New York court will set a hearing date. The preliminary cooling-off period expires on 25 March 2025.declared by the US court

3.5.   In Spain, on 17 January 2025, the Bilbao court granted . ITI ESP and ITI ARG's request for recognition of the RJ Procedure - in respect of these companiesThe Observer understands that as   , aresultthe until cooling-off period promulgated 4 April 2025 in the   RJProcedure also applies in Spain in respect of these companies. The Ad Hoc Group filed an appeal against this on 24 February 2025.

3.6.   On , 21  Februarythe Ad Hoc Group, in addition to ITI ESP and the directors of ITI ESP, also held ICBV and the directors of ICBV personally liable in tort for damages suffered by the Ad Hoc Groupallegedly , inter alia, as a result of the failure of the directors of ICBV to object to the recognition of the RJ Procedure of ITI ESP and ITI ARG (in the Spanish courtsAnnexes 6 to 8) . As a result of this omission, the directors of ICBV allegedly  (the causeddirectors of) ITI ESP to act unlawfully and allowed (the directors of) ITI ESP to perform acts that ICBV's asset (the risked rendering claim against ITI ESP) worthless, *intercompany* to the detriment of the .interests of ICBV's joint creditors

3.7.   In the Netherlands, the extended by your court on 13 February 2025 cooling-off period ended on 1 March 2025. Your court has determined that the Bankruptcy Petition will be heard on 1 April 2025.

**4.     Considerations under section 380(2) Fw**

4.1.   Pursuant to section 380(2) Fw, the observer will notify the court as soon as it becomes clear that the debtor will not succeed in reaching an agreement or that the interests of the joint creditors will be harmed. In

---

[5]   The Ad Hoc Group requests (inter ) that be ITI ESP, ITI ARG and ICBV excluded from the RJ Procedure and argues that, in view of the cooling-off period granted in the EJ Procedure, the cooling-off period in the RJ Procedure expires earlier than 4 April 2025.

205418000337388907.1



such a case, the court will the observer and the debtor in a manner give the opportunity to give an opinion it shall determine. This Notice shall also serve as a view under section 380(2) Fw.

4.2.    Based on the respective positions of ICBV, the Ad Hoc Group and the Trustee, as reflected in the letters dated 28 February 2025, the Observer sees no other conclusion than that, as things stand, ICBV will not succeed in bringing about a WHOA agreement. The Observer explains this in terms of the two most relevant aspects.

(i)    The RJ Plan and by extension the feasibility of a WHOA agreement

4.3.    ICBV states that any payment by ICBV to its creditors will have to economically flow from the s Group'activities (to be restructured) and will be governed by the RJ Plan as far as ICBV is concerned. The  RJPlan will provide added value to its creditors compared to a liquidation of . The Group believes that the RJ Plan - subject to amendments that can be negotiated with all respective creditors of the RJ Debtors - will be approved and ratified by the Brazilian courts.[6]

4.4.    Briefly, the Ad Hoc Group believes that the RJ Plan violates Brazilian and Spanish law. The RJ Plan, in combination with the Mover Plan, would constitute an abuse of shareholder power and a breach of fiduciary duties of the Group's management (including the Board), as the Group's assets would be used to satisfy claims of creditors Mover's without (substantial) contribution by Mover. This would be unlawful vis-à-vis the Group's creditors, in particular the creditors of ITI ESP and ICBV.[7] A WHOA arrangement, if it is the elaboration of the current RJ Plan, could not be homologated as such by a Dutch court. In addition, the WHOA arrangement not have the support will of external creditors. The Trustee endorses the Ad Hoc Group's contention that the RJ Plan does not fairly the value of ICBV's assets distribute to ICBV's external creditors.[8] For a further explanation of ICBV's grounds and the objections of the Ad Hoc Group and the Trustee, refers the Observer to the letters dated 28 February 2025.

4.5.    The Ad Hoc Group has indicated that it will not agree to the current RJ Plan. While the ICBV Observer understands that the RJ Plan is subject to change

---

[6]    Annex 3: Letter from (the lawyers of) ICBV to the Observer dated 28 February 2025, p. 2 and 3.

[7]    Annex 4: Letter from (the lawyers of) the Ad Hoc Group to the Observer dated 28 February 2025, p. 3.

[8]    Annex 5: Letter from (the lawyers of) the Trustee to the Observer dated 28 February 2025.

205418000/37388907.1

Machine Translation

**HOUTHOFF**

and that ICBV is open to counter-proposals from the Ad Hoc Group (and the Trustee),[9] the Observer has not been able to establish that the RJ Plan has been or is being negotiated. The Ad Hoc Group has indicated to the Observer that, on the basis of the current RJ Plan, it will not submit a counter-proposal partly in view of s position Mover'under the RJ Plan (respectively the Mover Plan).[10]

4.6.    The Observer understands that ICBV intends to offer a WHOA agreement to its creditors that reflects or confirms the economic propositions of the RJ Plan. The Observer is currently unable to assess whether the RJ Plan, when translated into a WHOA agreement, will meet the homologation requirements of the WHOA. However, it has become clear that a WHOA agreement that will reflect what is offered under the current RJ Plan will not be supported by any of ICBV's external creditorsto the Observer .[11]

(ii)    Continuing WHOA proceedings

4.7.    The Ad Hoc Group argues that the WHOA proceedings should be terminated as soon as possible to prevent ICBV and ITI ESP from taking further steps that would be irreversible and against the interests of ICBV's creditors. ICBV's creditors would benefit from a receiver who the interests  could represent ofthe creditors.[12] The Trustee endorses this.[13]

4.8.    The Observer concludes that, at the very least, a contractual *standstill* between ICBV and the Ad Hoc Group will be necessary to  ICBV's WHOA proceedings another chance. Given the (in fact, since  theinception of the WHOA, consistent) positioning of the Ad Hoc Group and the Trustee, this is not the likely outcome. Immediately after the expiry of the cooling-off period, requested the court the handling of the the Ad Hoc Group to determine . Bankruptcy PetitionIn addition, it can be concluded from the liabilities of the directors of ICBV and ICBV that the

---

[9]    The s Group'financial adviser indicated in a discussion on 7 February 2025 that the is open to a counter-proposal. In addition, ICBV's US lawyer informed the Observer on 20  February2025 that ICBV is open to counter-proposals from the Ad Hoc Group.

[10] Ad Hoc s lawyers Group'informed the Observer that they based on on 26 February 2025 would not counter-proposal Plansubmit a .the current RJ

[11] For the Observatory's considerations regarding the lack of support by the external creditorsrefers , the Observatory to para 5.4 - 5.9 of the November View.

[12] Annex 4: Letter from (the lawyers of) the Ad Hoc Group to the Observer dated 28 February 2025, p. 3.

[13] Annex 5: Letter from (the lawyers of) Trustee to the Observer dated 28 February 2025, p. 2.

**HOUTHOFF**

Ad Hoc Group (permanently) confidence in ICBV as a debtor under this WHOAhas lost .

## 5.    Concluding findings

5.1.    It is clear from the above that, in the Observer's view, the ICBV is not going to succeed in reaching a WHOA agreement. The Ad Hoc Group's objections to the RJ Plan are so fundamental in nature and the parties have so far failed to overcome these objections. As mentioned, the entire external liabilities have expressed a preference for bankruptcy of ICBV over the continuation of the WHOA proceedings. A contractual *standstill* is therefore not in the offing, also in view of the fact that these WHOA proceedings have been "underway" for quite time and the position of s creditors ICBV'has effectively remained unchanged since inception.

5.2.    Even if ICBV - in anticipation of a final RJ Plan - will offer a WHOA agreement, this trajectory is likely to be thwarted by the processing of the Bankruptcy Petition on 1 April 2025.

5.3.    As for the impact of the Dutch route on the RJ Procedure, in case of a bankruptcy of ICBV, whether or not combined with a bankruptcy settlement, an implementation of an RJ plan could still be among the possibilities.[14]

5.4.    The Observer sees no other conclusion than that, on the basis of the foregoing, he should inform your court in accordance with section 380(2) Fw that ICBV not succeed in will bringing about an agreement.

*****

---

[14] As happened with the homologation of the bankruptcy settlements in Oi Brasil Coöperatief U.A. and Portugal Telecom International Finance B.V., see Rb. Amsterdam 11 June 2018, ECLI:NL:RBAMS:2018:5047 (Portugal Te - lecom International Finance B.V.) and Rb. Amsterdam 11 June 2018, ECLI:NL:RBAMS:2018:5048 (Oi Brasil Coöperatief U.A.), *JOR* 2018/259.

205418000307388907.1

HOUTHOFF

**ANNEXES**

Annex 1   Observer's letter to Amsterdam court regarding information on factual bases cooling-off period of 9 January 2025;

Annex 2   Letter from the Observer to (the lawyers of) ICBV, the Ad Hoc Group and the Trustee dated 21 February 2025;

Annex 3   Letter from (the lawyers of) ICBV to the Observer dated 28 February 2025 ;

Annex 4   Letter from (the lawyers of) the Ad Hoc Group to the Observer dated 28 February 2025;

Annex 5   Letter from (the lawyers of) the Trustee to the Observer dated 28 February 2025 ;

Annex 6   Letter from (the lawyers of) the Ad Hoc Group to (the lawyers of) ITI ESP and the directors of ITI ESP dated 21 February 2025;

Annex 7   Letter from (the lawyers of) the Ad Hoc Group to (the lawyers of) ICBV dated 21 February 2025; and

Annex 8   Letter from (the lawyers of) the Ad Hoc Group to (the lawyers of) the board-ders of ICBV dated 21 February 2025.

## Exhibit C

**April 1, 2025 Dutch Hearing Notice**

# THE ADMINISTRATION OF JUSTICE

Amsterdam court

Mr A.J.C.M. Meijs
PO Box 75965
1070 AZ Amsterdam

**Private law department**

insolvency team

Visiting address
Parnassusweg 280
1076 AV Amsterdam

correspondence address
**Postbus 84500**
1080 BN Amsterdam

| | |
|---|---|
| date | March 3, 2025 |
| contact person | insolvency team |
| contact number | (088) 361.1409 |
| our reference | appellant C/13/758985 / FT RK 24/1004 |
| attachment(s) | |
| subject | Notice to appear |

t (088) 361.7000

jurisdiction. n|/contact/ams

When replying, please indicate the date and our reference. Would you like to cover only one case in your letter.

Dear sir/madam,

I hereby notify you that consideration of the petition filed on behalf of  **REDWOOD MASTER FUND, LTD** seeking a declaration of bankruptcy of:

**INTERCEMENT FINANCIAL OPERATIONS B.V.**

is set for <u>1 April 2025 at 11:00 a.m.</u> I hereby summon you to appear in the chambers of this court. The name of the hearing judge will be known one week prior to the hearing.

The hearing will take place at the courthouse at 280 Parnassusweg in Amsterdam. You should report to the reception desk at least 15 minutes before the start of the hearing.

*Respondent(s)in this matter will be summoned by regular mail through attorneys mrs. E.R. Meerdink.and/or F.J.M. Hengst*

**If you wish to uphold or withdraw the bankruptcy petition, please use the appropriate forms. These forms can be found at <u>rechtspraak.nl/contact/ams,</u> under the heading 'to the court' and then forms. Under the heading insolvency forms, you can choose the form you require.**

Y o u r s   s i n c e r e l y

Ms. J.M. Heesbien
de griffier

Your personal data and if applicable those of your client are processed in a registration system of the court to the extent necessary for the purpose of proper litigation.

FT03

**de Rechtspraak**

Rechtbank Amsterdam

mr. A.J.C.M. Meijs
Postbus 75965
1070 AZ  Amsterdam

Afdeling privaatrecht

team insolventie

bezoekadres
Parnassusweg 280
1076 AV Amsterdam

correspondentieadres
Postbus 84500
1080 BN Amsterdam

| | |
|---|---|
| datum | 3 maart 2025 |
| contactpersoon | team insolventie |
| doorkiesnummer | (088) 361 1409 |
| ons kenmerk | rekestnummer C/13/758985 / FT RK 24/1004 |
| bijlage(n) | -- |
| onderwerp | oproep |

t (088) 361 7000

rechtspraak.nl/contact/ams

Bij beantwoording de datum en
ons kenmerk vermelden. Wilt u
slechts één zaak in uw brief
behandelen.

Geachte heer/ mevrouw,

Hierbij bericht ik u dat de behandeling van het door u namens **REDWOOD MASTER FUND,
LTD** ingediende verzoekschrift, strekkende tot faillietverklaring van:

**INTERCEMENT FINANCIAL OPERATIONS B.V.**

is bepaald op <u>**1 april 2025 te 11:00 uur**</u>. Hierbij roep ik u op te verschijnen in de raadkamer van
deze rechtbank. De naam van de behandelend rechter is één week voorafgaande aan de zitting
bekend.

De zitting zal plaatsvinden in het gerechtsgebouw aan de Parnassusweg 280 te Amsterdam. U dient
zich minimaal 15 minuten voor aanvang van de zitting te melden bij de receptie.

*Gerekestreerde(n) wordt via de advocaten mrs. E.R. Meerdink en/of F.J.M. Hengst per gewone
brief opgeroepen.*

**Indien u het faillissementsrekest wilt aanhouden of intrekken, verzoek ik u gebruik te maken
van de hiervoor bestemde formulieren. Deze formulieren kunt u vinden op
rechtspraak.nl/contact/ams, rubriek "naar de rechter" en vervolgens formulieren. Onder het
kopje insolventieformulieren kunt u een keuze maken voor het betreffende formulier.**

Hoogachtend,

Mevr. J.M. Heesbien
de griffier

Uw persoonsgegevens en indien van toepassing die van uw cliënt worden voor zover nodig, ten behoeve van een goede
procesvoering verwerkt in een registratiesysteem van het gerecht.

FT03

**<u>Exhibit D</u>**

**Brazilian Injunction Motion**



**HONORABLE JUDGE OF THE 1ST COURT OF BANKRUPTCY AND JUDICIAL
REORGANIZATION OF THE DISTRICT OF SÃO PAULO, STATE OF SÃO PAULO**

*Case No. 1192002-34.2024.8.26.0100*

**INTERCEMENT FINANCIAL OPERATIONS B.V.** ("IC Financial") e
**OTHERS** (jointly, "Mover Group" or "Recovering Parties"), already qualified in the records of
the judicial reorganization in reference ("Judicial Reorganization"), hereby, by their attorneys,
set forth and request the following.

