**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| | Case No. 24-12291 (MG) |
| InterCement Brasil S.A., *et al.*, | |
| | Chapter 15 |
| Debtors in a Foreign Proceeding. | (Jointly Administered) |

## MEMORANDUM OPINION AND ORDER RECOGNIZING
## FOREIGN MAIN PROCEEDINGS

*A P P E A R A N C E S:*

WHITE & CASE LLP
*Attorneys for Antonio Reinaldo Rabelo Filho,*
*as Petitioner and Foreign Representative*
1221 Avenue of the Americas
New York, New York 10020-1095
By:    John K. Cunningham, Esq.
       Thomas E. MacWright, Esq.
       Ricardo M. Pasianotto, Esq.
       Ashley R. Chase, Esq.

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
By:    Richard S. Kebrdle, Esq.
       Amanda Parra Criste, Esq.

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
By:    Jason N. Zakia, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
*Counsel to the Ad Hoc Group*
One Liberty Plaza
New York, New York 10006
By:    Richard J. Cooper, Esq.
       David H. Botter, Esq.
       Luke A. Barefoot, Esq.
       Thomas S. Kessler, Esq.
       David Z. Schwartz, Esq.
       Thomas Q. Lynch, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Antonio Reinaldo Rabelo Filho (the "Petitioner" or "Foreign Representative"), in his capacity as the duly authorized foreign representative of InterCement Brasil S.A. ("ICB"), InterCement Participações S.A ("ICP"), InterCement Financial Operations B.V. ("IC Financial" or "ICBV"), and InterCement Trading e Inversiones S.A. ("ITI" and, together with ICB, ICP, and IC Financial, the "Debtors" or "Chapter 15 Debtors"), seeks in the above-captioned cases (the "Chapter 15 Cases") recognition of a Brazilian *recuperação judicial* ("RJ") proceeding (the "Brazilian RJ Proceeding") commenced on December 3, 2024 as a foreign main or nonmain proceeding pursuant to section 1517 of the Bankruptcy Code. *See Chapter 15 Petition for Recognition of Foreign Proceeding* (the "Petition", ECF Doc. # 1) and *Petitioner's Declaration and Verified Petition for Recognition of the Brazilian Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1515, 1517, 1520, and 1521* ("Motion," ECF Doc. # 2). The Petitioner seeks entry of an order (the "Proposed Order," ECF Doc. # 2-1) that:

a)      grants the Petition in the Chapter 15 Cases and recognizes the Brazilian RJ Proceeding as the "foreign main proceeding" for each of the Chapter 15 Debtors pursuant to section 1517 of the Bankruptcy Code, or in the alternative, recognizes the Brazilian RJ Proceeding as a "foreign nonmain proceeding" and grants appropriate relief;

b)      finds that the Petitioner is the duly appointed "foreign representative" of each of the Chapter 15 Debtors within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of each Chapter 15 Debtor; and

c)      grants such other and further relief as the Court deems just and proper.

(Motion ¶ 42.)

The Motion is supported by the Declarations of Ana Elisa Laquimia (ECF Doc. # 4) and Guillermo Ruiz Medrano (the "Medrano Declaration," ECF Doc. # 46) pursuant to 28 U.S.C. § 1746.

On January 15, 2025, the Petitioner filed a *Brief on COMI Determination as of the December 9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI* ("COMI Brief," ECF Doc. # 30), arguing that recent developments, including the Debtors' pre-Petition restructuring activities, support a determination that the center of main interests of two Chapter 15 Debtors, as of the filing of the Chapter 15 Cases, is Brazil. The COMI Brief is supported by the declaration of Dr. Matthias Haentjens pursuant to 28 U.S.C. § 1746 (ECF Doc. # 32).

On January 31, 2025, an *ad hoc* group of holders (the "Ad Hoc Group") of New York law-governed notes (the "NY Notes"), filed an *(i) Objection to the Petitioner's Verified Petition and (ii) Opposition to the Petitioner's Brief of COMI Determination as of the December 9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI* (the "Objection," ECF Doc. # 39). The Objection is supported by the declaration of Thomas Q. Lynch (ECF Doc. # 40). The Objection argues that the COMI of ICBV is the Netherlands, and the COMI of ITI is Spain, notwithstanding the Debtors' pre-Petition restructuring activities in Brazil.[1]

On February 7, 2025, the Foreign Representative filed the *Petitioner's Omnibus Reply on COMI Determination as of the December 9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI* (the "Reply," ECF Doc. # 45).

Despite that two of the foreign debtors maintain their registered offices in Spain and the Netherlands, respectively, rather than in Brazil, for the reasons explained below, the Court

---

[1]     UMB Bank, N.A., Trustee for the NY Notes, filed a *Joinder to Ad Hoc Group's (i) Objection to the Petitioner's Verified Petition and (ii) Opposition to the Petitioner's Brief of COMI Determination as of the December 9, 2024 Filing Date for Chapter 15 Debtors IC Financial and ITI* (the "UMB Joinder," ECF Doc. # 41).

concludes that all of the foreign debtors, as of the date of the filing of the Brazilian RJ Proceeding, have their COMI in Brazil.  Therefore, the Court **GRANTS** the relief sought in the Motion, **RECOGNIZES** the Brazilian RJ Proceeding as a Foreign Main Proceeding, and **OVERRULES** the Ad Hoc Group's Objection.

## I. BACKGROUND

### A. History and Corporate Structure of the Debtors

The InterCement Group (the "InterCement Group" or "InterCement") is a large cement producer in Brazil.  (*In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. September 20, 2024) (the "Prior Chapter 15 Cases"), *Declaration of Antonio Reinaldo Rabelo Filho, as Petitioner and Foreign Representative for the Chapter 15 Debtors* (the "Rabelo Declaration," ECF Doc. # 78) ¶¶ 38–39.)  It is comprised of a Brazilian holding company ("Mover") and a collection of subsidiaries within and outside of Brazil.  A simplified organizational chart documenting the various entities comprising the InterCement Group is set forth below:



(Motion ¶ 9.)

Each of the subsidiaries plays a specific role within the group.

1.   The Brazilian Entities

Mover, the ultimate parent holding company, engages in capitalization and financing activities for the corporate group, and is responsible for business management, including providing the group with "strategic direction on key business matters"; it is incorporated and headquartered in Brazil.  (*Id.*)

InterCement Participações S.A, the holding company responsible for "concentrating all of Mover's investments in the cement sector," is also incorporated in Brazil, with its registered office in São Paulo.  (*Id.*)  All of ICP's directors, officers, and employees are located in Brazil.

(Rabelo Declaration ¶ 38, JX-284[2].)  ICP functions as the "head" of the InterCement Group, and its board of directors and executive officers make "the main strategic, financial, and operational decisions" for the company as a whole out if its headquarters in Brazil; for example, ICP decides whether the InterCement Group should "market and sell assets, incur or restructure indebtedness, grant collateral, initiate or defend against material lawsuits and commence insolvency proceedings."  (Rabelo Declaration ¶ 4.)   The Debtors contend that ICP "controls each of the other members of the InterCement Group," citing ICP's ability to "directly or indirectly . . . appoint or remove the directors of each of its direct and indirect subsidiaries, including the other Chapter 15 Debtors."  (*Id.* ¶ 38.)

InterCement Brasil S.A. is the InterCement Group's primary operating company and Brazil's third-largest cement company.  (*Id.* ¶ 5.)  ICB is "engaged in all stages of cement production and sales" in Brazil.  (*Id.*)  The company is incorporated in Brazil and has its registered office in São Paulo.  (*Id.*)  It has 1,745 employees, 99% of whom are located in Brazil. (JX-284.)

## 2.  The Netherlands Entity

InterCement Financial Operations B.V. is a Netherlands-incorporated special purpose financing vehicle created to provide the InterCement Group with "access to the international capital markets to support the InterCement Group's funding needs."  (Rabelo Declaration ¶ 6.) ICBV's registered office is in Amsterdam.  (*Id.*)  It is owned by InterCement Portugal ("IC Portugal"), which is in turn owned by ICP.  (*Id.*)  As the issuer of the NY Notes, ICBV has two

---

[2]    Documents marked with the prefix "JX" were entered as exhibits in the evidentiary hearing held on November 20 and 21, 2024 in the case captioned *In re InterCement Brasil S.A.*, Case No. 24-11226 (MG); page numbers of exhibits are designated by the Bates stamps utilized by the parties if available. *See infra* I(B), Prior Chapter 15 Cases.

limited functions: managing relationships with the holders of the NY Notes, and paying on the NY Notes.  (*Id.* ¶ 41.)