**.I.
INTRODUCTIO
N**

1.      The purpose of this statement is to preserve the jurisdiction of this MM. Court and the
effectiveness of its decisions, in order to prevent belligerent creditors from using individual
proceedings in foreign jurisdictions to gain undue advantage over the Recovering Companies
and the other creditors participating in these proceedings.

2.      More specifically, it concerns the behavior of the group of international creditors ("Ad
Hoc Group") that claims to hold approximately USD 300 million in credits represented by
*5.750% Senior Notes Due 2024* issued by IC Financial, for which Intercement Participações
S.A. ("ICP") and Intercement Brasil S.A. ("ICB") provided fiduciary guarantees ("Notes"), as
well as UMB Bank in the exercise of its mandate as *trustee of the Notes*.

3.      The Ad Hoc Group, as this Court is aware, has been using procedures in different
jurisdictions(1) to disrupt the stability of the negotiations. Court, has been using procedures in
different jurisdictions[1] to disrupt the stability of the negotiations and thus gain some bargaining
power against the Recovering Companies and the other creditors.

---

[1] In this regard, the Ad Hoc Group filed **(i)** in Brazil, **(i.a)** a request for advance production of evidence, in which it sought to
promote a veritable raid on the Intercement Group's documents, in order to obtain business leverage, as recognized in the
extinguishing sentence (case no. 1102464-42.2024.8.26.0100), **(i.b)** a judicial protest (case no. 1181854-95.2023.8.26.0100),
as well as **(i. c)** in the context of this out-of-court reorganization (case no. 1111483- 72.2024.8.26.0100) **c)** within the scope
of the out-of-court reorganization (case no. 1111483- 72.2024.8.26.0100) and this judicial reorganization, appeals for the
exclusion of IC Financial and the other foreign companies that are part of the active party; **(ii)** in the United States, requested
that this judicial reorganization not be recognized as a foreign procedure, seeking to prevent its effects from being produced
in US territory;
**(iii)** in Spain, even though he was not a creditor of Intercement Trading e Inversiones S.A. ("ITI") and Intercement Trading e
Inversiones Argentina S.L. ("ITI ARG"), he filed an appeal against the decision recognizing this judicial reorganization; and
**(iv)** in the Netherlands, in addition to requesting the appointment of a *restructuring expert* even before his claim was due
(**doc. 1**), he requested that the pre-insolvency procedure known as WHOA be converted into bankruptcy (**doc. 2**).

1

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.



4.      This disgraceful strategy has met with firm resistance in the decisions of the Brazilian Judiciary, which has refused to "*be instrumentalized with a view to acquiring greater bargaining power for certain creditors vis-à-vis the company***[s]** *under reorganization through transversal channels*"[2].

5.      However, in an opportunistic manner, the Ad Hoc Group is taking advantage of the lack of legal instruments to produce the effects of this judicial reorganization in the <u>Dutch jurisdiction</u>, where IC Financial has its registered office, to pursue its abusive strategy.

6.      There, as the Recovering Companies have explained on previous occasions[3] and as will be detailed below, there is no legal instrument for the effective recognition of foreign insolvency proceedings processed outside the European Union. Although it is possible to adopt local pre-insolvency instruments, the misalignment between the local Dutch procedure and the Brazilian procedure ends up being exploited opportunistically by creditors - a situation that the Brazilian courts have already encountered in the case of the judicial reorganization of Oi Brasil Holdings Coöperatief U.A. and Portugal Telecom International Finance B.V., Dutch vehicles of the Oi Group[4].

7.      In the present case, the very same belligerent behavior is observed. As will be shown, the Ad Hoc Group, taking advantage of the end of the period of suspension of actions and executions in the Netherlands ("<u>Dutch *Cooling-Off*</u>"), refuses to cooperate with any negotiating agenda proposed by IC Financial. In an absolutely aggressive approach, it **filed for bankruptcy** - which would then lead to the **liquidation** of IC Financial in the Netherlands - in order to, in good Portuguese, skip the queue to receive amounts for its tender claims.

8.      It is therefore necessary for this court to order the adoption of appropriate measures to prevent this abusive strategy from taking place. Court order the adoption of appropriate measures to prevent this abusive strategy from taking place. As will be seen, this is a position supported by international experience in insolvency matters, and already adopted by the Brazilian courts in similar cases, precisely to safeguard their authority and the useful outcome of the proceedings submitted to their jurisdiction.

.II.

**BACKGROUND ON THE ACTIONS OF THE AD HOC GROUP IN THE NETHERLANDS. SERIOUS DANGER OF DAMAGE TO THIS JUDICIAL REORGANIZATION**

---

[2] Case no. 1102464-42.2024.8.26.0100. Sentence handed down on December 3, 2024, on pages 2910-2922.
[3] Pages 2940-2965 and 3683-3713 of the Extrajudicial Reorganization records (Case No. 1111483-72.2024.8.26.0100, which was heard by the 1st Judicial Reorganization and Bankruptcy Court).
[4] Case No. 0203711-65.2016.8.19.0001, which was heard by the 7th Corporate Court of the District of the Capital of the State of Rio de Janeiro).

2

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

fls. 15613



9.      As part of its crusade to undermine the recovery efforts of the Recovering Companies, the Netherlands has been the scene of the most aggressive and nonsensical requests made by the Ad Hoc Group.

10.     In this jurisdiction, on July 9, 2024, even before the maturity of the securities held by the Ad Hoc Group, one of its members requested the initiation of an involuntary restructuring procedure, as well as the appointment of a "*restructuring expert*" (*herstructureringsdeskundige*), who was to explore the alternatives available for restructuring or liquidating the assets. In response, IC Financial filed a counterclaim for the granting of the Dutch *Cooling-Off*, to prevent patrimonial attacks on the entity. The Dutch court rejected the request made by the member of the Ad Hoc Group and, on the other hand, granted IC Financial's request, initiating the so-called WHOA procedure, granting the Dutch *Cooling-Off* and also appointing an observer to monitor its restructuring efforts ("Dutch Procedure").

11.     Setting up a parallel procedure was the only alternative available to achieve some stability in that jurisdiction, precisely because there is no mechanism in the Netherlands inspired by the UNCITRAL Model Law on Transnational Insolvency that would allow the effects of Brazilian procedures to be recognized (such as Chapter 15 in the United States and Chapter VI-A of the LFR in Brazil). Incidentally, the very maintenance of the proceedings in the Netherlands, necessary solely because of the bellicose behavior of the Ad Hoc Group, entails a substantial cash commitment on the part of the Recovering Companies, which have already shelled out millions of dollars just to achieve a of stability in the process.

12.     Substantially, it was always admitted, within the framework of the Dutch Procedure, that any expectation of payment of its securities would derive from the agreement to be reached within the framework of the Brazilian procedure[5], since distributions within the framework of an autonomous bankruptcy of IC Financial would not lead to a significant payment for the holders of *Notes*[6]. In this sense, the Ad Hoc Group itself refused to align its actions in the Netherlands with the negotiation agenda conducted in Brazil, with its Dutch advisors refusing to sign the agreement.

---

[5] "IC Financial is situated - as part of the InterCement Group (as defined in item 7 below) - in a large and complex restructuring, in which it is playing chess on several (international) boards simultaneously [...]. The center of gravity of this restructuring is in Brazil [...]. IC Financial cannot play a significant independent role in this restructuring. Any payment to a creditor, and then to the economic stakeholders behind it (including Redwood), will have to come from Brazil, as a result of an agreement in the country." Application for cooling-off and appointment of an observer originally filed before the Dutch Court on July 17, 2024. In the original: "ICBV bevindt zich - als onderdeel van de InterCement Groep (zoals gedefinieerd in nr. 7 hierna) - in een grote, complexe herstructurering waarin zij op meerdere (internationale) borden tegelijk [...]. Het zwaartepunt van die herstructurering ligt in Brazilië [...]. ICBV will have a permanent role for betekenis spelen in this herstructurering. Elke betaling aan een schuldeiser em vervolgens aan de economisch belanghebbenden daarachter (waaronder Redwood), zal moeten komen vanuit Brazilië, als resultante van een akkoord aldaar".

[6] [-]. Furthermore, in the recognition process in the United States filed by IC Financial and some other entities of the Mover Group ("*Chapter 15*"), the members of the Ad Hoc Group stated that they had always expected that a restructuring of IC Financial and other guarantors of the *Notes* would be centralized in Brazil.

3

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

fls. 15614



confidentiality agreements that could enable effective negotiations around a restructuring proposal[7].

13.    Despite this, the Dutch Procedure was used by the Ad Hoc Group as a litigious front to obtain undue business advantages - and, at the end of the day, to pay itself in front of the other creditors subject to this judicial reorganization.

14.    Its strategy is clear: the Ad Hoc Group wants all of IC Financial's assets in the Netherlands to be liquidated, including bank accounts with liquid resources worth approximately R$8.6 million, using them exclusively for the benefit of IC Financial's creditors, despite the recognition in Brazil of substantial consolidation. It will then succeed, in its view, in pressuring the *trustee* (a figure similar to the judicial administrator in charge of administering the bankruptcy estate) to be eventually appointed by the Dutch courts to *(i)* try to pursue *intercompany* credits held against the other Recovering Companies - especially Intercement Trading e Inversiones S.A. ("ITI") - by collecting their existing assets in different jurisdictions so that they are also directed only to the members of the Ad Hoc Group; and *(ii)* seek to interfere with and disrupt this judicial reorganization, as well as the ancillary proceedings initiated in the United States and Spain, in order to exercise bargaining power vis-à-vis the Recovering Companies.

15.    Eager to implement this strategy, since the beginning of the Dutch procedure, **the Ad Hoc Group has sent threatening notices to the entities that make up the Mover Group and to their administrators (doc. 3)**, seeking to pressure them to adopt measures that are detached from the overall restructuring efforts (conducted for the benefit of the collectivity of creditors), in order to favor the Ad Hoc Group's own interests.

16.    Additionally, in November 2024, the Ad Hoc Group requested the **immediate termination of the Dutch *Cooling-Off* and the decree of bankruptcy of IC Financial (doc. 2)**. At first, the Dutch court rejected the request, keeping the Dutch Cooling-Off in force until February 28th.

17.    During this period, IC Financial sought to demonstrate to the Dutch court, the appointed observer and the Ad Hoc Group the clear advantages in coordinating the Dutch Procedure and this Judicial Recovery. In addition, the Recovering Companies took all steps to ensure that a meaningful negotiation could take place, including:
**(i)** negotiated and entered into confidentiality agreements with the members of the Ad Hoc Group, as well as disclosed *blowout* materials, allowing everyone to get involved in the discussions without causing restrictions on the circulation of their Notes; **(ii)** prepared a detailed business plan to discuss it with the Ad Hoc Group and its advisors; **(iii)** provided all the information requested by the Ad Hoc Group regarding the Mover Group's contingencies, its general financial situation and the business plan; and **(iv)** made itself available

---

[7] As recorded in the request for extension of the Dutch *Cooling-Off* filed on 24.01.2025, "*the Dutch lawyers of the Ad Hoc Group and the members of the Ad Hoc Group themselves simply did not receive confidential information about the Global Restructuring because they had not entered into confidentiality agreements*".

4

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under case number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.



to discuss the premises and terms of the initial proposal for the judicial reorganization plan, with various interactions between the parties.

18. In contrast, even after the Mover Group adopted all these measures, the Ad Hoc Group simply refused to present any counter-proposal to the Mover Group, insisting on the claims for the closure of the Dutch *Cooling-Off* and the conversion of the Dutch Procedure into bankruptcy.

19. At the same time, on February 21, 2025, the Ad Hoc Group sent another unfounded notification to the directors of Financial BV (**doc. 4**), threatening to hold them responsible for the fact that IC Financial had not objected to the procedure for recognizing this judicial reorganization in Spain. According to the Ad Hoc Group, IC Financial's supposed "omission" would be an attempt to harm them, which corroborates the abusive strategy of these creditors who, instead of seeking the negotiation environment that exists in Brazil, prefer to litigate to prevent the judicial recovery from being recognized in other jurisdictions.

20. In view of the lack of support for a consensual *standstill* and the proximity of reaching the maximum duration legally foreseen for the Dutch *Cooling-Off*, the Dutch Procedure was no longer a viable alternative (**doc. 5**). The Dutch courts then scheduled a hearing for **April 1, 2025**, to hear IC Financial's petition for bankruptcy filed by the Ad Hoc Group.

21. In this scenario, there is an imminent risk that the Dutch courts, at the request of **the** Ad Hoc Group, will declare **IC Financial bankrupt**. The consequences of this route would be extremely damaging for this Judicial Recovery, in that:

   (i)   IC Financial's current accounts, with funds in the amount of approximately R$8.6 million, would be immediately used to pay expenses related to the bankruptcy and then liquidated in favor of IC Financial's international creditors, without considering the global scope of this judicial reorganization and the fact that, among the companies that make up the Intercement Group, substantial consolidation has already been recognized by this Court (doc. 6). Court (**doc. 6**);

   (ii)  the *intercompany* credits owed by the Recovering Companies, in particular by ITI, to IC Financial would be pursued by means of collection attempts and the seizure of assets around the globe, in order to collect and direct resources specifically to the Ad Hoc Group (to the detriment of the payments that should be made to all creditors subject to this Judicial Recovery);

   (iii) means of judicial reorganization provided for in the plan presented on pages 11,585- 11,643 could not be implemented, such as the cancellation of the *Notes* and

5

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJM25405522570
To check the original, go to https://esaj.jsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.



its exchange for new dollar-denominated unsecured debt securities[8], resulting in a loss of efficiency - and even lower returns for international creditors, including the Ad Hoc Group members themselves;

**(iv)**    from bankruptcy onwards, the appointed *trustee* would most likely seek to interfere with IC Financial's powers of representation within the scope of this Judicial Reorganization and *Chapter* 15, jeopardizing the performance of all acts that, by legal provision and by order of this , the Recovering Companies must carry out for the benefit of all creditors. Court, the Recovering Companies must comply with, to the benefit of creditors in general; and

**(v)**    Significant tax implications for the implementation of the judicial reorganization plan could result from IC Financial's bankruptcy, also for this reason reducing the amounts available for distribution to creditors subject to this judicial reorganization.