ICBV's primary assets are intercompany claims against ITI and ICP (incorporated in Spain and Brazil, respectively), and its only other asset is $2 million in cash.  (*Id.* ¶ 52.)  ICBV's intercompany loans are denominated in USD or Euros, and its largest asset, its intercompany claim against ITI, is denominated in Euros and worth over a billion dollars.  (*Deposition Designations of Matthijs Paul Adrian Stoop* ("Stoop Dep."), Prior Chapter 15 Cases, ECF Doc. # 81, at 65:4-10, 66:6-17; *Transcript Regarding Hearing Held on 11/20/24* ("Trial Tr. Day 1"), Prior Chapter 15 Cases, ECF Doc. # 93, at 140:4-6 ("Q: So then necessarily, 90 percent of IC Financial's intercompany receivables are located in Spain, right? A: Right.").)  As for ICBV's cash, it is kept in six bank accounts, including one Dutch account.  Three of the accounts are denominated in Euros, two in USD, and one in Brazilian *reais.*  (Stoop Dep. 32:22–33:7.)  As of July 2024, the majority of ICBV's cash was located in an account in the Bahamas and denominated in USD.  (JX-149; Trial Tr. Day 1 at 141:9–19.).  ICBV's Brazilian bank accounts have been inactive since 2022 and show a balance of zero *reais* as of October 2024.  (JX-272, -277, -182 at IC_FR_00003838; Trial Tr. Day 1 at 143:6-144:21.)

As for ICBV's liabilities, all holders of the USD-denominated NY Notes, ICBV's largest debt at $750 million, are located outside of both Brazil and the Netherlands (Rabelo Declaration ¶ 53), and its second-largest debt, worth $436.27 million, stems from intercompany loans owed to ICP (*id.* ¶ 54).  Apart from the intercompany claims, ICBV has no creditors in Brazil.  (JX-232.)

ICBV's key operations involving the NY Notes are governed by two documents: the Offering Memorandum (the "OM," JX-1), a 2014 document which advertised the sale of the NY

Notes, and the indenture agreement governing the NY Notes (the "Indenture," JX-209, Prior

Chapter 15 Cases, ECF Doc. # 2-5).  The Offering Memorandum, which displays ICBV's

country of incorporation on the first page, describes the InterCement Group on the first page of

its Executive Summary as among the largest "international cement producers . . . with operations

in South America . . . Europe . . . and Africa," and as a "market leader[] in Argentina, Portugal,

Mozambique and Cape Verde, the second largest cement producer in Brazil, and a regional

leader in South Africa."  (JX-1 at IC_FR_00002669, IC_FR_00002680.)  At the same time, the

Offering Memorandum makes clear that, at the time, InterCement's largest operations and its

controlling shareholder were located or based in Brazil.  (*Id.* at IC_FR_00002709 ("Brazilian

operations . . . account for the most significant portion of our overall revenues and expenses"),

IC_FR_00002728 (describing InterCement as a "Brazilian company with a significant portion of

our operations in Brazil").)[3]  The OM provides:

> The issuer's [ICBV's] principal business activity is to act as a financing vehicle for
> our activities and operations. The issuer has no substantial assets (other than in
> connection with transactions entered into with [Mover] and its affiliates) and its
> only sources of cash flow are from its financing activities and capital contributions
> made by us[4] and our other subsidiaries. Accordingly, the ability of the issuer to pay
> principal, interest and other amounts due on the notes and other indebtedness will
> depend upon our financial condition and results of operations.

(JX-1 at IC_FR_00002712.)

The OM warns creditors that, in the event of a bankruptcy, the guarantors of the NY

notes—ICP and ICB, both Brazilian entities—"may become subject to bankruptcy proceedings

in Brazil," which may be "less favorable to creditors" than proceedings in other jurisdictions.

---

[3]    Since the OM was written, the InterCement Group has sold 48% of its Argentinian interests and all of its
other businesses outside Brazil (Rabelo Declaration ¶¶ 66-67; Motion ¶ 67), and announced these divestments
publicly (*see, e.g.*, JX-86 (announcing divestment of operations in Egypt), JX-119 (announcing sale of business in
rest of Africa).

[4]    The OM provides that references to terms like "we," "our company," "ours", and "us" refer to ICP and its
subsidiaries, rather than ICBV.  JX-1 at IC_FR_00002670.
.

(*Id.* at IC_FR_00002714.)  However, any insolvency involving the ICBV would likely be affected by, if not governed by, Dutch law: "Any insolvency proceedings with respect to the issuer in the EEA [European Economic Area] (excluding Denmark) would most likely be based on and governed by the insolvency laws of the Netherlands.  In addition, there can be no assurance as to how the insolvency laws of the Netherlands would be applied in the event that the issuer is subject to one or more insolvency proceedings outside the Netherlands."  (*Id.*)

The Indenture Agreement directs investors to send related correspondence to a Brazilian address, and provides that ICBV can be substituted as issuer with either ICP or ICB without the consent of the noteholders.  (Rabelo Declaration ¶¶ 61–62; Indenture at 62, 90.)  ICBV files taxes solely in the Netherlands.  (Stoop Dep. 59:2–13.)  ICBV's annual reports (with financial results denominated in euros) are filed with the Dutch Chamber of Commerce and are publicly available.  (Stoop Dep. 28:14–25, 32:10–18.)  ICBV's original books and records are kept by its vendor Vistra in the Netherlands, with copies separately maintained in Brazil, pursuant to Dutch law.  (Rabelo Declaration ¶ 51; Stoop Dep. 25:7–11.)

ICBV has six directors, three of whom are Dutch and reside in the Netherlands and three of whom are Brazilian and reside in Brazil.  (Rabelo Declaration ¶ 46.)  Any action taken by ICBV's board requires the approval of at least one Dutch director and at least one Brazilian director.  (*Id.*; Stoop Dep. 23:13–25:6.)  This means that, without approval from at least one Dutch (or Brazilian) director, the board cannot act.  (Trial Tr. Day 1 122:8–20.)  Because ICBV's Dutch directors are not employees of the InterCement Group, the Dutch directors rely on the Brazilian directors (and other InterCement employees) to provide them with information regarding the corporate group's operations at large.  (Rabelo Declaration ¶ 47.)[5]  ICBV's board

---

[5]    *See also* Stoop Dep. 23:13-24:5 ("[T]he Brazilian board members are obviously well integrated into the overall InterCement Group, so they bring that knowledge to" ICBV.)

may take into account advice from the Brazilian component of the InterCement Group when determining what course of action to take, but ultimately acts independently and maintains independent judgment in executing its fiduciary duties.[6]  In fact, the Foreign Representative was unable to think of a time when the shareholders of ITI and ICBV refused to ratify any action of the companies' respective boards.  (Trial Tr. Day 1 127:14–19.) Vistra Employment Services, B.V., a Dutch corporation, has a permanent seat on ICBV.  (*See* Stoop Dep. 11:7–23.)  Over the three years prior to the Petition Date, formal board meetings have been held virtually, with the Dutch directors calling in from the Netherlands and the Brazilian directors from Brazil, but all in-person meetings typically took place in the Netherlands, whether formal or informal.  (Rabelo Declaration ¶ 48; Stoop Dep. 29:2–31:16; Trial Tr. Day 1 122:3–7.)

ICBV's operations are, in significant part, run out of Brazil: ICP's agents hold calls and meetings with the holders of the NY Notes, prepare investor presentations, audit quarterly financial statements (prepared on a consolidated basis for ICP and all its subsidiaries), make market announcements, and run quarterly public investor calls out of Brazil.  (Rabelo Declaration ¶¶ 42, 59.)  ICP's board of directors and officers makes "material strategic decisions for all entities" within the InterCement Group from the company's Brazilian headquarters, and, according to the Foreign Representative, this encompasses the decision as to "when and how to pay the scheduled interest payments on the NY Notes" and whether to transfer money from other entities to allow ICBV to make such payments.[7]  (*Id.* ¶ 43.)  However, while ICP determines

---

[6]    Stoop Dep. 55:5–11, 57:6–16 ("Q: "[Y]ou're not aware of any instances in which Mover provided direction on a resolution to the IC Financial board of directors?" . . . A: . . . [T]hey can propose something which for the consideration of the board.  Ultimately, the board needs to make its own assessment and decision."); Trial Tr. Day 1 123:7–10 ("Q: [Y]ou are not aware of an instance in which IC Financial shareholder has instructed IC Financial's board to take an action, are you? A: No.").