22.    For all these reasons, it is clear that the Ad Hoc Group has used every artifice to purposely put the Dutch Procedure on a collision course with this Judicial Reorganization.

### .III.
### THE AUTHORITY OF THIS COURT TO CURB AND REPRIMAND ILLEGAL ACTS PRACTICED BY TENDERING CREDITORS

23.    As indicated in the rulings issued by this MM. Judgment on folios 756-758 and folios 216-2217 of case file no. 1111483-72.2024.8.26.0100, as well as in the decision on folios 7226-7231, supplemented by the decision on folios 7853-7854 of these case files, the Ad Hoc Group has been prevented from pursuing the payment or constriction of any of the Recovering Companies' assets since July 15, 2024.

24.    Clearly, the acts indicated in **item II** above are **absolutely incompatible** with the aforementioned rulings. And, contrary to what might be alleged, the fact that these acts were carried out abroad does not rule out the violation of the handed down by this Court, nor does it prevent the adoption of appropriate measures to preserve the dignity of Brazilian justice and the useful outcome of this process. Nor does it prevent the adoption of appropriate measures to preserve the dignity of Brazilian justice and the useful outcome of these proceedings.

---

[8] Clause 5.3.1.1 of the Intercement Group's judicial reorganization plan (folios 11.585-11.643): "Liquidation. In the event that IC Financial is liquidated, does not have the restructuring implemented under the terms of this Plan in the Netherlands or does not have the capacity to carry out the issuance of the Unsecured Notes, the Financial Unsecured Creditors - Option A may choose between: (i) receiving the Debentures; or (ii) maintaining this Plan as an extrajudicial enforcement instrument, subject to the provisions of article 50, paragraph 2, of the LFR".

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.



25.    After all, under the terms of article 167-R of the LFR[9], as a general rule, the orders of the judicial reorganization court **are not limited to** "*the assets and establishment of the debtor located in Brazil*". In all cases - such as that of the Recovering Companies - in which there is **no** competing foreign procedure that has been recognized as the main one[10], the prohibitions to which creditors are subject as a result of the cogent guidelines and rules of the judicial reorganization procedure cover all of the debtors' assets, regardless of where they are located.

26.    This provision was introduced following the incorporation of the UNCITRAL Model Law on Transnational Insolvency ("Model Law") by Law 14.112/20. Its aim was precisely to overcome a **strictly territorial model** - based on state sovereignty, according to which there must be insolvency proceedings, in which local law is applied, opened in each country where the debtor's assets are located[11] - in favor of a **universalist model** (albeit mitigated) - in which a main procedure prevails for the assessment of the generality of the debtor's legal relations, regardless of where the assets are located or where the legal relations were entered into[12].

27.    It is true that the Model Law proposes a specific approach to allow the effects of a Brazilian insolvency procedure to be projected into foreign territories. In this sense, the Model Law emphasizes the establishment of simplified recognition procedures to be requested by foreign representatives - from which, for example, the Brazilian judicial recovery process becomes effective in other jurisdictions, allowing for a cohesive recovery project for debtors with multinational operations.

28.    This was exactly the path sought by the Recovering Companies to project the effects of this Judicial Recovery in the United States and Spain. In these countries, the respective foreign representatives of the Recovering Companies have filed requests for recognition, and have already obtained decisions that keep the assets of the Recovering Companies protected, precisely in order to provide a stable global platform for this Judicial Recovery:

---

[9] Art. 167-R. After a foreign main proceeding has been recognized, judicial reorganization, extrajudicial reorganization or bankruptcy proceedings shall only be initiated in Brazil if the debtor has assets or an establishment in Brazil. Sole paragraph. The effects of the proceeding filed in Brazil shall be restricted to the debtor's assets and establishment located in Brazil and may extend to others, provided that this measure is necessary for cooperation and coordination with the main foreign proceeding.

[10] It should be noted that foreign proceedings, in order to be recognized in Brazil, must be subject to the procedure set out in article 167-H et seq. of the LFR. No request has been made for recognition of a Dutch procedure in Brazil in relation to IC Financial.

[11] CAMPANA FILHO, Paulo Fernando. The development of theoretical models of international insolvency. São Paulo: Revista de Direito Recuperacional e Empresa, vol. 6 (2017).

[12] "This growing internationalization of business and legal relations and the increasing need for a more appropriate treatment of the entire set of assets have required national insolvency legislation to be changed. In order to adapt to the new business reality, no longer limited to national borders, cross-border insolvency had to be regulated. From then on, the theory of mitigated universalism was established, applying a single law to all assets, regardless of location, but subject to the recognition of the foreign proceeding as the main one, through Chapter VI-A, "Transnational insolvency". SACRAMONE, Marcelo Barbosa. Comentários à Lei de Recuperação de Empresas e Falência, 5th ed. São Paulo: Saraiva, 2024, p. 33.

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28, under number WJMJ25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

fls. 15618



"Having complied with the procedural and substantive requirements of **the** national legal system, **the decision to grant judicial reorganization processing must be recognized as a foreign main proceeding, since it is being processed in the State where the debtor companies (parent company and subsidiaries) have their main center of interests** (art. 742.2 of the TRLC). And, as a result of this recognition, **the decision to initiate this main proceeding in Brazil will produce in Spain the effects attributed to it by the law of the State of origin, in** accordance with the provisions of art. 745.1 of **the** TRLC, **including the suspension of executions on the debtors' assets for the period established there**"[13] (**doc. 7**)

"The provisional relief established herein is urgently needed to protect the assets of the Chapter 15 Debtors and the interests of their creditors, pending the Court's consideration of the pending application for recognition of the Brazilian Judicial Reorganization Proceeding. [...] The Petitioner has demonstrated that **there is a material risk that the Chapter 15 Debtors will suffer irreparable harm in the absence of the provisional relief established herein. Granting the provisional relief set forth in this Decision will preserve the *status quo* and will not result in significant harm to the non-petitioning parties.** [...] It is now, therefore, ordered as follows: 1. Interim relief is granted as set **forth** in this Decision. 2. **Section 362 of the Bankruptcy Code shall apply with respect to each of the Chapter 15 Debtors and their assets located within the territorial jurisdiction of the United States.**"[14] (**doc. 8**)

29.    However, such a route is simply not available to the Recoverers - and in particular to IC Financial - in the Netherlands.

30.    This is a jurisdiction that still adheres to **territorialism**, which **does not admit** the full projection of the effects of any non-European foreign reorganization procedure on its territory, to the extent that creditors can still seek satisfaction of their claims through constrictions against the debtor's assets, as explained in the Technical Notes prepared by the Dutch specialist firm De Brauw Blackstone Westbroek.

N.V. (**doc. 9**), as well as excerpts from doctrine and precedents of the Dutch Supreme Court dealing with the issue:

---

[13] In the original, "Tercero. Los Efectos del reconocimiento. Once the procedural and substantive requirements demanded by domestic law have been met, the opening resolution must be recognized as a main foreign proceeding, since it is being processed in the State where the debtor companies (parent company and subsidiaries) have their main center of interests (art. 742.2 TRLC). Y, derivado de este reconocimiento, la resolución de apertura de este procedimiento principal en Brasil producirá en España los efectos que le atribuya la ley del Estado de apertura del prodicimiento, de conformidad con lo dispuesto en el art. 745.1 del TRLC, incluida la suspensión de las ejecuciones sobre bienes de las deudoras por el plazo que haya fijado en ella (que es lo que se pedía en la demanda, incluso con carácter cautelar)".

[14] In the original, "The provisional relief set forth herein is urgently needed to protect the assets of the Chapter 15 Debtors and the interests of their creditors pending the Court's consideration of the pending application to recognize the Brazilian RJ Proceeding, as required by 11 U.S.C. § 1519(a). [...] The Petitioner has demonstrated that there is a material risk that the Chapter 15 Debtors will suffer irreparable harm in the absence of the provisional relief set forth herein. Granting the provisional relief set forth in this Order will preserve the status quo and not result in significant harm to nonmoving parties. [...] NOW THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS: 1. The Requested Relief is granted as set forth herein. 2. Section 362 of the Bankruptcy Code shall apply with respect to each of the Chapter 15 Debtors and their property located within the territorial jurisdiction of the United States".

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28, under number WJM25405522570
To check the original, go to https://esaj.jsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.



"[T]he effects of this decision [to open judicial reorganization] must meet the conditions for the recognition of foreign insolvency proceedings. Notably, creditors must remain in a position to satisfy their claims and have recourse to assets in the Netherlands, which is contrary to the very purpose of any restructuring process with relief or a cooling-off period, such as the Brazilian EJ and RJ Proceedings. As a result, IC Financial (i) could not have sought recognition of the Brazilian EJ or RJ Proceedings as such, and (ii) would not have been able to obtain the cooling-off period granted under the WHOA by seeking recognition of the São Paulo court decisions that opened the Brazilian EJ Proceeding or the Brazilian RJ Proceeding."[15] (**doc. 9**)

\* \* \*

"As an observation: **one of the weaknesses of the Dutch international insolvency framework is that it does not contain a system of international insolvency law for cases beyond the scope of the European Union Insolvency Regulation (EIR)**. The Dutch system, as explained by the Supreme Court, **still adheres to the principle of territoriality**, expressed in the sentence: '[] a Convention binding **on** the Netherlands provides otherwise, **insolvency proceedings opened in another country have territorial effect in the Netherlands**. **Foreign insolvency proceedings do not extend to assets belonging to the debtor which are located in the** Netherlands' (Supreme Court of the Netherlands, June 2, 1967, NJ 1968, 16)."[16]

\* \* \*

"[...] Unless a Convention binding on the Netherlands provides otherwise, insolvency proceedings opened in another country have territorial effect. Foreign insolvency proceedings do not cover assets belonging to the debtor which are located in the Netherlands (Supreme Court of the Netherlands, June 2, 1967, NJ 1968, 16), moreover**, the legal consequences arising from the insolvency law of that other country cannot be invoked when such action would result in unpaid creditors being prevented from having recourse - during or after**

---

[15] In the original, "the effects of that decision must meet the conditions for recognition of foreign insolvency proceedings. Notably, creditors must remain in a position to satisfy their claims and take recourse against assets in the Netherlands, which is contrary to the very purpose of any restructuring proceedings with relief or a cooling-off period such as the Brazilian EJ and RJ Proceedings. As a result, IC Financial (i) could not have sought the recognition of the Brazilian EJ or RJ Proceedings as such, and (ii) would not have been able to obtain the cooling-off period granted under the WHOA by seeking the recognition of the decisions of the Sao Paulo court opening the Brazilian EJ Proceeding or the Brazilian RJ proceeding".
[16] Free translation of the original: "As an interim remark: one of the weaknesses of the Dutch international insolvency framework is that it (in many respects mirroring the Russian situation) does not contain a system of international insolvency law for cases beyond the scope of the EU Insolvency Regulation (EIR). The Dutch system, as explained by the Supreme Court above, still adheres to the territoriality principle, expressed in the line: '[u]nless a Convention, binding the Netherlands, provides otherwise, insolvency proceedings opened in another country have territorial effect' in the Netherlands". Kokorin & Wessels 2017, European Company Law 14, no. 6 (2017).

9

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under case number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.



insolvency proceedings - in relation to the assets of the (former) debtor which are located in the Netherlands"[17]

\* \* \*

"To the extent that an international treaty binding on the Netherlands does not provide otherwise, a bankruptcy decision rendered in another country has no territorial effect not only in the sense that (a) the bankruptcy decision dealing with the assets of the bankrupt does not include his assets present in the , but also in such a way that (b) **the legal consequences attached to an insolvency proceeding under the bankruptcy law of the other country cannot be invoked in the Netherlands to the extent that they would result in the inability of unsatisfied creditors to recover any assets of the bankrupt in the Netherlands** [...]"[18]

31.     In other words, while a Dutch recovery procedure could be recognized and produce its full effects in the Brazilian jurisdiction, by applying the procedure set out in article 167-H et seq. of the LFR, the opposite is not true. Dutch legislation and jurisprudence do not extend the same treatment to proceedings underway before the Brazilian Judiciary, determining in particular that the *stay period* granted by this MM. In particular, the stay period granted by this Court does not have full repercussions on Dutch territory, to the extent that creditors are still able to seek satisfaction of their claims by attacking the debtor's assets located in the Netherlands.

32.     As explained in **item II** above, the establishment of a local procedure parallel to this judicial reorganization was the only alternative available to IC Financial - which, however, did not prove to be sufficient precisely because of the mismatch between the procedures, which has been exploited in an abusive and opportunistic manner by the Ad Hoc Group, by filing for IC Financial's bankruptcy in its sole interest.

33.     The Dutch legislative option - by not offering an effective instrument for producing the effects of pre-insolvency procedures conducted in Brazil - cannot impose the sacrifice of interests that are extremely dear to this Judicial Recovery (e.g. *preservation of the company* and *parity between creditors*). After all, even though Dutch adherence to territorialism allows, from the perspective of **Dutch law**, actions and executions against assets located in that territory to continue, the acts continue to represent, from the perspective of **Brazilian law**, violations of the rulings handed down by this Court, insofar as they are placed before the Court. Judgment, to the extent that they put the useful outcome of this Judicial Recovery at risk.

34.     After all, it would be nonsense to admit that the restructuring of a Brazilian business group, which has Brazil as its nerve center, would be dictated by a jurisdiction in which there is no operational activity. The organizational chart below shows

---

[17] Supreme Court of the , May 31, 1996, ECLI:NL:HR:1996:ZC2091 (Vleeschmeesters).
[18] Supreme Court of the , September 13, 2013, ECLI:NL:HR:2013:BZ5668 (Yukos II).

10

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under case number WJMJ25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

fls. 15621



There is a clear need for the Brazilian procedure to prevail in the general restructuring intended:



35.     This exact situation has already been dealt with irretrievably by the Brazilian Judiciary in the judicial recovery of the Oi Group.