[7]    The Foreign Representative provided an example of the exercise of such power: "For instance, if IC Financial's Dutch directors wanted to make a scheduled interest payment on the NY Notes, the effectuation of such interest payment would in fact be dependent on decisions made in Brazil to transfer funds to pay IC Financial." (Rabelo Declaration ¶ 43.)

how to extract the necessary funds from the InterCement Group's operations and provide those funds to ICBV for the purpose of paying on the NY Notes, it is ultimately the ICBV board which decides whether and when to make payments on the Notes.[8]

ICBV has no employees but engages with a number of Dutch contractors in order to run its business.  (JX-284; Rabelo Declaration ¶ 44.)  ICBV does not have an office of its own, but rents shared office space from Vistra, which provides a number of additional services, including recordkeeping, mail services, tax return preparation, and payment of daily expenses.  (Rabelo Declaration ¶ 40; Trial Tr. Day 1 115:3–116:4.).  Vistra also provides draft annual reports for ICBV, which are prepared by individuals in the Netherlands working in "close connection and interaction with the financial team in Brazil."  (Stoop Dep. 27:18–28:2.)  ICBV pays Vistra for the services it provides.  (Trial Tr. Day 1 121:4–14.)  Vistra does not any provide services for the InterCement Group in Brazil.  (*Id.* 121:18–20.)  PricewaterhouseCoopers Nederland  prepares the first draft of ICBV's tax returns and Vistra prepares the first drafts of its accounts, but ICP's employees in Brazil review and sign off on these documents before they are finalized.  (Rabelo Declaration ¶ 44.)  However, ahead of the November 2024 evidentiary hearing, one of ICBV's Dutch board members testified, unchallenged, that it is the responsibility of ICBV's 50% Dutch board of directors to ultimately approve the annual report.  (Stoop Dep. 28:3–7.)  ICBV's annual financial reports are audited by Ernst & Young Nederland, but ICBV does not have its own audit committee; rather, it shares an Audit Committee with the rest of the InterCement Group. (Rabelo Declaration ¶ 44; JX-182 at IC_FR_00003824.)

---

[8]      Trial Tr. Day 1 133:21–134:4. ("Q: [T]he ultimate decision to make payments on the notes is made by the IC Financial Board, right? A: When the proceeds arrive in IC Financial's account, yes, the board is entitled to pay it, to press the button. But, of course, all the decision about the region of the money we [] provided and how it will be generated and how it's to be paid is derived from IC participants in Brasil.").

The NY Notes ICBV manages are governed by New York law, and ICBV, as a Netherlands-incorporated entity, is subject to Dutch law. (JX-1 at IC_FR_00002837, IC_FR_00002861.) However, as the operations generating cash flow in the InterCement Group, which generate funds used to pay the NY Notes, take place in Brazil, certain disputes likely to affect ICBV would largely be governed by Brazilian law. (Rabelo Declaration ¶ 55; *see also* JX-1 at IC_FR_00002694-IC_FR_00002698, IC_FR_00002703- IC_FR_00002714 (citing risk factors, most of which refer to Brazil.)) However, with the exception of intercompany agreements, ICBV is not a party to any third-party agreement governed by Brazilian law. (Trial Tr. Day 1 137:21–138:5).

3.   The Spanish Sub-Holding Company

InterCement Trading e Inversiones S.A. is a Spanish sub-holding company wholly owned by IC Portugal. (Rabelo Declaration ¶ 7.) ITI is the controlling shareholder of ICB and of ITI Argentina ("ITI ARG") (in turn a sub-holding company which is the controlling shareholder of the Argentine operating company Loma Negra). (*Id.*) ITI and ITI ARG both support InterCement's international financing efforts, including by guaranteeing debentures (the "Debentures") issued by ICB and ICP in the Brazilian capital markets. (*Id.*) ITI also issues inter-company loans denominated in euros, US dollars, and Brazilian *reais*, most of which are held by Brazilian entities ICP and ICB. (JX-250.) ITI represented to a Spanish court that its corporate purpose consists, in part, of:

> [T]he acquisition, holding and enjoyment, general administration, sale and encumbrance of Spanish securities, fixed or variable income, through the corresponding organization of personal and material resources . . . as well as the provision of technical management, auditing, consulting and technical assistance services, as well as technical know-how and implementation of initiatives in the cement sector and its derivative products or raw materials destined for construction companies within and outside the [InterCement G]roup.

(JX-215 at 2.)[9]

ITI is incorporated in Spain, and its registered office is in Bilbao, where it rents a one-room office. (Rabelo Declaration ¶ 68.) Its bylaws are in Spanish and are governed by Spanish law. (JX-165.) ITI has a single employee who is located in Spain, one Spanish director residing in Spain, and two Brazilian directors residing in Brazil (both of whom are ICP employees); it has no officers. (Rabelo Declaration ¶ 69, JX-284.) In recent years, many of ITI's board decisions have been made by written consent, which the two Brazilian directors executed from Brazil and the Spanish director executed from Spain. (Rabelo Declaration ¶ 69.) Most board meetings took place in Spain, as required by Spanish law, with the remainder taking place over videoconference with each director participating from his domicile. (*Id.*) The Foreign Representative testified that while ITI's board of directors "consider[s], take[s] into account, [and has] as part of the total mix of information" the "guidance, information, and recommendation[s] from the Brazilian employees [and] Brazilian directors" of the InterCement Group when making decisions, the ITI board does not take instruction from ICP or any other entity's agents, and makes all final decisions regarding actions carried out by ITI. (Trial Tr. Day 1 100:12–101:1, 113:2–4.)

ITI's sole employee "organizes the administrative affairs for ITI in Spain, such as paying the rent and utilities . . . preparing draft meeting minutes and preparing drafts of ITI's accounts, subject to approval by the . . . teams in Brazil," and she "takes direction from ICP's chief financial officer . . . in Brazil." (Rabelo Declaration ¶ 69.)) As with ICBV, employees of ICP provide legal, finance, treasury, tax, accounting, compliance, and investor relations services to ITI. (*Id.* ¶ 70.)

---

[9]    The Foreign Representative states that ITI no longer sells Spanish securities, and Rabelo testified that ITI has not sold Spanish securities since 2012. (Foreign Representative Closing Demonstrative at 8, Rabelo Declaration at 25 n.14.) However, in a 2024 filing in Spanish court, ITI asserted that it sold such securities more recently. (JX-215 at 2.)

ITI's books and records are kept in Spain, with copies separately maintained in Brazil; all entries in the books and records are first approved by an ICP employee.  (*Id.*)  ITI contracts with a number of Spanish counterparties as needed to support the company's operations, and has retained various Spanish professionals, including legal and tax advisors, auditors, and consultants to provide services in Spain.  (Trial Tr. Day 1 97:10–13; 104:25–105:6.)

ITI's assets consist of its equity interests in ICB, 100% of the shares of ITI ARG, and cash in various bank accounts.  (Rabelo Declaration ¶ 71.)  Most of ITI's cash is held in bank accounts in Spain.  (*Id.*; JX-252, -253.)  ITI has a mix of Brazilian and non-Brazilian creditors; the holders of the Debentures (the "Debenture Holders"), which ITI guarantees but is not directly a party to, are mostly based in Brazil.  (Rabelo Declaration ¶ 72.)  ITI has no other Brazilian creditors; its other creditors are entities within the InterCement Group to which it has made intercompany loans.  (JX-232, JX-250.)

While the Debentures are governed by Brazilian law, ITI's intercompany loans are governed by Spanish, Dutch and Brazilian law, and ITI itself is subject to certain Spanish laws as a Spain-incorporated company.  (Rabelo Declaration ¶¶ 75–76.)  Other than the holders of the Debentures, all of ITI's creditors are located outside of Brazil.  (JX-232.)