36.     In that procedure, the Dutch companies that make up the Oi Group - Oi Brasil Holdings Cöoperatief U.A. ("Finco") and Portugal Telecom International Finance B.V. ("PTIF") - requested injunctions to protect the integrity of their assets abroad, as well as to prevent the adoption of measures to destabilize the judicial reorganization procedure, given the imminent risk of bankruptcy in the Netherlands.

37.     Precisely on the basis of the unequivocal competence of the judicial reorganization court to adopt the necessary precautions to protect the useful outcome of the restructuring procedure - including in relation to acts carried out by foreign creditors or trusts in other jurisdictions - the Judge of the 7th Business Court of the Capital District of the State of Rio de Janeiro issued a decision (**doc. 10**) in which he ordered, among other measures, the safeguarding of assets located in foreign territory that could be seized in a Dutch bankruptcy procedure. See below:

11

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

fls. 15622



"**The elements presented in the case file clearly show the likelihood of the international court administrators filing for bankruptcy of FinCo and PTIF with the Dutch courts, in complete disregard and contradiction to the dictates of the judicial reorganization of these companies granted here. The effects of the bankruptcy decree, if it comes to pass, will clearly be detrimental to the success of the judicial reorganization. It is common knowledge that once bankruptcy is decreed, all of the bankrupt's assets are immediately collected in order to pay off its creditors. It is precisely in this respect that any attack on the debtors' assets, especially what has been reported, will inevitably cause damage to the Oi Business Group** [...]. In view of the foregoing, I hereby grant an incidental preliminary injunction, in order to [d]etermine the safeguarding, before this Universal Court of judicial reorganization, of the ADRs held by the recovering company PTIF and the ordinary and preferred shares issued by OI that serve as their backing, Therefore, the practice of any act that, directly or indirectly, may result in their transfer, sale, assignment, encumbrance or the imposition of any type of lien or encumbrance on such assets is prohibited, until further decision of this Court**. [...] The administrators appointed by the Dutch court, Mr. Jasper Berkenbosch and Mr. J. L. M. Groenewegem, should be informed of this decision [...]"

38.    Subsequently, after Finco and PTIF were effectively declared bankrupt, the Judge of the 7th Business Court of the District of the Capital of the State of Rio de Janeiro granted other injunctions to safeguard the useful result of the Oi Group's judicial reorganization, precisely because he understood that the main procedure, developed in the jurisdiction where the companies concentrate their main interests, could not be disrupted by a stray Dutch procedure, conducted for the benefit of a specific portion of international creditors.

39.    To this end, they ordered *(i)* the imposition of fines in the event of any acts, in any jurisdiction, that could jeopardize the proper development of the judicial reorganization; and *(ii)* the non-production in Brazil of decisions incompatible with the judicial reorganization (**doc. 11**):

"[The] decision that granted the processing of the judicial reorganization of the seven companies of the Oi Group, including the two Dutch companies, has not been reformed by the Superior Courts. In addition, the decision found international support in the US, the UK and Portugal, which admitted and recognized the Brazilian judicial recovery process, thus ensuring the necessary protection for companies in crisis abroad as well. **The Netherlands was the only country that diverged from this understanding, going so far as to decree the bankruptcy of Dutch companies, as if they were operational and independent companies, causing the imbroglio that is being analyzed here. Although the Court respects the decision of the Dutch courts, it is certain that the subsidiaries created there, without any activity, are not bankrupt.**

12



creditors, are attracted by those who effectively generate wealth, produce goods
and services and need protection, guaranteed by Brazilian law and by a decision of
this Court. [...] I believe that protection should be given to all creditors, and not just
international creditors. The protection of companies in reorganization, their assets
and creditors in general, must continue until the creditors' collective assessment of
the reorganization plan already presented by the debtors. [...] A serious judicial
recovery process cannot be disrupted by companies that, although bankrupt, are nothing
more than paper companies. The essence must prevail. [...] **[I order] under penalty of
a fine of R$300,000.00 per event of non-compliance, that the Dutch AJs, Mr.
Jasper Berkenbosch and Mr. J.L.Groenewegen, respect the decisions of the
Brazilian courts in their entirety and, among other things, refrain from carrying
out any act aimed at**: (a) impose or inhibit action or omission by the directors of Finco
or PTIF or any representative or person related to them in relation to this judicial
reorganization and the creditors and claims subject to it, including those claimed on
behalf of the creditors of the foreign companies in relation to the directors of the
reorganized companies Finco and PTIF; (b) **practice or cooperate with the practice of
any act tending to encumber, assign, transfer or in any way dispose of the assets of
Finco and PTIF, in any jurisdiction, authorized the payment of ordinary expenses,
all under penalty of personal liability**; and (c) use the cash of Finco and PTIF to pay
the fees of lawyers, Brazilian or foreign, who acted and are acting in favor of the
conversion of the bankruptcy of the Dutch companies".

40.    This paradigmatic decision has solid foundations both in **international experience in
insolvency matters** and in **Brazilian jurisprudential practice** in similar cases.

41.    In the international sphere, we highlight the precedents under *Chapter 11* - the US pre-
insolvency procedure that has largely shaped the characteristics of Brazilian judicial
reorganization. In this sense, "[d]*ecisions on the extraterritorial effects of the stay and the
imposition of sanctions on creditors who disrespect the suspension order, under the guise of
'contempt of court' and declaration of nullity of the act, have been found since the eighties of the
last century*"[19].

42.    When dealing with the absolute possibility of imposing sanctions on creditors who
violate the orders of the US reorganization court, even abroad, the US courts point out that, by
being part of the US insolvency process and seeking to receive payments through it, the creditor
cannot adopt the contradictory position of avoiding the *automatic stay* and seeking constrictions
on the debtor's assets in other territories:

---

[19] SATIRO, Francisco; BECUE, Sabrina Maria Fadel. *Local creditors and the transnational insolvency process*. In:
Migalhas, 2021. Available at: < https://www.migalhas.com.br/depeso/344261/os-credores-locais-e-o-processo-  de-
insolvência-transnacional>. Accessed on: 10.03. 2025.

13

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJMJ25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

fls. 15624



"[T]he extraterritorial jurisdiction of the United States courts for these purposes is *in personam* and not *in rem*. **If a creditor causes property of an estate subject to the *Bankruptcy Code to* be construed in a foreign country, that creditor has violated the *automatic stay*.** Whether that creditor can be punished is a question of its subjection to United States process."[20]

\*.\*.\*

"Hong Kong-Shanghai Banking Corporation may choose to initiate collection proceedings in Hong Kong against Simon, but it does so at the risk of sanctions from the bankruptcy court in the United States. [...] **Clearly, Hong Kong-Shanghai Banking Corporation's participation in the bankruptcy subjected it to the U.S. bankruptcy court's stay order pursuant to 11 U.S.C. § 524. A sanction for violating that order is not an improper extraterritorial application of the laws of the United States.**"[21]

43.     In Brazil, it is clear that the rationale used by US courts (i.e. jurisdiction *in personam*) is perfectly transposable to the Brazilian legal system. After all, in any matter, Brazilian courts have authority over the procedural subjects who are part of the cases processed in Brazil.

44.     In this respect, article 297 of the CPC provides for the judge's competence to "*determine the measures he deems appropriate to make the provisional protection effective*". This is the <u>general power of caution</u>, which ensures that the judge can grant all the measures that are appropriate to ensure the usefulness of the judicial protection.

45.     In addition, the judge has the power to require the parties to fully comply with the procedural duties set out in articles 77 and 78 of the CPC, in particular article 77, VI of the CPC, which prohibits "*unlawful innovation in the state of facts of the property or right in dispute*".

46.     In the same vein, the judge has the power to determine the measures that are necessary to ensure compliance with judicial decisions that have been handed down and that are not being complied with by the parties to the proceedings, which is not to be confused with the territorial limits of the effectiveness of the decision. After all, the Ad Hoc Group's failure to comply with the court decision does exist - and even if there is no effective mechanism in the Dutch jurisdiction for *enforcing* the decisions of this Court, the Brazilian courts are not bound by it. Judgment, the Brazilian courts are not obliged to

---

[20] In the original: "the extraterritorial jurisdiction of the United States courts for these purposes is in personam rather in rem. If a creditor causes property of a title 11 estate to be seized in a foreign country, that creditor has violated the automatic stay. Whether that creditor can be punished, however, is a function of that creditor's amenability to United States process". Sinatra v. Gucci (In re Gucci), 309 B.R. 679, 683-84 (S.D.N.Y. 2004), citing Collier on Bankruptcy
¶ 3.01[5], at 3-32 to 3-33 (15th ed. rev. 2003).
[21] In the original: "Hong Kong-Shanghai may choose to commence collection proceedings in Hong Kong against Simon, but it does so at the risk of bankruptcy court sanctions in the United States. [...] Clearly, Hong Kong-Shanghai's participation in the bankruptcy subjected it to the court's discharge order pursuant to 11 U.S.C. § 524. A sanction for violating that order is not an improper extraterritorial application of United States laws." Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon), 153 F.3d 991, 996 (9th Cir. 1998).

14

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

fls. 15625



passively accept this non-compliance. Especially when this is detrimental to the smooth running of the Judicial Recovery.

47.     In such cases, the party must be warned that "*their conduct may be punished as an act detrimental to the dignity of justice*" (art. 77, § 1, of the CPC). If the act is actually carried out, a *fine of up to twenty percent of the value of the case, according to the seriousness of the conduct*, should be imposed "*without prejudice to the applicable criminal, civil and procedural sanctions* [...]" (art. 77, § 2, of the CPC).

48.     In this sense, there are relevant precedents of injunctions (the so-called *anti-injunction suits*) that have been granted to prevent litigation strategies abroad from jeopardizing the useful outcome of proceedings conducted in Brazil:

> "[T]**he implementation or execution of the partial judgment that is the subject of this annulment action before any other court, Brazilian or foreign,** is expressly **prohibited**, as this court considers that such conduct would constitute an **alteration of the context of the facts, generating a danger of damage with irreversible potential and/or difficult to repair.**"[22]

> "[T]he aggravated parties should **be** ordered to **refrain from instituting the arbitration** proceedings **in London while the right of the insured parties to resort to this method of settling disputes** is being discussed [...] [since] if the arbitration proceedings are initiated (and continued) in London, the discussion of all the issues submitted for debate will be rendered null and void."[23]

49.     Insofar as the actions adopted by the Ad Hoc Group fit in perfectly with behaviors that have a very high potential for compromising the useful outcome of Brazilian proceedings, it is clear that similar measures are absolutely appropriate and urgently needed in this case.

## .IV.
## CONCLUSION AND
## REQUESTS

50.     In view of all the above, we conclude that:

   **(i)**     under the terms of art. 6, I and II, of the LFR, of the r. decisions handed down by this MM. Judgment on folios 756-758 and folios 216-2217 of case file no. 1111483- 72.2024.8.26.0100, as well as in the decision on folios 7226-7231, supplemented by the decision on folios 7853-7854 of these case files, are as follows

---

[22] Case no. 1027596-98.2021.8.26.0100, pending before the 2nd Corporate and Arbitration Dispute Court of the District of São Paulo/SP. Decision handed down on July 12, 2021.

[23] TJSP, AI n° 0304979-49.2011.8.26.0000, Rel. Paulo Alcides Amaral Salles, 6th CDPriv., j. on 19.04.2012.

15

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJMJ25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

**MUNHOZ**
A D V O G A D O S

all acts of collection and seizure of assets belonging to the assets of the Recovering Companies, regardless of whether they are located in Brazil, have been prohibited since July 15, 2024, as the restriction provided for in article 167-R of the LFR does not apply;

**(ii)**  Even so, the Ad Hoc Group has been abusively exploiting the absence of instruments in Dutch law aimed at recognizing and fully producing the effects of this judicial recovery in the Netherlands, having requested the decree of its bankruptcy, the appointment of a *trustee* and the subsequent liquidation of its assets in its exclusive interest, in violation of Brazilian public policy;

**(iii)**  the practice of such acts is, from the perspective of the Brazilian procedure, a very serious violation of the Ad Hoc Group's procedural duties - as has been concluded in national and foreign precedents -, bringing a risk of serious and irreversible damage, consisting mainly of **(iii.a)** an abuse of rights, **(iii.b)** a violation of parity between creditors, **(iii.c)** damage to the assets and cash of the Recovering Companies, as well as **(iii.d)** a marked compromise of the structure for the implementation of the reorganization plan.

51.     For these reasons, the Recovering Companies request that the Ad Hoc Group and UMB Bank, as trustee of the *Notes*, refrain from continuing (including in relation to measures already requested or proposed), practicing, cooperating with or instructing the practice of the following acts - by a *bewindvoerder* or any third party - under penalty of imposing a daily fine of R$ 5,000,000.00 (five million reais), per event of non-compliance (art. 77, § 2, and art. 297 of the CPC):

**(i)**  Any procedural act or judicial measure in the Netherlands or in any other jurisdiction, which is incompatible with the r. decisions handed down by this MM. Court in the context of this judicial reorganization;

**(ii)**  Any act aimed at imposing or inhibiting the action or omission of the directors of IC Financial regularly appointed by the Mover Group in connection with this judicial reorganization, including their liability for complying with procedures for the recognition of this judicial reorganization in foreign jurisdictions;

**(iii)**  Any act that seeks to remove, dismiss or replace the management of IC Financial regularly appointed by the Mover Group;

**(iv)**  Any act aimed at the collection, execution, satisfaction of *intercompany* credits owed by the Recovering Companies, in particular by ITI, to IC Financial;

16

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under case number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

fls. 15627



     **(v)**     Any act aimed at the liquidation, encumbrance, assignment, transfer, imposition of constriction, or disposal of IC Financial's assets, in any jurisdiction, including the liquidation of existing amounts in IC Financial's current account;

     **(vi)**     Any act aimed at contesting (or in any way opposing or requesting the discontinuance of) requests formulated by or on behalf of IC Financial to obtain, in the Dutch jurisdiction, protections compatible with those granted in this judicial reorganization - including the preliminary or definitive suspension of payments (*intrekkingsverzoek*, as provided for in art. 242 of the *Faillissementswet*); and

     **(vii)**     Any act aimed at continuing IC Financial's bankruptcy petition filed with the Dutch court,

52.     The Recovering Companies also request that the Ad Hoc Group submit a request to withdraw the bankruptcy petition already filed, within 48 (forty-eight) hours, the part of the court decision that grants this request, with this decision serving as an official letter to be presented by the Recovering Companies, under penalty of imposing a daily fine of R$ 5,000,000.00 (five million reais), per event of non-compliance (art. 77 of the Civil Code), § 2, and art. 297 of the CPC).