### B.  Prior Chapter 15 Cases

On July 15, 2024 (the "Prior Petition Date"), the Chapter 15 Debtors filed a petition (the "Prior Petition") seeking recognition under chapter 15 of the Bankruptcy Code, initiating the Prior Chapter 15 Cases (*In re InterCement Brasil S.A.*, Case No. 24-11226 (MG) (Bankr. S.D.N.Y. July 18, 2024)).  Immediately prior to the filing of the Prior Chapter 15 Cases, a portion of the InterCement Group[10] (the "Brazilian Applicants") had commenced a court-

---

[10]       The Brazilian Applicants are ICP, ICB, IC Financial, ITI, ITI Argentina, and Mover.  (Motion at 2 n.5.)

supervised mediation proceeding in in São Paulo (the "Brazilian Mediation") with a number of

creditors.  (Motion ¶ 1).  The 1st Bankruptcy and Restructuring Court of São Paulo (the

"Brazilian Bankruptcy Court") granted a 60-day injunction barring creditors from pursuing the

Brazilian Applicants' assets.  (*Id.*)  Three days later, on July 18, 2024, this Court granted a

provisional stay barring potential creditor actions against the Chapter 15 Debtors.  (*Id.*)

The Brazilian Applicants were able to reach an agreement in principle with the Debenture

Holders (who comprised a majority of their largest creditor constituency) regarding the terms of

a restructuring plan (the "EJ Plan").  (*Id.* ¶ 2.)  On September 16, 2024, a subset of the Brazilian

Applicants (the "EJ Debtors"[11]) filed a petition with the Brazilian Bankruptcy Court to convert

the Brazilian Mediation into a consensual *recuperação extrajudicial* proceeding (the "Brazilian

EJ Proceeding").  (*Id.*)  The Brazilian Bankruptcy Court promptly entered an order accepting the

Brazilian EJ Proceeding, and granted an additional 120-day stay to provide the EJ Debtors with

time to seek support for the EJ Plan.  (*Id.*)  This Court also granted a further provisional stay on

creditor actions against the Chapter 15 Debtors in the United States pending its consideration of

the relief requested in the Prior Petition.  (*Id.*)

In the Prior Petition, the Foreign Representative sought recognition of the Brazilian EJ

Proceeding as a foreign main or nonmain proceeding. [12]  The Ad Hoc Group objected to the Prior

Petition.  A two-day evidentiary hearing was held on November 20 and 21, 2024 to consider

---

[11]    The EJ Debtors are ICP, ICB, IC Financial, ITI, ITI Argentina.  The EJ Debtors include all of the Brazilian
Applicants except Mover, which consented to the EJ Plan but was not an EJ Debtor as it was not an obligor with
respect to any of the claims affected by the EJ Plan.  (Motion at 3 n.8.)

[12]    It is not contested that ICBV, ITI, ICP, and ICB have sufficient connections to the United States to warrant
this Court's exercise of jurisdiction over them.  As discussed *infra*, ICBV, ICP, and ICB have contract rights under
an indenture governed by New York choice-of-law and choice-of-forum provisions.  (Rabelo Declaration ¶ 35, 47.)
ITI has assets in the United States consisting of $200 million of the NY Notes held on deposit with an institution in
New York.  (*Id.* ¶ 36.)  These four debtors also have $5,000 each in cash in a trust account located in New York.
(*Id.* ¶ 37.)  The companies not seeking Chapter 15 protection have no connection to the United States.

15

factual issues related to each Chapter 15 Debtor's COMI and establishments as of the Prior

Petition Date.  (*Id.* ¶ 5.)  The Court did not rule on the requested relief.

### C.  Commencement of Proceedings in the Netherlands and Spain

1.  <u>The Netherlands</u>

On July 9, 2024, a few days before the filing of the Prior Petition, an NY Noteholder filed

a petition in the Amsterdam Court (Private Law Department) (the "Dutch Court") seeking the

appointment of a restructuring expert with the authority to submit a restructuring plan for ICBV

pursuant to a provision of the *Wet homologatie onderhands akkoord* ("WHOA").  (Prior Chapter

15 Cases, *Declaration of Robert van Galen in Support of the Ad Hoc Group's Objection to*

*Verified Petition and Verified Supplement* (the "Van Galen Declaration," ECF Doc. # 79), ¶ 10.)

In response, ICBV filed a Commencement Statement on July 17, 2024 (JX-282 at Exhibit 21),

requesting that the Dutch Court declare a four-month cooling-off period under a different

provision of the WHOA and appoint an observer pursuant to the WHOA rather than a

restructuring expert.  (Motion ¶ 30.)  In its Commencement Statement, ICBV identified the

Netherlands as ICBV's "centre of main interests" on the basis of its "corporate seat" being

located in the Netherlands.  (Objection ¶ 8; Trial Tr. Day 1 24:11–20.)

By filing the Commencement Statement, ICBV initiated a voluntary public restructuring

procedure (the "Dutch Proceeding").  In voluntary proceedings in the Netherlands, Dutch courts

remain largely uninvolved with the restructuring, and debtors in public proceedings can secure a

pan-European stay on creditor actions if the proceeding is recognized pursuant to the European

Insolvency Regulation ("EIR") (Trial Tr. 20:11–19.)  However, public proceedings only fall

within the scope of the EIR if the debtor's COMI is located within the European Union,

according to the EIR's definition of COMI.  (Van Galen Declaration ¶ 23; *see also* Trial Tr. Day 1 21:2–7.)

On July 31, 2024, the Dutch Court entered an order (the "Dutch Order") accepting ICBV's voluntary WHOA filing and rejecting the NY Noteholder's request for the appointment of an expert.  (Motion ¶ 30.)  Instead, as requested by ICBV, the Dutch Court appointed an observer (the "Dutch Observer") pursuant to Section 380 of WHOA to, *inter alia*, oversee the formation of a restructuring plan for ICBV (*Id.*; JX-282 at Exhibit 19).  In the Dutch Order, the Dutch Court found that ICBV's COMI is "situated in the Netherlands."  (JX282 at Exhibit 5, Section 5.2.)

On November 1, 2024, a member of the Ad Hoc Group filed a petition in the Dutch Court to end the cooling-off period imposed by the Dutch Court, along with a petition for bankruptcy on behalf of ICBV.  (Rabelo Declaration ¶ 27.)  On December 5, 2024, the Dutch Court denied the request to terminate the cooling-off period and permitted the Dutch Proceeding to continue. (Exhibit F to Motion.)  In doing so, the Dutch Court reiterated its earlier finding that ICBV's COMI is the Netherlands, a finding consistent with ICBV's own repeated representations in the Dutch Proceeding.  (*Id.* at 8.)

The cooling-off period in the Dutch Proceeding expired on March 1, 2025.  (ECF Doc. # 56 at ¶ 7.)  The Dutch Court held a hearing on March 14, 2025 to consider the continued necessity of the appointment of the Dutch Observer, and subsequently revoked the appointment of the Dutch Observer on March 21, 2025.  (*See* ECF Doc. # 61 at ¶ 1.)

2.  Spain

On July 16, 2024, ITI and ITI ARG filed a notice before the Commercial Court No. 2 of Bilbao, Spain (the "Spanish Court") communicating the initiation of creditor negotiations and

seeking an initial pre-insolvency protection period of three months (the "Spanish Proceeding").

(Rabelo Declaration ¶¶ 28-29.)  The Spanish Court accepted the notice and imposed the

requested stay on July 24, 2024.  (*Id.* ¶ 29.)  The Spanish Court extended the stay for an

additional three months on October 15, 2024.  (Motion ¶ 30.)

      Subsequently, ITI and ITI ARG filed a motion seeking recognition of the Brazilian RJ

Proceeding; a separate commercial court in Bilbao granted the motion on January 17, 2025 (the

"Spanish Recognition Order").  (*See* ECF Doc. # 56 at ¶ 9.)  Members of the Ad Hoc Group have

filed a notice of appeal of the Spanish Recognition Order, which remains pending at this time.

(*Id.*)

### D.  Liquidation Efforts

      In Brazil, the success of the Brazilian EJ Proceeding hinged on the proposed sale of all of

the EJ Debtors' business.  (Motion ¶ 2.)  Accordingly, a number of restructuring processes

occurred before and during the pendency of the Brazilian EJ Proceeding, beginning with the

Brazilian Mediation, and thereafter including the filing of the EJ Plan and a marketing and sales

process whereby the InterCement Group provided confidential information to creditors and the

leading bidder, Companhia Siderúrgica Nacional ("CSN").  (*Id.*).