53.     The Recovering Companies also point out the possibility of requesting other measures from this court.
MM. Judgment depending on the development of the Dutch Procedure and other measures that may be adopted by the Ad Hoc Group in the Netherlands and other jurisdictions.

In these terms, they ask to be granted.
São Paulo, March 11, 2025

Eduardo Secchi Munhoz
OAB/SP No. 126.764

Laura Amaral Patella
OAB/SP 313.970

Ana Elisa Laquimia de Souza
OAB/SP No. 373.757

Gabriela Matta Ristow
OAB/SP No. 412.463

Danilo Domingues Guimarães
OAB/SP nº 422.993

Raphael Maldi Mendes
OAB/SP 439.913

Julia Castro Constantino
OAB/SP 501.083

Lucas Pereira Calmon
OAB/SP nº 508.290

17

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28, under number WJMJ25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.



**List of documents**

| Doc. | Description |
|---|---|
| **Doc. 1** | Request for the appointment of a *restructuring expert* for IC Financial |
| **Doc. 2** | Request for the end of the Dutch *Cooling-Off* and convolution of the pre-insolvency procedure known as WHOA in bankruptcy |
| **Doc. 3** | Threatening notifications sent by the Ad Hoc Group to entities that are part of the Group Move and its administrators |
| **Doc. 4** | New threatening notices sent by the Ad Hoc Group to member organizations the Mover Group and its directors |
| **Doc. 5** | Notifications from the Observer and IC Financial within the framework of the Dutch Procedure |
| **Doc. 6** | Decisions to recognize substantial consolidation between the entities that make up the Intercement Group |
| **Doc. 7** | Decision recognizing judicial recovery in Spain |
| **Doc. 8** | Decision granting interim relief in the United States to prohibit executions against the equity of Mover Group entities during the stay period |
| **Doc. 9** | Technical Note prepared by the Dutch law firm De Brauw Blackstone Westbroek N.V. |
| **Doc. 10** | Decision of the 7th Corporate Court of the Capital District of the State of Rio de Janeiro in the Oi Group case, which ordered the seizure of assets located in the territory which could be collected in a Dutch bankruptcy procedure. |
| **Doc. 11** | Decision of the 7th Business Court of the District of the Capital of the State of Rio de Janeiro in the Oi case that determined *(i)* the imposition of fines in the event of acts, in any jurisdiction, that could jeopardize the proper development of the judicial reorganization; and *(ii)* that decisions incompatible with the judicial reorganization should not take effect in Brazil |

This document is a copy of the original, digitally signed by EDUARDO SECCHI MUNHOZ, filed on 11/03/2025 at 18:28 , under number WJM25405522570
To check the original, go to https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, enter case number 1192002-34.2024.8.26.0100 and code qATW5MPk.

18

fls. 15611



**EXCELENTÍSSIMO SENHOR JUIZ DE DIREITO DA 1ª VARA DE FALÊNCIAS E RECUPERAÇÕES JUDICIAIS DA COMARCA DE SÃO PAULO DO ESTADO DE SÃO PAULO**

*Processo nº 1192002-34.2024.8.26.0100*

   **INTERCEMENT FINANCIAL OPERATIONS B.V.** ("IC Financial") e **OUTRAS** (em conjunto, "Grupo Mover" ou "Recuperandas"), já qualificadas nos autos da recuperação judicial em referência ("Recuperação Judicial"), vêm, por seus advogados, expor e requerer o quanto segue.

## .I.
## INTRODUÇÃO

1.  Esta manifestação tem como objetivo a preservação da jurisdição deste MM. Juízo e da eficácia das suas decisões, de modo a evitar que credores beligerantes utilizem procedimentos individuais em jurisdições estrangeiras para obter vantagens indevidas perante as Recuperandas e os demais credores que participam deste procedimento concursal.

2.  Mais especificamente, trata-se do comportamento do grupo de credores internacionais ("Grupo Ad Hoc") que alega ser titular de cerca de USD 300 milhões em créditos representados por *5,750% Senior Notes Due 2024* emitidas pela IC Financial, para as quais a Intercement Participações S.A. ("ICP") e pela Intercement Brasil S.A. ("ICB") prestaram garantias fidejussórias ("Notes"), bem como do UMB Bank no exercício de seu mandato como *trustee* da *Notes*.

3.  O Grupo Ad Hoc, como é de conhecimento deste MM. Juízo, vem utilizando procedimentos em diferentes jurisdições[1] para tumultuar a estabilidade das negociações e, assim, obter algum poder de barganha contra as Recuperandas e os demais credores.

---

[1] Nesse sentido, o Grupo Ad Hoc apresentou **(i)** no Brasil, **(i.a)** um pedido de produção antecipada de provas, em que pretendeu promover uma verdadeira devassa sobre documentos do Grupo Intercement, para obtenção de leverage negocial, como reconhecido na sentença extintiva (processo nº 1102464-42.2024.8.26.0100), **(i.b)** um protesto judicial (processo nº 1181854-95.2023.8.26.0100), além de **(i.c)** no âmbito da recuperação extrajudicial (processo nº 1111483-72.2024.8.26.0100) e desta recuperação judicial, recursos para a exclusão da IC Financial e das demais sociedades estrangeiras que integram o polo ativo; **(ii)** nos Estados Unidos, requereu o não reconhecimento desta recuperação judicial como procedimento estrangeiro, buscando impedir a produção de seus efeitos em território norte-americano; **(iii)** na Espanha, mesmo não sendo credor da Intercement Trading e Inversiones S.A. ("ITI") e da Intercement Trading e Inversiones Argentina S.L. ("ITI ARG"), interpôs recurso contra a decisão de reconhecimento desta recuperação judicial; e **(iv)** na Holanda, além de ter requerido a nomeação de um *restructuring expert* antes mesmo do vencimento de seu crédito (**doc. 1**), requereu a convolação do procedimento de pré-insolvência conhecido como WHOA em falência (**doc. 2**).

1

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.

fls. 15612



4.      Tal estratégia lastimável tem encontrado firme resistência nas decisões do Poder Judiciário Brasileiro, que se recusou a "***ser instrumentalizado com vistas à aquisição de maior poder de barganha de certos credores em face d[e] sociedade[s] recuperanda[s] por vias transversas***"[2].

5.      Contudo, de forma oportunista, o Grupo Ad Hoc está se valendo da falta de instrumentos legais para produção de efeitos desta recuperação judicial na <u>jurisdição holandesa,</u> onde a IC Financial tem sua sede estatutária, para perseguir a sua estratégia abusiva.

6.      Lá, como já explicaram as Recuperandas em oportunidades anteriores[3] e como será detalhado a seguir, não existe instrumento legal para o efetivo reconhecimento de procedimentos de insolvência estrangeiros processados fora da União Europeia. Apesar de ser possível a adoção de instrumentos locais de pré-insolvência, o desalinhamento entre o procedimento local holandês e o procedimento brasileiro acaba sendo explorado de forma oportunista por credores – situação com a qual a Justiça Brasileira já se deparou, no caso da recuperação judicial das sociedades Oi Brasil Holdings Coöperatief U.A. e Portugal Telecom International Finance B.V., veículos holandeses do Grupo Oi[4].

7.      No presente caso, o mesmíssimo comportamento bélico é verificado. Como será demonstrado, o Grupo Ad Hoc, aproveitando o encerramento do período de suspensão de ações e execuções na Holanda ("*Cooling-Off* Holandês"), se recusa a cooperar com qualquer agenda negocial proposta pela IC Financial. Em abordagem absolutamente agressiva, formulou um **pedido de falência** – o que levaria, ato seguinte, à **liquidação** da IC Financial na Holanda –, a fim de, no bom português, furar a fila de recebimento de valores por seus créditos concursais.

8.      Assim, faz-se necessário que este MM. Juízo determine a adoção das medidas adequadas para impedir a concretização dessa estratégia abusiva. Trata-se, como se verá, de posição respaldada pela experiência internacional em matéria de insolvência, e já adotada pela Justiça Brasileira em casos análogos, justamente para resguardar sua autoridade e o resultado útil dos processos submetidos à sua jurisdição.

**.II.**
**CONTEXTUALIZAÇÃO SOBRE ATOS PRATICADOS PELO GRUPO AD HOC NA HOLANDA. GRAVE PERIGO DE DANO A ESTA RECUPERAÇÃO JUDICIAL**

---

[2] Processo nº 1102464-42.2024.8.26.0100. Sentença proferida em 03.12.2024, às fls. 2910- 2922.
[3] Fls. 2940- 2965 e 3683- 3713 dos autos da Recuperação Extrajudicial (Processo nº 1111483-72.2024.8.26.0100, que tramitou perante a 1ª Vara de Recuperação Judicial e Falência).
[4] Processo nº 0203711-65.2016.8.19.0001, que tramitou perante a 7ª Vara Empresarial da Comarca da Capital do Estado do Rio De Janeiro).

2

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570 Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.



9.      Como parte da cruzada que vem promovendo para minar os esforços de soerguimento das Recuperandas, a Holanda vem sendo palco dos pedidos mais agressivos e disparatados formulados pelo Grupo Ad Hoc.

10.     Nessa jurisdição, em 9 de julho de 2024, antes mesmo do vencimento dos títulos detidos pelo Grupo Ad Hoc, um de seus membros requereu a instauração de um procedimento de reestruturação involuntário, bem como a nomeação de um "*restructuring expert*" (*herstructureringsdeskundige*), que deveria explorar as alternativas disponíveis para reestruturação ou liquidação dos ativos. Em resposta, a IC Financial apresentou um pedido contraposto para concessão do *Cooling-Off* Holandês, para prevenir ataques patrimoniais à entidade. A corte holandesa indeferiu o pedido formulado pelo membro do Grupo Ad Hoc e, por outro lado, deferiu o pedido da IC Financial, iniciando o procedimento denominado WHOA, concedendo o *Cooling-Off* Holandês e indicando ainda um observador para acompanhar os seus esforços de reestruturação ("<u>Procedimento Holandês</u>").

11.     A instauração de um procedimento paralelo era a única alternativa disponível para se ter alguma estabilidade naquela jurisdição, justamente por inexistir, na Holanda, mecanismo inspirado na Lei Modelo de Insolvência Transnacional da UNCITRAL que permitisse reconhecer os efeitos de procedimentos brasileiros (tal qual o Chapter 15, nos Estados Unidos, e o Capítulo VI-A da LFR, no Brasil). Diga-se de passagem, a própria manutenção dos procedimentos na Holanda, necessária unicamente em função do comportamento belicoso do Grupo Ad Hoc, acarreta comprometimento substancial de caixa das Recuperandas, que já desembolsaram milhões de dólares apenas para conseguir uma mínima estabilidade no processo.

12.     Substancialmente, sempre se admitiu, no âmbito do Procedimento Holandês, que qualquer expectativa de pagamento de seus títulos decorreria do acordo a ser atingido no âmbito do procedimento brasileiro[5], já que distribuições no âmbito de uma falência autônoma da IC Financial não levariam a um pagamento significativo para os titulares de *Notes*[6]. Neste sentido, o próprio Grupo Ad Hoc se recusou a alinhar sua atuação na Holanda com a agenda de negociações conduzida no Brasil, tendo seus assessores holandeses se recusado a assinar

---

[5] "A IC Financial está situada - como parte do Grupo InterCement (conforme definido no item 7 abaixo) - em uma grande e complexa reestruturação, na qual está jogando xadrez em vários tabuleiros (internacionais) simultaneamente [...]. O centro de gravidade dessa reestruturação está no Brasil [...]. A IC Financial não pode desempenhar um papel independente significativo nessa reestruturação. Qualquer pagamento a um credor e, em seguida, às partes interessadas econômicas por trás dele (incluindo a Redwood), terá que vir do Brasil, como resultado de um acordo no país". Pedido de concessão de cooling-off e nomeação de um observador originalmente apresentado perante a Corte Holandesa, em 17 de julho de 2024. No original: "ICBV bevindt zich – als onderdeel van de InterCement Groep (zoals gedefinieerd in nr. 7 hierna) – in een grote, complexe herstructurering waarin zij op meerdere (internationale) borden tegelijk […]. Het zwaartepunt van die herstructurering ligt in Brazilië [...]. ICBV kan geen zelfstandige rol van betekenis spelen in deze herstructurering. Elke betaling aan een schuldeiser en vervolgens aan de economisch belanghebbenden daarachter (waaronder Redwood), zal moeten komen vanuit Brazilië, als resultante van een akkoord aldaar".

[6] [•]. Além disso, no processo de reconhecimento nos Estados Unidos movido pela IC Financial e algumas outras entidades do Grupo Mover ("*Chapter 15*"), os membros do Grupo Ad Hoc declararam que sempre esperaram que uma reestruturação da IC Financial e de outros garantidores das *Notes* fosse centralizado no Brasil.

3

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.

fls. 15614



acordos de confidencialidade que pudessem oportunizar negociações efetivas em torno de uma proposta de reestruturação[7].

13.     A despeito disso, o Procedimento Holandês foi instrumentalizado pelo Grupo Ad Hoc como frente litigiosa para obter vantagens negociais indevidas – e, no limite, pagar-se na frente dos demais credores sujeitos a esta recuperação judicial.

14.     Sua estratégia é clara: o Grupo Ad Hoc pretende que todos os ativos da IC Financial existentes na Holanda sejam liquidados, incluindo contas bancárias com recursos líquidos no valor de aproximadamente R$ 8,6 milhões, usando-os exclusivo benefício de credores da IC Financial, apesar do reconhecimento, no Brasil, da consolidação substancial. Em seguida, conseguirá, em sua visão, pressionar o *trustee* (figura semelhante ao administrador judicial encarregado de administrar a massa falida) a ser eventualmente nomeado pela Justiça Holandesa para que *(i)* tente perseguir créditos *intercompany* detidos em face das demais Recuperandas – sobretudo da Intercement Trading e Inversiones S.A. ("ITI") – arrecadando seus ativos existentes em diferentes jurisdições para que, igualmente, sejam direcionados apenas aos membros do Grupo Ad Hoc; e *(ii)* busque interferir e tumultuar esta recuperação judicial, bem como os procedimentos auxiliares iniciados nos Estados Unidos e na Espanha, com o intuito de exercer poder de barganha em face das Recuperandas.