      Ultimately, after months of negotiations, the EJ Debtors concluded that they would be

unable to execute a sale agreement or obtain the requisite creditor support for the EJ Plan prior to

the expiration of the deadline required by the Brazilian Bankruptcy Law.  (Motion ¶ 3.)

Accordingly, on December 3, 2024, the Chapter 15 Debtors and certain of their affiliates

(collectively, the "RJ Debtors"[13]) commenced the Brazilian RJ Proceeding and obtained a further

stay from the Brazilian Bankruptcy Court barring creditor actions.  (*Id.*)  Because the Brazilian

---

[13]     The other RJ Debtors are ITI Argentina, Sucea Participações S.A. ("Sucea"), Sincro Participações S.A. ("Sincro"), and Mover.  (*Id.* at 1 n.1.)

RJ Proceeding added new debtors, it is considered under Brazilian law a distinct insolvency proceeding from the Brazilian EJ Proceeding, rather than a continuation or conversion thereof. (*Id.*)

### E.  Chapter 15 Petition and Debtors

On December 9, 2024 (the "New Petition Date"), the Petitioner commenced the Chapter 15 Cases, seeking recognition of the Brazilian RJ Proceeding as a foreign main proceeding (or, in the alternative, a foreign nonmain proceeding) for each of the Chapter 15 Debtors.  (Motion ¶ 4).  The identities of the Chapter 15 Debtors are identical to the debtors in the Prior Chapter 15 Cases.  (*Id.*)

## II. LEGAL STANDARD

### A.  Section 1517(a): Foreign Proceeding Recognition

Section 1517(a) of the Bankruptcy Code establishes three requirements for the recognition of a foreign proceeding under chapter 15.  In order to recognize the foreign proceeding, a court must conclude that:

> (1) The foreign proceeding constitutes a foreign proceeding (either main or nonmain) as are defined under section 1502;
>
> (2) The foreign representative applying for recognition is a person or body; and
>
> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

Recognition of the foreign proceeding is statutorily mandated if the three requirements of section 1517(a) are met and no exception is applicable.  *See In re Millard*, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013).

1.  <u>1517(a)(1): Foreign Main Proceeding Recognition</u>

Section 1517(a) distinguishes between "foreign main" and "foreign nonmain"

proceedings.  Section 1517(b) establishes conditions for recognition of each.  In relevant part,

section 1517(b)(1) states that a foreign proceeding shall be recognized "as a foreign main

proceeding if it is pending in the country where the debtor has the center of its main interests."

11 U.S.C. § 1517(b)(1).  Section 1502(4) uses the same language to define "foreign main

proceeding."

*a.  "Foreign Proceeding"*

Section 101(23) defines a "foreign proceeding" as:

[A] collective judicial or administrative proceeding in a foreign country, including
an interim proceeding, under a law relating to insolvency or adjustment of debt in
which proceeding the assets and affairs of the debtor are subject to control or
supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Based on this definition, courts have held that a "foreign proceeding" requires:

(i) [the existence of] a proceeding;

(ii) that is either judicial or administrative;

(iii) that is collective in nature;

(iv) that is in a foreign country;

(v) that is authorized or conducted under a law related to insolvency or the
adjustment of debts;

(vi) in which the debtor's assets and affairs are subject to the control or supervision
of a foreign court; and

(vii) which proceeding is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah* (*In re Ashapura Minechem Ltd.*), 480 B.R. 129, 136

(S.D.N.Y. 2012) (*citing In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also*

*In re Overnight & Control Com'n of Avánzit, S.A.*, 385 B.R. 525, 532–36 (Bankr. S.D.N.Y 2008) (discussing factors).

> b. *"Center of Main Interests"*

The term "center of [debtor's] main interests" ("COMI") is not defined by the Bankruptcy Code. However, section 1516(c) provides that, in the absence of an objection or evidence to the contrary, a debtor's registered office or habitual residence "is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *see also In re Olinda Star I*, 614 B.R. 28, 41 (Bankr. S.D.N.Y. 2020); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 705 (Bankr. S.D.N.Y. 2017); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013). The relevant time period to determine the location of the debtor's COMI is the date on which the chapter 15 petition is filed. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (hereinafter "*Fairfield Sentry*").

In assessing whether the registered office presumption has been overcome, courts in this District have applied a list of non-exclusive factors for determining the COMI. Those factors include: (i) the location of the debtor's headquarters; (ii) the location of those who actually manage the debtor; (iii) the location of the debtor's primary assets; (iv) the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and (v) the jurisdiction whose law would apply to most disputes. *Fairfield Sentry*, 714 F.3d at 137 (*citing In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)). While these factors serve as a "helpful guide" in determining a debtor's COMI, the factors are not exclusive, and none of the factors is required nor dispositive. *Fairfield Sentry*, 714 F.3d at 137 (explaining that "consideration of these specific factors is neither required nor dispositive" and warning against mechanical application).

21

Additionally, in determining a debtor's COMI, the Second Circuit and this Court have examined the expectations of creditors and other interested parties, as a company's COMI must be "ascertainable to third parties." *See Fairfield Sentry*, 714 F.3d at 136–38; *In re Millennium Global Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 93 (S.D.N.Y. 2012).   As the Second Circuit has explained, by examining factors "in the public domain," courts are readily able a debtor's COMI is in fact "regular and ascertainable [and] not easily subject to tactical removal." *See Fairfield Sentry*, 714 F.3d at 136–37.   "Creditor expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017).   In practice, the evaluation of creditor expectations has focused on reviewing disclosures in offering memoranda and indentures. *See id.* at 228–32 (reviewing offering memorandum to establish noteholder expectations as part of a COMI analysis); *In re OAS S.A.*, 533 B.R. 83,102–03 (Bankr. S.D.N.Y. 2015) (same); *Millennium Glob.*, 474 B.R. at 93–94 (same); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 418 (Bankr. S.D.N.Y. 2014) (considering terms of indenture agreement to establish creditor expectations regarding likely location of a restructuring as part of a COMI analysis).

As noted, the Second Circuit has also clarified that the determination of a debtor's COMI should be based on the facts available at the time the Chapter 15 petition is filed. *Fairfield Sentry*, 714 F.3d at 138.   The Court explained that "the factors that a court may consider in this analysis are not limited and may include the debtor's liquidation activities." *Id.* at 137–38. *See also In re Modern Land (China) Co., Ltd.*, 641 B.R. 768, 783 (Bankr. S.D.N.Y. 2022) (finding that a Cayman court's supervision of a debtor's Cayman scheme of arrangement proceeding established the Cayman Islands as the debtor's COMI—although the debtor was a holding

company of entities involved with real estate investing in China and the United States—when other factors putting creditors on notice were considered).  Pre-filing restructuring efforts may shift a debtor's COMI, especially where a debtor is an entity with limited operations such that restructuring activity constitutes the debtor's "primary business activity" prior to the filing of a petition for recognition.  *Modern Land*, 641 B.R. at 789–90.

Relevant pre-filing restructuring efforts may include the negotiation or execution of a restructuring framework or support agreement, holding of meetings with creditors, or other operational or liquidation activities or administrative functions.  *Oi Brasil*, 578 B.R. at 222 (citing *In re Creative Fin.*, 543 B.R. 498, 517 (Bankr. S.D.N.Y. 2016)); *see, e.g.*, *Modern Land*, 641 B.R. at 778–81, 789–90.  However, courts may also undertake a "holistic analysis" to consider whether a debtor has manipulated COMI in bad faith prior to the filing of a chapter 15 petition in the debtor's preferred locale.  *Ocean Rig*, 570 B.R. at 706–07.  Indicators of bad-faith "COMI-shifting" may include "insider exploitation, untoward manipulation, [and] overt thwarting of third party expectations."  *Fairfield Sentry*, 440 B.R at 66.

### 2.  1502(5):  Foreign Non-Main Proceeding

A foreign nonmain proceeding is defined as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). An "establishment" is "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502(2).  The location should:

> constitute a 'seat for local business activity' for the debtor. The terms 'operations' and 'economic activity' require a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property.

*Creative Fin.*, 543 B.R. at 520.