15.     Ávido para implementação de tal estratégia, desde o início do Procedimento Holandês, **o Grupo Ad Hoc remete notificações ameaçadoras às entidades que integram o Grupo Mover e a seus administradores** (**doc. 3**), buscando pressioná-los a adotar medidas desgarradas dos esforços globais de reestruturação (conduzidos em prol da coletividade de credores), para privilegiar os interesses próprios do Grupo Ad Hoc.

16.     Adicionalmente, ainda em novembro de 2024, o Grupo Ad Hoc requereu o **imediato encerramento do *Cooling-Off* Holandês** e a **decretação da falência da IC Financial** (**doc. 2**). A princípio, a corte holandesa indeferiu o pedido formulado, mantendo o Cooling-Off Holandês em vigor até o último dia 28 de fevereiro.

17.     Nesse período, a IC Financial buscou demonstrar à corte holandesa, ao observador nomeado e ao Grupo Ad Hoc as claras vantagens na coordenação entre o Procedimento Holandês e esta Recuperação Judicial. Ainda, as Recuperandas adotaram todas as providências para que uma negociação significativa pudesse se desenvolver, tendo inclusive: **(i)** negociado e celebrado contratos de confidencialidade com os membros do Grupo Ad Hoc, bem como divulgado materiais de *blowout*, permitindo que todos se envolvessem nas discussões sem causar restrições à circulação de suas Notes; **(ii)** preparado um plano de negócios detalhado para discuti-lo com o Grupo Ad Hoc e seus assessores; **(iii)** fornecido todas as informações solicitadas pelo Grupo Ad Hoc com relação às contingências do Grupo Mover, sua situação financeira geral e o plano de negócios; e **(iv)** se colocado à disposição

---

[7] Conforme registrado no pedido de extensão do *Cooling-Off* Holandês apresentado em 24.01.2025, "*os advogados holandeses do Grupo Ad Hoc e os próprios membros do Grupo Ad Hoc simplesmente não receberam informações confidenciais sobre a sobre a Reestruturação Global porque não haviam firmado acordos de confidencialidade*".

4

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.

fls. 15615



para discutir as premissas e os termos da proposta inicial do plano de recuperação judicial, com diversas interações de parte a parte.

18.     Em contraste, mesmo após a adoção de todas essas medidas pelo Grupo Mover, o Grupo Ad Hoc simplesmente se recusou a apresentar qualquer contraproposta ao Grupo Mover, tendo insistido nos pleitos de encerramento do *Cooling-Off* Holandês e convolação do Procedimento Holandês em falência.

19.     Em paralelo, o Grupo Ad Hoc enviou, em 21 de fevereiro de 2025, mais uma notificação infundada aos administradores da Financial BV (**doc. 4**), ameaçando responsabilizá-los pelo fato de a IC Financial não ter se insurgido contra o procedimento de reconhecimento desta recuperação judicial na Espanha. Segundo o Grupo Ad Hoc, a suposta "omissão" da IC Financial seria uma tentativa de prejudicá-los, o que corrobora a estratégia abusiva desses credores que, ao invés de buscar o ambiente de negociação existente no Brasil, preferem litigar para evitar que a recuperação judicial seja reconhecida em outras jurisdições.

20.     Diante da ausência de apoio para um *standstill* consensual e a proximidade do atingimento da duração máxima prevista legalmente para o *Cooling-Off* Holandês, o Procedimento Holandês deixou de ser uma alternativa viável (**doc. 5**). A Justiça Holandesa agendou, então, para o dia **1º de abril de 2025**, a audiência em que será apreciado o pedido de falência da IC Financial formulado pelo Grupo Ad Hoc.

21.     Nesse cenário, há o risco iminente de que a Justiça Holandesa decrete, a pedido do Grupo Ad Hoc, a **falência da IC Financial**. As consequências desta rota seriam extremamente danosas para esta Recuperação Judicial, na medida em que:

    (i)     as contas correntes da IC Financial, com recursos no valor de aproximadamente R$ 8,6 milhões, seriam imediatamente utilizadas para pagamento das despesas relacionadas à falência e, em seguida, liquidada em favor dos credores internacionais da IC Financial, sem considerar o escopo global desta recuperação judicial e o fato de que, entre as sociedades que integram o Grupo Intercement, a consolidação substancial já foi reconhecida por este MM. Juízo (**doc. 6**);

    (ii)    os créditos *intercompany* devidos pelas Recuperandas, em especial pela ITI, à IC Financial seriam perseguidos por meio de tentativas de cobrança e de excussão de ativos ao redor do globo, para arrecadar e direcionar recursos especificamente ao Grupo Ad Hoc (em detrimento dos pagamentos que deveriam ser feitos a todos os credores sujeitos a esta Recuperação Judicial);

    (iii)   meios de recuperação judicial previstos no plano apresentado às fls. 11.585-11.643 não poderiam ser implementados, como o cancelamento das *Notes* e

5

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.



sua troca por novos títulos de dívida quirografários denominados em Dólar[8], resultando em perda de eficiência – e, inclusive, menores retornos para os credores internacionais, dentre os quais os próprios membros do Grupo Ad Hoc;

**(iv)** a partir da falência, o *trustee* nomeado muito provavelmente buscaria interferir nos poderes de representação da IC Financial no âmbito desta Recuperação Judicial e do *Chapter* 15, prejudicando a prática de todos os atos que, por previsão legal e por determinação deste MM. Juízo, as Recuperandas devem cumprir, em benefício da generalidade de credores; e

**(v)** implicações tributárias significativas para implementação do plano de recuperação judicial poderão decorrer da falência da IC Financial, reduzindo, também por essa razão, os valores disponíveis para distribuição aos credores sujeitos a esta recuperação judicial.

22.    Por todas essas razões, fica evidente que o Grupo Ad Hoc utilizou de todos os artifícios para, propositalmente, colocar o Procedimento Holandês em rota de colisão com esta Recuperação Judicial.

## .III.
## AUTORIDADE DESTE MM. JUÍZO PARA FREAR E REPREENDER ATOS ILEGAIS PRATICADOS POR CREDORES CONCURSAIS

23.    Conforme indicado nas r. decisões proferidas por este MM. Juízo às fls. 756-758 e fls. 2.216-2.217 dos autos nº 1111483-72.2024.8.26.0100, bem como na r. decisão de fls. 7.226-7.231, complementada pela r. decisão de fls. 7.853-7.854 destes autos, o Grupo Ad Hoc está impedido de perseguir o pagamento ou a constrição de qualquer ativo das Recuperandas desde o dia 15.07.2024.

24.    Evidentemente, os atos indicados no **item II** acima são **<u>absolutamente incompatíveis</u>** com as referidas decisões. E, ao contrário do que poderia se alegar, a circunstância de tais atos terem sido praticados no exterior não afasta a violação às r. decisões proferidas por este MM. Juízo, tampouco impede a adoção das medidas adequadas para a preservação da dignidade da Justiça Brasileira e do resultado útil deste processo.

---

[8] Cláusula 5.3.1.1 do plano de recuperação judicial do Grupo Intercement (fls. 11.585-11.643): "Liquidação. Caso a IC Financial seja liquidada, não tenha a reestruturação implementada nos termos deste Plano nos Países Baixos ou não tenha a capacidade para realizar a emissão das Notas Quirografárias, os Credores Quirografários Financeiros – Opção A poderão escolher entre: (i) receber as Debêntures; ou (ii) manter este Plano como título executivo extrajudicial, observado o previsto no art. 50, §2º, da LFR".

6

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.



25.      Afinal, nos termos do art. 167-R da LFR[9], como regra geral, as determinações do juízo da recuperação judicial **não se circunscrevem** "*aos bens e ao estabelecimento do devedor localizados no Brasil*". Em todos os casos – como o das Recuperandas – em que **não** houver um procedimento estrangeiro concorrente que tenha sido reconhecido como principal[10], as vedações a que os credores estão sujeitos em função das diretrizes e regras cogentes do procedimento de recuperação judicial abarcam todos os bens dos devedores, independentemente de onde se encontrem.

26.      Trata-se de previsão introduzida a partir da incorporação da Lei Modelo da UNCITRAL sobre Insolvência Transnacional ("Lei Modelo") pela Lei nº 14.112/20. Seu objetivo foi justamente superar um ***modelo estritamente territorial*** – calcado na soberania estatal, de acordo com o qual deve haver um processo de insolvência, em que é aplicada a lei local, aberto em cada país em que estiverem situados bens do devedor[11] – em prol de um ***modelo universalista*** (ainda que mitigado) – em que prepondera um procedimento principal para a apreciação da generalidade das relações jurídicas do devedor, independentemente do local dos ativos ou de onde as relações jurídicas tiverem sido celebradas[12].

27.      É certo que a Lei Modelo propõe uma abordagem específica para permitir a projeção dos efeitos de um procedimento de insolvência brasileiro em territórios estrangeiros. Nesse sentido, a Lei Modelo enfatiza o estabelecimento de procedimentos simplificados de reconhecimento a serem requeridos pelos representantes estrangeiros – a partir dos quais, por exemplo, o processo de recuperação judicial brasileiro passa a produzir efeitos em outras jurisdições, permitindo um projeto de soerguimento coeso de devedores com atuação multinacional.

28.      Este foi exatamente o caminho buscado pelas Recuperandas para a projeção dos efeitos desta Recuperação Judicial nos Estados Unidos e na Espanha. Nesses países, os respectivos representantes estrangeiros das Recuperandas apresentaram pedidos de reconhecimento, tendo já obtido decisões que mantêm os ativos das Recuperandas protegidos, justamente para oferecer uma plataforma estável global a esta Recuperação Judicial:

---

[9] Art. 167-R. Após o reconhecimento de um processo estrangeiro principal, somente se iniciará no Brasil um processo de recuperação judicial, de recuperação extrajudicial ou de falência se o devedor possuir bens ou estabelecimento no País. Parágrafo único. Os efeitos do processo ajuizado no Brasil devem restringir-se aos bens e ao estabelecimento do devedor localizados no Brasil e podem estender-se a outros, desde que esta medida seja necessária para a cooperação e a coordenação com o processo estrangeiro principal.

[10] Destaca-se que o procedimento estrangeiro, para ser reconhecido no Brasil, deve se submeter ao procedimento previsto no art. 167-H e seguintes da LFR. Não foi feito qualquer pedido de reconhecimento de procedimento holandês no Brasil em relação à IC Financial.

[11] CAMPANA FILHO, Paulo Fernando. O desenvolvimento dos modelos teóricos da insolvência internacional. São Paulo: Revista de Direito Recuperacional e Empresa, vol. 6 (2017).

[12] "Essa crescente internacionalização dos negócios e das relações jurídicas e a necessidade cada vez maior de um tratamento mais adequado a todo o conjunto de ativo exigiram que a legislação de insolvência nacional fosse alterada. Sua adequação à nova realidade negocial existente, não mais limitada às fronteiras nacionais, exigiu que fosse disciplinada a insolvência transfronteiriça. Consagrou-se, a partir de então, a teoria do universalismo mitigado, de aplicação de uma legislação única a todos os ativos, independentemente da localização, mas condicionada ao reconhecimento do processo estrangeiro como principal, por meio do Capítulo VI-A, "Da insolvência transnacional". SACRAMONE, Marcelo Barbosa. Comentários à Lei de Recuperação de Empresas e Falência, 5ª ed. São Paulo: Saraiva, 2024, p. 33.

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.

fls. 15618



"Tendo cumprido os requisitos processuais e substantivos do sistema jurídico nacional, **a decisão de deferimento do processamento da recuperação judicial deve ser reconhecida como um processo principal estrangeiro, pois está sendo processada no Estado onde as empresas devedoras (matriz e subsidiárias) têm seu principal centro de interesses** (art. 742.2 do TRLC). E, como resultado desse reconhecimento, **a decisão de iniciar esse processo principal no Brasil produzirá na Espanha os efeitos que lhe são atribuídos pela lei do Estado de origem**, de acordo com o disposto no art. 745.1 do TRLC, **incluindo a suspensão das execuções sobre os bens dos devedores pelo período que for lá estabelecido**"[13] (**doc. 7**)

"A tutela provisória aqui estabelecida é urgentemente necessária para proteger os ativos dos Devedores do Capítulo 15 e os interesses de seus credores, enquanto se aguarda a consideração do Tribunal sobre o pedido pendente de reconhecimento do Processo Brasileiro de Recuperação Judicial. [...] O Peticionário demonstrou que **há um risco material de que os Devedores do Capítulo 15 sofrerão danos irreparáveis na ausência da tutela provisória aqui estabelecida. A concessão da medida provisória estabelecida nesta Decisão preservará o *status quo* e não resultará em danos significativos às partes não requerentes**. [...] Agora, portanto, fica ordenado o seguinte: 1. A tutela provisória é concedida conforme estabelecido nesta Decisão. 2. **A Seção 362 do Código de Falências deverá ser aplicada com relação a cada um dos Devedores do Capítulo 15 e seus ativos localizados dentro da jurisdição territorial dos Estados Unidos**"[14] (**doc. 8**)

29.    Contudo, tal via simplesmente não está disponível às Recuperandas – e, em especial, à IC Financial – na Holanda.

30.    Trata-se de uma jurisdição que ainda adere ao **territorialismo**, que **não admite a** projeção plena dos efeitos de qualquer procedimento recuperacional estrangeiro não-europeu em seu território, na medida em que os credores continuam a poder buscar a satisfação de seus créditos mediante constrições contra o patrimônio do devedor, como explicado na Notas Técnica preparada pelo escritório especializado holandês De Brauw Blackstone Westbroek N.V. (**doc. 9**), bem como em excertos de doutrina e de precedentes da Suprema Corte Holandesa que tratam do tema:

---

[13] No original, "Tercero. Los Efectos del reconocimiento. Cumplidos los requisitos procesales y de fondo exigidos por el ordenamiento interno, debe reconocerse la resolución de apertura como procedimiento extranjero principal, al estar tramitándose en el Estado donde las mercantiles deudoras (matriz y filiales) tiene su centro de intereses principal (art. 742.2 TRLC). Y, derivado de este reconocimiento, la resolución de apertura de este procedimiento principal en Brasil producirá en España los efectos que le atribuya la ley del Estado de apertura del prodicimiento, de conformidad con lo dispuesto en el art. 745.1 del TRLC, incluida la suspensión de las ejecuciones sobre bienes de las deudoras por el plazo que se haya fijado en ella (que es lo que se pedía en la demanda, incluso con carácter cautelar)".