Recognition as a foreign nonmain proceeding requires "a showing of a local effect on the marketplace, more than mere incorporation and record-keeping and more than just the maintenance of property." *Id.*

### 3. 1517(a)(2): Foreign Representative Recognition

The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

### 4. 1517(a)(3): Section 1515 and Rule 1007 Requirements

Section 1515 separately imposes the following procedural requirements:

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b) A petition for recognition shall be accompanied by—

> (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

> (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

> (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

11 U.S.C. § 1515.

Additionally, Bankruptcy Rule 1007 imposes additional procedural requirements, including the filing of a corporate disclosure statement.  FED. R. BANKR. P. 1007.

## B.  Additional Relief

### 1.  Automatic Relief Under Section 1520

Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign main proceeding, including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the debtor and its property located within the territorial jurisdiction of the United States.  *See* 11 U.S.C. § 1520(a).

### 2.  Discretionary Relief Under Section 1521

Section 1521(a) outlines the discretionary relief a court may order upon recognition.  *See* 11 U.S.C. § 1521(a).  "The discretion that is granted is 'exceedingly broad,' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the Debtor's assets and the interests of creditors," provided that the interests of creditors and other interested entities are sufficiently protected.  *In re Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) (citing 11 U.S.C. §§ 1521(a), 1522(a)).  In *Atlas Shipping*, this Court described "sufficient protection" as embodying three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law."  *Atlas Shipping*, 404 B.R. at 740.

3.  Relief Under Section 105

Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title."  11 U.S.C. § 105(a).

## III. ANALYSIS

### A.  The Brazilian RJ Proceeding Should be Recognized as a Foreign Main Proceeding

1.  The Brazilian RJ Proceeding is a "Foreign Main Proceeding" under Sections 1517(a) and 1517(b)

a.  *The Brazilian RJ Proceeding Proceeding is a "Foreign Proceeding"*

The Brazilian RJ Proceeding qualifies as a "foreign proceeding."  Courts in this Circuit

have long agreed that the Brazilian RJ process satisfies these standards.  *See In re Servicos de*

*Petroleo Constellation S.A.*, 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) (collecting cases).  As

such, the Court will not further examine each specific requirement of section 101(23).

b.  *Each Chapter 15 Debtor's COMI is Brazil as of the New Petition Date*

i.  Uncontested Entities: ICP & ICB

ICP is the parent company of the other Chapter 15 Debtors.  No party contests that ICP's

COMI is Brazil.  (Rabelo Declaration ¶ 38.)  ICP's registered office in São Paulo, Brazil.  *Id.*

Therefore, absent "evidence to the contrary," the Bankruptcy Code presumes its COMI is Brazil.

11 U.S.C. § 1516(c); *see also In re Bear Stearns High-Grade Structured Credit Strategies*

*Master Fund, Ltd.*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007).  Here, no evidence contradicts

this presumption: ICP's directors, officers, and employees are all based in Brazil, and its books

and records are maintained in Brazil.  (Rabelo Declaration ¶ 38.)  Accordingly, ICP's COMI is

Brazil.

26

Similarly, ICB, a Brazilian operating company and cement production and sales corporation, has near-exclusive ties to Brazil, and no party disputes that its COMI is Brazil. (Rabelo Declaration ¶ 39.)  ICB's registered office is also located in São Paulo, and no evidence undercuts the resultant statutory presumption that its COMI is Brazil: 99% of ICB's 1,745 employees are based in Brazil, where it represents the country's third-largest cement company. (*Id*.)  As such, ICB's COMI is Brazil.

ii.  <u>ICBV</u>

ICBV's COMI as of the New Petition Date is contested: the Foreign Representative maintains that ICBV's COMI is Brazil, while the Ad Hoc Group asserts that it is the Netherlands.  ICBV's registered office is in Amsterdam, (Motion ¶ 40), entitling it to a rebuttable statutory presumption that its COMI is the Netherlands.  11 U.S.C. § 1516(c).

There are several other *Fairfield Sentry* factors that would ordinarily undercut a straightforward determination that ICBV's COMI is Brazil.  First, ICBV's Board meetings are typically held in the Netherlands, the entity contracts with almost exclusively Dutch contractors and offers no services in Brazil, and the Board requires consent from at least one of its Dutch constituent directors to make ultimate corporate decisions regarding the payment of the NY Notes.  ICBV's assets are dispersed, with its largest (an intercompany receivable) held by a Spanish entity, while the majority of its cash is denominated in USD and held in a Bahamanian bank, and its Brazilian bank accounts are empty.  The same pattern applies for ICBV's creditors, the majority of whom are neither based in Brazil nor in the Netherlands.  Similarly, the law applicable to ICBV's disputes is mixed: New York law governs the NY Notes, which constitute the majority of ICBV's debt, and its intercompany loans are governed by a mix of New York and

Brazilian law.  However, as a Dutch-incorporated company, ICBV is bound to certain Dutch

laws.  *See supra* I(A)(2).

The analysis of ICBV's creditor and other third-party expectations is more salient—and

more complex.  Governing law in this District provides that where, as here, a debtor is a special

purpose financing vehicle (SPV) with no operations other than managing relationships with

creditors and paying off obligations on behalf of a larger corporate parent, the debtor's COMI

should be determined by the location of the corporate "nerve center."  *Oi Brasil*, 578 B.R. at

222–30.  And the developments immediately before the commencement of the Brazilian RJ

Process—namely, the Brazilian Mediation and Brazilian EJ Proceeding—bolster the Foreign

Representative's position that ICBV's COMI, as of the New Petition Date, is Brazil.

The facts in *Oi Brasil* were remarkably similar to the circumstances presently before the

Court.  There, the debtor was an SPV to a large conglomerate in Brazil.  The SPV was

incorporated in the Netherlands and maintained its registered office in Amsterdam.  *Oi Brasil*,

578 B.R. at 177.  Like ICBV, the SPV in *Oi Brasil* had no operations or business independent of

its Brazil-based corporate parent, had "never held money for any entity" other than a member of

the conglomerate, and performed only two functions, primarily "borrowing, or issuing or

assuming notes."  *Id*. at 177–78.  The SPV was the issuer of two series of notes governed by

New York law, the governing indentures of which disclosed that the SPV had "no operations

other than the issuing and making payments on the Notes and other indebtedness ranking equally

with the Notes, and using the proceeds therefrom as permitted by the documents governing these

issuances," and explained that the ability of the SPV to "pay principal, interest and other

amounts due on the Notes and other indebtedness" would "depend upon the financial condition

and results of operations" of the Brazilian parent.  *Id*.  Similarly, ICBV's OM provides:

> The issuer's principal business activity to act as a financing vehicle for [ICP's] activities and operations. The issuer has no substantial assets . . . and its only sources of cash flow are from its financing activities and capital contributions made by [ICP] and [its] other subsidiaries. Accordingly, the ability of the issuer to pay principal, interest, and other amounts due on the notes and other indebtedness will depend upon [ICP's] financial condition and results of operations.

(JX-1 at IC_FR_00002712; *see also id.* at IC_FR_00002670 (clarifying that references to "we," "our company," "ours", and "us" in the OM refer to ICP and its subsidiaries, not ICBV).) The notes indentures at issue in *Oi Brasil* also "explicitly warn[ed] of the possibility of a Brazilian bankruptcy" in terms nearly identical to ICBV's OM: "[i]f we are unable to pay our indebtedness, including our obligations under the notes, then we may ***become subject to bankruptcy proceedings in Brazil***. Brazilian bankruptcy laws ***are significantly different from, and may be less favorable to creditors than***, those of the United States." *Oi Brasil*, 578 B.R. at 180 (emphases added). Given these striking similarities, it would be reasonable to find that ICBV's COMI, is, and has always been, Brazil.

However, the Court need not answer this question; rather, it must only identify ICBV's COMI as of the New Petition Date. *Fairfield Sentry*, 714 F.3d at 137. In addressing that more narrow question, the Court finds that applicable restructuring activities occurring as part of the Brazilian Mediation and Brazilian EJ Proceeding establish conclusively that, as of December 9, 2024, ICBV's COMI was Brazil. In the months leading up to the filing of the Chapter 15 Petition, ICBV's "primary business activity" was clearly limited to repayment of the NY Notes. *Modern Land*, 641 B.R. at 789–90. As a practical matter, this effort was channeled through— and its success depended on—the success of the Brazilian Mediation and Brazilian EJ Proceeding and related creditor negotiations in Brazil. *See OAS*, 533 B.R. at 101 (finding that an Austrian-incorporated SPV had "no other business except to pay [notes governed by New York

law] off," and observing that this was "the very business [the SPV] and the other Brazilian

Debtors were engaged in through the Brazilian [b]ankruptcy [p]roceedings").