[14] No original, "The provisional relief set forth herein is urgently needed to protect the assets of the Chapter 15 Debtors and the interests of their creditors pending the Court's consideration of the pending application to recognize the Brazilian RJ Proceeding, as required by 11 U.S.C. § 1519(a). [...] The Petitioner has demonstrated that there is a material risk that the Chapter 15 Debtors will suffer irreparable harm in the absence of the provisional relief set forth herein. Granting the provisional relief set forth in this Order will preserve the status quo and not result in significant harm to nonmoving parties. [...] NOW THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS: 1. The Requested Relief is granted as set forth herein. 2. Section 362 of the Bankruptcy Code shall apply with respect to each of the Chapter 15 Debtors and their property located within the territorial jurisdiction of the United States".

8

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.



"[O]s efeitos dessa decisão [de abertura da recuperação judicial] devem atender às condições para o reconhecimento de procedimentos de insolvência estrangeiros. Notadamente, os credores devem permanecer em posição de satisfazer suas reivindicações e recorrer a ativos na Holanda, o que é contrário ao próprio objetivo de qualquer processo de reestruturação com alívio ou período de reflexão, como os Processos EJ e RJ brasileiros. Como resultado, a IC Financial (i) não poderia ter buscado o reconhecimento dos Processos EJ ou RJ brasileiros como tais, e (ii) não teria conseguido obter o período de reflexão concedido nos termos do WHOA ao buscar o reconhecimento das decisões do tribunal de São Paulo que abriram o Processo EJ brasileiro ou o Processo RJ brasileiro"[15] (**doc. 9**)

\* \* \*

"Como uma observação: **um dos pontos fracos da estrutura de insolvência internacional holandesa é que ela não contém um sistema de lei de insolvência internacional para casos além do escopo do Regulamento de Insolvência da União Europeia (EIR)**. O sistema holandês, conforme explicado pela Suprema Corte, **ainda adere ao princípio da territorialidade**, expresso na frase: '[a] não ser que uma Convenção, que vincule os Países Baixos, estabeleça o contrário, os **procedimentos de insolvência abertos em outro país têm efeito territorial nos Países Baixos**. Os **processos de insolvência estrangeiros não abrangem bens pertencentes ao devedor que estejam localizados nos Países Baixos**' (Suprema Corte dos Países Baixos, 2 de junho de 1967, NJ 1968, 16)"[16]

\* \* \*

"[...] A menos que uma Convenção, vinculando os Países Baixos, estabeleça o contrário, os processos de insolvência abertos em outro país têm efeito territorial. Os processos de insolvência estrangeiros não abrangem bens pertencentes ao devedor que estejam localizados nos Países Baixos (Suprema Corte dos Países Baixos, 2 de junho de 1967, NJ 1968, 16), além disso, **as consequências legais decorrentes da lei de insolvência desse outro país não podem ser invocadas quando tal ação resultaria no impedimento dos credores não pagos de recorrer – durante ou após**

---

[15] No original, "the effects of that decision must meet the conditions for recognition of foreign insolvency proceedings. Notably, creditors must remain in a position to satisfy their claims and take recourse against assets in the Netherlands, which is contrary to the very purpose of any restructuring proceedings with relief or a cooling-off period such as the Brazilian EJ and RJ Proceedings. As a result, IC Financial (i) could not have sought the recognition of the Brazilian EJ or RJ Proceedings as such, and (ii) would not have been able to obtain the cooling-off period granted under the WHOA by seeking the recognition of the decisions of the Sao Paulo court opening the Brazilian EJ Proceeding or the Brazilian RJ proceeding".

[16] Tradução livre do original: "As an interim remark: one of the weaknesses of the Dutch international insolvency framework is that it (in many respects mirroring the Russian situation) does not contain a system of international insolvency law for cases beyond the scope of the EU Insolvency Regulation (EIR). The Dutch system, as explained by the Supreme Court above, still adheres to the territoriality principle, expressed in the line: '[u]nless a Convention, binding the Netherlands, provides otherwise, insolvency proceedings opened in another country have territorial effect' in the Netherlands". Kokorin & Wessels 2017, European Company Law 14, no. 6 (2017).

9

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.



**o processo de insolvência - em relação aos bens do (antigo) devedor que estejam localizados nos Países Baixos**"[17]

\* \* \*

"Na medida em que um tratado internacional vinculante para os Países Baixos não disponha em contrário, uma decisão de falência proferida em outro país não tem efeito territorial não apenas no sentido de que (a) a decisão de falência que trata dos ativos do falido não inclui seus ativos presentes nos Países Baixos, mas também de tal forma que (b) **as consequências legais associadas a um procedimento de insolvência pela lei de falências do outro país não podem ser invocadas nos Países Baixos na medida em que resultariam na incapacidade dos credores não satisfeitos de recuperar quaisquer ativos do falido nos Países Baixos** [...]"[18]

31.     Ou seja, enquanto um procedimento recuperacional holandês poderia ser reconhecido e produzir plenamente seus efeitos na jurisdição brasileira, mediante aplicação do procedimento previsto no art. 167-H e seguintes da LFR, o contrário não é verdade. A legislação e a jurisprudência holandesas não estendem o mesmo tratamento a procedimentos em curso perante o Poder Judiciário brasileiro, determinando em especial que o *stay period* concedido por este MM. Juízo não repercuta plenamente em território holandês, na medida em que se conserva a possibilidade de os credores buscarem a satisfação de seus créditos por meio de ataques aos ativos do devedor localizados na Holanda.

32.     Como exposto no **item II** acima, a instauração de um procedimento local paralelo a esta recuperação judicial foi a única alternativa disponível para a IC Financial – que, contudo, não se revelou suficiente justamente pelo descompasso entre os procedimentos, que vem sendo explorada de forma abusiva e oportunista pelo Grupo Ad Hoc, ao requerer a falência da IC Financial em seu exclusivo interesse.

33.     A opção legislativa holandesa – ao não oferecer instrumento efetivo para produção de efeitos de procedimentos de pré-insolvência conduzidos no Brasil – não pode impor o sacrifício de interesses extremamente caros a esta Recuperação Judicial (e.g., *preservação da empresa* e *paridade entre credores*). Afinal, ainda que a aderência holandesa ao territorialismo permita, sob a perspectiva da *lei holandesa*, que ações e execuções contra ativos localizados naquele território prossigam, os atos continuam a representar, sob a perspectiva da *lei brasileira*, violações às r. decisões proferidas por este MM. Juízo, na medida em que colocam o resultado útil desta Recuperação Judicial em risco.

34.     Afinal, seria um contrassenso admitir que os rumos da reestruturação de um grupo empresarial brasileiro, que tem o Brasil como centro nevrálgico, fossem ditados por uma jurisdição em que não há qualquer atividade operacional. O organograma abaixo deixa

---

[17] Suprema Corte dos Países Baixos, 31 de maio de 1996, ECLI:NL:HR:1996:ZC2091 (Vleeschmeesters).
[18] Superam Corte dos Países Baixos, 13 de setembro de 2013, ECLI:NL:HR:2013:BZ5668 (Yukos II).

10

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.



evidente a necessidade de que o procedimento brasileiro tenha preponderância na reestruturação geral pretendida:



35.     Esta exata situação já foi enfrentada de forma irretocável pelo Poder Judiciário brasileiro na recuperação judicial do Grupo Oi.

36.     Naquele procedimento, as sociedades holandesas integrantes do Grupo Oi – Oi Brasil Holdings Cöoperatief U.A. ("Finco") e Portugal Telecom International Finance B.V. ("PTIF") – requereram a concessão de medidas liminares que pudessem proteger a integridade de seus ativos no exterior, bem como impedir a adoção de medidas de desestabilização do procedimento de recuperação judicial, diante do risco iminente de falência na Holanda.

37.     Justamente com fundamento na inequívoca competência do juízo da recuperação judicial para adotar as cautelas necessárias para a proteção do resultado útil do procedimento de reestruturação – inclusive em relação a atos praticados por credores ou trustes estrangeiros, em outras jurisdições –, o MM. Juízo da 7ª Vara Empresarial da Comarca da Capital do Estado do Rio de Janeiro proferiu decisão (**doc. 10**) em que determinou, dentre outras medidas, o acautelamento de bens localizados em território estrangeiro e que poderiam ser arrecadados em um procedimento falimentar holandês. Confira-se:

11

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.



"**Os elementos trazidos aos autos retratam de forma cristalina a probabilidade da formulação do pedido de falência das sociedades FinCo e PTIF por parte dos administradores judiciais internacionais junto à Justiça Holandesa, em completo arredio e contrariedade aos ditames da recuperação judicial das referidas sociedades empresárias aqui deferida. Serão, a toda evidência, e para todos, nefastos os efeitos do decreto de quebra, se assim se concretizar, com evidente prejuízo ao êxito da recuperação judicial. É cediço por todos que decretada a falência desde logo são arrecadados todos os ativos da falida com o escopo de solver os seus credores. É justamente neste aspecto que qualquer ataque ao patrimônio das devedoras, em especial, ao que fora informado, trará inevitáveis prejuízos ao Grupo Empresarial Oi** [...]. Ante o exposto, defiro medida liminar de caráter cautelar incidental, para **[d]eterminar o acautelamento, perante este Juízo Universal da recuperação judicial, dos ADRs de titularidade da recuperanda PTIF e das ações ordinárias e preferenciais de emissão da OI que lhe servem de lastro, de modo que fica vedada a prática de qualquer ato que, direta ou indiretamente possa importar na sua transferência, alienação, cessão, oneração ou na imposição de qualquer tipo de ônus ou gravame sobre tais ativos, até decisão ulterior deste Juízo**. [...] Intimem-se os administradores nomeados pela justiça holandesa, Mr. Jasper Berkenbosch e Mr. J. L. M. Groenewegem, para ciência da presente decisão [...]"

38.     Na sequência, após a efetiva decretação da quebra da Finco e da PTIF, o MM. Juízo da 7ª Vara Empresarial da Comarca da Capital do Estado do Rio de Janeiro deferiu outras tutelas para resguardar o resultado útil da recuperação judicial do Grupo Oi, justamente por entender que o procedimento principal, desenvolvido na jurisdição em que as sociedades concentram seus principais interesses, não poderia ser tumultuado por um procedimento holandês desgarrado, conduzido em benefício de uma parcela específica de credores internacionais.

39.     Nesse sentido, foram determinadas *(i)* a imposição de multas em caso de prática de atos, em qualquer jurisdição, que pudessem comprometer o adequado desenvolvimento da recuperação judicial; e *(ii)* a não produção de efeitos no País de decisões incompatíveis com a recuperação judicial (**doc. 11**):

"[A] decisão que deferiu o processamento da recuperação judicial das sete empresas do Grupo Oi, dentre elas as duas empresas holandesas, não foi reformada pelas Cortes Superiores. Além disso, a decisão encontrou amparo internacional, nos EUA, no Reino Unido e em Portugal, que admitiram e reconheceram o processo de recuperação judicial brasileiro, assegurando, dessa forma, a necessária proteção às empresas em crise também no território estrangeiro. **A Holanda foi o único país que destoou de tal entendimento, tendo chegado ao extremo de decretar a falência das empresas holandesas, como se empresas operacionais e independentes fossem, causando o imbróglio que ora se analisa. Não obstante o Juízo respeite a decisão da justiça holandesa, é certo que as subsidiárias lá criadas, sem qualquer atividade**

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.



econômica, são atraídas por quem efetivamente gera riqueza, produz bens e
serviços e necessita de proteção, assegurada pela lei brasileira e por decisão deste
Juízo. [...] Entendo que **a proteção deve se dar à universalidade de credores, e não
apenas a credores internacionais. A proteção às empresas em recuperação, aos
seus patrimônios e credores em geral, precisa continuar até que se tenha a
apreciação pela coletividade de credores do plano de recuperação já apresentado
pelos devedores**. [...] O processo de recuperação judicial sério não comporta
distúrbio provocado por sociedades que, embora falidas, nada mais são do que
sociedades de papel. A essência tem de prevalecer. [...] **[Determino] sob pena de
multa de R$ 300.000,00 por evento de descumprimento, que os AJs holandeses,
Srs. Jasper Berkenbosch e J.L.Groenewegen respeitem as decisões da Justiça
brasileira, na sua integralidade e, entre outros, abstenham-se de praticar
qualquer ato que vise a**: (a) impor ou inibir ação ou omissão dos diretores da Finco
ou PTIF ou qualquer representante ou pessoa relacionada a elas com relação a esta
recuperação judicial e aos credores e créditos a ela sujeitos, inclusive aqueles arguidos
em prol dos credores das sociedades estrangeiras em relação aos diretores das
recuperandas Finco e PTIF; (b) **praticar ou cooperar com a prática de qualquer
ato tendente a onerar, ceder, transferir ou de qualquer forma alienar os ativos
da Finco e PTIF, em qualquer jurisdição, autorizado o pagamento de despesas
corriqueiras, tudo sob pena de responsabilidade pessoal**; e (c) utilizar o caixa da
Finco e PTIF para pagar honorários de advogados, brasileiros ou estrangeiros que
atuaram e atuam em prol da conversão da falência das empresas holandesas".

40.      Tal decisão paradigmática encontra fundamento sólido tanto na **experiência
internacional em matéria de insolvência** quanto na **prática jurisprudencial brasileira** em
casos análogos.