Specifically, ICBV participated in the Brazilian Mediation as a debtor, attending

approximately six mediation sessions with the Ad Hoc Group's advisors and four sessions with

the Indenture Trustee.  (Rabelo Declaration ¶ 32; Motion ¶ 31; COMI Brief ¶ 38.)  ICBV also

commenced the Brazilian EJ Proceeding, and signed the EJ Plan, which was filed with the

Brazilian Bankruptcy Court.  (COMI Brief ¶ 39.)  ICBV actively participated in litigation before

the Brazilian Bankruptcy Court and filed pleadings addressing matters substantively affecting its

interests in the Brazilian EJ Proceeding.  (Laquimia Declaration ¶¶ 9, 12, 13.)  ICBV's Brazilian

directors also executed non-disclosure agreements in connection with the provision of

information regarding the InterCement Group to the Ad Hoc Group and its advisors.  (Rabelo

Declaration ¶¶ 32–34; COMI Brief ¶ 15.)  ICBV's Brazilian advisors and directors met with the

Ad Hoc Group's counsel to discuss matters directly impacting the scope of potential recoveries

on the NY Notes—the sole focus of ICBV's business operations at that time.  (Rabelo

Declaration ¶¶ 32–34; COMI Brief ¶ 15.)  Finally, the Brazilian Mediation, Brazilian EJ

Proceeding, and ultimate commencement of the Brazilian RJ Proceeding were all publicly and

widely disclosed by press releases by ICP from Brazil.  (COMI Brief ¶ 43.)  Accordingly, when

considered as a whole, the Brazilian Mediation and Brazilian EJ Proceeding provide strong

indicia that ICBV's creditors were on notice of the proceedings in Brazil.[14]

---

[14]    The Foreign Representative emphasizes that the Ad Hoc Group had no connection to the Netherlands: no
Ad Hoc Group member ever interacted with anyone in the Netherlands.  (*See* Prior Chapter 15 Cases, ECF Doc. #
72, Joint Stipulated Facts.)  Similarly, the Foreign Representative points out that the Ad Hoc Group stipulated to the
fact that its members "anticipated that any main plenary proceeding in which [the NY Notes] would be restructured
would be in the Federative Republic of Brazil," (*id.* ¶ 6), and points to email evidence showing that the Ad Hoc
Group's members subjectively anticipated a bankruptcy process in Brazil to affect their holdings (*see, e.g.*, JX-15, -
55, -102, -116) and understood the importance of InterCement's operations in Brazil to their investment (*see, e.g.*,
JX-17, -61, JX-102).   Note, however, that even were this not the case, the subjective beliefs of a debtor's creditors

By contrast, no restructuring activities with the capacity to materially impact ICBV's ability to conduct its business operations occurred in the Netherlands during this timeframe. While the Ad Hoc Group focuses on the progress of the Dutch Proceeding during this timeframe, the existence of parallel developments in that proceeding fails to negate the fact that, as a matter of United States law, ICBV's COMI as of the New Petition Date was Brazil. The Dutch Observer's activity in the Dutch Proceeding, while continuous and consistent, "do[es] little to change the economic realities associated with [ICBV's] status as a special purpose financing vehicle and the related expectations of its creditors," and separately has minimal impact on the COMI determination because "there are significant legal and pragmatic limitations on the [Observer's] authority with respect to ICBV." *Oi Brasil*, 578 B.R. at 225. As to the first point, ICBV's unique "economic reality," which stems from its structure as an SPV, cannot be ignored and has special implications for its COMI analysis. *Id.* Given that ICBV's primary business activity has, at all relevant times, been limited to the repayment of the NY notes, its economic reality was tied inextricably to Brazil as of the New Petition Date because, up until that point, the Brazilian EJ Proceeding had "provide[d] the only realistic chance to repay [ICBV's] debts." *Id.* at 226. Indeed, even the Dutch Observer acknowledged in his monthly reports that ICBV's financial prospects were wholly dependent on the success of the Brazilian EJ Proceeding. (*See* the "October Report," ECF Doc. # 30-1, at §§ 1.2.3, 2.3.3, 2.3.4; the "November Report," ECF Doc. # 30-2, at § 1.2.3).[15] Therefore, notwithstanding the involvement of the Dutch Observer in

---

concerning the debtor's COMI does not matter—it is the perspective of the *hypothetical* (i.e., objective) third party/creditor which the Court must consider.

[15]    In an apparent acknowledgement of ICBV's involvement in the Brazilian EJ Proceeding, the Observer also explained in the November Report that he was kept "sufficiently informed by ICBV (and its advisers and those of the Group) . . . about the course of events in the EJ Procedure." (November Report at § 5.3.).

the Dutch Proceeding, in totality, all relevant circumstances underscore that, as of the New

Petition Date, ICBV's COMI is Brazil.

The Ad Hoc Group also relies on ICBV's representations in the Dutch Proceeding that,

ICBV's COMI, pursuant to the EIR, has at various points in time been the Netherlands—a

representation which it reiterated in November 2024, a few weeks before the New Petition Date.

(Objection ¶ 16.)  On December 5, 2024, the Dutch Court referenced this representation in

extending the cooling-off period in the Dutch Proceeding, commenting that ICBV had provided

"no reason" for the Dutch Court to "reconsider its earlier finding" that ICBV's COMI was the

Netherlands.  (*Id.*)  The Ad Hoc Group further emphasizes ICBV's continued reiteration of this

position in the Dutch Proceeding in January 2025, even after the Foreign Representative filed the

COMI Brief.  (*Id.* ¶ 17.)  The Ad Hoc Group asserts that the Petitioner should be estopped from

proffering an apparently contradictory position in these Chapter 15 Cases: namely, that

contemporaneous developments have shifted ICBV's COMI from the Netherlands to Brazil.

(*Id.*)

The Ad Hoc Group's position is incorrect.  Corporate entities are not precluded from

having different COMIs in European and Chapter 15 proceedings, because a "COMI finding

under the [EIR] in the Dutch proceedings is not the same as a COMI finding under Chapter 15 of

the Bankruptcy Code."  *Oi Brasil*, 578 B.R. at 206.  The Second Circuit made clear in *Fairfield*

*Sentry* that the EIR "does not operate as an analog to Chapter 15."  *Fairfield Sentry*, 714 F.3d at

136.  Critically, the EIR is a "poor analog" for Chapter 15 "in regards to the timeframe

considered in a COMI analysis . . . [t]he [EIR] looks to the date of the filing of the foreign

insolvency proceedings, whereas in the U.S. the inquiry centers on the date of the Chapter 15

recognition petition."  *Oi Brasil*, 578 B.R. at 207 (citing *Fairfield Sentry*, 714 F.3d at 136 n.9

32

(internal citations omitted)).  This distinction alone legitimizes what initially appear to be
contradictory COMI positions by ICBV before the Dutch Court and this Court.  On the one hand,
the EIR's tethering of the COMI analysis to the filing of the foreign insolvency proceedings
substantiates ICBV's continued representations to the Dutch Court that no intervening
developments would justify a departure from its initial position on ICBV's COMI at the
commencement of the Dutch Proceeding.  On the other hand, because it is the *Chapter 15
petition date* that controls the analysis under the Bankruptcy Code, the Foreign Representative
cannot be estopped from contending that ICBV's COMI in these cases is Brazil.  And for the
foregoing reasons, the centralization of the Brazilian Mediation and Brazilian EJ Proceeding
within Brazil justifies this Court's finding that ICBV's COMI, for purposes of these Chapter 15
Cases, is Brazil.

### iii. ITI

Like ICBV, ITI's COMI is contested: the Foreign Representative maintains that ITI's
COMI is Brazil, while the Ad Hoc Group asserts that its COMI is Spain.  ITI's registered office
is in Bilbao, Spain, (Motion ¶ 94), entitling it to a rebuttable statutory presumption that its COMI
is Spain.  11 U.S.C. § 1516(c).