41.      Na seara internacional, destacam-se os precedentes no âmbito do *Chapter 11* –
procedimento de pré-insolvência norte-americano que conformou, em grande medida, as
características da recuperação judicial brasileira. Nesse sentido, as "[d]*ecisões sobre os
efeitos extraterritoriais do stay e imposição de sanções aos credores que desrespeitam a
ordem de suspensão, sob o manto da 'contempt of court' e declaração de nulidade do ato,
são encontradas desde a década de oitenta do século passado*"[19].

42.      Tratando da absoluta possibilidade de impor sanções aos credores que violam as
determinações do juízo recuperacional norte-americano, ainda que no exterior, as cortes
norte-americanas pontuam que, ao integrar o processo de insolvência norte-americano e
pretender o recebimento de pagamentos por meio dele, o credor não pode adotar a postura
contraditória de esquivar-se do *automatic stay* determinado e buscar constrições ao
patrimônio do devedor em outros territórios:

---

[19] SATIRO, Francisco; BECUE, Sabrina Maria Fadel. *Os credores locais e o processo de insolvência transnacional*.
In: Migalhas, 2021. Disponível em: < https://www.migalhas.com.br/depeso/344261/os-credores-locais-e-o-processo-
de-insolvencia-transnacional>. Acesso em: 10.03. 2025.

13

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.

fls. 15624



"[A] jurisdição extraterritorial dos tribunais dos Estados Unidos para esses fins é *in personam* e não *in rem*. **Se um credor fizer com que a propriedade de um patrimônio sujeito ao** *Bankruptcy Code* **seja constrita em um país estrangeiro, esse credor violou o** *automatic stay*. Se esse credor pode ser punido é uma questão de sua sujeição ao processo dos Estados Unidos"[20]

\*.\*.\*

"A Hong Kong-Shanghai Banking Corporation pode optar por iniciar processos de cobrança em Hong Kong contra a Simon, mas o faz sob o risco de sanções da corte falimentar nos Estados Unidos. [...] **Claramente, a participação da Hong Kong-Shanghai Banking Corporation na falência a sujeitou à ordem de suspensão da corte falimentar norte-americana, de acordo com o § 524 do 11 U.S.C.. Uma sanção por violar essa ordem não é uma aplicação extraterritorial imprópria das leis dos Estados Unidos**"[21]

43.     Na seara nacional, evidencia-se que o racional empregado pelos tribunais norte-americanos (i.e., jurisdição *in personam*) é perfeitamente transponível para o ordenamento jurídico brasileiro. Afinal, em qualquer matéria, os órgãos jurisdicionais brasileiros têm autoridade sobre os sujeitos processuais que integram os feitos processados no Brasil.

44.     A esse respeito, o art. 297 do CPC prevê a competência do juiz para "*determinar as medidas que considerar adequadas para efetivação da tutela provisória*". Trata-se do poder geral de cautela, que assegura ao magistrado o deferimento de todas as medidas que se revelarem adequadas ao asseguramento da utilidade da tutela jurisdicional.

45.     Além disso, o juiz tem o poder de exigir das partes a plena observância dos deveres processuais previstos nos arts. 77 e 78 do CPC, em especial, ao art. 77, VI, do CPC, que veda a "*inovação ilegal no estado de fato de bem ou direito litigioso*".

46.     No mesmo sentido, o juiz tem o poder de determinar as medidas que sejam necessárias para assegurar o cumprimento das decisões judiciais proferidas e que estejam sendo descumpridas pelas partes do processo, o que não se confunde com os limites territoriais da eficácia da decisão. Afinal, o descumprimento da decisão judicial por parte do Grupo Ad Hoc existe – e, mesmo que na jurisdição holandesa não exista mecanismo efetivo para *enforcement* das r. decisões deste MM. Juízo, a Justiça Brasileira não fica obrigada a

---

[20] No original: "the extraterritorial jurisdiction of the United States courts for these purposes is in personam rather than in rem. If a creditor causes property of a title 11 estate to be seized in a foreign country, that creditor has violated the automatic stay. Whether that creditor can be punished, however, is a function of that creditor's amenability to United States process". Sinatra v. Gucci (In re Gucci), 309 B.R. 679, 683-84 (S.D.N.Y. 2004), citando Collier on Bankruptcy ¶ 3.01[5], at 3-32 to 3-33 (15th ed. rev. 2003).
[21] No original: "Hong Kong-Shanghai may choose to commence collection proceedings in Hong Kong against Simon, but it does so at the risk of bankruptcy court sanctions in the United States. [...] Clearly, Hong Kong-Shanghai's participation in the bankruptcy subjected it to the court's discharge order pursuant to 11 U.S.C. § 524. A sanction for violating that order is not an improper extraterritorial application of United States laws". Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon), 153 F.3d 991, 996 (9th Cir. 1998).

14

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.

fls. 15625



aceitar passivamente este descumprimento. Principalmente quando isto prejudica o bom andamento da Recuperação Judicial.

47.     Nesses casos, a parte deve ser advertida de que "*sua conduta poderá ser punida como ato atentatório à dignidade da justiça*" (art. 77, § 1º, do CPC). Caso o ato seja efetivamente praticado, deverá ser aplicada "*sem prejuízo das sanções criminais, civis e processuais cabíveis* [...] *multa de até vinte por cento do valor da causa, de acordo com a gravidade da conduta*" (art. 77, § 2º, do CPC).

48.     Nesse sentido, há precedentes relevantes de tutelas (as chamadas *anti-injunction suits*) que foram deferidas para evitar que estratégias de litígio no exterior pudessem comprometer o resultado útil dos processos conduzidos no Brasil:

> "[F]ica expressamente **proibida a implementação ou a execução da sentença parcial objeto da presente ação anulatória perante qualquer outro Tribunal, brasileiro ou estrangeiro**, por entender este juízo que tal conduta configuraria **alteração do contexto dos fatos, a gerar perigo de dano com potencial irreversível e/ou de difícil reparação**"[22]

> "[S]eja determinado às agravadas que **se abstenham da instituição da pretendida arbitragem em Londres, enquanto se discute o direito das seguradas de recursar-se a esse modo de solução de controvérsias** [...] [uma vez que] em caso de início (e prosseguimento) do procedimento arbitral em Londres restará esvaziada a discussão sobre a todas as questões apresentadas ao debate"[23]

49.     Na medida em que as ações adotadas pelo Grupo Ad Hoc se enquadram perfeitamente nos comportamentos com elevadíssimo potencial de comprometimento do resultado útil de procedimento brasileiro, fica claro o absoluto cabimento e a urgente necessidade de adoção de medidas similares neste caso.

## .IV.
## CONCLUSÃO E PEDIDOS

50.     Em face de todo o exposto, conclui-se que:

    **(i)**    nos termos do art. 6º, I e II, da LFR, das r. decisões proferidas por este MM. Juízo às fls. 756-758 e fls. 2.216-2.217 dos autos nº 1111483-72.2024.8.26.0100, bem como na r. decisão de fls. 7.226-7231, complementada pela r. decisão de fls. 7.853-7.854 destes autos, estão

---

[22] Processo nº 1027596-98.2021.8.26.0100, em trâmite perante a 2ª Vara Empresarial e de Conflitos de Arbitragem da Comarca de São Paulo/SP. Decisão proferida em 12.07.2021.

[23] TJSP, AI nº 0304979-49.2011.8.26.0000, Rel. Des. Paulo Alcides Amaral Salles, 6ª CDPriv., j. em 19.04.2012.

15

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.

**⌀MUNHOZ**

A D V O G A D O S

proibidos desde 15.07.2024 todos os atos de cobrança e constrição de bens integrantes do patrimônio das Recuperandas, independentemente de estarem localizados no Brasil, por não incidir a restrição prevista no art. 167-R da LFR;

**(ii)**    mesmo assim, o Grupo Ad Hoc vem explorando de forma abusiva a ausência de instrumentos no ordenamento holandês destinados ao reconhecimento e à plena produção de efeitos desta recuperação judicial na Holanda, tendo requerido a decretação de sua falência, a nomeação de um *trustee* e a subsequente liquidação de seus ativos em seu exclusivo interesse, em violação à ordem pública brasileira;

**(iii)**    a prática de tais atos é, na perspectiva do procedimento brasileiro, uma gravíssima violação aos deveres processuais do Grupo Ad Hoc – a exemplo do que se concluiu em precedentes nacionais e estrangeiros –, trazendo risco de danos graves e irreversíveis, consistentes sobretudo **(iii.a)** em abuso de direito, **(iii.b)** na violação à paridade entre credores, **(iii.c)** no prejuízo ao patrimônio e ao caixa das Recuperandas, bem como **(iii.d)** no comprometimento acentuado da estrutura para implementação de plano de recuperação

51.    Por essas razões, as Recuperandas requerem seja determinado que o Grupo Ad Hoc e o UMB Bank, na condição de trustee das *Notes*, se abstenham de dar prosseguimento (inclusive em relação a medidas já requeridas ou propostas), praticar, cooperar com ou instruir a prática dos seguintes atos – por um administrador (*bewindvoerder*) ou qualquer terceiro –, sob pena de imposição de multa diária de R$ 5.000.000,00 (cinco milhões de reais), por evento de descumprimento (art. 77, § 2º, e art. 297 do CPC):

**(i)**    Qualquer ato processual ou medida judicial na Holanda ou em qualquer outra jurisdição, que seja incompatível com as r. decisões proferidas por este MM. Juízo, no âmbito desta recuperação judicial;

**(ii)**    Qualquer ato que vise impor ou inibir ação ou omissão dos administradores da IC Financial regularmente nomeados pelo Grupo Mover relacionados com esta recuperação judicial, inclusive a sua responsabilização por acatar procedimentos de reconhecimento desta recuperação judicial em jurisdições estrangeiras;

**(iii)**    Qualquer ato que busque remover, destituir ou substituir a administração da IC Financial regularmente nomeada pelo Grupo Mover;

**(iv)**    Qualquer ato que vise à cobrança, execução, satisfação dos créditos *intercompany* devidos pelas Recuperandas, em especial pela ITI, à IC Financial;

16



**(v)** Qualquer ato que vise à liquidação, oneração, cessão, transferência, imposição de constrição, ou alienação dos ativos da IC Financial, em qualquer jurisdição, incluindo a liquidação de valores existentes na conta corrente da IC Financial;

**(vi)** Qualquer ato destinado a contestar (ou de qualquer modo se opor ou requerer a descontinuidade de) pedidos formulados por – ou em nome da – IC Financial para que se obtenha, na jurisdição holandesa, proteções compatíveis com aquelas deferidas nesta recuperação judicial – incluindo a suspensão preliminar ou definitiva de pagamentos (*intrekkingsverzoek*, conforme prevista no art. 242 da *Faillissementswet*); e

**(vii)** Qualquer ato destinado a dar continuidade ao pedido de falência da IC Financial formulado perante a Corte Holandesa,

52.  As Recuperandas também requerem que seja determinado que o Grupo Ad Hoc apresente de pedido de desistência do pedido de falência já formulado, no prazo de 48 (quarenta e oito) horas a parte da decisão judicial que deferir este pedido, servindo esta decisão de ofício a ser apresentada pelas Recuperandas, sob pena de imposição de multa diária de R$ 5.000.000,00 (cinco milhões de reais), por evento de descumprimento (art. 77, § 2º, e art. 297 do CPC).

53.  As Recuperandas ressalvam ainda a possibilidade de solicitar outras medidas a este MM. Juízo a depender do desenvolvimento do Procedimento Holandês e de outras medidas que venham a ser adotadas pelo Grupo Ad Hoc na Holanda e em outras jurisdições.

Termos em que pedem deferimento.
São Paulo, 11 de março de 2025

Eduardo Secchi Munhoz
OAB/SP nº 126.764

Laura Amaral Patella
OAB/SP nº 313.970

Ana Elisa Laquimia de Souza
OAB/SP nº 373.757

Gabriela Matta Ristow
OAB/SP nº 412.463

Danilo Domingues Guimarães
OAB/SP nº 422.993

Raphael Maldi Mendes
OAB/SP nº 439.913

Julia Castro Constantino
OAB/SP nº 501.083

Lucas Pereira Calmon
OAB/SP nº 508.290

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.

fls. 15628

**MUNHOZ**
A D V O G A D O S

## Lista de Documentos

| Doc. | Descrição |
|---|---|
| **Doc. 1** | Requerimento de nomeação de um *restructuring expert* para a IC Financial |
| **Doc. 2** | Requerimento de fim do *Cooling-Off* Holandês e convolação do procedimento de pré-insolvência conhecido como WHOA em falência |
| **Doc. 3** | Notificações ameaçadoras enviadas pelo Grupo Ad Hoc a entidades que integram o Grupo Mover e a seus administradores |
| **Doc. 4** | Novas Notificações ameaçadoras enviadas em  pelo Grupo Ad Hoc a entidades que integram o Grupo Mover e a seus administradores |
| **Doc. 5** | Notificações do Observador e da IC Financial no âmbito do Procedimento Holandês |
| **Doc. 6** | Decisões de reconhecimento da consolidação substancial entre as entidades que integram o Grupo Intercement |
| **Doc. 7** | Decisão de reconhecimento da recuperação judicial na Espanha |
| **Doc. 8** | Decisão concedendo tutela provisória nos Estados Unidos para proibir execuções contra o patrimônio de entidades do Grupo Mover durante o stay period |
| **Doc. 9** | Nota Técnica preparada pelo escritório holandês De Brauw Blackstone Westbroek N.V. |
| **Doc. 10** | Decisão do Juízo da 7ª Vara Empresarial da Comarca da Capital do Estado do Rio de Janeiro no caso do Grupo Oi que determinou o acautelamento de bens localizados em território estrangeiro e que poderiam ser arrecadados em um procedimento falimentar holandês |
| **Doc. 11** | Decisão do Juízo da 7ª Vara Empresarial da Comarca da Capital do Estado do Rio de Janeiro no caso Oi que determinou *(i)* a imposição de multas em caso de prática de atos, em qualquer jurisdição, que pudessem comprometer o adequado desenvolvimento da recuperação judicial; e *(ii)* a não produção de efeitos no País de decisões incompatíveis com a recuperação judicial |

18

Este documento é cópia do original, assinado digitalmente por EDUARDO SECCHI MUNHOZ, protocolado em 11/03/2025 às 18:28 , sob o número WJMJ25405522570
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1192002-34.2024.8.26.0100 e código qATW5MPk.