However, as with ICBV, ITI's COMI analysis as relevant to these Chapter 15 Cases is
heavily dependent on the nature of its operations as of time of the New Petition Date.  ITI's
primary assets are its equity interests in ICB, which undisputedly has its COMI in Brazil.
(Rabelo Declaration ¶ 39; Motion ¶ 97.)  As guarantor to the Debentures issued by ICB and ICP,
ITI's primary business activities at the time of the commencement of the Brazilian RJ
Proceeding, and these Chapter 15 Cases, were the restructuring of its obligations under the
Debentures—activities which predominantly occurred in Brazil.

33

Like ICBV, ITI participated in the Brazilian Mediation and was a debtor in the Brazilian EJ Proceeding, and its key creditors, including the Debenture Holders, participated in these processes as well. (Motion ¶ 31; COMI Brief ¶ 47.) The Debenture Holders and their advisors engaged substantively in the Brazilian EJ Proceeding, and the majority of the Debenture Holders ultimately signed onto the EJ Plan. (COMI Brief ¶ 47.) The Debenture Holders appeared at a creditors' meeting in Brazil and were appointed to a committee to oversee the sales process and negotiations under the EJ Plan. (*Id.*) Like ICBV, ITI's creditors were all made aware of the Brazilian Mediation, Brazilian EJ Proceeding, and ultimate commencement of the Brazilian RJ Proceeding through widely-disseminated press releases issued by ICP from Brazil. (*Id.*) Notably, ITI itself does not contest that its COMI is Brazil, and it previewed as much to the Spanish Court prior to the New Petition Date; a commercial court in Bilbao has since granted ITI's request for recognition of the Brazilian RJ Proceeding.[16] (ECF Doc. # 56 at ¶ 9.)

Accordingly, when considered as a whole, the factual circumstances leading up to the New Petition Date provide strong indicia that ITI's creditors were on notice of the proceedings in Brazil, and, more broadly, that ITI's COMI is Brazil.

---

[16] The Ad Hoc Group speculates that any "events in Spain" subsequent to the New Petition Date were "plainly engineered to boost Petitioner's recognition efforts." (Objection ¶ 17; *see also id.* at 9 n.51). While the Ad Hoc Group does not directly accuse the Foreign Representative of bad faith conduct or forum-shopping, it is worth briefly addressing this point directly, as courts have authority to "look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition" in order to "offset [the] debtor's ability to manipulate its COMI." *Fairfield Sentry,* 714 F.3d at 133. In short, here, neither party's description of the Brazilian Mediation and the Brazilian EJ Proceeding rings of bad faith or COMI manipulation. Courts have declined to find bad faith even where parties have sought to shift COMI from a debtor's principal place of business to a "letterbox" jurisdiction where the debtor plainly does not conduct meaningful business. *See Suntech Power,* 520 B.R. at 419 (liquidators who shifted COMI from China to Cayman Islands did not act in bad faith). Here, the opposite is true: the Foreign Representative's position is that COMI has shifted from a "letterbox" jurisdiction to the undisputed principal place of business of the debtor's corporate family. Under these circumstances, there is no factual basis reasonably supporting a presumption of bad faith.

### B.  The Petitioner is a "Foreign Representative"

The Petitioner was duly appointed by the Chapter 15 Debtors via corporate resolution to

act as the foreign representative of the Brazilian RJ Proceeding and commence the Chapter 15

Cases in accordance with 101(24) of the Bankruptcy Code.  (Motion ¶ 112.)  The appointment of

the Petitioner comports with applicable requirements.  *See, e.g.*, *In re Mina Tucano Ltda.*, No.

22-11198 (LGB) (Bankr. S.D.N.Y. Oct. 12, 2022) (ECF Doc. # 26) (approving verified petition

where the foreign representative was authorized by chapter 15 debtors' corporate resolution).

### C.  The Petition Otherwise Meets Section 1515's and Rule 1007(a)(4)'s Procedural Requirements

The Foreign Representative satisfies section 1517(a)(3) of the Bankruptcy Code, which

states that the petition shall meet the requirements of section 1515, which in turn provides

applicable requirements in subsections 1515(b) and (c).  Those subsections require that a

recognition petition include a certified copy of the decision commencing the foreign proceeding

and appointing the foreign representative, as well as a statement identifying all foreign

proceedings with respect to the Chapter 15 debtors known to the foreign representative.  11

U.S.C. §§ 1515(b)–(c), 1517(a)(3).

The Petitioner has satisfied those requirements.  The Foreign Representative properly

commenced these Chapter 15 Cases in accordance with sections 1504 and 1509(a), which require

the filing of a petition for recognition along with all the documents and information required

under section 1515.  (Motion ¶ 114.)  In accordance with section 1515(b), the Foreign

Representative filed original and certified translated copies of the petition in and the order by the

Brazilian Bankruptcy Court accepting the Brazilian RJ Proceeding, as well as the corporate

resolutions authorizing the Petitioner to act on behalf of each Chapter 15 Debtor as a foreign

representative.  (*Id.* ¶ 115.)  As required by section 1515(c) of the Bankruptcy Code, the Foreign

35

Representative also submitted a declaration identifying all known foreign proceedings on behalf of the Chapter 15 Debtors.  (*Id.* ¶ 116.)  Finally, the Foreign Representative has satisfied the requirement of Bankruptcy Rule 1007(a)(4) to file a corporate ownership statement including all information required by Rule 7007.1, as well as a list including the names and addresses of all person or bodies authorized to administer the foreign proceedings of the Chapter 15 Debtors and all parties to litigation pending in the United States to which the Chapter 15 Debtors are parties. (*Id.* ¶ 117; *see* FED. R. BANKR. P. 1007.)

Accordingly, all elements of Section 1517 and Rule 1007(a)(4) have satisfied, and the Court should recognize the Brazilian RJ Proceeding as a foreign main proceeding.

**D.  The Court Need Not Consider Recognition as a Foreign Nonmain Proceeding**

Because the Court has concluded that the COMI of each Chapter 15 Debtor is Brazil and therefore that the Brazilian RJ Proceeding constitutes a foreign main proceeding, the Court need not assess whether to grant recognition of the Brazilian RJ Proceeding as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Code.

**E.  The Debtors Should Receive Additional Relief**

1.  Automatic Relief Under Section 1520

Upon the recognition of a foreign main proceeding, a debtor is automatically entitled to the protection of the automatic stay under section 362(a) with respect to the debtor and its property within the jurisdiction of the United States.  11 U.S.C. § 1520(a).  As the Foreign Representative has shown that the Brazilian RJ Proceeding should be recognized as the foreign main proceeding in these Chapter 15 Cases, the Chapter 15 Debtors are entitled to the automatic relief under section 1520.

36

2.  Discretionary Relief Under Section 1521

Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant

"any appropriate relief" at the request of the foreign representative "where necessary to

effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the

creditors."  11 U.S.C. § 1521(a).  Pursuant to section 1521(a)(6), the Foreign Representative

requests that any protective relief that is the subject of the Provisional Relief Motion (ECF Doc.

# 5) be extended pursuant to section 1521(a)(6) of the Bankruptcy Code.  (Motion ¶ 133.)

Courts granting discretionary relief pursuant to section 1521 must ensure that the interests of "the

creditors and other interested entities, including the debtor, [must be] sufficiently protected."  11

U.S.C. § 1522(a).  The Bankruptcy Code does not define "sufficient protection."  A

determination of sufficient protection "requires a balancing of the respective parties' interests."

*In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013) (citing *SNP Boat Serv. S.A.*

*v. Hotel Le St. James*, 483 B.R. 776, 784 (S.D. Fla. 2012)).

Here, the extension of provisional relief will provide adequate protection to the Chapter

15 Debtors and their creditors by centralizing the orderly administration of the debtors' assets in

the United States.  Additionally, the balance of the parties' interests weighs in favor of extending

provisional relief, as the Chapter 15 Debtors represent that permitting creditor actions "could

threaten their ability as a going concern" and the parties have previously agreed to extend

provisional relief to mirror the relief extended by the Brazilian Bankruptcy Court.  (Motion ¶

137; *see* ECF Doc. # 58.).

37

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** the relief sought in the Foreign

Representative's Motion, **RECOGNIZES** the Brazilian RJ Proceeding as a Foreign Main

Proceeding, and **OVERRULES** the Ad Hoc Group's Objection.

**IT IS SO ORDERED.**

Dated:    March 31, 2025
          New York, New York

                                      *Martin Glenn*
                                _____
                                    MARTIN GLENN
                            Chief United States Bankruptcy Judge